# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE<br>4805 Mount Hope Drive<br>Baltimore, MD 21215,<br><br>PENELOPE LANTZ, individually and as next friend of minor child A.C.<br>c/o Southern Poverty Law Center<br>400 Washington Avenue<br>Montgomery, AL 36104,<br><br>MARSHA LOPEZ, individually and as next friend of minor children M.L. and G.L.<br>c/o Southern Poverty Law Center<br>400 Washington Avenue<br>Montgomery, AL 36104,<br><br>SUSAN BOOK, individually and as next friend of minor child E.P.<br>c/o Southern Poverty Law Center<br>400 Washington Avenue<br>Montgomery, AL 36104,<br><br>MICHELE WILSON, individually and as next friend of minor children A.W. and K.W.<br>c/o Southern Poverty Law Center<br>400 Washington Avenue<br>Montgomery, AL 36104,<br><br>ADRIENNE GILBY, individually and as next friend of minor children C.G. and E.G.<br>c/o Southern Poverty Law Center<br>400 Washington Avenue<br>Montgomery, AL 36104,<br><br>KIMBERLY ROMMEL-ENRIGHT and STEPHEN ENRIGHT, individually and as next friends of minor child A.E.<br>c/o Southern Poverty Law Center<br>400 Washington Avenue<br>Montgomery, AL 36104,<br><br>TRACY O'CONNOR, individually and as next friend of minor children C.O., S.O. & M.O.<br>c/o Southern Poverty Law Center<br>400 Washington Avenue<br>Montgomery, AL 36104, | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

ELISE MCINTOSH, individually and as next
friend of minor children H.K. and M.K.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

DEBORAH JOHNSON, individually and as
next friend of minor child D.J.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

BETH LEWIS, individually and as next friend
of minor children G.L. and M.L.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

JEANNETTE DIAZ, individually and as next
friend of minor child T.D.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

BRITTANY ALDOUS, individually and as
next friend of minor child J.R.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

ABRAHAM CAMEJO, individually and as
next friend of minor children A.P. and S.P.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

KEISHA GUYTON, individually and as next
friend of minor child Z.C.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

LISA MINGRONE, individually and as next
friend of minor child A.M.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

WHITNEY BATTEAST, individually and as
next friend of  minor child K.Y.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

HERBERT BROWN, individually and as next
friend of minor child J.B.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

VILLI PREMPEH, individually and as next
friend of minor children W.N. and P.N.
c/o Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104,

DENVER COUNTY SCHOOL DISTRICT
NO. 1
1860 Lincoln Street
Denver, CO 80203,

PASADENA UNIFIED SCHOOL DISTRICT
351 South Hudson Avenue
Pasadena, CA 91109,

        and

STAMFORD PUBLIC SCHOOLS
888 Washington Boulevard
Stamford, CT 06901,

        Plaintiffs,
    vs.

ELISABETH "BETSY" D. DEVOS, in her
official capacity as the United States Secretary
of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202,

        and

UNITED STATES DEPARTMENT OF
EDUCATION
400 Maryland Avenue, S.W.
Washington, D.C. 20202,

        Defendants.

Plaintiffs allege as follows:

## INTRODUCTION

1.    Plaintiffs—public school children and their parents, public school districts, and

the National Association for the Advancement of Colored People ("NAACP")—bring this action

to enjoin and then vacate the July 1, 2020 Interim Final Rule (the "Rule") illegally issued by Defendants Secretary of Education Elisabeth "Betsy" D. DeVos (the "Secretary") and the United States Department of Education (the "Department").  In this moment of dire need for America's public schools, the Rule compels public school districts to divert essential CARES Act[1] funds for the benefit of private schools or face unlawful limitations on the way that those funds can be spent in public schools—both in direct contravention of the Act.  The Rule harms American children and subverts the will of Congress; it cannot stand.

2.      On March 27, 2020, in response to a global pandemic that has disrupted every aspect of the economy and placed particular strain on American public schools, Congress enacted the CARES Act.  Among other important purposes, the CARES Act appropriated $30.75 billion to help K-12 schools and higher education institutions respond to COVID-19.  Over $13.5 billion will be distributed to local public school districts that administer elementary and secondary public schools.  School districts have broad flexibility to use the funds to address the extraordinary needs created by the pandemic, the effects of which have been particularly devastating for the nation's least advantaged students.

3.      Recognizing that some private schools serve a small number of lower-income students, Congress instructed school districts to set aside a correspondingly small percentage of CARES Act funds for the benefit of disadvantaged private-school students.  Specifically, the CARES Act directs public school districts to calculate the amount to set aside for the benefit of private-school students "in the same manner" as Title I funds are calculated for the benefit of disadvantaged private-school students under the Elementary and Secondary Education Act of 1965 ("ESEA").  Title I funds are indisputably allocated based on the number of local students from low-income families who attend private schools from the district, which number is relatively small.  Accordingly, the percentage of CARES Act funds that Congress intended to be set aside for the benefit of private-school students is minimal and focused on children in need.

---

[1] Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) (referred to herein as the "CARES Act" or the "Act").

4.      Despite the Act's clear language and express instruction, on April 30, 2020, the Department of Education issued guidance (the "Guidance Document") purporting to "interpret" how school districts, also known as Local Educational Agencies ("LEAs"), should apportion CARES Act funding for private schools.[2]  Contrary to the Act's plain language, the Guidance Document directed LEAs to apportion CARES Act funds for private schools based on the *total* number of private-school students residing in the district, as opposed to the number of *low-income* private-school students.  The consequences of the Guidance Document were as obvious as they were severe:  if followed, hundreds of millions of dollars in CARES Act funds would have been diverted from public schools to private-school students.

5.      The Department's Guidance Document drew swift backlash from education experts, state officials, and members of Congress from across the United States, all of whom criticized the Department for seeking to divert congressional funding intended for public schools. On May 5, 2020, for example, the Executive Director of the Council of Chief State School Officers published a letter to the Secretary criticizing the Department's Guidance Document for attempting to funnel "an inequitable amount of funding" under the CARES Act to private schools.  Using Orleans Parish in Louisiana as an example, the letter estimated that, if the Department's guidance were followed, "at least 77% of its CARES formula allocation would be directed to non-public schools."[3]  The diversion of CARES Act education funds to private schools was particularly troubling because private schools, unlike public schools, were already eligible for forgivable loans under the Payroll Protection Plan—meaning the Guidance Document would have inexplicably doubled-up federal aid to private schools at the expense of America's public school students.

---

[2] U.S. Dep't of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs* (Apr. 30, 2020) (hereinafter "Guidance Document"), https://oese.ed.gov/files/2020/06/Providing-Equitable-Services-under-the-CARES-Act-Programs-Update-6-25-2020.pdf.

[3] *See* Letter from Carissa Moffat Miller, Exec. Dir., Council of Chief State Sch. Officers, to Betsy D. DeVos, Sec'y, U.S. Dep't of Educ. (May 5, 2020), https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.

6.     Ignoring public outcry, on July 1, 2020, the Department dug in its heels and—
forgoing the mandated notice-and-comment procedures—published an Interim Final Rule,
*CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools*, 85
Fed. Reg. 39,479 (July 1, 2020) (the "Rule") to purportedly "clarify the requirement in the
[CARES Act] that local educational agencies (LEAs) provide equitable services to students and
teachers in non-public schools under the Governor's Emergency Education Relief Fund (GEER
Fund) and the Elementary and Secondary School Emergency Relief Fund (ESSER Fund)."  *Id.*
The Rule became effective upon its publication in the Federal Register on July 1, 2020.  *See id.*

7.     In attempted window-dressing for the unlawful siphoning of public funds for
private schools, the Rule now contained a so-called "choice" for public school districts that, in
reality, is no choice at all.  Under the Rule, LEAs have two options ("Option 1" and "Option 2"):

a.     Option 1:  Under the default option, an LEA must apportion funds for the
benefit of private-school students based on the total number of students attending private
schools, rather than the number of low-income students attending private schools, dramatically
reducing the funding available to public schools.

b.     Option 2:  Alternatively, if the LEA wants to maintain the full amount of
funding provided by Congress by allocating funding for the benefit of private-school students
based on the number of students in poverty, then the LEA must adhere to two severe limitations
on the use of the CARES Act funding that were never intended nor authorized by Congress.

i.     First, an LEA that chooses Option 2 may not spend any CARES
Act funds in *any non-Title I* schools.  By way of background, the current threshold proportion of
low-income students required for designation as a Title I school is 40 percent.  *See* 20 U.S.C.
§ 6314(a)(1)(A).  Of course, many public schools serve significant populations of low-income
students but are not designated as Title I schools.  All of those schools and their students will be
excluded from the CARES Act programs under this option.  This restriction on spending is
plainly irreconcilable with the broad flexibility that Congress has afforded LEAs to use CARES
Act funds in any school within their districts, and it has no basis in statute, policy, or reason.

ii.     Second, an LEA that chooses this option may not spend any
CARES Act funds such that federal funds would "supplant," as opposed to "supplement,"
traditional state and local funding sources for the program or service.  This restriction forbids
LEAs from using CARES Act funds to cover preexisting expenditures previously paid with state
and local funds—an irrational result, considering that one of the CARES Act's key purposes is to
make up for steep budget shortfalls due to COVID-19.  Another express purpose of the CARES
Act was to ensure that LEAs "maintain the operation of and continuity of services" as well as
continued employment of "existing staff."  CARES Act, § 18003(d), 134 Stat. 566.  Indeed,
LEAs that receive funds *must* continue to pay their employees and contractors to the greatest
extent possible during the pandemic.  *See id.*  Prohibiting LEAs from using the CARES Act
funding for these purposes flies in the face of express congressional intent.  The Rule's
"supplement, not supplant" restriction is found nowhere in the CARES Act and sharply
contradicts its purposes.

8.     The Rule, which purports to provide "flexibility," in fact presents LEAs with an
illusory choice:  Districts can either (1) forfeit a substantial share of their CARES Act funds for
the benefit of private schools, but maintain their congressionally granted discretion for spending
what is left; or (2) maintain the full funding intended for public schools under the CARES Act,
but give up the ability to serve all of their students and adhere to severe restrictions on how the
money can be spent.  This is not a "choice," but rather a coercive set of restrictions intended to
illegally divert federal funds from public to private education institutions.  The Rule is yet
another attempt of many by the Secretary to divert public money away from public schools for
the benefit of private school companies and organizations.

9.     The Department's Rule is manifestly illegal.  The Department does not have the
authority to promulgate administrative rules that interpret—much less amend—the CARES Act's
unambiguous allocation requirements for funds provided to private-school students.  Nor does
the Department's generic rulemaking authority enable it to promulgate the Rule.  *See* 20 U.S.C. §
1221e-3.  Congress unambiguously dictated the allocation of CARES Act funds for "equitable

services" in the statute.  Congress left no gaps in the statute implicitly justifying rulemaking by the Department, and so the Rule is not entitled to deference by this Court.

10.     The Department's Rule is also arbitrary and capricious for a variety of reasons, including that it takes funds that Congress specifically appropriated for public schools to alleviate their state and local budget crises created by the pandemic, and instead diverts them to benefit privately funded schools, regardless of need.  The Department also failed to consider the impact of the Rule on economically vulnerable students and students of color, who are disproportionately represented in public schools and under-represented in private schools.[4] Given that the purpose of Title I—which Congress cites in the CARES Act—was to "benefit the youngsters which come from our poorest families,"[5] the Department's failure to consider the needs of the nation's most vulnerable students during this crisis was arbitrary and capricious.

11.     In promulgating the Rule, the Department further ignored the procedural steps required by the Administrative Procedure Act—specifically, by bypassing notice-and-comment proceedings while lacking "good cause" to do so.  *See* 5 U.S.C. § 553(b)(B).

12.     The Department's Rule also violates steadfast separation-of-powers principles enshrined in the United States Constitution and reiterated in Supreme Court case law.  It is axiomatic constitutional law that an executive agency may not impose spending conditions on federal funds distributed to the states via legislative rulemaking without congressional authorization.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[W]here previously appropriated money is available for an agency to perform a statutorily mandated activity," separation-of-powers

---

[4] *See generally* Jongyeon Ee et al., *Private Schools in American Education: A Small Sector Still Lagging in Diversity* (UCLA Civ. Rights Project Working Paper Mar. 5, 2018) (finding that private-school enrollment in the United States was 68.6% white and students from low-income families make up only 9% of private-school enrollment but over 50% of public-school enrollment), https://www.civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/private-schools-in-american-education-a-small-sector-still-lagging-in-diversity/Ee-Orfield-Teitell-Private-School-Report_03012018.pdf.

[5] *A Bill to Strengthen and Improve Educational Quality and Opportunity in the Nation's Elementary and Secondary Schools: Hearings on S. 370 Before the Subcomm. on* Educ. of the Comm. on Labor and Public Welfare, 89th Cong. 3 (1965) (statement of Senator Wayne Morse).

principles dictate that "federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress."). Congress did not authorize the Department to impose the Rule's conditions for spending CARES Act funds, and in fact prescribed the only conditions for spending those funds in the CARES Act itself. Constitutional separation-of-powers principles forbid the Department from imposing the additional, different conditions in the Rule.

13.     Finally, the Department's Rule violates the Spending Clause of the United States Constitution. *See* U.S. Const. art. I, § 8. First, Congress did not delegate rulemaking authority to the Secretary to impose spending conditions on CARES Act funds, and it explicitly authorized LEAs to spend those funds on a broad set of expenditures. Second, states applied for CARES Act funding before the Rule was promulgated, thereby entering into a "contract" with the federal government. *See Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius*, 567 U.S. 519, 577 (2012). The Department's retroactive imposition of spending conditions alters that contract in violation of the Spending Clause. The Rule also coerces LEAs into compliance with the Secretary's own policy goal of increasing the share of CARES Act funds going to private schools, or else forgo all federal aid to non-Title I schools in their districts and be severely restricted in how the funds can be spent in Title I schools. These spending restrictions put "a gun to the head" of school districts in order to further the Secretary's policy goals. *See id.* at 581.

14.     The Rule is as immoral as it is illegal. In a moment of crisis—when public school districts are called upon to educate their students in unprecedented circumstances, to protect their students and staff from disease, and to feed families who have been plunged into poverty,[6] all with decimated state and local revenues—it is unconscionable for Defendants to siphon away the CARES Act's desperately needed funds for the benefit of more affluent private-school students. The Rule will most negatively impact students in high-poverty districts; because of long-standing

---

[6] More than two-thirds of the nation's students who eat school lunches are economically dependent on their school districts to provide the meal. *See* Bettina Elias Siegel, *As Coronavirus Closes Schools, USDA Offers Limited Help to Kids Who Rely on School Meals*, CIVIL EATS (updated June 10, 2020), https://civileats.com/2020/03/06/coronavirus-is-closing-schools-heres-what-it-means-for-millions-of-kids-who-rely-on-school-meals/.

institutional racism, students of color are disproportionately represented in those schools and districts, whereas white students are disproportionately enrolled in the private schools to which the Rule attempts to funnel federal funds. This unlawful diversion will directly impair the education, health, and safety of low-income students and students of color for the benefit of more affluent, white, private-school students, further perpetuating institutional racism. Defendants' actions should be immediately enjoined and the Rule vacated.

## JURISDICTION AND VENUE

15.     This action arises under the federal Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701–706, and the United States Constitution. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1346. The Department's Rule is a "final agency action" and thus reviewable under the APA. 5 U.S.C. § 704; *see also Career College Ass'n v. Riley,* 74 F.3d 1265, 1268 (D.C. Cir. 1996) (concluding that an interim final rule is a final agency action within the meaning of the APA, and therefore subject to immediate judicial review).

16.     This Court has the authority to issue declaratory relief, injunctive relief, and other relief pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the APA, 5 U.S.C. §§ 702, 706.

17.     This is a civil action in which Defendants are agencies of the United States or officers of such an agency. Venue is proper in this Court because Defendants reside in this district and a substantial part of the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(e)(1).

## THE PARTIES

### I.    PLAINTIFFS

18.     Plaintiff National Association for the Advancement of Colored People ("NAACP") is an American civil-rights organization founded in 1909 to ensure the educational, political, social, and economic equality of all persons and eliminate all forms of race-based discrimination. The NAACP has a clear and demonstrable interest in ensuring that federal education funds under the CARES Act are distributed and spent in support of their intended

recipients in America's public schools.  The principal address of the NAACP is 4805 Mount Hope Drive, Baltimore, Maryland 21215.

a.    The NAACP's national membership includes numerous individuals who would be irreparably harmed by the Department's illegal Rule, including many parents of minor children attending Title I and non-Title I public schools in districts that either (1) stand to lose substantially increased amounts of CARES Act funds to private-school students, or (2) will be forced to accept significant restrictions on their use of CARES funds, if the Department's Rule were enforced.  The Rule will disproportionately harm students of color and benefit primarily white students.  By way of background, in the 2016–17 school year, enrollment in public schools receiving federal Title I aid was 33% white and 67% students of color. In contrast, private school enrollment was 67% white and 33% students of color.  Private schools serve about 10% of all students in the United States, but approximately 1% of all low-income students in the United States.[7]  Accordingly, the NAACP has a clear and demonstrable interest in ensuring that federal education funds under the CARES Act are distributed to their intended recipients and can be used as needed to serve all public school students, without diversion to majority-white and affluent private-school students.

b.    Likewise, as a core part of its mission, the NAACP advocates for racial equality in public education.  Its goals include ensuring resource equity by targeting federal funding to the nation's neediest children; opposing the privatization of public schools; and fighting to ensure adequate state, local, and federal funding of public schools.  The NAACP expends considerable resources to train its units and members on proper implementation of the Elementary and Secondary Education Act, and all relevant federal regulations governing funding to the nation's least-resourced students.  The Rule disproportionately impacts students of color, either by decreasing funding for students of color for the benefit of white, affluent private-school

---

[7] National Center for Education Statistics, *Racial/Ethnic Enrollment in Public Schools* (last updated May 2020), https://nces.ed.gov/programs/coe/indicator_cge.asp#:~:text=In%20fall%202017%2C%20of%20the,million%20were%20American%20Indian%2FAlaska.

11

students; or by restricting the expenditure of funds for students in need. The Rule also forces LEAs to make decisions concerning the distribution of federal funds among and between public schools, in direct contravention of Congressional intent. The NAACP will therefore need to expend a greater portion of its finite resources advocating for equity in CARES Act spending in order to advance its educational mission.

19.    Plaintiffs Penelope Lantz, Marsha Lopez, Susan Book, Michele Wilson, Adrienne Gilby, and Kimberly Rommel-Enright and Stephen Enright, individually and as next friends of their minor children, are parents of minor children who are enrolled in non-Title I public elementary and secondary schools administered by local educational agencies that administer both Title I and non-Title I schools. Their children's schools will lose resources under the Department's Rule regardless of which budgeting "option" their districts adopt. If their children's school district follows Option 1 by apportioning funds for the benefit of private schools based on the total number of students attending private schools, rather than the number of low-income students attending private schools, this will reduce the amount of CARES Act funding available to their children's public schools. If their children's school district follows Option 2, retaining the full grant amount provided by Congress without diverting additional funds to private schools, then their children's schools will receive no CARES Act funds.

a.    Plaintiff Penelope Lantz and her minor child C.A. live in Washington, D.C. C.A. attends Woodrow Wilson High School, a non-Title I school located within District of Columbia Public Schools ("DCPS"), a district that contains both Title I and non-Title I schools and approximately 108 private schools. Under the Department's unlawful interpretation of the CARES Act contained in the Rule, C.A.'s school will either receive no funds or decreased funds, which will result in decreased resources and services for C.A.

b.    Plaintiff Marsha Lopez and her minor children M.L. and G.L. live in Bethesda, Maryland. M.L attends Bethesda-Chevy Chase High School, a non-Title I school located within Montgomery County Public Schools ("MCPS"), a district that contains both Title I and non-Title I schools and approximately 183 private schools. G.L. attends Westland Middle School, which is also a non-Title I school located within MCPS. Under the Department's

unlawful interpretation of the CARES Act contained in the Rule, M.L. and G.L.'s schools will either receive no funds or decreased funds, which will result in decreased resources and services for M.L. and G.L.

        c.     Plaintiff Susan Book and her minor child E.P. are from Raleigh, North Carolina. E.P. attends Root Elementary School, a non-Title I school located within Wake County Public School System ("WCPSS"). WCPSS contains both Title I and non-Title I schools and approximately 76 private schools. In addition to the funding necessary for all public school students, E.P. relies on crucial funding for services to which E.P. is entitled under the Individuals with Disabilities Education Act ("IDEA") to support E.P.'s learning with autism. Prior to the COVID-19 crisis, an independent examination of North Carolina schools conducted at the order of a state court judge found widespread deficiencies in public school funding in the state, including major deficiencies in education for children with disabilities.[8] Under the Department's unlawful interpretation of the CARES Act contained in the Rule, E.P.'s school will either receive no funds or decreased funds, which will result in further decreased resources and services for E.P.

        d.     Plaintiff Michele Wilson and her minor children A.W. and K.W. are from Cary, North Carolina. A.W. and K.W. both attend Farmington Woods Elementary School, a non-Title I school located within WCPSS. Under the Department's unlawful interpretation of the CARES Act contained in the Rule, A.W. and K.W.'s school will either receive no funds or decreased funds, which will result in decreased resources and services for A.W. and K.W.

        e.     Plaintiff Adrienne Gilby and her minor children C.G. and E.G. are from Chandler, Arizona. C.G. attends Corona Del Sol High School, a non-Title I school located within Tempe Union High School District, which contains private high schools. E.G. attends Kyrene Traditional Academy, a non-Title I school, which is located within Kyrene School District, where Adrienne also teaches. The Kyrene School District serves Tempe, Chandler, and Phoenix areas and contains private schools. Under the Department's unlawful interpretation of

---

[8] WestEd, *Sound Basic Education for All: An Action Plan for North Carolina* (2018), https://www.wested.org/resources/leandro-north-carolina/.

the CARES Act contained in the Rule, C.G. and E.G.'s schools will either receive no funds or decreased funds, which will result in decreased resources and services for C.G. and E.G.

      f.     Plaintiff Kimberly Rommel-Enright and Stephen Enright are the parents of minor child A.E. and live in Jupiter, Florida.  A.E. is a young adult with significant intellectual disabilities who receives transitional services from Jupiter Community High School, a non-Title I school in the School District of Palm Beach County.  SDPBC contains both Title I and non-Title I schools and approximately 143 private schools.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, A.E.'s school will either receive no funds or decreased funds, which will result in decreased resources and services for A.E.

    20.    Plaintiffs Tracy O'Connor, Elise McIntosh, Deborah Johnson, Beth Lewis, Jeannette Diaz, Brittany Aldous, Abraham Camejo, Keisha Guyton, and Lisa Mingrone, individually and as next friends of their minor children, are parents of minor children who are enrolled in Title I public elementary and secondary schools administered by a local educational agency that administers both Title I and non-Title I schools.  Under the Rule, their children's schools will either lose resources to private schools or be forced to accept severe, unintended restrictions on the way they can spend these funds.  If their children's school districts follow Option 1 by apportioning funds for the benefit of private schools based on the total number of students attending private schools, rather than the number of low-income students attending private schools, this will reduce the funds available to their children's school.  If their children's schools district retains the full grant amount provided by Congress without diverting additional funds for private schools, then their children's school will not be able to use CARES Act funds for any services previously provided using state and local funding.

      a.     Plaintiff Tracy O'Connor and her minor children C.O., S.O., and M.O. are from Memphis, Tennessee.  C.O. and S.O. attend East High School, a Title I school, which is located within Shelby County Schools ("SCS"), a district that contains both Title I and non-Title I schools and approximately 80 private schools.  M.O. attends Snowden School, a Title I school, which is also located within SCS.  Under the Department's unlawful interpretation of the

CARES Act contained in the Rule, C.O, S.O and M.O.'s schools will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

        b.      Plaintiff Elise McIntosh and her minor children H.K. and H.M. are from Memphis, Tennessee.  H.M. attends Snowden School, a Title I school within SCS.  H.M. receives critical services under Section 504 of the Rehabilitation Act to support H.M.'s multiple exceptionalities, including ADHD and what is currently diagnosed as a sensory processing disorder.  H.K. attends Central High, a Title I school located within SCS, and also has a Section 504 education plan.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, H.K. and H.M.'s schools will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

        c.      Plaintiff Deborah Johnson and her minor child D.J. are from Covington, Georgia. D.J. is on the autism spectrum, and Deborah and D.J. have had to move to find a school that provides D.J. with appropriate services.  This fall, D.J. will attend Alcovy High School, a Title I school located within Newton County Schools, a district that contains both Title I and non-Title I schools and at least seven private schools.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, D.J.'s school will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

        d.      Plaintiff Jeannette Diaz and her minor child T.D. are from Decatur, Georgia.  T.D. attends Druid Hills High School, a Title I school located within DeKalb County Public Schools.  DeKalb County Public Schools contains both Title I and non-Title I schools and approximately 93 private schools.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, T.D.'s school will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

        e.      Plaintiff Beth Lewis and her minor children G.L. and M.L. are from Chandler, Arizona.  Both children attend Arredondo Elementary School, a Title I school located within Tempe Elementary School District, where Beth also teaches.  The district contains both Title I and non-Title I schools and approximately seven private elementary schools.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, G.L. and M.L.'s

schools will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

    f.  Plaintiff Brittany Aldous and her minor child J.R. live in Las Vegas, Nevada.  J.R. attends a Title I elementary school administered by Clark County School District ("CCSD"), which contains both Title I and non-Title I schools and approximately 100 private schools.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, J.R.'s school will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

    g.  Plaintiff Abraham Camejo and his minor children, A.P. and S.P., live in Clark County, Nevada.  A.P. and S.P. attend Rancho High School, a majority-Latinx, Title I school administered by CCSD.  Last year, per-pupil funding in CCSD was below the state and national averages.[9]  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, A.P. and S.P.'s school will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

    h.  Plaintiff Keisha Guyton and her minor child, Z.C., live in Miami Lakes, Florida.  Z.C. is a high school senior at Miami Lakes Educational Center, a Title I school administered by Miami-Dade Public Schools, where Z.C. qualifies for free school lunch.  There are private schools in Z.C.'s district.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, Z.C.'s school will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

    i.  Plaintiff Lisa Mingrone and her minor child A.M. are from Nashville, Tennessee. A.M. attends East Nashville Magnet School, a Title I school located within the Metro Nashville Public School district ("MNPS"), which contains both Title I and non-Title I schools and approximately 71 private schools.  Under the Department's unlawful interpretation of the CARES Act contained in the Rule, A.M.'s school will either receive decreased funds or be unable to spend the CARES Act funds for critical services.

---

[9] *See* Clark County School District, *Popular Annual Financial Report for FY Ended June 30, 2019* (2019) 11,  http://www.ccsd.net/resources/accounting-department/2019-pafr.pdf.

21.     Plaintiffs Whitney Batteast, Herbert Brown, and Villi Prempeh, individually and as next friends of their minor children, are parents of minor children who are enrolled in Title I public elementary and secondary schools administrated by a local educational agency that administers only Title I schools.  Their children's schools will be forced to accept severe, unintended restrictions on the way they spend their CARES Act Funds.

a.     Plaintiff Whitney Batteast and her minor child K.Y. live in Jackson, Mississippi.  K.Y. attends Barack H. Obama Magnet Elementary School, a Title I school located within the Jackson Public School District ("JPS"), which is an all-Title I district.  K.Y. has an Individualized Education Plan ("IEP") and relies on two hearing aids.  Under the Department's Rule, K.Y.'s school will be forced to adhere to the Rule's burdensome supplement-not-supplant provision.

b.     Plaintiff Herbert Brown and his minor child J.B. are from Jackson, Mississippi. J.B. attends Bailey APAC Middle School, a Title I school, which is located within JPS.  Under the Department's Rule, J.B.'s school will be forced to adhere to the Rule's burdensome supplement-not-supplant provision.

c.     Villi Prempeh and her minor children W.N. and P.N. live in Union Springs, Alabama.  W.N. attends South Highland Middle School, a Title I School located within Bullock County School District ("BCSD"), a majority-Black, all-Title I district.  P.N. attends Union Springs Elementary School, a Title I school also located within BCSD.  Both W.N. and P.N. are students with disabilities and have Individualized Education Programs ("IEPs").  P.N. also relies on crucial funding from the school to receive speech therapy to meet P.N.'s educational needs.  Under the Department's Rule, W.N. and P.N.'s schools will be forced to adhere to the Rule's burdensome supplement-not-supplant provision.

22.     Plaintiff Denver County School District No. 1, a/k/a Denver Public Schools ("DPS"), is an LEA located in the State of Colorado that operates 224 public primary and secondary schools serving 87,317 children in a district covering the City-County of Denver.  Its principal address is 1860 Lincoln Street, Denver, Colorado 80203.

a.      DPS has a demonstrable interest in this litigation and will be directly impacted by the Rule.  DPS is a "local educational agency" within the meaning of both the ESEA, *see* 20 U.S.C. § 7801(30), and the CARES Act, *see* § 18007(8), 134 Stat. 569, and received Title I-A subgrants in the previous fiscal year.  DPS administers 159 Title I schools.  The SEA for Colorado has been allocated $120,993,782 from the CARES Act's ESSER Fund.  DPS is eligible to receive $22,908,618 in ESSER funds from the SEA, as well as GEER funds to be determined.

b.      The Rule will inevitably and irreparably harm public schools that DPS operates.  If the Department's Rule is not vacated, DPS will have to choose Option 1 in order to maintain the flexibility necessary for the spending of its CARES Act funds.  Accordingly, all of its public schools will receive fewer CARES Act funds on a per-pupil basis than they would in the Rule's absence.  There are 7,571 private-school students residing in the district, but only 698 of them (less than 10 percent) were calculated to be from "low-income families" under section 1117(c)(1) of the ESEA, 20 U.S.C. § 6320(c)(1), in the last fiscal year.  This means that DPS's expenditures for the benefit of privates schools under the Department's Rule will increase by more than ten-fold.  Accordingly, DPS has an obvious interest in litigation to vacate the Rule.

c.      The Rule's harm will be disproportionately felt by students of color and low-income students, who are overrepresented in DPS schools.  Indeed, over 75% of DPS students are students of color, and approximately 65% of them qualify for free or reduced-price school lunches.  DPS has an obvious interest in litigation to maximize the financial resources available to assist its neediest students.

23.     Plaintiff Pasadena Unified School District ("Pasadena Unified") is an LEA located in the State of California that operates 23 public primary and secondary schools serving more than 16,000 children in a district that includes portions of the City of Pasadena, the City of Sierra Madre, and the unincorporated community of Altadena.  Approximately 60% of the district's students meet the poverty guidelines for free or reduced-price school lunches.  Likewise, approximately 60% of the students are students of color.  Pasadena Unified's district

contains more than fifty private schools. Pasadena Unified's principal address is 351 South Hudson Avenue, Pasadena, California 91109.

a.  Pasadena Unified has a demonstrable interest in this litigation and will be directly impacted by the Rule. Pasadena Unified is a "local educational agency" within the meaning of both the ESEA, *see* 20 U.S.C. § 7801(30), and the CARES Act, *see* § 18007(8), 134 Stat. 569, and received Title I-A subgrants in the previous fiscal year. The SEA for California has been allocated $1,647,306,127 from the CARES Act's ESSER Fund. The SEA must allocate a minimum of $1,482,575,514 (i.e., 90%) of those funds for local education agencies that received Title I-A subgrants during the previous fiscal year, including Pasadena Unified. The Rule directly injures Pasadena Unified by restricting how it can spend its share.

b.  The Rule will inevitably and irreparably harm the public schools Pasadena Unified operates. In the previous fiscal year, Pasadena Unified's district contained a mixture of both Title I and non-Title I schools. If Pasadena Unified chooses Option 1, all of its public schools will receive fewer CARES Act funds on a per-pupil basis than they would in the Rule's absence. If Pasadena Unified chooses Option 2, none of Pasadena Unified's non-Title I public schools will receive CARES Act funds, and the CARES Act funds for its Title I public schools entail a "supplement, not supplant" restriction that would not exist in the Rule's absence. Accordingly, Pasadena Unified has an obvious interest in litigation to vacate the Rule.

i.  Pasadena Unified received ~$4.6 million in ESSER Funds and ~$15 million in GEER Funds. Before the Department's Rule was published, Pasadena Unified intended to use its CARES Act funds to cover the costs associated with its nutritional programs and the spike in children and families needing food, to purchase technology software and hardware for distance learning, to make essential physical changes to school facilities to stop the spread of the coronavirus, to pay for supplies and PPE necessary for increased cleaning, and to make up for significant losses in state and local revenues for all of the district's ordinary expenses.

c.  Under section 1117 of the ESEA, Pasadena Unified would set aside 2.1% of these grants for the benefit of private-school students in poverty—or ~$96,000. If Pasadena

Unified follows Option 1 by apportioning funds for the benefit of private schools based on the total number of students attending private schools, rather than the number of low-income students attending private schools, the district must divert as much as 40% of its CARES Act funds for the benefit of private schools—or ~$8 million.  If it chooses Option 2, it will be unable to use its CARES Act funds at five non-Title I schools and will be unable to use CARES Act funs to make up the significant loss in local sales tax and state funding, among other onerous restrictions.

24.     Plaintiff Stamford Public Schools ("SPS") is a public school district located in Stamford, Connecticut.  SPS' principal address is 888 Washington Boulevard, Stamford, Connecticut 06901. SPS serves 16,600 students.  The district expects enrollment to increase in the 2020–21 school year as a result of the closure of two local high schools, a charter school and a private school, in the city this year.  The SPS student population is 44.5% Latinx, 30% White, 14.5% African-American, 7% Asian and 3% multi-racial.  Among SPS students, 59% qualify for free or reduced price lunch, 14% are English Language learners, and 14% are students with disabilities.  SPS administers 21 schools, 11 of which are Title I schools.  There are 2,035 private school students who reside in Stamford.  Only 17 private school students are low-income for the purposes of calculating the set-aside for equitable services pursuant to Title I.

a.     SPS has a demonstrable interest in this litigation and will be directly impacted by the Rule.  SPS is a "local educational agency" within the meaning of both the ESEA, *see* 20 U.S.C. § 7801(30), and the CARES Act, *see* § 18007(8), 134 Stat. 569, and received Title I-A subgrants in the previous fiscal year.  The SEA for Connecticut has been allocated $111,068,059 from the CARES Act's ESSER Fund.  The SEA must allocate a minimum of $99,961,253 (i.e., 90%) of those funds for local education agencies that received Title I-A subgrants during the previous fiscal year, including SPS.  The Rule directly injures SPS by restricting how it can spend its share.

b.     The Rule will inevitably and irreparably harm SPS' schools.  In the previous fiscal year, SPS contained a mixture of both Title I and non-Title I schools.  Under the Rule's first option, all of SPS's public schools will receive far fewer CARES Act funds on a per-

pupil basis than they would in the Rule's absence.  If SPS chooses the Rule's second option, SPS's non-Title I public schools will receive no CARES Act funds at all, and the CARES Act funds for SPS's Title I public schools will be subject to a "supplement, not supplant" restriction that would not exist in the Rule's absence.  Accordingly, SPS has an obvious interest in litigation to vacate the Rule.

       i.      SPS relies on local funds to support over 96% of its operating budget.  The State provides less than $500 per pupil annually to SPS through its school funding formula.  This year, Stamford's Board of Finance held the mill rate flat in order to alleviate the financial burden facing the City's taxpayers caused by the pandemic.  As a result, SPS's budget was reduced and funds to cover the additional costs associated with the pandemic were drastically curtailed.  Because of the budget limitations, SPS was forced to cut over $12.5 million in staff, services, and programming, including school counselors, deans of students, all middle and high school media specialists, and kindergarten paraprofessionals.

      ii.      SPS received a CARES Act allocation of $2.7 million.  Before the Department's Rule was published, the district intended to use these funds districtwide to purchase cleaning supplies and personal protective equipment; expand its contract with the district's cleaning company; purchase laptops and hot spots to facilitate distance learning; launch targeted support programs for disengaged students; hire Technical Support Specialists for each school building to assist teachers, staff, and students with learning technology; fund technology teachers districtwide; and fund school counselor and dean of students positions that have been lost due to budget cuts.

      iii.      Under Option 1, SPS must set aside $330,000 for the benefit of private-school students, in contrast to the $20,000 SPS would have to set aside for equitable services under the proper calculation pursuant to Title I.  As a result, the district will be forced to forgo spending on Technical Support Specialists, who would fill a critical need for remote learning and to ensure all students are able to use essential technology.

      iv.      Under Option 2, the district would not be able to use CARES Act funds to provide personal protective equipment and increased cleaning services, technological

devices and hotspots, Technical Support Specialists, technology teachers, support programs for disengaged students, deans of students, or counselors in its non-Title I schools. Additionally, the district would be prevented from using CARES Act funds to restore any of the other staff, programs, and supplies that have been lost due to the $12.5 million in budget cuts.

## II.   DEFENDANTS

25.     Defendant Elisabeth "Betsy" D. DeVos is Secretary of the United States Department of Education and is sued in her official capacity pursuant to 5 U.S.C. § 702. Her principal address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

26.     Defendant United States Department of Education is an executive agency of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671. As such, it engages in agency action and is named as a defendant in this action pursuant to 5 U.S.C. § 702. Its principal address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

27.     Secretary DeVos is responsible for carrying out the duties of the Department of Education under the Constitution of the United States of America and relevant statutes, including the CARES Act and the ESEA.

## FACTUAL ALLEGATIONS

## I.   THE CARES ACT

28.     The novel Coronavirus Disease 2019 ("COVID-19") is a deadly, infectious disease caused by severe acute respiratory syndrome coronavirus 2 ("SARS-CoV-2"). The global spread of COVID-19 began in December 2019, and reached the United States in January 2020. By the end of March, cases of COVID-19 had been confirmed in all 50 States and the District of Columbia. As of July 22, 2020, the U.S. had the most confirmed active cases and deaths from COVID-19 in the world, and its case and death counts continue to grow as of the filing of this document. The COVID-19 pandemic has created a public-health emergency with devastating effects on individuals, families, businesses, communities, and local, state, and federal governments.

29.     Educational agencies and school systems have been particularly hard-hit by COVID-19.  As of April 10, 2020, nearly all primary and secondary schools nationwide—at least 124,000—closed their physical sites, affecting over 55 million students.  Schools have been required to respond to the pandemic by taking drastic measures—including transitioning to remote "distance learning" and providing the technology infrastructure and hardware for students to learn from home, training teachers and providing the necessary resources and support for fully online learning, and providing food and other essential services to families devastated by the economic impacts of the crisis.[10]  School closures are particularly challenging for children in poverty and others with elevated needs, such as students with disabilities.  Many students were without home internet access and devices when the pandemic began, which districts are working to provide.  In addition, tens of millions of students rely on free and reduced-price meals at school.[11]  Districts continue to provide student meals, with the added responsibility of providing food for families as increased numbers of people lose work and are thrown into poverty by the virus.

30.     Physically reopening schools will require unprecedented health and safety expenditures, including personal protective equipment ("PPE"), thermometers, cleaning supplies, testing kits, and additional personnel required to maintain the sanitation and distance necessary to reduce the risk of the virus.  Schools will also need sufficient staff and programs to address the academic, social, and emotional effects of the pandemic and school closures on students, particularly our most vulnerable students.  The Council of Chief State School Officers estimates

---

[10] *See* Letter of Council of the Great City Schools to U.S. Rep. Nancy Pelosi, U.S. Rep. Kevin McCarthy, U.S. Sen. Chuck Schumer, and U.S. Sen. Mitch McConnell (Apr. 28, 2020) (describing the costs incurred by public school districts throughout the spring), https://www.cgcs.org/cms/lib/DC00001581/Centricity/Domain/4/Coronavirus--Aid%20Letter%20II.pdf.

[11] In fiscal year 2018, for example, the National School Lunch Program "provided low-cost or free lunches to 29.7 million children daily."  U.S. Dep't of Agric., *Nat'l School Lunch Program*, U.S.D.A. ECON. RESEARCH SERV. (Aug. 20, 2019), https://www.ers.usda.gov/topics/food-nutrition-assistance/child-nutrition-programs/national-school-lunch-program/#:~:text=In%20fiscal%20year%20(FY)%202018,a%20cost%20of%20%2413.8%20billion.

that nationwide, schools will need as much as $245 billion in additional funding to reopen schools safely.[12]

31.    The challenges of responding to COVID-19 are compounded for the nation's public schools by the severe stress that COVID-19 has inflicted on state and local government budgets.  Public education depends primarily on state and local funding.  In many states, those funds are chronically inadequate.  Prior to the pandemic, many states had not yet restored school funding or staff positions cut during the Great Recession of 2008.[13]  Moreover, state and local government budgets have been decimated by COVID-19 in the form of reduced sales and income taxes, as well as drastic increases in spending on public health and other safety net programs.  According to the National Conference of State Legislatures, almost half the states report at least a 10% decline in revenues in fiscal year 2021, with some declines climbing as high as 30%.[14]  Some experts project state budget shortfalls totaling $555 billion over the 2020–22 fiscal years.[15]  Dwindling budgets necessarily leave less funding available for public education. Moreover, school districts must present a balanced budget every year. Because districts cannot run a deficit, if there are inadequate funds to maintain staff, programs and services, school districts must make cuts to educational resources.  Nevertheless, public schools continue to incur the normal costs of educating students, as well as substantial novel expenses required for them to do so remotely while school buildings are closed or have hybrid remote/in-person schedules, and safely once schools resume in-person classes.

---

[12] Letter from Carissa Miller, Exec. Dir., CCSSO to Hon. Lamar Alexander, U.S. Sen. (July 24, 2020), https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf.

[13] Sarah Reber & Nora Gordon, *Supporting Students and Promoting Economic Recovery in the Time of COVID-19*, BROOKINGS INST. (May 7, 2020), https://www.brookings.edu/blog/brown-center-chalkboard/2020/05/07/supporting-students-and-promoting-economic-recovery-in-the-time-of-covid-19/

[14] *See generally* Nat'l Conf. on State Legis., *COVID-19 Revised State Revenue Guidelines* (July 7, 2020 update), https://www.ncsl.org/Portals/1/Documents/fiscal/Rev-Projection-Page-Data-Visualizations-7.7.20.pdf.

[15] Elizabeth McNichol & Michael Leachman, Center on Budget and Policy Priorities, *States Continue to Face Large Shortfalls Due to COVID-19 Effects* (July 7, 2020 update), https://www.cbpp.org/research/state-budget-and-tax/states-continue-to-face-large-shortfalls-due-to-covid-19-effects.

32.     Congress recognized the devastating financial effects of COVID-19 on the nation's communities, businesses, and public educational institutions and acted to ameliorate those harms.  On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), was signed into law.

33.     With respect to educational relief, the CARES Act created a $30.75 billion Education Stabilization Fund to enable public education institutions nationwide to "prevent, prepare for, and respond to coronavirus."  CARES Act § 18001, 134 Stat. 565-566.

34.     The CARES Act directs the Secretary of Education to allocate a majority of the moneys appropriated for the Education Stabilization Fund for three separate sub-funds: (1) the Governor's Emergency Education Relief Fund ("GEER") (9.8%); (2) the Elementary and Secondary School Emergency Relief Fund ("ESSER") (43.9%); and (3) the Higher Education Emergency Relief Fund ("HEER") (46.3%).  CARES Act §§ 18001(b)(1)–(3), 134 Stat. 564.  Ultimately, $2,953,230,000 was allocated for the GEER Fund[16] and $13,229,265,000 was allocated for the ESSER Fund.[17]

**A.     Governor's Emergency Education Relief ("GEER") Fund**

35.     The CARES Act provisions governing the GEER Fund direct the Secretary to make emergency relief grants from the Fund "to the Governor of each State with an approved application."  CARES Act § 18002(a), 134 Stat. 564.  The statute further directs the Secretary to allocate the "amount of each grant" using the following formula: (1) 60 percent based on the State's "relative population of individuals aged 5 through 24"; and (2) 40 percent based on the State's "relative number of children counted under section 1124(c)" of the ESEA.  CARES Act § 18002(b), 134 Stat. 564–565.

36.     Once the Secretary has made a grant from the GEER Fund to the Governor, the Governor may use the GEER funds for any of three, broad purposes:

---

[16] *See* U.S. Dep't of Educ., *Governor's Emergency Education Relief Fund State Allocations Table* 1 (2020), https://oese.ed.gov/files/2020/04/GEER-Fund-State-Allocations-Table.pdf.

[17] *See* U.S. Dep't of Educ., *Elementary and Secondary School Emergency Relief Fund State Allocations Table* 1 (2020), https://oese.ed.gov/files/2020/04/ESSER-Fund-State-Allocations-Table.pdf.

       a.      To "provide emergency support through grants to local educational agencies that the State educational agency deems have been most significantly impacted by coronavirus," CARES Act § 18002(c)(1), 134 Stat. 565;

       b.      To "provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus," CARES Act § 18002(c)(2), 134 Stat. 565; and

       c.      To "provide support to any other institution of higher education, local educational agency, or education related entity within the State that the Governor deems essential for carrying out emergency educational services to students." CARES Act § 18002(c)(3), 134 Stat. 565.

37.     The CARES Act contains no restrictions on which schools within eligible LEAs may receive GEER funds. For example, LEAs and their schools are eligible to receive GEER funds regardless of whether they also receive Title I funds. Instead, the CARES Act provides broad flexibility to LEAs to simply use such funds "to provide educational services to their students and to support the on-going functionality of the [LEA]." *See* CARES Act §§ 18002(c)(1), (3), 134 Stat. 565.

**B.    Elementary and Secondary School Education Relief ("ESSER") Fund**

38.     The CARES Act provisions governing the ESSER Fund direct the Secretary to make emergency relief grants from the Fund to "each State educational agency [SEA] with an approved application." CARES Act § 18003(a), 134 Stat. 565. The statute further directs that the "amount of each grant . . . shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 ["Title I-A"] in the most recent fiscal year." CARES Act § 18003(b), 134 Stat. 565. The allocation of Title I-A funds to the States is determined by various formulas specified in 20 U.S.C. §§ 6632–6639, and is based primarily on the number of children from low-income families and foster children in each State's LEAs.

39.     Under the CARES Act, at least 90% of ESSER funds received by SEAs must be subgranted to LEAs within the State. CARES Act § 18003(c), 134 Stat. 565. Similar to the

Secretary's allocation to the SEAs, the SEAs are required to subgrant those funds to LEAs "in proportion to the amount of funds such [LEAs] . . . received under [Title I-A] in the most recent fiscal year." *Id.*

40.     Unlike LEAs receiving GEER funds, only LEAs that participate in Title I-A are eligible to receive ESSER funds.  LEAs that do not receive Title I-A funds—generally speaking, those with small numbers of low-income students—are ineligible for ESSER funds.   However, the CARES Act contains no restrictions on *which* schools within the eligible LEAs may receive ESSER funds, meaning non-Title I schools within LEAs that receive Title I-A funds may still receive ESSER funds for the low-income students they serve under the CARES Act.

41.     In other words, so long as an LEA receives Title I-A funds, the LEA may distribute ESSER funds even to non-Title I schools within its district.

42.      The CARES Act authorizes LEAs to use ESSER funds for a broad range of purposes, including (1) any activities authorized under the ESEA and various other federal education statutes; (2) coordination of preparedness and response efforts of LEAs with State, local, Tribal, and territorial public health departments and other relevant agencies; (3) any activities to address the unique needs of low-income and/or disabled students, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth; (4) planning and coordination during long-term closures, including purchases of technology for online distance learning; (5) mental health services and support; and other purposes.  *See generally* CARES Act § 18003(d), 134 Stat. 565–566 (cataloging permissible purposes for ESSER funds).

### C.     Equitable Services for Private-School Students

43.     The crux of Plaintiffs' suit concerns section 18005(a) of the CARES Act.  Section 18005(a) requires that LEAs receiving funds from either the GEER Fund or the ESSER Fund

allocate some of those funds for the provision of "equitable services" to private-school students within their districts. 134 Stat. 568.[18]

44.      In particular, section 18005(a) unambiguously specifies that LEAs "shall provide equitable services *in the same manner as provided under section 1117 of the ESEA of 1965* to students and teachers in non-public schools." *Id.* (emphasis added).

45.      Under section 1117 of the ESEA, LEAs must allocate a portion of their Title I-A funds to provide equitable services to eligible children and staff at private schools.  Section 1117 dictates that LEAs calculate the proportionate share of Title I-A funds to be used for equitable services "based on the number of children from low-income families who attend private schools" and reside in the "participating school attendance areas" (i.e., the geographic area in which children are normally served by a Title I-A school).  20 U.S.C. § 6320(a)(4)(A); *see also* 20 U.S.C. § 6313(a)(2) (defining "school attendance area").

46.      In other words, the "manner" in which equitable services are provided under section 1117 of the ESEA allocates the proportionate share of federal funds to be used for equitable services based on the number of *low-income* private-school children.  By explicitly incorporating the terms of section 1117's mandates into the CARES Act, Congress unmistakably dictated that LEAs provide equitable services with CARES Act funds in exactly the same manner as they do with Title I-A funds.

47.      By contrast, the ESEA contains a different provision—section 8501—specifying a narrow range of services that SEAs must provide based on the *total* enrollment of private-school students.  *See generally* 20 U.S.C. § 7881(a)–(b).  By selecting the formula specified under section 1117, rather than section 8501, Congress unambiguously directed LEAs to provide

---

[18] Equitable services include:  Books, materials, and equipment necessary to implement the Title I program; 2. Extended-day services; 3. Summer programs; 4. Saturday programs; 5. Counseling programs; 6. Computer-assisted instruction (CAI) with noninstructional computer technicians who supervise computer labs, maintain discipline, and escort students to and from class; 7. Home tutoring; 8. Computers and software products; and 9. Take-home computers.

equitable services under the CARES Act to private-school students based on the number of *low-income* private-school students, not the *total* number of private-school students.

48. Prior to the CARES Act, the Department's own materials fully acknowledged that "section 1117" allocated funds for equitable services based on private school students in poverty, not the total number of private-school students.[19]

## II. THE DEPARTMENT'S APRIL 30, 2020 GUIDANCE DOCUMENT

49. On April 30, 2020, the Department issued a Guidance Document regarding the CARES Act, entitled *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs*.

50. Without explanation and contrary to the Department's previous statements about section 1117, the Guidance Document advises LEAs to determine the allocation of CARES Act (GEER and ESSER) funds for equitable services based on the *total* number of students enrolled in private schools, as opposed to the number of *low-income* students enrolled in private schools as specified in section 1117 of the ESEA. *See* Guidance Document at 4, 6.

51. In other words, the Guidance Document discards the calculation formula specified in section 1117 of the ESEA in favor of one resembling the calculation formula in section 8501 of the ESEA. *See* 20 U.S.C. § 7881(a)–(b). Congress did not incorporate section 8501 of the ESEA into the CARES Act. By adopting the calculation formula of section 8501, the Department not only ignored the clear statutory mandate of Congress in the CARES Act, but also grossly inflated the share of CARES Act funds to be allocated for the benefit of private-school students in order to advance its own school privatization agenda.

---

[19] U.S. Dep't of Educ., *Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families – Updated Non-Regulatory Guidance* 19 (Oct. 7, 2019) ("The ESEA requires an LEA to determine an accurate count of children from low-income families who attend public and private schools and reside in participating Title I public school attendance areas in order to allocate the proportional share."), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf.

52.     The Department's erroneous conclusion in the Guidance Document that "[t]o calculate the proportional share for equitable services under the CARES Act programs, an LEA determines the overall number of children who are enrolled in public schools and non-public schools in the LEA that wish to participate under one or both CARES Act programs," Guidance Document at 6, was arbitrary and capricious, misstated and misapplied the law as written, and exceeded the Department's lawful authority delegated by Congress.

### III.    PUBLIC RESPONSE TO THE APRIL 30, 2020 GUIDANCE DOCUMENT

53.     The Department's Guidance Document drew swift criticism from education experts, state education officials, and federal legislators nationwide.

54.     On May 5, 2020—less than a week after the Department published the Guidance Document—the Council of Chief State School Officers ("CCSSO"), a nationwide organization of public officials who head SEAs, wrote to the Secretary urging her to align the Department's guidance with the CARES Act's requirements for equitable services.[20]  The CCSSO criticized the Guidance Document for, among other things, transgressing congressional intent "by basing the non-public share [of CARES Act funds] on total enrollments rather than on the number of *low-income children* living in the LEA and attending non-public schools, as LEAs do every year under Section 1117 [of the ESEA] and are expressly required to do under the CARES Act statute."[21]  The CCSSO admonished that the effect of the Guidance Document "would be that non-public schools . . . receive an inequitable amount of funding, much more federal support than Congress intended, or LEAs anticipated[,] based upon the CARES statute."[22]  Accordingly, the CCSSO asked the Department to issue new guidance to "advise LEAs to look at the

---

[20] Letter from Carissa Moffat Miller, Exec. Dir., Council of Chief State Sch. Officers, to Betsy D. DeVos, Sec'y, U.S. Dep't of Educ. (May 5, 2020), https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.

[21] *Id.*

[22] *Id.*

percentage of FY2019 Title I funds they set aside for equitable services and apply that
percentage to ESSERF funds."[23]

55.     The Secretary did not respond to the CCSSO's letter until several weeks later—on
May 22, 2020.[24]  In her response, she flatly refused to clarify the Guidance Document in
accordance with the plain text of the CARES Act, and in fact confirmed the Department's intent
to issue a formal rule enshrining the Department's interpretation in the Guidance Document "in
the next few weeks."[25]  In the meantime, the Secretary ominously warned that if LEAs "insist on
acting contrary to the Department's stated position" in the Guidance Document, "they should, at
minimum, put into an escrow account the difference between the amount generated by the
proportional-student enrollment formula and the Title I, Part A formula."[26]  The Secretary's
benighted insistence that LEAs place scarce and desperately needed emergency funding into
escrow was not only ludicrous in the midst of a global health pandemic, but also clearly
inconsistent with Congress's intent in the CARES Act to expeditiously bestow funding on LEAs
to meet their *immediate* needs.

56.     In the weeks following the Department's publication of the Guidance Document,
a host of State education officials also expressed concern that the Guidance Document
misinterpreted the CARES Act and, if followed, would inequitably divert significant emergency
funding away from public schools.  Indeed, some State officials went so far as to affirmatively
advise their LEAs to disregard the Guidance Document entirely.  For example:

        a.      On May 7, 2020, Pennsylvania Secretary of Education Pedro A. Rivera
wrote to the Department's Assistant Secretary for Elementary and Secondary Education, Frank

---

[23] *Id.*

[24] Letter from Betsy DeVos, Secy' of Educ., to Carissa Moffat Miller, Exec. Dir., Council of
Chief State Sch. Officers (May 22, 2020), https://ccsso.org/sites/default/files/2020-
06/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%20
20.pdf.

[25] *Id.*

[26] *Id.*

T. Brogan, urging the Department to clarify the Guidance Document.[27]  Secretary Rivera correctly observed that "[u]nder the CARES Act statute and [the Department's] longstanding interpretation of equitable participation," reservations for equitable services to private schools "are based on the number of low-income children in each participating non-public school in the LEA."[28]  He went on to note that the Guidance Document's advice to "instead base these calculations on the total number of nonpublic students[] is inconsistent with the CARES statute" and with "the fiscal year 2019 Title I-A administration that serves as the basis of CARES Act allocations."[29]  Secretary Rivera's letter also included figures for 18 Pennsylvania school districts in which CARES Act funding supporting private schools would increase by at least 53%, and as much as 4,634%, if the Guidance Document were binding.[30]

       b.      On May 12, 2020, Indiana Superintendent of Public Instruction Jennifer McCormick issued a memorandum on behalf of the Indiana Department of Education instructing the State's LEAs to disregard the Guidance Document and instead "enact[] the CARES Act as written in the law . . . including the provision to administer equitable services according to Sec. 1117 of the [ESEA]."[31]  Dr. McCormick explained that the State's decision to ignore the Department's Guidance Document "ensure[d] that the [CARES Act] funds are distributed according to Congressional intent and a plain reading of the law, which prioritizes communities and schools with high-poverty who are at most risk and in need of additional funds."[32]  The

---

[27] Letter from Pedro A. Rivera, Pa. Sec'y of Educ., to Frank T. Brogan, Ass't Sec'y for Elementary & Secondary Educ., U.S. Dep't of Educ. (May 7, 2020), https://www.education.pa.gov/ Documents/K-12/Safe%20Schools/COVID/CARESAct/Letter%20to%20Secretary%20 Brogan.pdf.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Mem. from Jennifer McCormick to Indiana Superintendents, Program Administrators & Treasurers of LEAS, Non-Public School Administrators, *Final Language for Equitable Share of CARES Act Funds* (May 12, 2020), https://www.doe.in.gov/sites/default/files/news/final-language-equitable-share-cares-actfunds.pdf.

[32] *Id.*

Presidents of the Indiana State Conference and the Greater Indianapolis Branch of the NAACP sent a letter to Dr. McCormick thanking her for rejecting the Guidance Document and instructing LEAs to instead adhere to the text of the CARES Act.[33]

      c.    On May 14, 2020, Martha James-Hassan, President of the Maryland Association of Boards of Education, wrote to Benjamin L. Cardin and Christopher J. Van Hollen, the United States Senators from Maryland, requesting their "support and advocacy for immediate action by the [Department] to rescind and revise the guidance issued on April 30, 2020," the methodology of which "is neither equitable nor in compliance with the controlling federal statute."[34]  Dr. James-Hassan cautioned that if the Guidance Document were not rescinded, the Maryland Department of Education would be forced to consider following the State of Indiana and instructing its LEAs to disregard the Guidance Document entirely.

      d.    On May 14, 2020, the New Mexico Public Education Department issued a memorandum directing State superintendents and charter school leaders "to determine equitable services dollar amounts [of CARES Act funds] based on the number of children from low-income families in each participating non-public school in the attendance area boundaries of Title I schools within the school district."[35]  According to the memorandum, such an approach "aligns with the plain language of the CARES Act and is consistent with long-standing equitable services calculations under Title I criteria, as well as U.S. Department of Education's (ED) interpretations of the Elementary and Secondary Education Act of 1965 over decades[,] and as

---

[33] Letter from Barbara Bolling-Williams & Chrystal M. Radcliffe, NAACP, to Dr. Jennifer McCormick, Superintendent of Public Instruction (June 8, 2020), https://b9423f67-93b3-44f1-ae42-f33e05fe9eb8.filesusr.com/ugd/e80d1a_9d279210e3de46a9aed4f0b3fda7dd7a.pdf.

[34] Letter from Martha James-Hassan, Pres., Md. Ass'n of Bds. of Educ., to Sen. Benjamin L. Cardin and Sen. Christopher J. Van Hollen, Jr. (May 14, 2020), https://www.mabe.org/wp-content/uploads/2020/05/MABE-CARES-Act-Nonpublic-School-Funding-ED-Guidance-Concerns.Letter-to-Sen-Van-Hollen-and-Cardin-5-14-20.pdf.

[35] Mem. from Gabriel C. Baca to N.M. State Superintendents and Charter School Leaders, *Funds available under Coronavirus Aid, Relief and Economic Security (CARES) Act through the Elementary and Secondary School Education Relief Fund (ESSER), Index 24301* (May 14, 2020), https://webnew.ped.state.nm.us/wp-content/uploads/2020/05/CARES-Act-memo-ESSER-Funds-2020-05-14-Final.pdf.

recently as October 2019."[36]  The memorandum affirmatively instructed New Mexico school districts not to follow the Department's April 30, 2020 Guidance Document because it is "inconsistent with Title I" and its "interpretation of the CARES Act . . . does not align with the State's reading."[37]

       e.      On May 21, 2020, the Mississippi Department of Education "concluded that the CARES Act section 18005(a) . . . requires Mississippi school districts to calculate the private school equitable share using the ESEA section 1117 method of identifying the 'low-income' qualifying students in public and private schools and dividing the district's allocated funds proportionally.  Contrary guidance issued by the United States Department of Education will not be followed."[38]

       f.      On May 27, 2020, the Maine Department of Education reached the same conclusion that the CARES Act "requires LEAs to make equitable provision to private schools using the Title 1 distribution formula.  This is unambiguous in the language of the law . . . which invokes section 1117 of ESEA[,] which is quite specific in the formula and process by which public schools must make the equitable provision.  [The Department's] guidance from April 30, 2020 contradicts the law and the [Department's] interpretation of the law, as recently as October of 2019."[39]

       g.      On June 8, 2020, the Connecticut State Board of Education issued a statement confirming its position that the Department's April 30, 2020 Guidance Document was "inconsistent with the plain language of the CARES Act."[40]  The Board concluded that it would

---

[36] *Id.*

[37] *Id.*

[38] Mississippi Dep't of Educ., *Cares Act Equitable Services*, Miss. Achieves (May 21, 2020), https://msachieves.mdek12.org/cares-act-equitable-services.

[39] Me. Dep't of Educ., *CARES Act: Frequently Asked Questions*, Me. Dep't of Educ. Priority Notice (May 27, 2020), https://mailchi.mp/maine/cu5lemq6y0-1321452.

[40] Letter from Miguel A. Cardona, Conn. Comm'r of Educ., to Conn. State Superintendents (June 8, 2020), https://portal.ct.gov/-/media/SDE/Digest/2019-20/Equitable-services-under-ESSERF-CARES-Act-06082020.pdf.

be most "appropriate to enact the plain language of the CARES Act and follow the methodology under Title 1, rather than the Guidance [Document]."[41]  As noted in the Board's statement, by June 8, "[o]ther state departments of education . . . made similar determinations," including, but not limited to, departments in D.C., Colorado, Indiana, Maine, Oklahoma, Pennsylvania, South Dakota, and Wisconsin.[42]

> h.     On June 25, 2020, the Office of the Superintendent of Public Instruction for the State of Washington issued guidance to LEAs within that State instructing them to use the formula in section 1117 of the ESEA to calculate the proportional share of their CARES Act funds reserved for equitable services to private school children, effectively rejecting the Department's Guidance Document.[43]

57.     The Guidance Document also drew bipartisan ire from federal legislators who were responsible for passing the CARES Act.

> a.     On May 20, 2020, Chairman Bobby Scott of the House Committee on Education and Labor; Chairwoman Rosa DeLauro of the House Subcommittee on Labor, Health, Human Services, and Related Agencies; and Ranking Member Patty Murray of the Senate Committee on Health, Education, Labor, and Pensions, wrote the Secretary urging her to "immediately revise [the Department's] April 30 guidance . . . to come into compliance with the CARES Act and section 1117 of ESEA."[44]  The letter chastised the Guidance Document for attempting "to repurpose hundreds-of-millions of taxpayer dollars intended for public school students to provide services for private school students, in contravention of both the plain

---

[41] *Id.*

[42] *Id.*

[43] Wash. Office of Superintendent of Pub. Instruction, *ESSER Funds: Questions and Answers* 5 (June 25, 2020), https://www.k12.wa.us/sites/default/files/public/communications/ESSER%20Funds%20Q%26A_June%202020.pdf.

[44] Letter from Robert C. Scott, Chair, Comm. on Educ. & Labor, U.S. House of Representatives, et al., to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 20, 2020), https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf.

reading of the statute and the intent of Congress."[45]  The letter also requested the Department's internal records related to its development of "its interpretation of the equitable services provision and its inconsistency with long-standing requirements related to equitable services."[46]

      b.    The following day, May 21, 2020, Senator Lamar Alexander of Tennessee, Chair of the Senate Education Committee and a political supporter of the Secretary, reportedly confirmed that he, too, disagreed with the Guidance Document's interpretation of the CARES Act.  "My sense was that the money should have been distributed in the same way we distribute Title I money," Senator Lamar said. "I think that's what most of Congress was expecting."[47]

      c.    The Congressional Research Service, a research agency that provides information to Congress, prepared a memorandum analyzing the Secretary's interpretation of the CARES Act, and found that "a straightforward reading of section 18005(a) based on its text and context suggests that the CARES Act requires LEAs to follow section 1117's method for determining the proportional share, and thus to allocate funding for services for private school students and teachers based on the number of low-income children attending private schools."[48]

58.    Despite robust public outcry, the Department declined to clarify, revise, or rescind the Guidance Document.  To the contrary, the Department doubled down on the directive, making it not just Guidance, but an enforceable Rule.

---

[45] *Id.*

[46] *Id.*

[47] Laura Meckler, *Betsy DeVos defends decision to direct stimulus money to private schools*, WASH. POST, May 21, 2020, https://www.washingtonpost.com/local/education/betsy-devos-stimulus-private-schools/2020/05/21/d790b926-9b99-11ea-ad09-8da7ec214672_story.html.

[48] Congressional Research Service *Mem. to House Comm. On Educ. and Labor, Analysis of the CARES Act's Equitable Services Provision* (July 1, 2020) 2, https://blogs.edweek.org/edweek/campaign-k-12/CRS%20Analysis%20of%20CARES%20Act%27s%20Equitable%20Services%20Provision%20%282%29.pdf

## IV.   THE DEPARTMENT'S RULE

59.     On July 1, 2020, the Department published the Rule, in the form of an interim

final rule, entitled *CARES Act; Equitable Services to Students and Teachers in Non-Public

Schools*, 85 Fed. Reg. 39,479 (July 1, 2020), in the Federal Register.  Because it is an interim

final rule, the Rule became effective immediately upon its publication in the Federal Register

rather than after the normal public comment period.  *See id.*  The corresponding federal

regulations enacted by the Rule are collected under the heading, *Providing equitable services to

students and teachers in non-public schools*, 34 C.F.R. § 76.665 (2020).

### A.     Enacted Regulations under the Rule

60.     The Department's Rule enacts various regulations purporting to govern how

LEAs determine the "proportional share" of CARES Act funds reserved for equitable services to

private-school students.  *See generally* 85 Fed. Reg. 39,482–83 (July 1, 2020); 34 C.F.R. §

76.665(c) (2020).

61.     In a transparent attempt to create the illusion that the Department was responsive

to public criticism of the Guidance Document, the Rule provides LEAs a "choice" that in reality

is no choice at all.  *See* 85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R. § 76.665(c)(1) ("To

determine the proportional share of funds for equitable services to students and teachers in non-

public elementary and secondary schools for each CARES Act program, an LEA must use one of

the following measures.").  Both options are contrary to the CARES Act.

a.      Option 1: Fewer Public Funds; Spend in Any Schools.  An LEA may

follow the Guidance document—*i.e.*, apportion CARES Act funds for equitable services based

on the total number of students attending private schools, rather than the number of low-income

students attending private schools.  85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R.

§ 76.665(c)(1)(ii) ("LEA must calculate the proportional share based on enrollment in

participating non-public elementary and secondary schools in the LEA compared to the total

enrollment in both public and participating non-public elementary and secondary schools in the

LEA.").  This Option completely discards the calculation formula specified under section 1117

of the ESEA and explicitly incorporated into the CARES Act.  In so doing, Option 1 not only

ignores the clear statutory mandate of Congress in the CARES Act, but also grossly inflates the share of CARES Act funds that would be allocated for the benefit of private-school students.

        b.    <u>Option 2: Intended Amount of Public Funds; Spend Only Title I Schools, and No Supplanting</u>.  Alternatively, the Rule permits an LEA to apportion CARES Act funds for equitable services based on the number of low-income private-school students, as required under section 1117 of the ESEA and, by extension, section 18005(a) of the CARES Act.  85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R. § 76.665(c)(1)(i)(A).  However, this option entails two crippling restrictions on the LEA's discretion to expend the funds where and how they are most needed.

        i.    First, an LEA that chooses Option 2 may not spend any of the public-school share of its CARES Act funds on any non-Title I schools.  85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R. § 76.665(c)(1)(i) (making Option 1 applicable only to "[a]n LEA using *all its funds under a CARES Act program* to serve *only students and teachers in public schools participating under Title I, Part A* of the ESEA" (emphases added)).  This prevents it from using those funds to address the needs of low-income students in all schools across the district.

        ii.    Second, an LEA that chooses Option 2 may not spend any of its CARES Act funds such that federal funds would "supplant," as opposed to "supplement," traditional state and local funding sources for the same educational program or service.  85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R. § 76.665(c)(3) ("An LEA using funds from a CARES Act program in Title I schools under paragraph (c)(1)(i) of this section must comply with the supplement not supplant requirement in section 1118(b) of the ESEA.").  This restriction forbids LEAs from using CARES Act funds to pay for any preexisting educational expenditures previously funded by state or local dollars—a decidedly head-spinning result, since one of the CARES Act's key purposes was to make up for the effects of COVID-19-related state and local budget shortcomings on public education.  Consistent with the CARES Act's purpose, the "supplement, not supplant" language is not referenced anywhere in the Act and the section of the ESEA where the language appears is not cited or referenced in the Act.

        62.    Altogether, the Rule presents LEAs—and by extension, the public-school students and parents they serve—with a lose-lose situation: either (1) retain discretion to spend CARES

Act funds in their public schools as Congress intended, but forfeit a much larger share of those funds to private schools that Congress intended; or (2) minimize the amount of CARES Act funds that are spent in private schools, but forfeit the discretion to determine how and where those funds are spent in public schools.  Regardless of which option LEAs choose, public schools, public-school students, and their parents are harmed.

### B.      The Rule Conflicts with the Plain Language of the CARES Act

63.      Neither of the restrictions in Option 2, nor the apportionment calculation in Option 1, appears anywhere in the CARES Act.  They were apparently fashioned by the Department to coerce LEAs into apportioning their CARES Act funds under Option 1, because the more LEAs that choose Option 1, the greater the share of federal funds that Congress intended to support public education ends up benefitting private schools.  Option 2 works like a poison pill.  LEAs that choose Option 2 forfeit their authority to distribute CARES Act funds according to the needs of their districts.  LEAs that choose Option 1—and therefore agree to forfeit a greater portion of their CARES Act funds to private schools—at least retain their discretion and avoid the burden of Option 2's "supplement, not supplant" requirement.

64.      Not only do the Rule's provisions for apportioning and spending CARES Act funds appear nowhere in the CARES Act, they conflict with its plain language.

65.      First, the provision of the Rule requiring LEAs to apportion CARES Act funds for equitable services based on the *total* number of students attending private schools, rather than the number of *low-income* students attending private schools, *see* 34 C.F.R. § 76.665(c)(1)(ii)—*i.e.*, Option 1—is unlawful because Section 18005(a) of the CARES Act clearly dictates that LEAs "shall provide equitable services *in the same manner as provided under Section 1117 of the ESEA of 1965* to students and teachers in non-public schools."  134 Stat. 568 (emphasis added).  Section 1117 dictates that LEAs must calculate the proportional share of Title I-A funds to be used for equitable services "based on the number of children from *low-income* families who attend private schools" and reside in the "participating school attendance area" (i.e., the geographic area in which children are normally served by a Title I-A school).  20 U.S.C. § 6320(a)(4)(A) (emphasis added); *see also* 20 U.S.C. § 6313(a)(2) (defining "school attendance

area").  By explicitly incorporating the terms of section 1117's mandates into the CARES Act, Congress unmistakably instructed LEAs to apportion CARES Act funds for equitable services in exactly the same manner as they do with Title I-A funds.  The Rule's inexplicable directive for LEAs to apportion CARES Act funds based on the *total* population of private-school students, as opposed to *low-income* private-school students, is irreconcilable with congressional intent and has no basis in statute, policy, or reason.

66.     Second, the provision of the Rule requiring LEAs to limit their spending of CARES Act funds to Title 1 schools if they choose Option 2 unlawfully restricts LEAs' discretion to spend CARES Act funds wherever the need for them is greatest.  *See, e.g.*, CARES Act § 18003(d)(3), 134 Stat. 566 (authorizing LEAs' use of ESSER funds for any activities providing principals and school leaders with whatever "resources necessary to address the needs of their individual schools").  The CARES Act expressly guarantees that LEAs in receipt of CARES Act funds will retain flexibility to use those funds in any and all of the public schools within the LEA—not simply in their Title I schools.  *See* CARES Act §§ 18002(c)(1), (3), 18003(d)(1)–(12), 134 Stat. 564–67.  The Rule's conditional restriction of CARES Act funds to Title I schools is irreconcilable with the statutory text and congressional intent and has no basis in policy or reason.

67.     Third, Option 2 unlawfully imposes a "supplement, not supplant" requirement.  This conditional restriction effectively prohibits LEAs from using CARES Act funds for purposes that Congress explicitly intended them to be used in the CARES Act, including to retain existing staff and maintain existing educational services in the midst of an urgent crisis.  *See, e.g.*, CARES Act § 18003(d)(12), 134 Stat. 566-567 (authorizing use of ESSER Fund grants for any "activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff of the [LEA]"); *see also* CARES Act § 18002(c)(1), 134 Stat. 565 (authorizing use of GEER Fund grants "to support the ability of . . . [LEAs] to continue to provide educational services to their students and to support the on-going functionality of [LEA]").  The Rule's conditional restriction of CARES Act funds to "supplement," but not "supplant," state and local funding sources appears nowhere in—and

40

blatantly conflicts with—the plain text of the CARES Act.  In fact, the Rule explicitly concedes that the "supplement, not supplant" restriction actually appears in section 1118(b)(2) of the ESEA—a provision of the ESEA that is cited nowhere in the CARES Act.  *See* 85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R. § 76.665(c)(3).  As such, this restriction in Option 2 of the Rule is irreconcilable with congressional intent and has no basis in statute, policy, or reason.

68.     Indeed, the Department has explicitly acknowledged that "Congress . . . intended that grantees have substantial flexibility in the use of these [CARES Act] dollars."[49] Nevertheless, the Department's Rule arbitrarily imposes unreasonable restrictions on LEAs under Option 2 that hamper the LEAs' flexibility to use CARES Act funds to meet their schools' needs.

69.     Under either Option 1 or Option 2, the Rule ensures the diversion of CARES Act funds away from their intended purpose—broad-based relief for America's public schools and students.

a.     Under Option 1, millions of public-school students will see their districts retaining fewer CARES Act funds on a per-pupil basis than they would if the CARES Act allocations for equitable services for private-school students were calculated in accordance with section 1117 of the ESEA as Congress intended.  For example, Pasadena Unified will lose almost $8 million dollars of their CARES Act funding to private schools under Option 1.

b.     Under Option 2, all public-school students attending non-Title I schools, many of whom will undoubtedly be low-income or otherwise in need of increased resources, including students with disabilities and English language learners, will be in schools that receive zero CARES Act funds.  Instead, the ESSER and GEER Funds that Congress specifically designed to assist all public schools in LEAs that receive CARES Act funds will benefit only a

_____

[49] Letter from Mitchell M. Zais, Deputy Sec'y, U.S. Dep't of Educ., to Gene Dodaro, Comptroller Gen., U.S. Gov't Accountability Office (June 12, 2020) 3 (available as pp. 375–89 of the U.S. Gov't Accountability Office, *COVID-19 Opportunities to Improve Federal Response and Recovery Efforts*, GAO-20-625 (June 2020), *available at* https://www.gao.gov/products/GAO-20-25).

subset of those schools.  And for public-school students in Title I schools that do receive CARES Act funds under Option 2, the permissible uses of those funds are severely restricted.

**C.    The Department Lacks Any Authority to Issue the Rule**

70.    The Department had no authority to issue the Rule.  The Department credits two provisions of federal law—20 U.S.C. § 1221e-3 and § 3474—as conferring rulemaking authority upon the Secretary with respect to the CARES Act.  *See* 85 Fed. Reg. 39,481 & 39,488 (July 1, 2020).  Neither statute authorizes the Department's promulgation of this Rule.

a.    The first statute, 20 U.S.C. § 1221e-3, confers a general rulemaking authority on the Secretary only to the extent necessary "to carry out functions otherwise *vested in the Secretary by law or by delegation of authority pursuant to law*, and subject to limitations as may be otherwise imposed by law."  *Id.* (emphasis added).  But because the CARES Act unambiguously prescribes the formula for LEAs to allocate the portion of their CARES Act funds reserved for the provision of equitable services to private-school students, the statute in no way "vest[s] in the Secretary" nor "delegate[s]" to the Secretary any "authority" whatsoever to prescribe the additional conditions or different formula in the Department's Rule.

b.    Similarly, the second statute, 20 U.S.C. § 3474, only authorizes the Secretary to prescribe rules and regulations to the extent "necessary or appropriate to administer and manage the functions of the Secretary or the Department."  *Id.*  Again, because the CARES Act unambiguously prescribes the formula for LEAs to allocate the portion of their CARES Act funds reserved for the provision of equitable services to private-school students, the Department's Rule was neither "necessary" nor "appropriate" to carrying out the functions of the Secretary or of the Department.

71.    In the CARES Act itself, Congress delegated no authority, express or implied, to the Secretary or the Department to issue rules or regulations interpreting the CARES Act generally, nor with regard to the GEER and/or ESSER Funds or the distribution of appropriated funds for equitable services to private-school students in particular.

72.    The Department further failed to articulate even a reasonable—much less persuasive—justification for the provisions of the Rule that Plaintiffs challenge.

42

a.     The Department claims, citing no authority, that "[n]othing in the CARES Act suggests Congress intended to differentiate between students based upon the public or non-public nature of their school with respect to eligibility for relief."  85 Fed. Reg. 39,479 (July 1, 2020).  The Department blindly overlooks the fact that section 18005(a) of the CARES Act explicitly incorporates section 1117 of the ESEA, and section 1117 of the ESEA in fact *does* differentiate between public- and private-school students in a number of respects.

b.     The Department purportedly justifies its *ultra vires* promulgation of the Rule by characterizing section 18005(a) of the CARES Act as "facially ambiguous."  85 Fed. Reg. 39,481 (July 1, 2020).  The Department's only explanation as to why § 18005(a) is "facially ambiguous" is that "Congress did not need to add the words 'in the same manner' if it simply intended to incorporate 'section 1117 of the ESEA of 1965' by reference in the CARES Act. The unqualified phrase 'as provided in' alone would have been sufficient."  *Id.*  Unsurprisingly, the Department cites no authority even suggesting that when one congressional statute incorporates another using more words than are strictly necessary, the former statute somehow becomes "facially ambiguous."

c.     The Department observes that "Congress included a separate consultation requirement in section 18005(a) of the CARES Act, and a public control of funds provision in section 18005(b), notwithstanding the fact that section 1117 [of the ESEA] contains precisely parallel provisions."  *Id.*  From there, the Department "reasons" that "[i]f Congress intended to incorporate 'section 1117 of the ESEA of 1965' wholesale into the CARES Act, and to have the Department mechanistically apply it, then these provisions in sections 18005(a) and (b) must be deemed superfluous and other key CARES Act text ignored."  *Id.*  This argument is nonsensical in numerous respects—including, but not limited to, the following:

i.     Contrary to the Department's representations, the "consultation" and "public control" provisions of section 1117 are absolutely not—and much less "precisely"—"parallel" to sections 18005(a) and 18005(b) of the CARES Act.  For example, section 1117 of the ESEA contains at least 30 subparagraphs defining and describing the legally required "consultation" process under Title I, *see generally* 20 U.S.C. § 6320(b); in contrast, section

43

18005(a) of the CARES Act simply directs LEAs to allocate funds for the provision of equitable services to private-school students in the same manner as section 1117, "as determined in consultation with representatives of non-public schools," *see* CARES Act § 18005(a), 134 Stat. 568 (emphasis added).  The CARES Act's provisions that make passing references to "consultation" or "public control" are in no way rendered "superfluous" by the painstakingly more detailed provisions defining "consultation" and "public control" in section 1117 of the ESEA.  On the contrary, those provisions are entirely consistent.

        ii.      Even assuming that passing statutory references to "consultation" and "public control" in the CARES Act were rendered "superfluous" by the consultation and public control provisions in section 1117 of the ESEA, the Department apparently and illogically assumed that if *any* provision of section 1117 is not "incorporate[d] . . . wholesale" into the CARES Act, then *no* provision of section 1117 is "incorporate[d] . . . wholesale" into the CARES Act.  *See* 85 Fed. Reg. 39,481 (July 1, 2020).  That is absurd.  The Department overlooks that no provision of the CARES Act contradicts, renders superfluous, or even speaks to the formula for calculating the share of federal funds that LEAs must reserve for equitable services to private-school students under section 1117 of the ESEA—except for section 18005(a) of the CARES Act, which unambiguously prescribes that the proportional share be calculated "*in the same manner*" as that very formula.  CARES Act § 18005(a), 134 Stat. 568 (emphasis added).  ).  Section 1117, in turn, unambiguously specifies a formula based on the number of *low-income* private-school students, not the *total* number of private-school students, in an LEA. Whatever ambiguities the Department can rightfully point to in the CARES Act, the formula for equitable services is not one of them.

        d.      The Department breezily concludes that "[b]y definition, the provisions in section 1117 relating to funding and eligibility for services, *e.g.,* section 1117(a)(1) and (4) and (b)(1)(E) and (J)(ii) [of the ESEA], are inapposite in a CARES Act frame."  85 Fed. Reg. 39,481 (July 1, 2020).  But the Department does not specify what "definition" it is that makes those provisions inapposite, "[b]y definition."  Instead, the Department declares by fiat that "the CARES Act is a separate appropriation allowing separate permissible uses of taxpayer funds"

than section 1117 of the ESEA permits.  85 Fed. Reg. 39,481 (July 1, 2020).  As detailed above, there is neither statutory, nor legislative-historical, nor logical support for that conclusion.

73.     Finally, the Department failed to credibly demonstrate that it had the authority to issue the Rule as an interim final rule.  An interim final rule is permissible only "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that" public notice-and-comment proceedings were "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b).  The Department plainly lacked "good cause."  The Department's justification was that "the statute requires an LEA to provide services for students and teachers in non-public schools that are equitable in comparison to services provided to public school students and teachers," but an "LEA cannot begin services for public or non-public school students and teachers without consulting on determining the amount of funds available for those services," and hence the "national emergency" of COVID-19 required that the Department tell them how to determine the amount.  85 Fed. Reg. 39,483 (July 1, 2020).  But Congress already told LEAs exactly how to determine the amount: by using the formula in section 1117 of the ESEA.  There was no cause, much less "good cause," for an interim final rule.

74.     For the foregoing reasons, the Rule is unlawful and must be vacated.  *See Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated.'" (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989))); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 118 (D.D.C. 2019) (prescribing "vacatur—i.e., nullification—of [an] Interim Final Rule" as the proper remedy upon concluding that the interim final rule was unlawful).

## V.    THE RULE WILL CAUSE IMMEDIATE AND IRREPARABLE HARM TO PLAINTIFFS

75.     The Rule will cause immediate and irreparable harm to Plaintiffs, all of whom have a demonstrable interest in ensuring that CARES Act funds serve their intended recipients.

76.     As detailed above, Plaintiffs—who are public school students and parents, LEAs, and the NAACP—will each be irreparably harmed by the Rule.

77.     If an LEA chooses the Rule's Option 1, the LEA will forfeit substantial funds Congress intended it to receive, impeding its ability to provide safe and effective instruction and essential services to the plaintiff public school children.  If an LEA chooses Option 2, then plaintiff students in non-Title I schools will receive nothing, and the expenditure of CARES Act funds will be severely restricted in Title I schools, denying plaintiff Title I school students important resources that state and local funds are no longer sufficient to cover.

78.     The Rule will most negatively impact students in under-resourced schools in high-poverty districts.  Students of color are disproportionately represented in these under-resourced schools and districts, whereas white and/or affluent students are disproportionately enrolled in the private schools to which the Rule attempts to funnel federal funds.  Permanently impairing the education and well-being of our most disadvantaged students during a public health crisis is unconscionable and must be averted.

## CAUSES OF ACTION

### COUNT 1

#### *Ultra Vires* Agency Action in Violation of Constitutional Separation-of-Powers

79.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

80.     Article I, section 1 of the United States Constitution specifies that "[a]ll legislative Powers herein granted shall be vested in [the] Congress of the United States."

81.     The authority of the executive branch, including executive agencies, to act "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes.").

82.     An executive agency acts *ultra vires* when it acts in excess of its statutory authority conferred by Congress.

83.     Section 18005(a) of the CARES Act requires LEAs to calculate the proportionate share of CARES Act funds reserved for the provision of equitable services to private-school

students "based on the number of children from low-income families who attend private schools." *See* CARES Act § 18005(a), 134 Stat. 568 (incorporating by reference 20 U.S.C. § 6320(a)(4)(A)).

84.     The regulations promulgated by the Department's Rule are *ultra vires* and violate the constitutional principles of separation-of-powers in several respects:

a.     There is no provision of the CARES Act, nor of any other federal law, permitting LEAs to apportion CARES Act funds for the provision of equitable services to private-school students based on the total number of students attending private schools, rather than the number of low-income students attending private schools. Accordingly, 34 C.F.R. § 76.665(c)(1)(ii) is *ultra vires*.

b.     There is no provision of the CARES Act, nor of any other federal law, requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to expend their CARES Act funds exclusively in their Title I schools. Accordingly, 34 C.F.R. § 76.665(c)(1)(i) is *ultra vires*.

c.     There is no provision of the CARES Act, nor of any other federal law, requiring LEAs to calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to abide by the "supplement, not supplant" rule embodied in section 1118(b) of the ESEA. Accordingly, 34 C.F.R. § 76.665(c)(3) is *ultra vires*.

85.     By unilaterally imposing its interpretations of the CARES Act via the Rule that are contrary to the above, Defendants unconstitutionally usurped Congress's legislative power in violation of the constitutional principle of separation-of-powers.

86.     Absent declaratory and injunctive relief suspending and vacating these regulations, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' unlawful actions.

## COUNT 2

### Violation of the Spending Clause of the U.S. Constitution

87.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

88.     Article I, section 8 of the United States Constitution (the "Spending Clause") states that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

89.     The federal government may not impose conditions on spending that (1) are so coercive that they compel, rather than encourage, the recipient to comply with federal policy priorities; (2) are ambiguous; (3) are retroactive; or (4) are unrelated to the federal interest in the particular program. *NFIB*, 567 U.S. at 575–78; *South Dakota v. Dole*, 483 U.S. 203, 206–08 (1987).

90.     Congress has not delegated any authority to the Department to impose spending requirements on the allocation and/or use of GEER or ESSER Fund monies.

91.     To the extent that Congress has delegated any authority to the Department to undertake rulemaking regarding the use of GEER or ESSER Fund monies, the Rule violates the Spending Clause.

92.     The Department's interpretation of Section 18005 of the CARES Act, as codified in the Rule, violates the relatedness requirement under the Spending Clause because it is contrary to Congress's plainly expressed intent in the CARES Act to require SEAs and LEAs to follow Section 1117 of the ESEA when apportioning CARES Act funds for equitable services.

93.     The Rule also violates the requirement that conditions on the spending of federal funds must be made "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Congress did not unambiguously impose a requirement that LEAs calculate and set aside GEER and ESSER Fund monies for equitable services to all private-school students and teachers or else limit their use of GEER and ESSER Fund monies to Title I schools; indeed, Congress unambiguously did the opposite.

94.     Finally, the Department's Rule imposed improper "post-acceptance" restrictions on the uses of federal funds.  *Id*. at 17, 25.  States—and by extension, LEAs that applied for funding, including Plaintiffs DPS, Pasadena Unified, and SPS—could not "knowingly accept conditions of which they [were] 'unaware' or which they [were] 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).  Because the Department's Rule imposed "retroactive" conditions on congressionally appropriated funds, Defendants have violated the Spending Clause.  *Pennhurst*, 451 U.S. at 25; see also *NFIB*, 567 U.S. at 585.

95.     The States in which Plaintiffs reside did not know of the Department's unlawful interpretation at the time they applied for and received emergency aid grants from the GEER and ESSER Funds.  The States in which Plaintiffs reside signed Certification agreements attesting to the requirements under the CARES Act.  Plaintiffs DPS, SPS, and Pasadena Unified likewise applied to their SEAs for subgrants pursuant to the terms and conditions of the CARES Act.  Therefore, the States and LEAs were unable to exercise their choice knowingly, cognizant of the consequences of their participation.  *See Sch. Dist. v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253, 262 (6th Cir. 2009) (finding that plaintiff school districts had standing to bring suit against the Department of Education under the Spending Clause over certain provisions in the No Child Left Behind Act).

96.     Absent declaratory and injunctive relief suspending and vacating the Rule, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' unlawful actions.

## COUNT 3

### Violation of the Administrative Procedure Act:
### Agency Action Not in Accordance with Law

97.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     The APA requires that a court hold unlawful and set aside any agency action, findings, and conclusions that are found to be in excess of statutory authority or not in accordance with law.  5 U.S.C. § 706(2)(A), (C).

99.     The following regulations promulgated via the Department's Rule are not in accordance with law, including duly enacted federal statutes and the Constitution of the United States of America:

a.     34 C.F.R. § 76.665(c)(1)(ii).  Directing LEAs to apportion CARES Act funds for the provision of equitable services to private-school students based on the total number of students attending private schools, rather than the number of low-income students attending private schools, conflicts with the plain text of the CARES Act and represents an unconstitutional condition on spending in violation of Article I, section 8 of the United States Constitution.

b.     34 C.F.R. § 76.665(c)(1)(i).  Requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to expend their CARES Act funds exclusively in their Title I schools conflicts with the plaint text of the CARES Act and represents an unconstitutional condition on spending in violation of Article I, section 8 of the United States Constitution.

c.     34 C.F.R. § 76.665(c)(3).  Requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to abide by the "supplement, not supplant" rule embodied in section 1118(b) of the ESEA conflicts with the plain text of the CARES Act and represents an unconstitutional condition on spending in violation of Article I, section 8 of the United States Constitution.

100.    Absent declaratory and injunctive relief suspending and vacating these regulations, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' unlawful actions.

---

**COUNT 4**

**Violation of the Administrative Procedure Act:
Agency Action in Excess of Statutory Authority**

101.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

102.    The APA requires that a court hold unlawful and set aside any agency action, findings, and conclusions that are found to be in excess of statutory authority or not in accordance with law.  5 U.S.C. § 706(2)(A), (C).

103.    Congress did not authorize the Department to interpret or make rules regarding section 18005 of the CARES Act.  In particular, the following regulations promulgated via the Rule are unauthorized by and contrary to section 18005 of the CARES Act:

a.    34 C.F.R. § 76.665(c)(1)(ii).  There is no provision of the CARES Act, nor of any other applicable federal law, directing LEAs to apportion CARES Act funds for the provision of equitable services to private-school students based on the total number of students who attend private schools, rather than the number of low-income students who reside in the district and attend private schools.

b.    34 C.F.R. § 76.665(c)(1)(i).  There is no provision of the CARES Act, nor of any other federal law, requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to expend their CARES Act funds exclusively in their Title I schools.

c.    34 C.F.R. § 76.665(c)(3).  There is no provision of the CARES Act, nor of any other federal law, requiring LEAs to calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to abide by the "supplement, not supplant" rule deriving from section 1118(b) of the ESEA.

104.     Absent declaratory and injunctive relief suspending and vacating these regulations, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' unlawful actions.

## COUNT 5

### Violation of the Administrative Procedure Act:
### Arbitrary and Capricious Agency Action

105.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

106.     The APA requires that a court hold unlawful and set aside any agency action, findings, and conclusions found to be arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A).

107.     An agency's rule is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

108.     Defendants failed to consider the impact of the Department's Rule on economically vulnerable students, and students of color in particular, who are disproportionately represented in public schools and under-represented in private schools.  Yet the express purpose of Title I of the ESEA was to achieve educational equity for these precise populations.  By allocating ESSER Funds—the larger of the two funds dedicated to K-12 schools under the CARES Act's Education Stabilization Fund—according to state and district Title I funding allotments, and by further instructing LEAs to calculate expenditures for equitable services in the same manner as they calculate such expenditures under Title I, section 1117, Congress made very clear its intention to center federal COVID-19 response and relief funds around students with the highest demonstrated need.  Defendants' failure to consider the obvious fact that

inadequately funded public schools will bear the brunt of the nation's fiscal crisis was arbitrary and capricious.

109.    Defendants failed to consider the impact of the Department's Rule on students who attend non-Title I schools in districts that serve primarily Title I schools.

110.    Defendants failed to consider the impact of the Department's Rule on school districts that serve only Title I schools, who cannot choose between these two budgeting options and will necessarily be bound by the Rule's burdensome supplement-not-supplant mandate.

111.    Defendants entirely failed to consider the administrative burden on LEAs, which must now dedicate precious time and resources to understand the impact on their district under Options 1 and 2, and then make an unlawful and unreasonable choice between retaining their full amount of federal funding or serving all of their public-school students equitably.

112.    Defendants instead seem to have foregrounded the needs of private schools—who are undoubtedly facing their own set of challenges in light of COVID-19—even though Congress did not include the unique interests of private schools generally in the text of the CARES Act.  In fact, Congress expressly instructed LEAs to set aside only that portion of their CARES Act funds sufficient to meet the needs of disadvantaged children who attend private schools.

113.    Specifically, the following regulations promulgated by the Department's Rule are arbitrary and capricious:

a.    34 C.F.R. § 76.665(c)(1)(ii).  Requiring LEAs to apportion CARES Act funds for the provision of equitable services to private-school students based on the total number of students attending private schools, rather than the number of low-income students attending private schools, if they share their funds with non-Title I schools relies on factors which Congress has not intended the Department to consider, entirely fails to consider an important aspect of the problem, offers an explanation for a decision that runs counter to the evidence before the agency, and/or is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.

b.      34 C.F.R. § 76.665(c)(1)(i).  The Department's dictate requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to expend their CARES Act funds exclusively in their Title I schools relies on factors which Congress has not intended the Department to consider, entirely fails to consider an important aspect of the problem, and offers an explanation for a decision that runs counter to the evidence before the agency, and/or is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.

c.      34 C.F.R. § 76.665(c)(3).  The Department's dictate requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to abide by the "supplement, not supplant" rule embodied in section 1118(b) of the ESEA relies on factors which Congress has not intended the Department to consider, entirely fails to consider an important aspect of the problem, and offers an explanation for a decision that runs counter to the evidence before the agency, and/or is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.

114.    Absent declaratory and injunctive relief suspending and vacating these regulations, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' unlawful actions.

## COUNT 6

### Violation of the Administrative Procedure Act:
### Agency Action Without Observance of Procedure Required by Law

115.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

116.    The APA requires that a court hold unlawful and set aside any agency action, findings, and conclusions found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D).

117.     In order to promulgate a legislative rule bearing the force of law, an executive agency must first publish a "[g]eneral notice of proposed rulemaking" in the Federal Register.  5 U.S.C. § 553(b).  The agency must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.* § 553(b)(3).  This procedural requirement is generally referred to as the "notice" requirement.

118.     Furthermore, the agency must provide "interested persons" with the "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  *Id.* § 553(c).  This requirement is referred to as "comment."

119.     The Department's Rule is a legislative rule that was adopted without complying with the APA's notice-and-comment requirements.

120.     The Department's Rule was issued as an interim final rule—meaning it became effective and binding on LEAs the day it was published in the Federal Register.  However, the Department failed to establish "good cause" to bypass notice-and-comment because rulemaking was neither impracticable nor contrary to the public interest.  *See* 5 U.S.C. § 553(b).

121.     Absent declaratory and injunctive relief suspending and vacating the Rule and its regulations, Plaintiffs will be immediately, continuously, and irreparably harmed by Defendants' unlawful actions.

## **COUNT 7**

### **Declaratory Relief**

122.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

123.     Plaintiffs contend that:

a.     The Department's Rule requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to expend their CARES Act funds exclusively in their Title I schools, *see* 34 C.F.R. §

76.665(c)(1)(i), is unlawful because it conflicts with the plain text of the CARES Act and violates the United States Constitution and federal Administrative Procedure Act.

       b.    The Department's Rule requiring LEAs that calculate their proportionate share of CARES Act funds reserved for the provision of equitable services to private-school students "based on the number of children from low-income families who attend private schools" to abide by the "supplement, not supplant" rule embodied in section 1118(b) of the ESEA, *see* 34 C.F.R. § 76.665(c)(3), is unlawful because it conflicts with the plain text of the CARES Act and violates the United States Constitution and federal Administrative Procedure Act.

       c.    The Department's Rule permitting LEAs to apportion CARES Act funds for the provision of equitable services to private-school students based on the total number of students attending private schools, rather than the number of low-income students attending private schools, *see* 34 C.F.R. § 76.665(c)(1)(ii), is unlawful because it conflicts with the plain text of the CARES Act and violates the United States Constitution and federal Administrative Procedure Act.

    124.    As laid out in Defendants' justification for the Rule, Defendants dispute Plaintiffs' contentions.

    125.    An actual controversy now exists between Plaintiffs and Defendants.

    126.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration of their "rights and other legal relations," *id.*, consistent with the above.

## PRAYER FOR RELIEF

    127.    **WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor and grant the following relief:

       a.    Declare the Rule unlawful within the meaning of 5 U.S.C. § 706(2)(A), (C), and (D);

       b.    Preliminarily and permanently enjoin the Department and any and all of its officers, employees, and/or agents from applying and/or enforcing the Rule or any version thereof;

       c.    Vacate and set aside the Rule and all versions thereof;

d.      Award Plaintiffs reasonable costs and expenses, including attorney's fees;

and

e.      Grant such other and further relief as the Court deems just and proper.

Dated:  July 22, 2020                    Respectfully submitted,

                                         MUNGER, TOLLES & OLSON LLP
                                             TAMERLIN J. GODLEY
                                             (*Pro Hac Vice* application filed concurrently)
                                             ADELE M. EL-KHOURI
                                             (D.C. Bar No. 1025090)
                                             JESSICA REICH BARIL
                                             (*Pro Hac Vice* application filed concurrently)
                                             DAVID P. THORESON
                                             (*Pro Hac Vice* application filed concurrently)


                                         By:  _____/s/ *Adele M. El-Khouri*_____
                                                 ADELE M. EL-KHOURI


                                          ADELE M. EL-KHOURI
                                          Adele.El-Khouri@mto.com
                                          MUNGER, TOLLES & OLSON LLP
                                          1117 F. Street, N.W., Seventh Floor
                                          Washington, D.C. 20004–1357
                                          Telephone:   (202) 220-1100
                                          Facsimile:    (202) 220-2300

                                          TAMERLIN J. GODLEY
                                          Tamerlin.Godley@mto.com
                                          JESSICA REICH BARIL
                                          Jessica.Baril@mto.com
                                          DAVID P. THORESON
                                          David.Thoreson@mto.com
                                          MUNGER, TOLLES & OLSON LLP
                                          350 South Grand Avenue, Fiftieth Floor
                                          Los Angeles, California, 90017
                                          Telephone:   (213) 683-9100
                                          Facsimile:    (213) 687-3702

                                          *Counsel for All Plaintiffs*

                                          *Additional Co-Counsel for All Plaintiffs Listed on*
                                          *Next Page*

*Additional Co-Counsel for All Plaintiffs*

BACARDI JACKSON
bacardi.jackson@splcenter.org
(*Pro Hac Vice* application filed concurrently)
CHRISTINE BISCHOFF
christine.bischoff@splcenter.org
(*Pro Hac Vice* application filed concurrently)
KATHERINE DUNN
katherine.dunn@splcenter.org
(*Pro Hac Vice* application filed concurrently)
LINDSEY RUBINSTEIN
lindsey.rubinstein@splcenter.org
(*Pro Hac Vice* application filed concurrently)
SAM BOYD
sam.boyd@splcenter.org
(*Pro Hac Vice* application filed concurrently)
MICHAEL TAFELSKI
michael.tafelski@splcenter.org
(*Pro Hac Vice* application filed concurrently)

SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
Telephone:     (334) 315-0179
Facsimile:     (334) 956-8481

WENDY LECKER
WLecker@edlawcenter.org
(*Pro Hac Vice* application filed concurrently)
JESSICA LEVIN
JLevin@edlawcenter.org
(*Pro Hac Vice* application filed concurrently)

EDUCATION LAW CENTER
60 Park Place, Suite 300
Newark, New Jersey 07102
Telephone:     (973) 624-1815
Facsimile:     (973) 624-7339

.