**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), *et al.*,

       *Plaintiffs*,

  vs.

ELISABETH "BETSY" D. DEVOS, in her official
capacity as the United States Secretary of Education,
and the UNITED STATES DEPARTMENT OF
EDUCATION,

       *Defendants*.

**Case No. 1:20-cv-01996 (DLF)**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................................1

STATUTORY AND FACTUAL BACKGROUND ..............................................................4

    I.     THE CARES ACT ..............................................................................................4

    A.    Governor's Emergency Education Relief ("GEER") Fund .....................................5

    B.    Elementary and Secondary School Emergency Relief ("ESSER") Fund ..............6

    C.    Equitable Services for Private-School Students .....................................................7

    II.    THE APRIL 30, 2020 GUIDANCE DOCUMENT & PUBLIC RESPONSE .........................9

    III.   THE DEPARTMENT'S RULE ...............................................................................10

    IV.   THE COMPLAINT ..............................................................................................11

LEGAL STANDARD............................................................................................................14

ARGUMENT ........................................................................................................................14

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. ..........14

    A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Rule is *Ultra Vires* in Violation of the Separation of Powers................................14

           1.    Congress delegated no rulemaking authority to the Secretary in the CARES Act.....................................................................................15

           2.    The Secretary does not have rulemaking authority under the general rulemaking provisions.......................................................16

           3.    Defendants cannot substitute their policy preferences for Congress's decisions. ................................................................17

           4.    The Rule is not entitled to *Chevron* deference...........................18

           5.    The Rule's attempt to limit spending to only Title I schools and its requirement that the funding "supplement, not supplant" current expenditures are also *ultra vires*. ..............................................21

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Rule Violates the Spending Clause of the United States Constitution. .................22

    C.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims. .................23

           1.    The Rule is ripe for review under the APA. ................................23

           2.    The Rule was an agency action in excess of statutory authority and not in accordance with law. ........................................................23

           3.    The Rule was arbitrary and capricious.......................................25

           4.    The Rule was enacted without observance of procedure required by law.......................................................................................28

i

**TABLE OF CONTENTS**
**(Continued)**

**Page**

    **(a)**   Promulgation of the Rule with notice-and-comment was neither "impracticable" nor "unnecessary." ...................................29

    **(b)**   Promulgation of the Rule without notice and comment was not in the "public interest." ........................................................30

**II.**    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT INJUNCTIVE RELIEF. ....................31

    **A.**   Plaintiffs Will Suffer Irreparable Harm to Public-School Students' Health Absent an Injunction. ..............................................34

    **B.**   Plaintiffs Will Suffer Irreparable Harm to Public-School Students' Education Absent an Injunction. ..........................................35

    **C.**   Even if Plaintiffs' Harms Were Merely "Economic," Those Harms Are Irreparable Because the Losses of CARES Act Funds Are Imminent, Certain, and Unrecoverable. ...........................................37

    **D.**   Plaintiffs Will Face Irreparable Administrative and Legal Burdens Absent an Injunction. ......................................................40

**III.**   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS. ...........................41

**IV.**   PLAINTIFFS ARE ENTITLED TO NATIONWIDE RELIEF. .........................................42

**V.**    ALTERNATIVELY, PLAINTIFFS ARE ENTITLED TO EXPEDITED SUMMARY JUDGMENT..........44

CONCLUSION.................................................................................................45

## TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) ...........................................................................41

*Agua Caliente Band of Chuilla Indians v. Mnuchin*, No. 20-cv-01136 (APM),
    2020 WL 325071 (D.D.C. June 15, 2020) .............................................................35

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
    321 F.3d 1166 (D.C. Cir. 2003) ....................................................................15, 16

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ............................................................................17

*Al-Joudi v. Bush*,
    406 F. Supp. 2d 13 (D.D.C. 2005) ......................................................................34

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ..........................................................................42

*Am. Fed'n of Gov't Emps., AFL-CIO v. Block*,
    655 F.2d 1153 (D.C. Cir. 1981) ..........................................................................31

*Am. Hosp. Ass'n v. Dep't of Health & Hum. Srvs.*,
    No. 18-2112 (JDB), 2018 WL 5777397 (D.D.C. Nov. 2, 2018) ...........................45

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ...........................................................................40

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ...........................................................................................23

*Asante v. Azar*,
    No. 20-CV-601 (TSC), 2020 WL 1930263 (D.D.C. Apr. 21, 2020) ...............33, 37

*Azar v. Allina Health Servs.*,
    139 S. Ct. 1804 (2019) .......................................................................................20

*Banks v. Booth*,
    No. 20-849 (CKK), 2020 WL 3303006 (D.D.C. June 18, 2020) ..........................34

*Barnes v. Gorman*,
    536 U.S. 181 (2002) ...........................................................................................23

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Blackman v. District of Columbia,*
  185 F.R.D. 4 (D.D.C. 1999) ........................................................................... 34, 36

*Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald,*
  830 F.3d 570 (D.C. Cir. 2016) ..................................................................................... 42

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988) ...................................................................................................... 24

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) .................................................................................. 37, 43

*Career Coll. Ass'n v. Riley,*
  74 F.3d 1265 (D.C. Cir. 1996) ..................................................................................... 23

*Chevron, U.S.A. v. Natural Resources Defense Council,*
  467 U.S. 837 (1984) ...................................................................................... 18, 19, 24

*City of Chi. v. Barr,*
  961 F.3d 882 (7th Cir. 2020) ....................................................................................... 22

*City of Los Angeles v. Barr,*
  941 F.3d 931 (9th Cir. 2019) ....................................................................................... 15

*City of Philadelphia v. Att'y Gen. of U.S.,*
  916 F.3d 276 (3d Cir. 2019) ......................................................................................... 15

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ...................................................................................................... 18

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
  466 F.3d 134 (D.C. Cir. 2006) ..................................................................................... 24

*Confederated Tribes of Chehalis Reservation v. Mnuchin,*
  No. 20-CV-01002 (APM), 2020 WL 1984297 (D.D.C. Apr. 27, 2020) ............. 14, 33, 34

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) ...................................................................................................... 19

*Council of S. Mountains, Inc. v. Donovan,*
  653 F.2d 573 (D.C. Cir. 1981) ..................................................................................... 29

*Cox v. Brown,*
  498 F. Supp. 823 (D.D.C. 1980) ................................................................................. 36

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Davenport v. Int'l Bd. of Teamsters*,
 166 F.3d 356 (D.C. Cir. 1999) .............................................................................14

*Davis v. Pension Benefit Guar. Corp.*,
 571 F.3d 1288 (D.C. Cir. 2009) ...........................................................................14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
 140 S. Ct. 1891 (2020) ...................................................................................27, 28

*District of Columbia v. U.S. Dep't of Agric.*,
 No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020) ...............43, 44

*Doe 1 v. Trump*,
 275 F. Supp. 3d 167 (D.D.C. 2017) .....................................................................43

*Doe v. Rumsfeld*,
 341 F. Supp. 2d 1 (D.D.C. 2004) .........................................................................43

*Doe, 1 v. FEC*,
 920 F.3d 866 (D.D.C. 2019) ................................................................................25

*Doeskin Prods., Inc. v. United Paper Co.*,
 195 F.2d 356 (7th Cir. 1952) ..............................................................................41

*Everglades Harvesting & Hauling, Inc. v. Scalia*,
 427 F. Supp. 3d 101 (D.D.C. 2019) .....................................................................41

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) ........................................................................................27, 28

*Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*,
 830 F.3d 515 (D.C. Cir. 2016) .............................................................................15

*Greatness v. FEC*,
 831 F.3d 500 (D.C. Cir. 2016) .............................................................................14

*Harmon v. Thornburgh*,
 878 F.2d 484 (D.C. Cir. 1989) .............................................................................42

*Harris v. Bd. of Supervisors, L.A. Cty.*,
 366 F.3d 754 (9th Cir. 2004) ..............................................................................40

*Holland v. Nat'l Min. Ass'n*,
 309 F.3d 808 (D.C. Cir. 2002) .............................................................................24

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Humane Soc'y of U.S. v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ........................................................................42

*J.D. v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019) ......................................................................14

*Jacksonville Port Auth. v. Adams*,
    556 F.2d 52 (D.C. Cir. 1977) ..........................................................................41

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ......................................................................29

*Kildare v. Saenz*,
    325 F.3d 1078 (9th Cir. 2003) ........................................................................40

*Kimberly–Clark Corporation v. District of Columbia*,
    286 F. Supp. 3d 128 (D.D.C. 2017) ................................................................41

*Knight v. Comm'r*,
    552 U.S. 181 (2008) ........................................................................................20

*Kollaritsch v. Mich. State Univ. Bd. of Trs.*,
    944 F.3d 613 (6th Cir. 2019) ..........................................................................22

*L.M.-M. v. Cuccinelli*,
    No. 19-2676 (RDM), 2020 WL 985376 (D.D.C. Mar. 1, 2020)......................45

*Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
    469 U.S. 256 (1985).........................................................................................19

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................14

*Lofton v. District of Columbia.*,
    7 F. Supp. 3d 117 (D.D.C. 2013) ....................................................................36

*Mack Trucks, Inc. v. EPA*,
    682 F.3d 87 (D.C. Cir. 2012) .....................................................................29, 31

*Marshall Cty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ......................................................................45

*Methodist Hosp. of Sacramento v. Shalala*,
    38 F.3d 1225 (D.C. Cir. 1994) ........................................................................29

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Mittleman v. Postal Regulatory Comm'n,*
    757 F.3d 300 (D.C. Cir. 2014) ...................................................................................15

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1,*
    554 U.S. 527 (2008) ...................................................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................25, 26, 27

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ...................................................................................................27

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ............................................................................................19, 23

*Nat'l Min. Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2014) .......................................................................24, 37

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) .................................................................................42

*Nat'l Treasury Emps. Union v. Horner,*
    854 F.2d 490 (D.C. Cir. 1988) ...................................................................................26

*Navajo Nation v. Azar,*
    292 F. Supp. 3d 508 (D.D.C. 2018) (Friedrich, J.) ....................................................45

*Navajo Nation v. Azar,*
    302 F. Supp. 3d 429 (D.D.C. 2018) (Friedrich, J.) ....................................................44

*New York v. United States Dep't of Health & Human Servs.,*
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) .......................................................................18

*Nken v. Holder,*
    556 U.S. 418 (2009) ...................................................................................................41

*NLRB. v. Sw. Gen., Inc.,*
    137 S. Ct. 929 (2017) .................................................................................................21

*Oceana, Inc. v. Ross,*
    363 F. Supp. 3d 67 (D.D.C. 2019) .............................................................................25

*Open Cmtys. Alliance v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017) ...........................................................................41

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Orion Reserves Ltd. P'ship v. Salazar,*
   553 F.3d 697 (D.C. Cir. 2009) ...................................................................................25

*Pennhurst State Sch. & Hosp. v. Halderman,*
   451 U.S. 1 (1981) ...............................................................................................22, 23

*Petry v. Block,*
   737 F.2d 1193 (D.C. Cir. 1984) ...............................................................................29

*Planned Parenthood Fed'n of Am., Inc., v. Heckler,*
   712 F.2d 650 (D.C. Cir. 1983) .................................................................................43

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.,*
   263 F. Supp. 3d 293 (D.D.C. 2017) ..........................................................................41

*Public Health Citizen Rsch. Grp. v. Auchter,*
   702 F.2d 1160 (D.C. Cir. 1983) ................................................................................35

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.,*
   187 F. Supp. 3d 100 (D.D.C. 2016) ..........................................................................26

*Rubin v. United States,*
   449 U.S. 424 (1981) ..................................................................................................19

*San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ..................................................................................18

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) .................................................................................14

*Sorenson Commc'ns Inc. v. FCC.,*
   755 F.3d 702 (D.C. Cir. 2014) .................................................................................29

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ..................................................................................................22

*Texas Children's Hosp. v. Burwell,*
   76 F. Supp. 3d 224 (D.D.C. 2014) ..............................................................33, 37, 39

*Trump v. Int'l Refugee Assistance Project,*
   137 S. Ct. 2080 (2017) .............................................................................................44

*Univ. of Tex. v. Camenisch,*
   451 U.S. 390 (1981) .................................................................................................14

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).................................................................................16

*Util. Solid Waste Activities Grp. v. EPA*,
236 F.3d 749 (D.C. Cir. 2001)...........................................................29, 30, 31

*Wilson v. Grp. Hosp. & Med. Servs., Inc.*,
791 F. Supp. 309 (D.D.C. 1992).................................................................34

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008).................................................................................14

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)...................................................................38

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...............................................................................18

**FEDERAL STATUTES**

5 U.S.C. ch. 5, subch. I § 500 *et seq.*
Administrative Procedure Act........................................23, 24, 25, 28, 30

5 U.S.C. § 553.................................................................................28, 29, 30

5 U.S.C. § 704.......................................................................................23

5 U.S.C. § 706.........................................................................23, 24, 25, 28

5 U.S.C. § 8501.................................................................................7, 9, 20

20 U.S.C. § 1102.....................................................................................26

20 U.S.C. § 1117................................................................................. 1, passim

20 U.S.C. § 1118(b).............................................................................11, 21

20 U.S.C. § 1124(c)...................................................................................5

20 U.S.C. § 1221e-3.........................................................................16, 17, 24

20 U.S.C. § 3474.................................................................................16, 17

20 U.S.C. § 6313(a)(2)...............................................................................7

20 U.S.C. § 6314(a)(1)(A).........................................................................11

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

20 U.S.C. § 6320(a)(4)(A) ..................................................................................7, 19

20 U.S.C. § 6321(b)(1) ...........................................................................................11

20 U.S.C. § 6333(c) ..................................................................................................5

20 U.S.C. §§ 6632–6639 ..........................................................................................6

20 U.S.C. § 7881 ...........................................................................................7, 9, 20

Pub. L. No. 116-136, 134 Stat. 281 (2020)
  ("CARES Act"), Coronavirus Aid, Relief, and Economic Security Act ................... 4, passim

**FEDERAL RULES**

Fed. R. Civ. P. 65(a)(2) ..........................................................................................44

**FEDERAL REGULATIONS**

34 C.F.R. § 76.665 ...................................................................................10, 21, 38

85 Fed. Reg. 39,479 (July 1, 2020) ............................................................. 10, passim

**FEDERAL GUIDANCE**

U.S. Dep't of Educ., *Ensuring Equitable Services to Private School Children: A
  Title I Resource Tool Kit* (Sept. 2006) ..................................................................8

U.S. Dep't of Educ., *Title I, Part A of the Elementary and Secondary Education
  Act of 1965, as Amended by the Every Student Succeeds Act: Providing
  Equitable Services to Eligible Private School Children, Teachers, and
  Families – Updated Non-Regulatory Guidance* (Oct. 7, 2019) ................................8

U.S. Dep't of Educ., *Title I Services to Eligible Private School Children, Non-
  Regulatory Guidance* (Oct. 17, 2003) ....................................................................8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8 ..............................................................................................22

**TREATISES**

Black's Law Dictionary (10th ed. 2014) ................................................................15

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

OTHER AUTHORITIES

Laura Meckler, *Betsy DeVos defends decision to direct stimulus money to private schools*, WASH. POST, May 21, 2020 ........................................................................10

Letter from Robert C. "Bobby" Scott, Chair, Comm. on Educ. & Labor, U.S. House of Representatives, et al., to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 20, 2020) to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (July 31, 2020), .......................10

Letter from Robert C. "Bobby" Scott, Chair, Comm. on Educ. & Labor, U.S. House of Representatives, et al., to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 20, 2020)..........................................................................................................9, 10

Valerie Strauss, *Betsy DeVos Doubles Down on Her Education Agenda During the Pandemic*, WASH. POST (May 29, 2020) ..........................................................18

## INTRODUCTION

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which—among other critical measures—appropriated $16.5 billion to elementary and secondary public schools. Congress recognized the increased costs to public schools for food, safety, and technology due to the pandemic as well as COVID-19's devastating impact on state and local revenues. In light of the urgent need for emergency relief, Congress appropriated funds for immediate disbursement to school districts. Public schools, which serve 99% of low-income students and almost 70% of students of color in America, need every penny that Congress allocated in these unprecedented times. Defendants Elisabeth "Betsy" D. DeVos, the United States Secretary of Education (the "Secretary"), and the United States Department of Education (the "Department") have unilaterally and unlawfully decided to funnel hundreds of millions of those dollars away from students in public schools to the benefit of affluent private-school students. They did so by enacting, without delegated authority, a rule requiring public-school districts to allocate CARES Act funds to private schools in a manner that is flatly inconsistent with the plain text of the statute. This illegal diversion of funds at this perilous moment must be halted in its tracks. Plaintiffs respectfully ask this Court to enter a preliminary injunction to stop implementation of Defendants' harmful rule.

Plaintiffs—the National Association for the Advancement of Colored People ("NAACP"), individual public-school students and their parents from across the country, Broward County Public Schools ("BCPS"), DeKalb Public Schools ("DeKalb"), Denver Public Schools ("DPS"), Pasadena Unified School District ("Pasadena Unified"), and Stamford Public Schools ("SPS")— are likely to succeed on the merits of their claims. In the text of the CARES Act, Congress expressly limited the provision of funds to private-school students, providing for allocation "in the same manner as provided under section 1117 of the ESEA [Elementary and Secondary Education

Act] of 1965." Section 1117 of the ESEA indisputably requires allocation of funds to private schools based on the number of *low-income* private-school students. Likewise, for decades the Department has recognized in its own guidance that section 1117 of the ESEA allocates funding for the benefit of private schools based on the number of *low-income* private-school students.

Nevertheless, the Department inexplicably issued guidance, and then an interim final rule (the "Rule"), requiring local educational agencies ("LEAs") to divert CARES Act funds to private schools based on the *total* private-school population, not just low-income students who attend private schools, or else face severe limitations on the expenditure of the rest of their CARES Act funds that appear nowhere in the Act. The Rule would result in the diversion of hundreds of millions of dollars—which Congress appropriated to help public schools provide safe and productive learning environments during the pandemic—away from public-school students.

The Rule violates the federal Administrative Procedure Act ("APA") and the United States Constitution. First, the Department exceeded its congressionally delegated authority by issuing the Rule. The CARES Act delegates no rulemaking authority to the Department, and the Rule cannot be reconciled with the unambiguous statutory text that it purports to interpret. The Rule warrants no deference. Second and third, the Rule infringes on Congress's power under the Spending Clause and violates the constitutional separation of powers by rewriting the appropriation established by Congress in the statute. Fourth, the Rule is arbitrary and capricious because it is inconsistent with prior Department guidance, and is based on an interpretation so ungrounded in the text and purpose of the CARES Act as to render it wholly implausible. Fifth, the Rule was promulgated without observance of the procedures required by law. In light of the direct conflict between the plain text of the statute and the Rule, Plaintiffs are highly likely to prevail in this suit.

Plaintiffs will be irreparably harmed absent a preliminary injunction.  The CARES Act funds are needed now—not three, six, or twelve months from now.  As Congress recognized when it appropriated billions of dollars to public schools, this is no ordinary time.  It is challenging enough to determine how to safely and effectively educate students in a pandemic.  On top of these extraordinary challenges, the Rule is causing profound confusion and consequent delay in school districts' use of the CARES Act funds.  Meanwhile, children's education, health, and safety literally hang in the balance.  The last thing that vulnerable children can afford is to have large swaths of money diverted to more affluent private-school students as this enormously difficult school year begins.  Indeed, the impact of delayed educational services on children's learning grows exponentially, exacerbating existing achievement gaps and creating new ones that cannot be bridged.  And, the lack of important safety equipment, supplies, and personnel could be the difference between a student, a teacher, or a family member's life and death—truly irreparable consequences.

Finally, the balance of equities weighs strongly in Plaintiffs' favor, and the public interest warrants entry of an injunction.  A preliminary injunction would merely preserve the status quo, while causing no harm to Defendants, and preventing enormous harm to Plaintiffs and the public. Defendants cannot suffer harm from a preliminary injunction that simply ends an unlawful practice.  Nor had private schools expected this windfall of public funds.  Equitable services have been provided the same way for decades.  Continuing this practice causes no harm.  The public interest also favors protecting vulnerable public-school students and their families and ensuring Defendants comply with Congress's mandate concerning emergency pandemic funds.  The Court should grant Plaintiffs' motion for preliminary injunctive relief.

In the alternative, Plaintiffs ask the Court to convert this motion to a motion for summary judgment, expedite briefing and consideration of that motion, including submission of the

administrative record, and conclusively decide the facial invalidity of the Rule.  Time is of the essence in unprecedented ways.

## STATUTORY AND FACTUAL BACKGROUND

### I.   THE CARES ACT

Congress acted to address the devastating financial effects of COVID-19 on the nation's communities, businesses, and public education institutions.  On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), was signed into law.  With respect to educational relief, the CARES Act created a $30.75 billion Education Stabilization Fund ("ESF") to enable public education institutions nationwide to "prevent, prepare for, and respond to coronavirus."  CARES Act § 18001, 134 Stat. 564-566.

The CARES Act directs the Secretary to allocate the moneys appropriated for the ESF to three separate sub-funds: (1) the Governor's Emergency Education Relief ("GEER") Fund (9.8%); (2) the Elementary and Secondary School Emergency Relief ("ESSER") Fund (43.9%); and (3) the Higher Education Emergency Relief ("HEER") Fund (46.3%).  CARES Act §§ 18001(b)(1)– (3), 134 Stat. 564.[1]  The Act further directs the Secretary to disburse those funds in accordance with precise formulas.  The only grant of discretionary authority to the Secretary with respect to the funds is the authority to allocate 2.5 percent of the HEER funds to the institutions that the Secretary determines have the greatest unmet needs.  CARES Act § 18004(a)(3), 134 Stat. 567– 68.  The Secretary is granted no discretionary authority over the allocation of the GEER or ESSER Funds.

---

[1] Ultimately, $2,953,230,000 was allocated for the GEER Fund and $13,229,265,000 was allocated for the ESSER Fund.  *See* U.S. Dep't of Educ., *Governor's Emergency Education Relief Fund State Allocations Table* 1 (2020), https://oese.ed.gov/files/2020/04/GEER-Fund-State-Allocations-Table.pdf; U.S. Dep't of Educ., *Elementary and Secondary School Emergency Relief Fund State Allocations Table* 1 (2020), https://oese.ed.gov/files/2020/04/ESSER-Fund-State-Allocations-Table.pdf.

A.     **Governor's Emergency Education Relief ("GEER") Fund**

The CARES Act provisions governing the GEER Fund direct the Secretary to make emergency relief grants from the Fund "to the Governor of each State with an approved application." CARES Act § 18002(a), 134 Stat. 564.  The Act directs the Secretary to allocate the "amount of each grant" using the following formula: (1) 60 percent based on the State's "relative population of individuals aged 5 through 24," and (2) 40 percent based on the State's "relative number of children counted under section 1124(c)" of the ESEA.  CARES Act § 18002(b), 134 Stat. 564–565.  Section 1124(c)—part of Title I-A of the ESEA—defines "children to be counted" as those from low-income families.  *See* 20 U.S.C. § 6333(c).

Once the Secretary has made a grant from the GEER Fund to a Governor, the Governor may use the GEER funds for any of three, broad purposes: (1) to "provide emergency support through grants to [LEAs] that the [State Educational Agency or "SEA"] deems have been most significantly impacted by coronavirus," CARES Act § 18002(c)(1), 134 Stat. 565; (2) to "provide emergency support through grants to institutions of higher education serving students within the State that the Governor determines have been most significantly impacted by coronavirus," CARES Act § 18002(c)(2), 134 Stat. 565; and (3) to "provide support to any other institution of higher education, [LEA], or education related entity within the State that the Governor deems essential for carrying out emergency educational services to students."  CARES Act § 18003(c)(3), 134 Stat. 565.  The Act contains no restrictions on which schools within eligible LEAs may receive a subgrant of GEER funds under subsection 18002(c)(1).  Instead, the Act provides broad flexibility to LEAs to use such funds "to provide educational services to their students and to support the on-going functionality of the [LEA]."  *See* CARES Act §§ 18002(c)(1), (3), 134 Stat. 565.

### B.   Elementary and Secondary School Emergency Relief ("ESSER") Fund

The CARES Act provisions governing the ESSER Fund direct the Secretary to make emergency relief grants from the Fund to "each [SEA] with an approved application."  CARES Act § 18003(a), 134 Stat. 565.  Specifically, the statute directs that the "amount of each grant . . . shall be allocated by the Secretary to each State in the same proportion as each State received under [Title I-A] in the most recent fiscal year."  CARES Act § 18003(b), 134 Stat. 565.  The allocation of Title I-A funds to the States is determined by formulas specified in 20 U.S.C. §§ 6632–6639, based primarily on the number of children from low-income families and foster children in each State's LEAs.  At least 90 percent of ESSER grants received by SEAs must then be subgranted to LEAs within the State.  CARES Act § 18003(c), 134 Stat. 565.  Similar to the Secretary's allocations to SEAs, SEAs are required to subgrant those funds to LEAs "in proportion to the amount of funds such [LEAs] . . . received under [Title I-A] in the most recent fiscal year." *Id.*  An LEA that did not participate in Title I-A in the previous fiscal year—generally speaking, those with small numbers of low-income students—is not eligible for an ESSER subgrant. However, the Act contains no restrictions on which schools within the eligible LEAs may receive ESSER Funds.  So long as an LEA receives Title I-A funds, the LEA may distribute ESSER funds to both Title I and non-Title I schools within its district.

The CARES Act authorizes LEAs to use ESSER funds for a broad range of purposes, including (1) any activities authorized under the ESEA and various other federal education statutes; (2) coordination of preparedness and response efforts of LEAs with State, local, Tribal, and territorial public health departments and other relevant agencies; (3) activities to address the unique needs of low-income students and/or students with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth; (4) planning and coordination during long-term closures, including purchases of technology for online distance

learning; (5) mental health services and support; and (6) other purposes.  *See generally* CARES

Act § 18003(d), 134 Stat. 565–566 (cataloging permissible purposes for use of ESSER funds).

### C.    Equitable Services for Private-School Students

Section 18005(a) of the CARES Act requires that LEAs receiving funds from either the

GEER Fund or the ESSER Fund allocate some of those funds to the provision of "equitable

services" to private-school students within their district.  134 Stat. 568.  In particular, section

18005(a) unambiguously specifies that LEAs "shall provide equitable services *in the same manner*

*as provided under section 1117 of the ESEA of 1965* to students and teachers in non-public

schools."  *Id.* (emphasis added).   Section 1117, in turn, unambiguously provides that

"[e]xpenditures for educational services and other benefits to eligible private school children shall

be equal to the proportion of funds allocated to participating school attendance areas *based on the*

*number of children from low-income families who attend private schools*."   20 U.S.C.

§ 6320(a)(4)(A)(i) (emphasis added); *see also* 20 U.S.C. § 6313(a)(2) (defining "school attendance

area" as the geographic area in which children are served by a Title I-A school).  In other words,

the "manner" in which equitable services are provided under section 1117 of the ESEA is the

allocation of federal funds to private schools based on the number of *low-income* students in those

private schools.

By explicitly incorporating the terms of section 1117 into the CARES Act, Congress

unambiguously dictated that LEAs allocate CARES Act funds for equitable services to private-

school students in exactly the same way as they allocate Title I-A funds to private-school students.

Indeed, the ESEA contains a different provision—section 8501—specifying a range of equitable

services that SEAs must provide based on the *total* enrollment of private-school students.  *See*

*generally* 20 U.S.C. §§ 7881(a)–(b).  By selecting the formula specified in section 1117, rather

than section 8501, Congress unambiguously directed LEAs to provide equitable services under the

CARES Act to private-school students based on the number of *low-income* private-school students, not the *total* number of private-school students.

As recently as October 2019, the Department's own guidance regarding equitable services to private-school students under section 1117 fully acknowledged that federal funding for equitable services should be based on the number of low-income private-school students, not the total number of private-school students.[2]  That guidance, which is still still in effect, provides: "The ESEA requires an LEA to determine an accurate count of children from low-income families who attend public and private schools and reside in participating Title I public school attendance areas in order to allocate the proportional share."[3]  Department guidance has reflected that same formula for decades.[4]

---

[2] U.S. Dep't of Educ., *Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers, and Families – Updated Non-Regulatory Guidance* 19 (Oct. 7, 2019) https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf.

[3] *Id.*

[4] *See* U.S. Dep't of Educ., *Non-Regulatory Guidance: Fiscal Changes and Equitable Services Requirements under the Elementary and Secondary Education Act of 1965 (ESEA), as Amended by the Every Student Succeeds Act (ESSA)* 29 (Nov. 21, 2016) ("Using the proportion of children *from low-income families who attend private schools*, the LEA would determine the amount of funds available for equitable services based on that proportionate share of the LEA's total Title I allocation.") (emphasis added), https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf; U.S. Dep't of Educ., *Ensuring Equitable Services to Private School Children: A Title I Resource Tool Kit* 55 (Sept. 2006) ("[The ESEA] requires that Title I expenditures for educational services and other benefits to eligible private school students be equal to the proportion of funds allocated to participating public school attendance areas *based on the number of private school children from low-income families*.") (emphasis added); https://www2.ed.gov/programs/titleiparta/ps/titleitoolkit.pdf; U.S. Dep't of Educ., *Title I Services to Eligible Private School Children, Non-Regulatory Guidance* 5 (Oct. 17, 2003) ("The amount of Title I funds allocated to each participating public school attendance area is determined mainly on the basis of the *total number of low-income students*— both public and private-- residing in each area.") (emphasis added), https://www2.ed.gov/programs/titleiparta/psguidance.doc.

## II.   THE APRIL 30, 2020 GUIDANCE DOCUMENT & PUBLIC RESPONSE

For over a month after the CARES Act's passage, the Department stayed silent, and Plaintiff LEAs made plans to follow the plain language of the Act, understanding that funds would be allocated to services for private-school students following the formula set forth in section 1117. But, on April 30, 2020, the Department issued a guidance document for the CARES Act ("Guidance Document").  Without explanation and in direct contradiction of the Department's prior guidance concerning section 1117, the Guidance Document advised LEAs to calculate the allocation of CARES Act (GEER and ESSER) funds for equitable services based on the *total* number of students enrolled in private schools, as opposed to the number of *low-income* students enrolled in private schools as specified in section 1117 of the ESEA.

In other words, the Guidance Document discarded the calculation formula specified in section 1117 of the ESEA in favor of one resembling the calculation formula in section 8501 of the ESEA.  *See* 20 U.S.C. § 7881(a)–(b); *supra* 7.  But, Congress incorporated section 1117, not section 8501, of the ESEA into the CARES Act.

Unsurprisingly, the Department's Guidance Document drew swift criticism from education experts, state education officials, and members of Congress who passed the CARES Act,[5] including Republicans and Democrats.  For example, members of several Committees in the House and Senate wrote the Secretary urging her to "immediately revise [the Department's] April 30 guidance . . . to come into compliance with the CARES Act and section 1117 of ESEA."[6]  The

---

[5] The responses of state education officials and education experts are detailed and documented in the Complaint.  *See* Dkt. No. 1 at 30–35, ¶¶ 54–56(a)–(h).

[6] Letter from Robert C. "Bobby" Scott, Chair, Comm. on Educ. & Labor, U.S. House of Representatives, et al., to Betsy DeVos, Sec'y, U.S. Dep't of Educ. (May 20, 2020), https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20 Equitable%20Services.pdf; The Congressional Research Service, too, recognized that the Guidance Document was seemingly contrary to the plain text of the statute.  Congressional Research Service Report, *CARES Act Education Stabilization Fund: Background and Analysis* 24 (last updated Aug. 6, 2020), https://crsreports.congress.gov/product/pdf/R/R46378.

letter chastised the Department for attempting "to repurpose hundreds-of-millions of taxpayer dollars intended for public school students to provide services for private school students, in contravention of both the plain reading of the statute and the intent of Congress."[7]  The following day, Senator Lamar Alexander of Tennessee, Chair of the Senate Education Committee, reportedly confirmed his—and Congress's—understanding "that the money should have been distributed in the same way we distribute Title I money."[8]  Nevertheless, the Department declined to clarify, revise, or rescind the Guidance Document.

## III.    THE DEPARTMENT'S RULE

Despite robust public outcry, on July 1, 2020, the Department dug in its heels and enshrined the guidance in a  binding interim final rule, *CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools*.  *See* 85 Fed. Reg. 39,479 (July 1, 2020).  The Rule became effective upon its publication in the Federal Register, rather than after a public comment period. *See id.*  Corresponding federal regulations are collected at 34 C.F.R. § 76.665.

Rather than follow Congress's explicit instruction in the CARES Act,[9] the Rule creates two unlawful options that are binding on LEAs.  Under one option, an LEA must follow the formula outlined in the Guidance Document and calculate the share of CARES Act funds for the benefit of private schools based on the total population of private-school students, instead of low-income private-school students ("Option 1").  85 Fed. Reg. 39,482.  Or, under the other option, an

---

[7] *Id.*

[8] *See* Laura Meckler, *Betsy DeVos defends decision to direct stimulus money to private schools*, WASH. POST, May 21, 2020, https://www.washingtonpost.com/local/education/betsy-devos-stimulus-private-schools/2020/05/21/d790b926-9b99-11ea-ad09-8da7ec214672_story.html.

[9] As they did with the Guidance Document, members of Congress wrote a letter to Secretary DeVos demanding that she rescind the Rule.  *See* Letter from Robert C. "Bobby" Scott, Chair, Comm. on Educ. & Labor, U.S. House of Representatives, et al., to Betsy DeVos, Sec'y, U.S. Dep't        of        Educ.        (July        31,        2020), https://underwood.house.gov/sites/underwood.house.gov/files/IL%20Delegation%20Equitable%20Services%20IFR%20Comment%20letter.pdf.

LEA can follow the formula set forth in section 1117 (calculating the amount based only on the number of low-income students attending private schools), but must use its remaining CARES Act funds to serve *only* its Title I-A schools, which are schools with at least 40% of their students from low-income families or foster care, *see* 20 U.S.C. § 6314(a)(1)(A), and cannot use any funds for its non-Title I schools ("Option 2"), *see* 85 Fed. Reg. 49,482.  And, importantly, LEAs choosing Option 2 are subjected to a "supplement, not supplant" requirement, which prohibits the LEA from using CARES Act funds to cover expenditures that would normally be covered by state and local funds.  *Id.*; *see also* 20 U.S.C. § 6321(b)(1) (section 1118(b) of the ESEA, providing that "[a] State educational agency or local educational agency shall use Federal funds . . . only to supplement the funds that would, in the absence of such Federal funds, be made available from State and local sources for the education of students participating in programs assisted under this part, and not to supplant such funds").  But the CARES Act expressly does not limit the type of schools at which the funds may be spent and contains no "supplement, not supplant" restriction on the use of the funds.

The Rule thus presents LEAs—and by extension, the public-school students and families they serve—with a lose-lose decision: either (1) retain discretion to spend CARES Act funds in all public schools as Congress intended, but forfeit a much larger share of those funds to private schools than Congress intended; or (2) allocate CARES Act funds to private schools according to the formula set forth in the statute, but forfeit the discretion to determine how and where those funds are spent in public schools.  Regardless which option LEAs choose, the LEAs, their public schools, public-school students, and students' families are harmed.

## IV.   THE COMPLAINT

On July 22, 2020, Plaintiffs filed a Complaint seeking declaratory and injunctive relief.  Dkt. No. 1.  On the same day they filed this motion, Plaintiffs filed a First Amended Complaint

("Complaint") adding new Plaintiffs to the lawsuit.  Count One of the Complaint alleges that the Rule constitutes *ultra vires* agency action in violation of the constitutional separation of powers.  Count Two alleges that the Rule violates the Spending Clause of the U.S. Constitution.  Counts Three and Four allege that the Rule exceeds the Secretary's statutory authority and is not in accordance with law, in violation of the Administrative Procedure Act ("APA").  Count Five alleges that the Rule is arbitrary and capricious agency action in violation of the APA.  And Count Six alleges that the Department promulgated the Rule without complying with the APA's notice-and-comment requirements.

The Amended Complaint, now buttressed by Plaintiffs' declarations, alleges that Plaintiffs Broward County Public Schools ("BCPS"), DeKalb County School District ("DeKalb"), Denver County School District No. 1, a/k/a Denver Public Schools ("DPS"), Pasadena Unified School District ("Pasadena Unified"), and Stamford Public Schools ("SPS") each will be directly injured by the Rule, because each is an LEA within the meaning of the ESEA, and the Rule thus directly restricts the amount and use of each LEA's CARES Act funds.  FAC ¶¶ 22-26.  If these LEAs choose Option 1, all of their public schools will receive fewer CARES Act funds on a per-pupil basis.  *Id.*  If they choose Option 2, none of their non-Title I public schools will receive CARES Act funds, and the CARES Act funds for their Title I public schools will be subject to an unlawful "supplement, not supplant" restriction.  *Id.*

The Complaint further alleges that each individual Plaintiff and his or her minor children will be directly injured by the Rule because the children are enrolled in either (1) non-Title I public schools in LEAs that administer both Title I and non-Title I schools ("mixed districts"), (2) Title I public schools in LEAs administering mixed districts, or (3) Title I public schools in LEAs that administer only Title I schools.  FAC ¶¶ 19-21.  Their children's schools will lose resources under the Rule regardless of which budgeting "option" their districts adopt.  For children enrolled in non-

Title I public schools in mixed districts, Option 1 will reduce the amount of CARES Act funding available to the schools, and Option 2 will eliminate the CARES Act funds to the schools entirely. *Id.* ¶ 19.  For children enrolled in Title I schools in mixed districts, Option 1 will reduce the CARES Act funding available to the schools, and Option 2 will prohibit the schools from using CARES Act funds for any services previously provided using state and local funding.  *Id.* ¶ 20.  For children enrolled in Title I schools in Title I-only districts, the schools will be forced to accept additional "supplement, not supplant" restrictions on the way they spend their CARES Act funds.  *Id.* ¶ 21.

Finally, the Complaint alleges that Plaintiff NAACP's national membership includes numerous individuals who would be directly injured by the Rule, including many parents of minor children attending Title I and non-Title I public schools in LEAs that either (1) stand to lose substantially increased amounts of CARES Act funds to private-school students, or (2) will be forced to accept significant restrictions on their use of CARES Act funds, if the Rule were enforced.  FAC ¶ 18a.  These individuals include Teresa Haley and her minor grandchild, T.M., Kimberly Griffin and her minor child, C.G., Eugene Howard and his minor children, M.R. and E.H., and Jabari Jones and his minor children, J.J. and J.J.  *Id.*  Public schools that will be harmed by the Rule serve the vast majority of students of color in the United States, whereas private schools that will benefit from the Rule are almost 70% white.  *Id.*  Because the Rule directly injures its members, and disproportionately harms students of color and benefits primarily white students, the NAACP has a clear and demonstrable interest in ensuring that federal education funds under the CARES Act are distributed to their intended recipients.  *Id.*

Likewise, Plaintiffs allege that, as a core part of its mission, the NAACP advocates for racial equity in public education, and trains its units and members on proper implementation of the ESEA and all relevant regulations.  *Id.* ¶ 18b.  Because the Rule disproportionately harms students of color and causes considerable confusion in how LEAs may distribute federal funds, the NAACP

will need to expend a greater portion of its finite resources advocating for equity in CARES Act spending and training its units and members on proper implementation of the Act. *Id.*

## LEGAL STANDARD

The purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "The decision whether to enter a preliminary injunction turns on four factors: (i) whether the plaintiff is likely to succeed on the merits of the action; (ii) whether she will suffer irreparable harm absent an injunction; (iii) whether the balance of the equities tips in her favor; and (iv) whether an injunction is in the public interest." *J.D. v. Azar*, 925 F.3d 1291, 1325 (D.C. Cir. 2019). In this Circuit, courts evaluate the four preliminary injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).[10]

## ARGUMENT

### I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A.   Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Rule is *Ultra Vires* in Violation of the Separation of Powers.

---

[10] Though the sliding scale approach was called into question by *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008), this Court has since clarified that "[i]n the absence of a D.C. Circuit decision overruling it, the sliding scale framework remains binding precedent that this court must follow." *Confederated Tribes of Chehalis Reservation v. Mnuchin*, No. 20-CV-01002 (APM), 2020 WL 1984297, at *7 (D.D.C. Apr. 27, 2020). Accordingly, at minimum, Plaintiffs "must make a 'clear showing that four factors, taken together, warrant relief.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The sliding scale "allow[s] that a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). "It is in this sense that all four factors 'must be balanced against each other.'" *Davis*, 571 F.3d at 1292 (quoting *Davenport v. Int'l Bd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). The weighing of the four factors is within this Court's discretion. *See id.* at 1291.

First, Plaintiffs are likely to prevail on their claim that the Rule is *ultra vires* and violates the separation of powers.  Defendants imposed conditions on federal spending without any authority whatsoever to do so and in direct contradiction of the CARES Act.  It is well-established that such an *ultra vires* action is unlawful and void.

An agency action is *ultra vires* if it is "a patent violation of agency authority." *Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*, 830 F.3d 515, 522 (D.C. Cir. 2016) (internal quotation marks omitted); *see also Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014).  "A violation is 'patent' if it is '[o]bvious' or 'apparent.'" *Fla. Health Scis. Ctr.,* 830 F.3d at 522 (quoting Black's Law Dictionary (10th ed. 2014)).  An agency acts *ultra vires* when it takes action that contradicts a statute or makes interpretive rules without authority to do so.  *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172 (D.C. Cir. 2003).

The Secretary lacked statutory authority to promulgate the Rule.  The CARES Act does not give the Department *any* rulemaking authority, and the Department's general rulemaking power does not authorize it to impose special conditions on federal grants as it did in the Rule.  Even if Defendants did have rulemaking authority, they cannot lawfully promulgate a rule that contradicts the Act.  The Secretary's effort to impose her own policy preferences regarding the allocation of CARES Act funds between public and private schools exceeds her statutory authority and therefore constitutes an unlawful *ultra vires* agency action in violation of the constitutional separation of powers.

        **1.**      **Congress delegated no rulemaking authority to the Secretary in the CARES Act.**

The CARES Act itself does not give the Secretary rulemaking authority.  Without rulemaking authority, the Rule is void.  *See City of Los Angeles v. Barr*, 941 F.3d 931, 942 (9th Cir. 2019); *see also City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 288 (3d Cir. 2019).

Courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted).  There is no such statement—clear or unclear—in the CARES Act with respect to GEER and ESSER funds.  Sections 18002 and 18003 direct the Secretary simply to distribute the majority of the GEER and ESSER Funds to either the Governor of each State or to each SEA in accordance with prescribed formulas—and nothing more.  *See* CARES Act §§ 18002(b) & 18003(b), 134 Stat. 564-565; *supra* 5-6.

If the absence of a clear delegation of discretionary authority with respect to those funds left any doubt, the Act *does* grant the Secretary discretionary authority to allocate 2.5 percent of the HEER funds to the institutions of higher education that the Secretary determines have the greatest unmet needs.  *See* CARES Act § 18004(a)(3), 134 Stat. 567–558.  Plainly, Congress knew how to delegate discretionary authority to the Secretary when it wanted to do so.  Yet it did not do so with respect to the GEER and ESSER Funds; there, the Secretary's *only* authority is to give the funds to the States in prescribed amounts.  Once GEER and ESSER funds are distributed as subgrants—i.e., from the States to LEAs—they are not part of a program "administered" by the Department.  *See* 20 U.S.C. § 1221e-3.  By placing restrictions on LEAs' use of GEER and ESSER funds that are no longer in a program "administered" by the Department, the Secretary plainly imposed conditions "that were not authorized by Congress."  *See Aid Ass'n for Lutherans*, 321 F.3d at 1172.

### 2.   The Secretary does not have rulemaking authority under the general rulemaking provisions.

With no rulemaking authority under the CARES Act, Defendants bypassed the Act and instead cited two provisions of federal law outside the CARES Act—20 U.S.C. § 1221e-3 and § 3474—as conferring general rulemaking authority upon the Secretary with respect to the CARES

Act.  *See* 85 Fed. Reg. 39,481 & 39,488 (July 1, 2020).  Neither statute authorizes the Department's promulgation of the Rule.

The first statute, 20 U.S.C. § 1221e-3, confers general rulemaking authority on the Secretary only to the extent necessary "to carry out functions otherwise *vested in the Secretary by law or by delegation of authority pursuant to law*, and subject to limitations as may be otherwise imposed by law."  *Id.* (emphasis added).  But because the CARES Act unambiguously prescribes the formula for LEAs to allocate the portion of their CARES Act funds reserved for the provision of equitable services, the statute in no way "vest[s] in the Secretary" or "delegate[s]" to the Secretary any "authority" whatsoever to prescribe the additional conditions or different formula in the Rule.

Similarly, the second statute, 20 U.S.C. § 3474, only authorizes the Secretary to prescribe rules and regulations to the extent "necessary or appropriate to administer and manage the functions of the Secretary or the Department."  *Id.*  Because the Secretary's *only* delegated authority under the CARES Act is to disburse the funds per the amounts prescribed in the Act, the Department's Rule was neither "necessary" nor "appropriate" to carrying out the functions of the Secretary or the Department.

### 3.     Defendants cannot substitute their policy preferences for Congress's decisions.

It does not matter that Defendants may disagree with Congress on policy.  "[F]ederal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress."  *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.).  In a May 19, 2020 interview, the Secretary stated that the coronavirus pandemic "had brought into clear focus that everyone has been impacted and we shouldn't be thinking about students that are in

public schools versus private schools."[11]  But it is not for the Secretary to decide how Congress appropriates monies from the Treasury.  "Absent congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals [without violating the separation of powers]."  *New York v. United States Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 562 (S.D.N.Y. 2019) (alteration in original) (quoting *San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018)).

*Ultra vires* rules trample separation-of-powers principles.  The authority of the executive branch, including executive agencies, to act "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes.").  The Secretary had no such authority to act in promulgating the Rule.  Plaintiffs are therefore likely to succeed on the merits of their claim that the Rule was *ultra vires* in violation of the constitutional separation of powers.

### 4.    The Rule is not entitled to *Chevron* deference.

Even assuming that Defendants had rulemaking authority here—and they do not—the Rule is an unlawful interpretation of an unambiguous statute.  The Court reviews Defendants' construction of the CARES Act under the standard set out in *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).  Applying *Chevron*, the Secretary plainly acted in excess of statutory authority.

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for

---

[11] Valerie Strauss, *Betsy DeVos Doubles Down on Her Education Agenda During the Pandemic*, WASH. POST (May 29, 2020), https://www.washingtonpost.com/education/2020/05/29/betsy-devos-doubles-down-on-her-education-agenda-during-pandemic/

the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

Congress directly spoke to the precise question of how LEAs are to allocate CARES Act funds for equitable services. Section 18005 unambiguously instructs LEAs to "provide equitable services *in the same manner as provided* under section 1117 of the ESEA." CARES Act §18005, 134 Stat. 568 (emphasis added). Because "courts must presume that a legislature says in a statute what it means and means in a statute what it says," the Court must presume LEAs are to provide equitable services to private-school students under the CARES Act on the same terms as prescribed in section 1117 of the ESEA. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). That includes section 1117's directive that expenditures for equitable services to private-school students "*shall be . . . based* on the number of children from *low-income* families who attend private schools." 20 U.S.C. § 6320(a)(4)(A) (emphases added). *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 545–46 (2012) ("[The Affordable Care Act's] command that the penalty be 'assessed and collected *in the same manner*' as taxes is best read as referring to those chapters [of the Internal Revenue Code] and giving the [Treasury] Secretary *the same authority and guidance* with respect to the penalty." (emphases added)); *Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 271 (1985) (reading a state statute requiring that federal funds be distributed "*in the same manner as* taxes are distributed" to mean that localities allocated tax revenues and federal aid in proportionally identical ways) (emphasis added).

Because the plain text speaks directly to the question, the Rule is entitled to no deference, and the *Chevron* inquiry ends here. When the words of a statute are unambiguous . . . 'judicial inquiry is complete.'" *Germain*, 503 U.S. at 254 ( (quoting *Rubin v. United States,* 449 U.S. 424, 430 (1981)). Congress spoke unambiguously here. It is no surprise, then, that both Republicans

and Democrats in Congress have said that the Department's interpretation does not reflect the plain text of the statute or Congressional intent. *See supra* 10-11.

Even if the Court were to conclude that section 18005 of the CARES Act is ambiguous— and it is not—the Rule is an indefensible interpretation of the statute. If Congress had wanted LEAs to use *total* private-school enrollment data when calculating the proportional share for equitable services, it could easily have done so, by incorporating not section 1117 of the ESEA, but rather section 8501 *of that same law*, which instructs LEAs to calculate expenditures for certain services to private-school students in precisely that manner. *See* 20 U.S.C. § 7881(4)(A). "The fact that [Congress] did not adopt this readily available and apparent alternative strongly supports" the conclusion that it intended for LEAs to calculate expenditures of CARES Act funds for equitable services based on low-income students as provided under section 1117. *See Knight v. Comm'r*, 552 U.S. 181, 188 (2008); *see also Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019) ("Congress's choice to include a cross-reference to one but not the other of the [statute's] neighboring exemptions strongly suggests it acted intentionally and purposefully in the disparate decisions.") (internal quotation marks omitted)).

Equally telling is the fact that the Rule conflicts with the Department's *own* prior guidance concerning section 1117 of the ESEA. *See supra* 8. October 2019 guidance for LEAs receiving Title I funds states in no uncertain terms that the equitable-services calculation is based on "an accurate count of children *from low-income families* who attend public and private schools and reside in participating Title I public school attendance areas in order to allocate the proportional share."[12] What is more, Department guidance has reflected that same understanding of section 1117 for decades, under both Republican and Democratic administrations.[13] Thus the

---

[12] See *supra* n.2.

[13] *See supra* n.4.

Department's Rule—which quite literally interprets "in the same manner" to mean "in a different manner"—is not only indefensible in light of the CARES Act's plain text, but also turns decades-old guidance about how to provide equitable services under section 1117 on its head.

5. **The Rule's attempt to limit spending to only Title I schools and its requirement that the funding "supplement, not supplant" current expenditures are *ultra vires*.**

Finally, the Rule's attempts to limit spending of CARES Act funds to Title I schools and to require that the funds "supplement, not supplant" current expenditures are in complete contradiction to the CARES Act and are *ultra vires*.

The CARES Act contains no restrictions on which schools within LEAs may receive the benefit of the funds. Instead, the Act provides broad flexibility to LEAs to use the funds "to provide educational services to their students and to support the on-going functionality of the [LEA]." *See* CARES Act §§ 18002(c)(1), (3), 134 Stat. 565. The Rule's limitation on the use of funds only at Title I schools finds no support in, and directly contradicts, the Act.

Likewise, the Secretary's inclusion of the "supplement[,] not supplant" requirement, *see* 34 C.F.R. § 76.665(c)(3), appears nowhere in the text of the CARES Act. Indeed, as the Department concedes in the Rule, that requirement is taken from "section 1118(b) of the ESEA," *id.*—a provision of the ESEA that the CARES Act nowhere mentions, much less incorporates. "Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line." *NLRB. v. Sw. Gen., Inc.*, 137 S. Ct. 929, 938–39, (2017). But Congress did not incorporate the entirety of Title I-A of the ESEA into the CARES Act. If Congress had intended for LEAs to abide by the ESEA's supplement-not-supplant provision, it would have incorporated section 1118(b)(2) explicitly, just as it did section 1117. *Cf. Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 557 (2008) ("If Congress had intended to impose such detailed constraints on the Commission's authority . . . , it would have done so itself.").

21

The Secretary may not rewrite the CARES Act to include either of these requirements without exceeding her statutory authority.

**B.      Plaintiffs Are Likely to Succeed on the Merits of Their Claim that the Rule Violates the Spending Clause of the United States Constitution.**

Plaintiffs are also likely to succeed on the merits of their claim that the Rule violates the Spending Clause of the United States Constitution. *See* U.S. Const. art. I, § 8. Under the Spending Clause, conditions may be imposed on congressional funding measures only if they are "unambiguous[]" and related "to the federal interest in particular . . . programs." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal quotation marks omitted).

The Rule's conditions on the use of GEER and ESSER funds violate the Spending Clause's unambiguous requirement for two reasons. First, as discussed *supra* 21-22, the Act does not include any of the Rule's conditions on spending. Far from being unambiguous, the Act fully contradicts the imposition of these conditions. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 629 (6th Cir. 2019) ("Congress ha[s] to identify any condition on its funding 'unambiguously.'"). The GEER and ESSER provisions of the CARES Act "in no way suggest[] that the grant of . . . funds is 'conditioned'" on using the funds according to the Rule's alternative options for allocating equitable services. *See Pennhurst*, 451 U.S. at 23. Congress, therefore, did not in "clear terms"— or any terms—authorize imposition of the Rule's conditions under the Spending Clause. *See id.*; *City of Chi. v. Barr*, 961 F.3d 882, 907 (7th Cir. 2020) ("Congress must speak with a clear voice" to impose conditions under the Spending Clause.).

Second, the Rule violates the Spending Clause's prohibition on "post acceptance" conditions. *See Pennhurst*, 451 U.S. at 25. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract." *Id*. at 17. In this case, States applied for CARES Act funding before the Secretary promulgated the Rule. Before the Rule took effect, States had already signed

binding certifications in which they acknowledged their legal obligations under the CARES Act, including Section 18005.  *See* Ferrandino Decl. ¶ 26, Ex. 1.  By doing so, States entered into a contract with the federal government.  *See Sebelius*, 567 U.S. at 577 (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)).  As with any contract, grant recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). As such, the federal government cannot "surpris[e]" grant recipients with funding conditions after the recipients have legally accepted the terms of the grant.  *Pennhurst*, 451 U.S. at 25.  But that is exactly what the Rule's equitable-services allocation requirements do.

## C. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims.

Plaintiffs are equally likely to prevail on their claims that the Rule violates the APA. Pursuant to the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions" in a number of circumstances.  Among those are when an agency action is "in excess of statutory . . . authority," is "not in accordance with law," is "arbitrary [and] capricious," or was done "without observance of procedure required by law."  *See* 5 U.S.C. § 706(2).  Each of these circumstances applies to the Rule.

### 1. The Rule is ripe for review under the APA.

As a threshold matter, the Rule is ripe for review because it is a "final agency action" within the meaning of the APA.  *See* 5 U.S.C. § 704.  The Rule is an interim final rule which took immediate effect upon its publication in the Federal Register on July 1, 2020, and is therefore a "final agency action."  *See Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996); *see also* 85 Fed. Reg. 39,479 ("This interim final rule is effective July 1, 2020.").

### 2. The Rule was an agency action in excess of statutory authority and not in accordance with law.

Just as the rule is *ultra vires*, it is in excess of the Department's statutory authority within the meaning of the APA.  The APA commands a court to "hold unlawful and set aside agency action" that is found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "not in accordance with law." 5 U.S.C. § 706(2)(A), (C).  Under section 706(2), "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Without rulemaking authority, regulations are invalid. *Id.*  Even when an agency has rulemaking authority, "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority."  *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006).  Regulations that contradict statutory authority violate the APA.  *See Holland v. Nat'l Min. Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) (noting APA's "not in accordance with law" inquiry mirrors *Chevron*); *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 49 (D.D.C. 2014) (same with respect to APA's "in excess of statutory authority" inquiry).

As explained above, *see supra* 15-16, the CARES Act does not give the Secretary rulemaking authority and the Rule, therefore, violates the APA.  Further, as detailed *supra* 16-17, the Secretary's only purported source of delegated authority to promulgate the Rule was her general rulemaking authority, which permits her to "make, promulgate, issue, rescind, and amend rules and regulations . . . governing the applicable programs administered by" the Department.  20 U.S.C. § 1221e-3; *see also* 85 Fed. Reg. 39,481.  The Secretary plainly acted in excess of that authority by imposing conditions on CARES Act funds that are not authorized by Congress and that conflict with the exceedingly narrow discretionary authority with respect to a different fund afforded her under the CARES Act.

Moreover, the Rule is contrary to the express language of the statute as outlined *supra* 15-21.  Regulations that are directly contrary to congressional statutes violate the APA.   *See Doe, 1 v. FEC*, 920 F.3d 866, 874 (D.D.C. 2019) ("It is hornbook law that an agency cannot grant itself power via regulation that conflicts with plain statutory text." (citing *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("[R]egulation contrary to a statute is void."))).

Accordingly, for the same reasons that Plaintiffs are likely to prevail on their *ultra vires* claim, *see supra* 15-21, they are also likely to prevail on an APA claim that the Secretary acted in excess of her statutory authority.

### 3.       The Rule was arbitrary and capricious.

Under the APA, a reviewing court must hold unlawful any agency action that was "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).  An agency's rule is arbitrary and capricious if, for example, the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Rule is arbitrary and capricious in numerous respects.

First, the Secretary ignored important aspects of the problem that she unilaterally granted herself authority to address.  *See id.*; *Oceana, Inc. v. Ross*, 363 F. Supp. 3d 67, 94 (D.D.C. 2019) ("The APA requires agencies to examine all relevant data and consider all important aspects of a problem.")

To begin, the Secretary lacked any data to support the Rule.  The Secretary offered no evidence of an equal, or even proportional, need for CARES Act funds by private-school students.  *See* 85 Fed. Reg. 39,479.  Unlike the statute as written, the Secretary made no attempt to consider,

much less determine, the relative costs and benefits of the Rule for public- and private-school students where private schools educate only 1% of low-income students in America.  *See id.*  The Secretary's failure to provide any data at all in support of the Rule renders the Rule arbitrary and capricious.  *See, e.g.*, *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988) ("Because OPM has presented no data to support its rationale . . . we also affirm . . . that the decision was arbitrary and capricious."); *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016) ("[W]here an agency . . . has not made a reasonable effort to ensure that appropriate data was relied upon, its decision is arbitrary and capricious and should be overturned.").

Moreover, the Secretary ignored critical aspects of the problem.  For example, the Secretary failed to consider the obvious fact that public schools are funded through state and local budgets, which have been decimated by the pandemic, as opposed to private schools, which are funded by parents (with relatively secure employment), affluent donors, and endowments.  Private schools were also able to obtain funding under the Payroll Protection Program ("PPP")—funds unavailable to virtually any public schools.  *See* CARES Act § 1102, 134 Stat. 286.  Allowing private schools to benefit from GEER and ESSER funding significantly above the amounts Congress intended, as well as PPP funding, is unjustifiable double-dipping.  The Secretary also failed to consider that it was reasonable for Congress to direct CARES Act funds, which had to be disbursed quickly in light of the pandemic, in the same way it usually directs funds—restricting the allocation of such funds for equitable services based on those private-school students with demonstrable need and risk.

Second, the Secretary "relied on factors which Congress has not intended [her] to consider."  *See State Farm*, 463 U.S. at 43.  For example, the Secretary criticized the application of section 1117's calculation because she claimed it "would disadvantage some students based

simply on where they live," 85 Fed. Reg. 39,479.  But, Congress did not intend the Secretary to consider what she thought were the pros and cons of calculating equitable services under section 1117—the statute plainly required use of this calculation method regardless of the Secretary's personal opinions on the method.  Meanwhile, the Secretary ignored Congress's intention that ESSER Funds be available to meet the needs of maintaining "staff," "students," "facilities," and "buildings" in an LEA, CARES Act § 18003(d)(1)–(12), 134 Stat. 565–567, instead forcing LEAs to choose whether to maximize their CARES Act funds for public schools, but *only* use the funds on Title I public schools, or else forfeit significant sums of their CARES Act funding to benefit private schools.  The Secretary also imposed a "supplement, not supplant" requirement that appears nowhere in the CARES Act.

Third, the Secretary's abrupt change in position from prior guidance resulted in an "[u]nexplained inconsistency" that the Department has yet to acknowledge.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (holding that when an agency changes policy, "a reasoned explanation is needed for disregarding facts and circumstances that . . . were engendered by the prior policy").  At all times before April 30, 2020, the Department instructed school districts to "[e]nsure that [their] expenditures for equitable services are equal to the proportion of funds generated by *children from low-income families* who reside in participating Title I public school attendance areas and attend private schools."  *See supra* 10-11.  The Department has *never* adequately explained its about-face.  *See State Farm*, 463 U.S. at 52 (requiring agencies to "offer a rational connection between the facts found and the choices made," including "justification for rescinding the regulation") (internal quotation marks omitted); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (requiring an agency to provide "reasoned analysis" before rescinding a "prior policy").

Fourth, the Secretary failed to consider LEAs' reliance on guidance published prior to April 30, 2020. "When an agency changes course," the Supreme Court has cautioned, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (internal quotation marks omitted). LEAs have calculated funds for equitable services under section 1117 in the same way for decades. The October 2019 Guidance, which is still in effect, reaffirmed that LEAs must apportion funds for equitable services based on the number of children from low-income families who attend private schools. *See supra* 8. LEAs budgeted for FY 2020–2021 with the understanding that section 18005 directed them to provide equitable services "in the same manner as" section 1117 of the ESEA. The Rule now imposes a radically *different* manner of apportioning these funds that unleashes profound financial uncertainty. Where, as here, the prior policy engendered "serious reliance interests," an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television*, 566 U.S. at 515. The Secretary has never offered any justification, let alone a detailed one.

### 4. The Rule was enacted without observance of procedure required by law.

Under the APA, a reviewing court also must hold unlawful any agency action that was enacted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The proper procedure for rulemaking requires that all proposed rules be enacted pursuant to notice-and-comment proceedings. *Id.* § 553(b) ("General notice of proposed rulemaking shall be published in the Federal Register."); *id.* § 553(c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."). An agency is only exempt from this procedure if it "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued)

that" notice-and-comment was "impracticable, unnecessary, or contrary to the public interest."  *Id.* § 553(b)(3)(B).

The Secretary promulgated the Rule as an interim final rule without notice-and-comment proceedings required by the APA.  The Secretary lacked "good cause" to find notice-and-comment rulemaking prohibitively impracticable, unnecessary, or contrary to the public interest.  *See* 85 Fed. Reg. 39,483–84.  The Court owes "no particular deference" to the Secretary's finding that she did have good cause, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012), which is reviewed de novo, *Sorenson Commc'ns Inc. v. FCC.*, 755 F.3d 702, 706 (D.C. Cir. 2014).  What is more, the good cause exception "is to be narrowly construed and only reluctantly countenanced." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (internal quotation marks omitted).  The Secretary's invocation of the good-cause exception here fails.

### (a)  Promulgation of the Rule with notice-and-comment was neither "impracticable" nor "unnecessary."

An agency may invoke the impracticability exception in two circumstances, neither of which is applicable here.  First is "where congressional deadlines are very tight and where the statute is particularly complicated." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1236 (D.C. Cir. 1994); *see also Petry v. Block*, 737 F.2d 1193, 1203 (D.C. Cir. 1984) (upholding a good-cause determination where statute required the agency to promulgate "complex" regulations within a matter of months). Second is where immediate rulemaking was necessary to avoid a threat to life or property.  *See, e.g., Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (upholding expedited pilot license regulations where immediate rulemaking was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States"); *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981) (upholding agency's fast-track implementation of certain "life-saving" mining regulations).

It is true that the CARES Act is a multi-part law addressing an immediate and serious public health situation. But, the provisions about equitable services funding are straightforward, and neither circumstance justifying the lack of notice-and-comment procedures applies to the Rule.

First, Congress did not direct the Department of Education to promulgate any rules concerning the implementation of section 18005, so the agency cannot claim that expedited rulemaking was required to fulfill a congressional mandate.

Second, LEAs knew full well how to implement equitable services "in the same manner as section 1117." They have been doing it for decades and had already set their budgets based on their long-established practices. There was no need for immediate rulemaking, or any rulemaking whatsoever, to disrupt these practices. Congress provided LEAs with clear instructions on how to allocate funding for equitable services in the text of section 18005, States had already signed certifications stipulating to those statutory requirements, and LEAs were moving forward to implement the statute's straightforward direction. Far from being necessary to address confusion—the Rule has *created* confusion and delay for school districts, to their detriment.[14]

Nor can the Department claim public comment was "unnecessary." 5 U.S.C. § 553(b)(3)(B). That prong of the good-cause inquiry is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public." *Util. Solid Waste Activities Grp.*, 236 F.3d at 755. The Rule is none of those, and the Department's explanation did not suggest otherwise.

          **(b)**     **Promulgation of the Rule without notice and comment was not in the "public interest."**

---

[14] *See supra* n.9 at 2 ("However, the Department's actions caused considerable confusion for states and LEAs and slowed down their emergency response efforts. As of July 9, just four percent of $16.1 billion in CARES Act funding that can be used for K-12 education has been spent, even though such funding only covers a portion of unanticipated costs and lost revenues associated with the pandemic.").

Finally, an agency may invoke the "public interest" exception "only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks,* 682 F.3d at 95.  This exception applies when advance notice of rulemaking would encourage regulated parties to engage in the very unlawful behaviors that the "rule sought to prevent." *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.  There is no reason why notice-and-comment would harm the public interest in proper or timely implementation of equitable services.  Indeed, the public interest in notice-and-comment procedures is particularly acute because the Rule will impact almost every State and LEA in the country and disrupt decades-old methods of calculating expenditures for equitable services.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("The more expansive the regulatory reach of these rules, of course, the greater the necessity for public comment.").  And, as explained above, the Rule creates confusion where there was none.

In sum, the Rule is in excess of the Department's statutory authority, directly contradicts the CARES Act, is arbitrary and capricious, and was implemented without observance of procedure required by law.  Plaintiffs are likely to succeed on the merits of their APA claims.

## II. PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT INJUNCTIVE RELIEF.

Absent a preliminary injunction, Plaintiffs will suffer irreparable harm in the form of increased risks to health and safety, lost education time, and unrecoverable economic losses.  Defendants have admitted that this issue must be resolved promptly.  In issuing the Rule, the Department stated that "[t]he CARES Act programs were enacted to address the immediate effects of COVID-19," and that "time is of the essence" because "of the current national emergency, its disruption on education in both public and non-public schools, and the immediate need for certainty regarding applicable requirements."  85 Fed. Reg. 39,483-84.  This preliminary injunction seeks that certainty.

Given the urgency of the moment, Plaintiff LEAs are allocating CARES Act funds to their public schools *now* to spend for the upcoming school year.  Lucero Decl. ¶ 10; Blair Decl. ¶ 11-12, 18; Lerma Decl. ¶ 8; Mailliard Decl. ¶ 10.  Were it not for the Rule, Plaintiff LEAs would simply calculate the equitable-services amount and allocate funds to schools in the same manner as they always have.  Lucero Decl. ¶ 14; Blair Decl. ¶ 18; Ferrandino Decl. ¶ 22.  Those funds would pay for crucial items such as Personal Protective Equipment ("PPE") and desperately needed sanitation services, a host of distance-learning technologies, critical faculty and support personnel, and meals and nutritional support programs for public-school students.  *E.g.*, Lucero Decl. ¶¶ 11, 16–18; McDonald Decl. ¶ 13;  Ferrandino Decl. ¶ 25; Mailliard Decl. ¶ 12.  Instead, because of the Rule, LEAs either have to delay allocating funds until the legality of the Rule is adjudicated, thereby delaying services past the start of the school year, or be forced to divert hundreds of millions of dollars in CARES Act funds from public schools to provide equitable services for private-school students.  Lucero Decl. ¶ 10, 13-14, 16-18; Lerma Decl. ¶¶ 9-10; McDonald Decl. ¶¶ 22-24; Gohl Decl. ¶ 13; Ferrandino Decl. ¶ 22-23; Mailliard Decl. ¶ 10;[15] *see also State of Michigan v. DeVos*, 3:20-cv-04478, Dkt. No. 25 at 9 (N.D. Cal.) (noting plaintiffs estimate they will have to divert over $150 million in CARES Act funds).  In either case, the harm is irreparable.  *E.g.*, Lucero Decl. ¶¶ 15-18; McDonald Decl. ¶¶ 22-24.  Lost time is unrecoverable, as are the services that would be funded but-for the unlawful diversion of those funds from public schools to private-school students.  *See id.*

---

[15] Plaintiffs' declarations highlight how every LEA/school district in the country receiving CARES Act funds will be harmed by the Rule—along with every student in those school districts.  With or without a declaration, and based on the plain text of the Rule, the evidence is clear that every district will have to either set aside a greater proportion of their CARES Act funds for private school students than Congress intended, reducing the amount of funds they can spend for public school students, or submit to illegal limitations on the expenditure of the funds.

This irreparable harm accrues directly to individual Plaintiffs and their minor children. Each day that LEAs delay acting denies students the critical educational tools and programs they need to learn—preventing schools from being able to "hit the road running," either in person or remotely, as they begin to go back in session.  Lucero Decl. ¶ 17; McDonald Decl. ¶¶ 22-23; Gohl Decl. ¶¶ 15-16; Ferrandino Decl. ¶ 24-25.  If students' school districts are forced to "choose" one of the Rule's two options, individual Plaintiffs and their minor children will face irreparable harm regardless whether they attend a Title I school or non-Title I school, and regardless which option their districts choose.  Lucero Decl. ¶¶ 15-18; McDonald Decl. ¶¶ 22-24; Gohl Decl. ¶¶ 15-16; Ferrandino Decl. ¶¶ 22-25; Mailliard Decl. ¶¶ 12-13; *supra* 12-13.

For individual Plaintiffs and their minor children, this means that their educational progress will suffer.  The high-quality education that Congress intended to ensure with CARES Act funds will be replaced by underfunded remote learning (less hardware, software, remote curriculum support, and teacher training), on the one hand or unsafe and under-resourced in-person learning, on the other.  Lucero Decl. ¶¶ 17-18; Blair Decl. ¶ 15; McDonald Decl. ¶ 15-16, 19-21; Gohl Decl. ¶¶ 15-16; Ferrandino Decl. ¶ 15; Mailliard Decl. ¶ 13.  Every day that this harm continues is a learning day lost for Plaintiffs' minor children.

"[T]o characterize Plaintiffs' claimed harm as merely 'economic,'" therefore, would be " terribly misguided."  *Confederated Tribes of Chehalis Reservation v. Mnuchin*, No. 20-cv-01002 (APM), 2020 WL 1984297, *8 (D.D.C. Apr. 27, 2020).  The real effect of the Rule—at least until its illegality can be adjudicated on the merits—is to preclude LEAs' provision of essential health and educational services for students in public schools, further imperiling the students' physical and mental health and safety, and delaying their educations.  Lucero Decl. ¶¶ 16–17; McDonald Decl. ¶ 15-16, 19-21.  As detailed below, courts in this Circuit recognize such harms to health and education as quintessentially "irreparable" in nature.

Even if Plaintiffs' harms were merely "economic," they are nevertheless irreparable because the loss of federal funds for public schools is certain, imminent, and unrecoverable. *See Asante v. Azar*, No. 20-CV-601 (TSC), 2020 WL 1930263, at *3 (D.D.C. Apr. 21, 2020) (citing *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014)). As this Court recently explained in granting a preliminary injunction prohibiting an agency from unlawfully distributing CARES Act funds earmarked for Tribal governments, "[t]hese are not funds appropriated to carry out secondary or residual government functions. These are monies that Congress appropriated on an emergency basis to assist Tribal governments in providing core public services to battle a pandemic that is ravaging the nation." *Chehalis Reservation*, 2020 WL 1984297, at *8 (internal citation omitted). The same is true of CARES Act funds for public schools.

### A.   Plaintiffs Will Suffer Irreparable Harm to Public-School Students' Health Absent an Injunction.

First, the Rule places the health and physical and mental well-being of public-school students—and by extension, their entire families—in jeopardy. If school districts do not receive the CARES Act funds that Congress appropriated for them, they cannot reopen public schools safely by purchasing sufficient PPE, reducing class sizes, and/or hiring critical sanitation personnel, school nurses, and other health professionals. Lucero Decl. ¶¶ 16–17; McDonald Decl. ¶ 15, 19; Maillard Decl. ¶ 11. Absent a preliminary injunction, then, the Department's Rule thus threatens the bodily health of public-school children and their families with the potential contraction and/or transmission of the notoriously deadly coronavirus.

Such a showing is more than sufficient to establish irreparable harm. "Facing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (citing *Wilson v. Grp. Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) (granting preliminary injunction where cancer patient's "health and future remain[ed] in serious doubt" and

insurance would not pay for life-saving treatment)).  Indeed, this Court recently concluded that "Plaintiff [inmates]' risk of contracting COVID-19 and the resulting complications, including the possibility of death, is the prototypical irreparable harm."  *Banks v. Booth*, No. 20-849 (CKK), 2020 WL 3303006, at *16 (D.D.C. June 18, 2020); *see also Blackman v. District of Columbia,* 185 F.R.D. 4, 6–7 (D.D.C. 1999) (referring to related case in which court found plaintiff had established irreparable harm where defendant was not administering critical medication to a child). Plaintiffs need not demonstrate a personal risk of contracting the coronavirus in order to make an adequate showing of irreparable harm.  *See id.* (rejecting defendants' argument that plaintiffs failed to demonstrate irreparable harm because they did not submit evidence of each individual plaintiff's personal risk of contracting COVID-19).  In this case, the "'risk to human life need not be a certainty to justify expedition,'" particularly where the "'very purpose of the governing Act is to protect those lives.'"  *Agua Caliente Band of Chuilla Indians v. Mnuchin*, No. 20-cv-01136 (APM), 2020 WL 325071, at *3 (D.D.C. June 15, 2020) (quoting *Public Health Citizen Rsch. Grp. v. Auchter*, 702 F.2d 1160, 1157–58 & n.26 (D.C. Cir. 1983)).

### B.    Plaintiffs Will Suffer Irreparable Harm to Public-School Students' Education Absent an Injunction.

Second, the Rule jeopardizes the continuing education of public-school students, including Plaintiffs, whether they are in non-Title I public schools in mixed districts, in Title I schools in mixed districts, or in Title I-schools in Title I-only districts.  *See* Lucero Decl. ¶¶ 15-18; Blair Decl. ¶ 15; McDonald Decl. ¶¶ 18-24; Gohl Decl. ¶¶ 15-16; Ferrandino Decl. ¶¶ 22-25; Mailliard Decl. ¶¶ 12-13.  The Rule is already delaying what was supposed to be the immediate delivery of funds to public schools, which means that, at best, public schools will have to begin the school year without resources necessary to support remote learning.  *See* Lucero Decl. ¶¶ 18, 22; McDonald Decl. ¶¶ 22-23; Gohl Decl. ¶ 13-14; Mailliard Decl. ¶ 13.  At worst, public schools will not be able to deliver those resources to their students at all.  *See* Blair Decl. ¶¶ 14-16; Lucero

Decl. ¶ 10, 13-14, 16-18; Gohl Decl. ¶ 18; Ferrandino Decl. ¶ 24-25; Mailliard Decl. ¶ 11.  This has significant consequences for our most vulnerable students.  To take just a few examples: School Districts have "been planning in an effort to provide quality teaching and learning since March," including by budgeting amounts to purchase particular software for remote learning. Lucero Decl. ¶ 17.  They also have been planning to hire key personnel, such as technology support specialists, to train teachers on the use of remote-learning technology and enable teachers to livestream to homes from the classroom.  *Id.*  If school districts cannot allocate the correct, anticipated funds to public schools using the proportional calculation under section 1117, they cannot afford such programs or personnel at all.  *Id.* ¶¶ 15-16.  Even if their use of those funds is delayed but not prohibited entirely, the effect would be the same, because critical personnel would not be available to hire in the middle of the year.  *Id.* ¶ 18; *see also* McDonald Decl. ¶¶ 22-24.

Similarly, each dollar diverted to a private school from a public school results in direct, irreparable harm to students.  "For every $277 of CARES Act funds diverted from the DPS's public schools, whether Title I or non-Title I schools," for example, "a public-school student loses out on a desperately needed internet-connected device that would allow the student to participate in remote learning while schools are closed due to the pandemic."  Ferrandino Decl. ¶ 32. Likewise, "[f]or every $80,447 diverted from DPS's public schools, whether Title I or non-Title I, the public school, a public-school teacher risks losing his or her position and thus the ability to educate students during the pandemic."  *Id.* ¶ 33.

This showing, too, is sufficient to demonstrate irreparable harm.  *See Lofton v. District of Columbia.*, 7 F. Supp. 3d 117, 124 (D.D.C. 2013) (finding irreparable harm because every week a student was deprived of services "is another week that [the student's] educational progress is delayed and, [the district] cannot retroactively cure the harm caused by those missed weeks of required service"); *see also id.* (noting that students have "a finite amount of time to receive

educational services"); *Blackman v. District of Columbia*, 185 F.R.D. 4, 7–8 (D.D.C. 1999) ("[T]o a young, growing person, time is critical.  While a few months in the life of an adult may be insignificant, at the rate at which a child develops and changes, especially one at the onset of biological adolescence with or without special needs like those of our plaintiffs, a few months can make a word of difference in the life of that child."); *Cox v. Brown*, 498 F. Supp. 823, 828–29 (D.D.C. 1980) (finding that irreparable harm results when students "[lack] each day of their young lives an appropriate education, one that is sensitive to their particular disabilities, commensurate to their levels of understanding, and fulfilling of their immediate needs").

### C.  Even if Plaintiffs' Harms Were Merely "Economic," Those Harms Are Irreparable Because the Losses of CARES Act Funds Are Imminent, Certain, and Unrecoverable.

Even assuming Plaintiffs' harms are merely "economic" in nature—and they are not—such harms are irreparable for at least three reasons.  *See Asante*, 2020 WL 1930263, at *3 (holding that "economic losses can be sufficient" to show irreparable harm "if [the losses] are unrecoverable and threaten the existence of the business or, in the non-profit context, result in substantial reduction of services" (citing *Texas Children's Hosp.*, 76 F. Supp. 3d at 242)); *see also Nat'l Min. Ass'n*, 768 F. Supp. 2d at 53 (recognizing that if a movant "has shown that financial losses are certain, imminent, and unrecoverable," "the imposition of a preliminary injunction is appropriate and necessary").

First, Plaintiff LEAs' losses of CARES Act funds are "unrecoverable."  *Texas Children's Hosp.*, 76 F. Supp. 3d at 242.  Funds are considered "unrecoverable" when no statutory provision exists for recouping the funds.  *See id.*  Here, the Rule directly curtails the control Congress gave LEAs over emergency funds to provide essential services to the neediest students.  If not for the Rule, Plaintiff LEAs would distribute the funds as both they and Congress intended—according to section 1117 of the ESEA, which measures funds to be shared with private schools based on the number of students from low-income families in those schools.  There is no statutory provision

that would enable Plaintiffs to recoup these funds once disbursed under the Rule.  *See Texas Children's Hosp.*, 76 F. Supp. 3d at 244; *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (uncompensable financial harm is irreparable harm).  And, as described above, even if Plaintiffs were somehow to recoup the funds from private schools, it would be too late to spend them on items such as the hiring of critical support staff.  *See supra* 35-36.

Second, Plaintiffs will suffer "certain" losses of CARES Act funds in the absence of a preliminary injunction*, see Wis. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985), because LEAs must allocate funds to private-school students *before* they can spend any CARES Act funds on public schools.  34 C.F.R. § 76.665(b)(1); 85 Fed. Reg. 39,483 ("[A]n LEA cannot begin services for public or non-public school students and teachers without consulting on determining the amount of funds available for those services.").

The Rule thus requires LEAs to make a pre-allocation decision between either (1) allocating CARES Act funds based on total private-school enrollment, thereby forgoing millions of dollars in CARES Act funds that would otherwise be allocated to their public schools, *see* 34 C.F.R. § 76.665(c)(1)(ii); or (2) allocating CARES Act funds based on low-income private-school enrollment, thereby forgoing any CARES Act funds for their non-Title I public schools and accepting a restrictive "supplement, not supplant" requirement that is found nowhere in the CARES Act, *see* 34 C.F.R. § 76.665(c)(1)(i).  Once they make that choice, LEAs may not use any of the CARES Act funds allocated for private-school equitable services in their public schools, must abide by any restrictions that the Rule imposes on CARES Act funds for their public schools, and must expend CARES Act funds on equitable services requested by private schools.

In contrast, were the Court to issue a preliminary injunction preserving the status quo, Plaintiff LEAs would instead allocate equitable services "in the same manner" as under section 1117 of the ESEA—just as Congress intended—and thereafter enjoy immediate access to

substantially more, or less restricted, CARES Act funds for their public schools. *See supra* 32. Plaintiff LEAs' economic losses of CARES Act funds are "certain" absent a preliminary injunction.

Third, Plaintiffs will suffer an "imminent" loss of CARES Act funds absent a preliminary injunction. For one, LEAs need CARES Act funds right now. Plaintiff LEAs are finalizing public-school budgets for the 2020–2021 school year at this very moment. *See supra* 32-33. Without preliminary injunctive relief, LEAs will be forced to budget for the upcoming school year based on the illegal Rule, requiring them to cut programs, services, and staff from their budgets that would have been affordable under the CARES Act's plain text. *See id.*

LEA "Plaintiffs, moreover, are not for-profit entities facing the loss of profit; rather, they are non-profits for whom lost funds would mean reducing . . . services to children." *Texas Children's Hosp.*, 76 F. Supp. 3d at 243. For example, the CARES Act funds that LEAs will lose under the Rule could pay SPS's costs of hiring Technical Support Specialists for each of its school buildings to assist teachers, staff, and students with learning technology; technology teachers districtwide; and a counselor and dean of students, positions that were eliminated due to budget cuts that forced SPS to cut over $12.5 million in staff, services, and programming last year. Lucero Decl. ¶ 17. Similarly, the CARES Act funds that LEAs stand to lose could pay for the following costs in Pasadena Unified: providing nutritional programs to meet the COVID-19–related spike in public-school children and families needing food; purchasing technology software and hardware for distance learning; making essential physical changes to public-school facilities to stop the spread of COVID-19; and paying for PPE necessary for increased cleaning. McDonald Decl. ¶ 13.

Finally, irreparable harm to Plaintiffs is both "certain" and "imminent" because of the COVID-19 pandemic. Congress made a "policy judgment" that LEAs are in dire need of emergency relief, so they are "presumed already to be suffering great harm." *See Agua Caliente*

*Band*, , 2020 WL 3250701, at *3 ("Congress made a policy judgment that Tribal governments are in dire need of emergency relief to aid in their public health efforts and imposed an incredibly short time limit to distribute those dollars. Tribal governments therefore are *presumed already to be suffering great harm* . . . . Considering the public health challenges presented by the COVID-19 pandemic, the damage done by further delay cannot be fully cured by later remedial action, rendering Plaintiffs' harm irreparable." (emphasis added) (citing *Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 766 (9th Cir. 2004); *Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th Cir. 2003))); *see* CARES Act § 18003(d)(12), 134 Stat. 566–567 (authorizing LEAs to expend ESSER funds on any "activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff of the [LEA]"). Plaintiffs' showing is more than sufficient to establish irreparable harm.

### D. Plaintiffs Will Face Irreparable Administrative and Legal Burdens Absent an Injunction.

Finally, Plaintiff LEAs will suffer irreparable harm in the form of administrative and legal burdens absent a preliminary injunction. LEAs are already incurring—and, absent an injunction, will continue to incur—substantial staffing and time burdens in choosing between the options the Rule imposes, determining the impact of each option, and reviewing existing resources and needs in light of those impacts. Lucero Decl. ¶ 19; McDonald Decl. ¶ 25; Blair Decl. ¶ 17; Gohl Decl. ¶ 15-16. They will also incur severe burdens associated with using a new calculation for equitable services—after decades using another formula. Lucero Decl. ¶ 20; Gohl Decl. ¶ 15-16; Mailliard Decl. ¶¶ 14-16. This burden could not come at a worse time, as LEAs are already stretched beyond administrative capacity dealing with the pandemic's unprecedented challenges. Lucero Decl. ¶ 19; McDonald Decl. ¶ 25.

Plaintiff LEAs will also incur these burdens while under the threat of legal liability. Pursuant to the CARES Act, States applying for ESSER funds must certify that their LEAs will

comply with section 18005 and "any other applicable law or regulation."  Ferrandino Decl. ¶ 26,

Ex. 1.  Because of the direct conflict between the statute and the Rule, LEAs must either violate

the statute or violate the Rule.  *See id.*  This Hobson's choice is yet another irreparable harm

Plaintiffs face absent an injunction. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

1046, 1057–58 (9th Cir. 2009) (finding irreparable harm where plaintiff had to choose between

two options, either of which would result in monetary penalties); *Kimberly–Clark Corporation v.*

*District of Columbia*, 286 F. Supp. 3d 128, 147 (D.D.C. 2017) (holding that plaintiff's having to

face imminent decision whether to comply with regulation, potentially in violation of the First

Amendment, or expose itself to civil penalties, constituted irreparable harm).

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS.

"[T]he third and fourth factors required for injunctive relief—balancing of the equities and

the public interest—merge where a plaintiff seeks preliminary relief against the government."

*Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019) (citing

*Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Here, those factors weigh heavily in favor of Plaintiffs.

"The primary 'purpose of a preliminary injunction is to preserve the object of the

controversy in its then existing condition—to preserve the status quo.'" *Aamer v. Obama*, 742 F.3d

1023, 1043 (D.C. Cir. 2014) (quoting *Doeskin Prods., Inc. v. United Paper Co.*, 195 F.2d 356, 358

(7th Cir. 1952)).  Here, issuance of a preliminary injunction accomplishes this purpose with no

harm to Defendants or to the public interest.  Defendants "cannot suffer harm from an injunction

that merely ends an unlawful practice."  *Open Cmtys. Alliance v. Carson*, 286 F. Supp. 3d 148,

179 (D.D.C. 2017).  If Plaintiffs prevail on the merits of their facial challenge, the effect will only

be to end an unlawful practice by the Department.

The public interest also favors protecting Plaintiff LEAs' ability to serve vulnerable

students, including Plaintiff public-school children and their parents, so they can safely continue

to receive an adequate education during the pandemic, as Congress intended.  Indeed, "an agency's compliance with a mandatory statutory regime is presumably always in the public interest." *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 301 (D.D.C. 2017); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.").  Should Plaintiffs prevail on the merits of their facial challenge to the Rule, Plaintiffs will succeed only in enforcing Defendants' faithful adherence to the statute.

Preserving the status quo would not harm Defendants, and refraining from enforcing the Rule will cost Defendants nothing.  Plaintiffs merely seek to keep in place the decades-old funding formula provided under section 1117 of the ESEA and incorporated in the CARES Act—the same formula that Defendants recognized as valid in their October 2019 guidance that continues in effect.  The requested preliminary injunction, which stays the Rule, generates no negative public consequences; allowing the Rule to stand, on the other hand, imposes significant public harm.  Accordingly, both the balance of harms and the public interest favor a preliminary injunction.

## IV.  PLAINTIFFS ARE ENTITLED TO NATIONWIDE RELIEF.

Finally, Plaintiffs are entitled to a nationwide preliminary injunction.  As detailed above, Plaintiffs are likely to succeed on the merits of their facial challenge to the Rule.  The D.C. Circuit has held "that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"  *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also, e.g.*, *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("A common remedy when we find a rule is invalid is to vacate."); *Blue Water Navy Viet. Veterans*

*Ass'n, Inc. v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("[V]acatur is the 'normal remedy.'") (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).

"That a nationwide remedy is necessary to provide complete relief for promulgation of an unlawful rule follows from the nature of the claim that the rule is facially unlawful." *District of Columbia v. U.S. Dep't of Agric.*, No. CV 20-119 (BAH), 2020 WL 1236657, at *34 (D.D.C. Mar. 13, 2020). That is because "when a plaintiff proves that a rule was unlawfully promulgated, halting the rule's application to the plaintiff may lessen the real-world impact of the unlawful rule on the plaintiff[,] but does not fully redress 'the violation established'—that is, the promulgation of an unlawful rule." *Id.*

The same rationale has equal force in the preliminary injunction context here. *See, e.g.*, *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 18–19 (D.D.C. 2004) (entering a permanent injunction, after having issued a preliminary injunction, of the Department of Defense's "involuntary anthrax inoculation program" as to "all persons," not just the plaintiffs); *see also, e.g.*, *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 217 (D.D.C. 2017) (entering preliminary injunction of policy banning transgender individuals from the military in case filed by current and aspiring military service members without discussing scope of relief), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019); *Planned Parenthood Fed'n of Am., Inc., v. Heckler*, 712 F.2d 650, 651 (D.C. Cir. 1983) (affirming preliminary and then final injunction prohibiting enforcement of federal regulations).

Further, "[t]he record in this case establishes that implementation of the [Rule] would have 'nationwide impact' and would cause injuries of 'sufficient similarity to the plaintiff[s']' to other states and individuals throughout the country." *Dep't of Agric.*, 2020 WL 1236657, at *35 (quoting *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018)). Plaintiffs have presented evidence of the Rule's harm to LEAs and public-school children and their families across at least thirteen

States, *see supra* 31-41, and the NAACP's members and their schoolchildren live in states across the country, Goode Decl. ¶ 4. Almost every State and LEA in the country faces the same harms, and the threatened loss of congressionally guaranteed emergency funding by the innumerable, similarly situated districts and public-school children and families in other States merits nationwide preliminary relief. *See Dep't of Agric.*, 2020 WL 1236657, at *31 (citing *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2088–89 (2017)).

## V.   ALTERNATIVELY, PLAINTIFFS ARE ENTITLED TO EXPEDITED SUMMARY JUDGMENT.

For the reasons above, Plaintiffs are entitled to a preliminary injunction. If the Court concludes, however, that Plaintiffs are not entitled to a preliminary injunction, Plaintiffs request that the Court convert this motion to a motion for summary judgment, expedite Defendants' briefing and the Court's consideration of the motion, including submission of the administrative record, and enter judgment for Plaintiffs.[16] At the very least, the Court should expedite briefing and consideration of Counts 1–5, which do not depend on the administrative record.

Expedited consideration on the merits is consistent with the federal rules and with the resolution of APA cases by this Court. Under the federal rules, "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Fed. R. Civ. P. 65(a)(2). And "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." *Id.* 56(b). In an APA case like this one, "summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent

---

[16] Plaintiffs' counsel conferred with Defendants' counsel to propose a briefing schedule that would allow the parties to file cross-motions for partial summary judgment on an expedited basis. Kravis Decl. ¶ 2. Defendants' counsel subsequently informed Plaintiffs' counsel that they were unwilling to agree to the proposal. *Id.* ¶ 3. Defendants' counsel also requested a three-day extension of the typical seven-day deadline to respond to Plaintiffs' motion for preliminary injunction. *Id.* ¶ 4. As a matter of courtesy, Plaintiffs agreed to that request as long as this did not jeopardize a hearing the week of August 31 at the Court's convenience. *Id.*

with the APA standard of review. . .   In other words, the entire case . . . is a question of law and

the district court sits as an appellate tribunal." *Navajo Nation v. Azar*, 302 F. Supp. 3d 429, 435

(D.D.C. 2018) (Friedrich, J.) (internal quotation marks and citations omitted).  For that reason, "in

APA cases early summary judgment motions are often appropriate, as '[t]he entire case on review

is a question of law, and only a question of law.'"  *Am. Hosp. Ass'n v. Dep't of Health & Hum.

Srvs.*, No. 18-2112 (JDB), 2018 WL 5777397, at *2 (D.D.C. Nov. 2, 2018) (quoting *Marshall Cty.

Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).  This Court and others in

this Circuit can and routinely do resolve APA cases on expedited cross-motions for summary

judgment.  *See Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 513 (D.D.C. 2018) (Friedrich, J.); *see

also, e.g.*, *L.M.-M. v. Cuccinelli*, No. 19-2676 (RDM), 2020 WL 985376, at *8 (D.D.C. Mar. 1,

2020); *Am. Hosp. Ass'n*, 2018 WL 5777397, at *2.

Expedited consideration is warranted here.  For the reasons set forth above, the Rule is

preventing delivery of critical emergency relief to schools and students.  As Congress recognized

when passing the CARES Act, public schools are facing unprecedented challenges due to COVID-

19, and every day that passes without clarity on the Rule is a day of education lost for our nation's

most vulnerable students.  What is more, Plaintiffs' lawsuit raises legal issues that can be addressed

efficiently through expedited summary judgment.  Most of Plaintiffs' claims present questions of

law that do not require an administrative record, and the claims that do require an administrative

record are exceedingly narrow—limited to the Department's reasons for promulgating the Rule.

Finally, Plaintiffs are entitled to judgment on the merits for the reasons explained above.  If the

Court enters judgment on the merits for Plaintiffs, it should vacate the Rule.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion

for preliminary injunctive relief or, in the alternative, enter judgment for Plaintiffs.

Dated:  August 11, 2020        Respectfully submitted,

        MUNGER, TOLLES & OLSON LLP
          TAMERLIN J. GODLEY
          (Admitted *Pro Hac Vice*)
          JONATHAN KRAVIS
          (D.C. Bar No. 973780)
          ADELE M. EL-KHOURI
          (D.C. Bar No. 1025090)
          JESSICA REICH BARIL
          (Admitted *Pro Hac Vice*)
          DAVID P. THORESON
          (Admitted *Pro Hac Vice*)

By:      /s/ *Adele M. El-Khouri*
        ADELE M. EL-KHOURI

     TAMERLIN J. GODLEY
     Tamerlin.Godley@mto.com
     JESSICA REICH BARIL
     Jessica.Baril@mto.com
     DAVID P. THORESON
     David.Thoreson@mto.com
     MUNGER, TOLLES & OLSON LLP
     350 South Grand Avenue, Fiftieth Floor
     Los Angeles, California, 90017
     Telephone:   (213) 683-9100
     Facsimile:    (213) 687-3702

     JONATHAN KRAVIS
     Jonathan.Kravis@mto.com
     ADELE M. EL-KHOURI
     Adele.El-Khouri@mto.com
     MUNGER, TOLLES & OLSON LLP
     1117 F. Street, N.W., Seventh Floor
     Washington, D.C. 20004
     Telephone:   (202) 220-1100
     Facsimile:    (202) 220-2300

     *Counsel for All Plaintiffs*
     *Additional Co-Counsel for All Plaintiffs Listed on*
     *Next Page*

<u>**Additional Co-Counsel for All Plaintiffs**</u>

BACARDI JACKSON
bacardi.jackson@splcenter.org
(Admitted *Pro Hac Vice*)
CHRISTINE BISCHOFF
christine.bischoff@splcenter.org
(Admitted *Pro Hac Vice*)
KATHERINE DUNN
katherine.dunn@splcenter.org
(Admitted *Pro Hac Vice*)
LINDSEY RUBINSTEIN
lindsey.rubinstein@splcenter.org
(Admitted *Pro Hac Vice*)
SAM BOYD
sam.boyd@splcenter.org
(Admitted *Pro Hac Vice*)
MICHAEL TAFELSKI
michael.tafelski@splcenter.org
(Admitted *Pro Hac Vice*)

SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
Telephone:      (334) 315-0179
Facsimile:      (334) 956-8481

WENDY LECKER
WLecker@edlawcenter.org
(Admitted *Pro Hac Vice*)
JESSICA LEVIN
JLevin@edlawcenter.org
(Admitted *Pro Hac Vice*)

EDUCATION LAW CENTER
60 Park Place, Suite 300
Newark, New Jersey 07102
Telephone:      (973) 624-1815
Facsimile:      (973) 624-7339