**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), *et al.*, | **Case No. 1:20-cv-01996 (DLF)** |
| *Plaintiffs*, | |
| vs. | |
| ELISABETH "BETSY" D. DEVOS, in her official capacity as the United States Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants*. | |

**DECLARATION OF MARK FERRANDINO IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

1.      My name is Mark Ferrandino, and I am the Deputy Superintendent of Operations ("DSO") for the Denver Public School District ("DPS," or the "District") located in Denver, Colorado.   DPS is the school district operated and maintained by the Denver Public School Board of Education.  My educational background includes a bachelor's degree in Political Science and Economics and a master's degree in Public Policy from the University of Rochester. I have been employed as DSO of DPS since April 2019.  In my role as DSO, I have led development of the "Denver Plan," a collaborative process that has transformed public education in the City of Denver.  I have also been active nationally in the implementation of the Common Core State Standards curriculum and in the implementation of Social and Emotional Learning Standards for children.

2.      As DSO, I am responsible for overseeing all aspects of District operations, including curriculum, employment, facilities, and budgeting.

3.      I submit this Declaration in support of DPS's litigation against Elisabeth D. "Betsy" DeVos, in her official capacity as Secretary of Education (the "Secretary"), and the United States Department of Education (the "Department") regarding the recently issued Rule entitled *CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools*, 85 Fed. Reg. 39,479 (July 1, 2020) (the "Rule").  I have compiled the information in the statements set forth below through personal knowledge, through DPS personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me.  I have also familiarized myself with the Rule in order to understand its immediate impact on DPS and public schools in Denver, Colorado.

4.      DPS is the largest school district in Colorado.  For many years, DPS has faced a variety of challenges relating to its operations, finances, academics, and enrollment, among other things.  While other Colorado school districts may face similar challenges, the persistence of the problems at DPS is exceptional and unique.  Accordingly, since 2006, DPS has engaged in a comprehensive effort to confront these and other systemic challenges and improve the quality of educational opportunities available to all of our students through various versions of the Denver Plan.

5.      DPS first created the Denver Plan in 2006 and updated the plan in 2010. The results are promising.  Through the Denver Plan, DPS has (1) dramatically expanded preschool and kindergarten opportunities; (2) posted record enrollment increases; (3) driven the highest rate of student progress of any major district in the state; (4) increased the graduation rate by 23 percent; and (5) cut dropout rates in half.

6.      While our vision is clear and our progress is certain, there is a long road ahead. We are grateful for the commitment and hard work of our educators, who have led DPS to become the fastest growing urban school district in the country. At the same time, our largest achievement gaps are not closing, and not every child is succeeding.

7.      To build upon the momentum of the initial Denver Plan work, DPS is focused on changes that have proven successful and is introducing new strategies to continue to drive innovation and progress.  In the first half of 2014, DPS spoke with nearly 3,000 stakeholders—students, parents and families—who offered us vital feedback.  Based on their input, we established a few critical goals and key strategic priorities.  DPS is raising the bar to ensure our children have every possible advantage on the road to becoming well-prepared, successful, civically engaged adults.  Out of our conversations with stakeholders, the Denver Plan 2020 was created.

8.      The Denver Plan 2020 is DPS's current, five-year strategic plan. With the DPS vision of *Every Child Succeeds,* DPS is committed to five goals designed to close academic achievement gaps and prepare all students for success in college and career: (1) provide great schools in every neighborhood; (2) create a foundation for success in school; (3) prepare students for career and college success; (4) support the whole child; and (5) close the opportunity gap (this gap is the disparity between the achievement of white students and that of other student groups such as students of color, English learners and students with disabilities, even though all these students have the same academic potential).

9.      DPS is making promising gains pursuant to the Denver Plan 2020, but we still have a long way to go and progress is especially difficult given the current COVID-19 pandemic. The COVID-19 pandemic has drastically impacted K-12 education in Colorado.

10. Colorado school districts, including DPS, are funded primarily through local property taxes and state support. Colorado's budget was hit hard by dramatic reductions in revenues from state sales and income taxes caused by the COVID-19 pandemic, which results in drastic reductions to funds for education.

11. In the most recent fiscal year, DPS comprises 224 public schools and serves approximately 87,317 K-12 public-school students. More than 60% of DPS's students are considered economically disadvantaged.

12. One hundred fifty-nine (159) of DPS's schools receive Title I funding. DPS defines a Title I school as any public school in which the average rate of students who qualify for free or reduced-price lunch ("FRL") exceeds 60%.

13. In addition, private schools in Denver reported a total of 698 qualified "low-income" students within DPS's district under Section 1117 of the Elementary and Secondary Education Act of 1965 ("ESEA").

14. The largest category of DPS's funding is Per Pupil Funding ("PPF"), which is made up of local property taxes and DPS's state share of educational funding. Faced with deep budgetary cuts because of the economic impact of the COVID-19 pandemic, DPS's PPF has been reduced by more than $39 million for the coming school year.

15. COVID-19 also has had substantial non-economic impacts on school districts in Colorado. On March 18, 2020, Colorado Governor Jared Polis suspended all in-person learning in the State of Colorado. Denver Public Schools closed all of its schools and resumed operations on April 7, 2020 via remote learning. Given DPS's student population, DPS has had to take additional steps and incur additional expenses to ensure that all of its students have access to the technology necessary to participate in remote learning. DPS also has had to devote substantial

resources to converting its free breakfast and lunch programs to a takeout/delivery model, as

approximately 63% of DPS students qualify for free or reduced-price meals at school.

16.     In order to receive the CARES Act Elementary and Secondary School Emergency

Relief ("ESSER") Fund monies designated for Colorado, and as required by the CARES Act, the

Colorado Department of Education ("CDE"), the State educational agency ("SEA") for the State

of Colorado, executed a Certification and Agreement form and submitted it to the Department on

May 5, 2020.  A true and correct copy of the Certification and Agreement completed by CDE and

submitted to the Department is attached hereto as Exhibit 1.

17.     Within this Certification and Agreement, CDE agreed to the following terms:

> I acknowledge and agree that the failure to comply with all Assurances and
> Certifications in this Agreement, all relevant provisions and requirements of the
> CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law
> or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729,
> et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and
> Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as
> regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as
> appropriate.
>
> . . .
>
> LEAs receiving ESSER funds will provide equitable services to students and
> teachers in non-public schools as required under 18005 of Division B of the
> CARES Act.
>
> . . .
>
> LEA receiving ESSER funds will provide equitable services to students and
> teachers in non-public schools located within the LEA in the same manner as
> provided under section 1117 of the ESEA, as determined through timely and
> meaningful consultation with representatives of non-public schools

Ex. 1 at 1–2.

18.     At the time that CDE executed the Certification and Agreement form, the

Department had not yet published its April 30, 2020 Guidance Document, "*Providing Equitable

Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs*," or

the Rule.  Accordingly, CDE and DPS were unaware that the Department would subsequently

issue rules changing the required proportional-share calculation for equitable services to private-school students required under the CARES Act and the eligibility requirements for private-school students to receive equitable services with CARES Act funds.

19.     On May 7, 2020, CDE allocated $22,908,618 from the ESSER Fund received from the Department to DPS.

20.     The Colorado Governor's Office is responsible for distributing the GEER funds, working in collaboration with CDE.

21.     DPS has not yet received any GEER funding, nor is it clear if DPS will receive GEER funding.

22.     Using the proportional share calculation set forth in Section 1117 of the ESEA, DPS would reserve $340,369 in ESSER funds to provide equitable services to private school students.

23.     Using the proportional-share calculation set forth in the Department's Guidance Document and the Rule's enrollment-based formula, *see* 34 C.F.R. § 76.665(c)(1)(ii), however, DPS would reserve $1,835,939 in ESSER funds to provide equitable services to private-school students.  Thus, under the Department's preferred proportional-share calculation, private-school students in Denver would have access to an additional $1,495,569, and public schools would lose this same amount of CARES Act funds.

24.     The Department's rule significantly harms DPS and its students.  DPS is unlikely to be able to backfill any of the dollars diverted from public schools as a result of the Department's Guidance Document and Rule even if Plaintiffs eventually succeed on the merits of their claims that the Rule is unlawful.  At a time when DPS faces a $65 million hole in its education budget as a result of the pandemic, DPS had to enact cuts and any loss of the full measure of CARES Act funding for public schools will only magnify this shortfall.

25.     As Colorado remains in the throes of the pandemic, public schools remain desperate for funding as they continue to transition to remote learning and preparing for the coming school year.  Policies and procedures must be developed for remote learning; teachers must be trained to use remote learning techniques; school buildings must be thoroughly sanitized; and students and families must be educated on their learning options.  The costs of reacting to this pandemic are astronomical for public schools, and without the full measure of funds the CARES Act was intended to provide, DPS is put at a disadvantage in adjusting to the new realities presented by the pandemic.

26.     Finally, the Department's Guidance Document and Rule place DPS in legal jeopardy.  Colorado was required to certify in its ESSER Fund application that CDE, DPS and other schools in the State will comply with the equitable service provision of Section 18005 of the CARES Act and "any other applicable law or regulation." Ex. 1 at 1. Because the Guidance Document and the Rule require DPS to calculate the proportional share for equitable services to private-school students, and determine the eligibility of private-school students for equitable services, contrary to the proportional-share calculation and eligibility requirements in Section 1117 of the ESEA, as incorporated into the CARES Act, DPS cannot satisfy both the Rule and the CARES Act.  Accordingly, the Department's Rule forces DPS to violate Section 18005 of the CARES Act, placing DPS in breach of the certification in the Certification and Agreement and subjecting CDE and DPS to "liability under the False Claims Act, . . . [and the] OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)." Ex. 1 at 1.

27.     There remains confusion at the State level regarding CARES funding, which makes it difficult for DPS to be confident in allocating its resources.  DPS was originally told the funds would follow Title I-A guidance (i.e., calculating the share of federal funds for equitable services for private-school students based on the number of low-income private school students in

the district, as dictated by Section 1117 of the ESEA). Then DPS was told the funds were Title I-A, but that DPS must calculate the share of federal funds for equitable services for private-school students based on the total population of all students in non-public schools in the district, which provided a much larger set-aside to the non-public schools. Then, DPS was told to calculate the non-public allocation both ways and begin spending using the Title I-A method until a final decision is made by the Department. While DPS may now spend its CARES Act funds, it does so at the risk of severe penalties imposed by the Department.

28.     As DPS needs to use the ESSER funds as soon as possible to assist with the numerous pandemic-related challenges, this legal jeopardy will impact DPS immediately.

29.     The Department's Rule significantly harms DPS's K-12 students. The Department's Guidance and Rule will result in either less funding being distributed to public K-12 schools in Colorado, or in significant restrictions on where and for what those funds may be spent.

30.     Indeed, if DPS calculates the proportional share of CARES Act funds for private school students under the poverty-based formula in the Rule, *see* 34 C.F.R. §§ 76.665(c)(1)(i), (c)(3), DPS's schools would be prohibited from using CARES Act funds to respond to and prepare for the pandemic as the schools cannot supplant State and local funding sources under the Rule. This would significantly impact the Title I schools, many of which are in desperate need of additional funding to cope with the pandemic, and to assist students with online, remote learning tools that students often cannot afford within these Title I schools.

31.     And as detailed above, if DPS instead calculates the proportional share of CARES Act funds for private school students under the Rule's enrollment-based formula, *see* 34 C.F.R. § 76.665(c)(1)(ii), based on currently available information, an additional $1,495,569 of CARES Act funds will be diverted from public schools to private-school students.

32.     For every $277 of CARES Act funds diverted from DPS's public schools—whether Title I or non-Title I—a public-school student loses out on a desperately needed internet-connected device that would allow the student to participate in remote learning while schools are closed due to the pandemic.

33.     For every $80,447 diverted from DPS's public schools—whether Title I or non-Title I— a public-school teacher risks losing his or her  position and the ability to educate students during the pandemic.

34.     Finally, the Rule will even disadvantage low-income *private*-school students. Regardless of how DPS proportions the CARES Act funds, the Rule declares that all private-school students are eligible to receive equitable services.  In Denver, for the 2020–21 school year, approximately 698 private school students are eligible to receive equitable services under Section 1117 of the ESEA, as they were at-risk students within an LEA receiving Title I-A funds in the previous fiscal year.  Those 698 private school students receiving equitable services under Title I-A in 2020–21 will receive fewer services with CARES Act funds proportioned for equitable services, since those funds will be spread amongst all private school students, rather than only the private-school students who are most at-risk.

I declare under penalty of perjury under that the foregoing is true and correct.  Executed on August 11, 2020.

.

Mark Ferrandino (Aug 11, 2020 17:26 MDT)

Mark Ferrandino

# EXHIBIT 1

# U.S. Department of Education

## Certification and Agreement
## for Funding under the
## Education Stabilization Fund Program
## Elementary and Secondary School Emergency Relief
## Fund (ESSER Fund)

### CFDA Number: 84.425D



**OMB Number: 1810-0743**
**Expiration Date: 10/31/2020**

**Paperwork Burden Statement**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The OMB control number for this information collection is 1810-0743. The time required to complete this information collection is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain benefit under the Coronavirus Aid, Relief, and Economic Security Act. If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Christopher Tate, Office of Elementary and Secondary Education, U.S. Department of Education, 400 Maryland Ave., S.W., Room 3E229, Washington, D.C. 20202 directly.

# PROGRAM BACKGROUND INFORMATION

**Purpos**e

Under the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Department awards grants to State educational agencies (SEAs) for the purpose of providing local educational agencies (LEAs), including charter schools that are LEAs, with emergency relief funds to address the impact that Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the nation. LEAs must provide equitable services to students and teachers in non-public schools as required under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

**Eligibility**

SEAs in any of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

**Timeline**

The SEA will have one year, from the date of its ESSER award, to award funds. Any funds not awarded by the SEA within one year of receiving its award will be returned to the Department to be reallocated to other States consistent with the CARES Act.

**Uses of Funds**

**SEAs:**
The SEA must use no less than 90 percent of its allocation to make subgrants to LEAs, including charter schools that are LEAs, based on each LEA's share of funds received under part A of title I of the ESEA in fiscal year 2019. With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs, and the remaining funds may be used for emergency needs as determined by the SEA to address issues responding to COVID-19. These emergency needs may be addressed through the use of grants or contracts.

**LEAs:**
LEAs may use funds for any purposes listed in section 18003(d) of the CARES Act. (See Appendix A.)

**Program Contact**

For additional information, please contact Christopher Tate by telephone at (202) 453-6047 or by email at ESSERF@ed.gov.

# CERTIFICATION AND AGREEMENT INSTRUCTIONS

To receive an ESSER Fund allocation, SEAs must submit to the Department the following information:

- A completed cover sheet that includes the signature of the Chief State School Officer or authorized representative. *(Part A of the Certification and Agreement)*

- Programmatic, fiscal, and reporting assurances. *(Part B of the Certification and Agreement)*

- Information on the uses of ESSER funds. *(Part C of the Certification and Agreement)*

- Other assurances and certifications. *(Part D of the Certification and Agreement)*

For purposes of this document, the term "Certification and Agreement" is the application that an SEA is required to file under section 18003(a) of Division B of the CARES Act.

**Certification and Agreement Submission Information**

An SEA must submit a Certification and Agreement to the Department no later than July 1, 2020.

Please submit your Certification and Agreement to the Department as follows:

Email an electronic version of the ESSER Fund Certification and Agreement in .PDF (Portable Document Format) to ESSERF@ed.gov.

**APPENDICES**

Appendix A – Authorizing Statute
Appendix B – State Allocation Table

**ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND (ESSER FUND)**

**STATE EDUCATIONAL AGENCY**

**PART A: CERTIFICATION AND AGREEMENT COVER SHEET**

State:                                       CFDA Number: 84.425D

Legal Name:                                  DUNS Number:

Chief State School Officer:                  Mailing Address:

---

State Contact for Elementary and Secondary School Emergency Relief Fund:

Position and Office:

Mailing Address:


Telephone:

Email address:

---

To the best of my knowledge and belief, all the information and data in this agreement are true and correct.  I acknowledge and agree that the failure to comply with all Assurances and Certifications in this Agreement, all relevant provisions and requirements of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), or any other applicable law or regulation may result in liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and 18 USC § 1001, as appropriate.


Chief State School Officer or Authorized Representative (Typed Name):        Telephone:


Signature of Chief State School Officer or Authorized Representative:           Date:



Form Approved OMB Number: 1810-0743 Expiration Date: 10/31/2020

## PART B:  PROGRAMMATIC, FISCAL, AND REPORTING ASSURANCES

The [Chief State School Officer or his/her authorized representative] assures the following:

1.  The SEA will allocate no less than 90 percent of the grant funds under this program to local educational agencies (LEAs) (including charter schools that are LEAs) in the State. Under the ESSER Fund, the SEA will award grants by formula to State educational agencies (SEAs) for the purpose of providing LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that the Novel Coronavirus Disease 2019 (COVID-19) has had, and continues to have, on elementary and secondary schools across the Nation. This includes both continuing to provide educational services, such as remote learning, while schools and campuses are closed, and developing and implementing plans for the return to normal operations. The SEA will allocate these funds to LEAs on the basis of their respective shares of funds received under title I, part A of the Elementary and Secondary Education Act of 1965 in fiscal year 2019.

2.  The SEA will use the remaining funds (hereafter SEA reserve) for emergency needs as determined by the SEA to address issues related to COVID-19, which may be addressed through the use of grants or contracts. From an SEA's reserve, the SEA may use not more than 1/2 of 1 percent of the SEA's total grant for administrative costs.

3.  The SEA will ensure that LEAs use ESSER funds for activities allowable under section 18003(d) of Division B of the CARES Act. (See Appendix A.)
    The Department generally does not consider the following to be an allowable use of ESSER funds, under any part of 18003: 1) subsidizing or offsetting executive salaries and benefits of individuals who are not employees of the SEA or LEAs or 2) expenditures related to state or local teacher or faculty unions or associations.

4.  The SEA will ensure that LEAs receiving ESSER funds will provide equitable services to students and teachers in non-public schools as required under 18005 of Division B of the CARES Act.

5.  The SEA will ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, as determined through timely and meaningful consultation with representatives of non-public schools.
    - The SEA will ensure that a public agency will maintain control of funds for the services and assistance provided to a non-public school under the ESSER Fund.
    - The SEA will ensure that a public agency will have title to materials, equipment, and property purchased with ESSER funds.
    - The SEA will ensure that services to a non-public school with ESSER funds will be provided by a public agency directly, or through contract with, another public or private entity.

6.  The SEA will comply with the maintenance of effort provision in Section 18008(a) of Division B of the CARES Act absent waiver by the Secretary pursuant to Section 18008(b) thereof.

7.  The SEA and each LEA and any other entity that receives ESSER funds will, to the greatest extent practicable, continue to compensate its employees and contractors during the period of

any disruptions or closures related to COVID-19 in compliance with Section 18006 of Division B of the CARES Act.  In addition, each entity that accepts funds will continue to pay employees and contractors to the greatest extent practicable based on the unique financial circumstances of the entity. CARES Act funds generally will not be used for bonuses, merit pay, or similar expenditures, unless related to disruptions or closures resulting from COVID-19.

8.  The SEA must assure that, when applicable, it will provide technical assistance to LEAs on the use of ESSER funds for remote learning, which includes both distance education as defined in section 103(7) of the HEA and distance learning as defined in ESEA section 8101(14), so that students can continue learning during school closures.

9.  The SEA will comply with all reporting requirements, including those in Section 15011(b)(2) of Division B of the CARES Act, and submit required quarterly reports to the Secretary at such time and in such manner and containing such information as the Secretary may subsequently require. (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, which may include: the methodology LEAs will use to  provide services or assistance to students and staff in both public and non-public schools, the uses of funds by the LEAs or other entities and demonstration of their compliance with Section 18003(d), such as any use of funds addressing the digital divide, including securing access to home-based connectivity and remote-use devices, related issues in supporting remote learning for all students, including disadvantaged populations.

10. The SEA will submit to the Department, within 60 days of receiving ESSER funds, a report that will include:
    •   A budget for the SEA's reserve that includes information about the up to 1/2 of 1 percent of the SEA's total grant for administrative costs and the uses of funds for emergency needs to address issues related to COVID-19; and
    •   An Internal Control and Subrecipient Monitoring Plan to ensure that funds are used for allowable purposes in accordance with cash management principles.

11. The SEA will ensure that every recipient and subrecipient of ESSER funds will cooperate with any examination of records with respect to such funds by making records available for inspection, production, and examination, and authorized individuals available for interview and examination, upon the request of (i) the Department and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

12. The SEA will return to the Secretary any funds received under the ESSER Fund that the SEA does not award within 1 year of receiving such funds.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: |
|---|---|

## PART C: USES OF ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUNDS

Section 18003 of Division B of the CARES Act provides in relevant part that grants awarded under the Elementary and Secondary School Emergency Relief Fund be used to support the ability of local educational agencies (LEAs) to continue to provide educational services to their students. The Department requests the following:

1. Information that the SEA may request LEAs to include in their subgrant applications to the SEA. For example, an SEA might propose to include the following in developing its subgrant application:
    - How the LEA will determine its most important educational needs as a result of COVID-19.
    - The LEA's proposed timeline for providing services and assistance to students and staff in both public and non-public schools.
    - The extent to which the LEA intends to use ESSER funds to promote remote learning.
    - How the LEA intends to assess and address student learning gaps resulting from the disruption in educational services.

   The above considerations are in addition to the application information requirements from sections 442 and 427 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1232e and § 1228a).

2.  The extent to which the SEA intends to use any portion of its SEA reserve (up to 10 percent of its ESSER Fund award) to support:

    - technological capacity and access – including hardware and software, connectivity, and instructional expertise – to support remote learning. If so, please describe the strategies the SEA intends to use to serve disadvantaged populations listed in Sec. 18003(d)(4) of the CARES Act; and

    - remote learning by developing new informational and academic resources and expanding awareness of, and access to, best practices and innovations in remote learning and support for students, families, and educators.

## PART D:  OTHER ASSURANCES AND CERTIFICATIONS

The [Chief State School Officer or his/her authorized representative] assures or certifies the following:

1. The SEA will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood hazards; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

2. With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; the SEAe will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and the SEA will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

3. Any LEA receiving funding under this program will have on file with the SEA a set of assurances that meets the requirements of section 442 of the General Education Provisions Act (GEPA) (20 U.S.C. 1232e).

4. To the extent applicable, an LEA will include in its local application a description of how the LEA will comply with the requirements of section 427 of GEPA (20 U.S.C. 1228a). The description must include information on the steps the LEA proposes to take to permit students, teachers, and other program beneficiaries to overcome barriers (including barriers based on gender, race, color, national origin, disability, and age) that impede equal access to, or participation in, the program.

5. The SEA will comply with the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) requirements in Subpart D—Post Federal Award Requirements (2 CFR §§200.300-345) and Subpart E—Cost Principles (2 CFR §§200.400-475) to ensure that LEAs, including charter schools that are LEAs, are using ESSER funds for purposes that are reasonable, necessary, and allocable under the CARES Act.

6. The SEA and other entities will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 76, 77, 81, 82, 84, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Guidance in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Chief State School Officer or Authorized Representative (Printed Name):

| Signature: | Date: |
| --- | --- |

6

**Appendix A:  Relevant Excerpts from Title VIII of Division B of the CARES Act, the Emergency Appropriations for Coronavirus Health Response and Agency Operations**

DEPARTMENT OF EDUCATION
EDUCATION STABILIZATION FUND
For an additional amount for ''Education Stabilization Fund'', $30,750,000,000, to remain available through September 30, 2021, to prevent, prepare for, and respond to coronavirus, domestically or internationally: Provided, That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

GENERAL PROVISIONS
EDUCATION STABILIZATION FUND
SEC. 18001. (a) ALLOCATIONS.—From the amount made available under this heading in this Act to carry out the Education Stabilization Fund, the Secretary shall first allocate—
(1) not more than 1/2 of 1 percent to the outlying areas on the basis of their respective needs, as determined by the Secretary, in consultation with the Secretary of the Interior;
(2) one-half of 1 percent for the Secretary of Interior, in consultation with the Secretary of Education, for programs operated or funded by the Bureau of Indian Education; and
(3) 1 percent for grants to States with the highest coronavirus burden to support activities under this heading in this Act, for which the Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) RESERVATIONS.—After carrying out subsection (a), the Secretary shall reserve the remaining funds made available as follows:
(1) 9.8 percent to carry out section 18002 of this title.
(2) 43.9 percent to carry out section 18003 of this title.
(3) 46.3 percent to carry out section 18004 of this title.

ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND
SEC. 18003. (a) GRANTS.—From funds reserved under section 18001(b)(2) of this title, the Secretary shall make elementary and secondary school emergency relief grants to each State educational agency with an approved application. The Secretary shall issue a notice inviting applications not later than 30 days of enactment of this Act and approve or deny applications not later than 30 days after receipt.
(b) ALLOCATIONS TO STATES.—The amount of each grant under subsection (a) shall be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the ESEA of 1965 in the most recent fiscal year.
(c) SUBGRANTS TO LOCAL EDUCATIONAL AGENCIES.—Each State shall allocate not less than 90 percent of the grant funds awarded to the State under this section as subgrants to local educational agencies (including charter schools that are local educational agencies) in the State in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under part A of title I of the ESEA of 1965
in the most recent fiscal year.
(d) USES OF FUNDS.—A local educational agency that receives funds under this title may use the funds for any of the following:

(1) Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 U.S.C. 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 U.S.C. 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.).

(2) Coordination of preparedness and response efforts of local educational agencies with State, local, Tribal, and territorial public health departments, and other relevant agencies, to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

(3) Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

(4) Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

(5) Developing and implementing procedures and systems to improve the preparedness and response efforts of local educational agencies.

(6) Training and professional development for staff of the local educational agency on sanitation and minimizing the spread of infectious diseases.

(7) Purchasing supplies to sanitize and clean the facilities of a local educational agency, including buildings operated by such agency.

(8) Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et seq.) and how to ensure other educational services can continue to be provided consistent with all Federal, State, and local requirements.

(9) Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

(10) Providing mental health services and supports.

(11) Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

(12) Other activities that are necessary to maintain the operation of and continuity of services in local educational agencies and continuing to employ existing staff of the local educational agency.

(e) STATE FUNDING.—With funds not otherwise allocated under subsection (c), a State may reserve not more than 1/2 of 1 percent for administrative costs and the remainder for emergency needs as determined by the state educational agency to address issues responding to coronavirus, which may be addressed through the use of grants or contracts.

(f) REALLOCATION.—A State shall return to the Secretary any funds received under this section that the State does not award within 1 year of receiving such funds and the Secretary shall reallocate such funds to the remaining States in accordance with subsection (b).

ASSISTANCE TO NON-PUBLIC SCHOOLS

SEC. 18005. (a) IN GENERAL.—A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools.

(b) PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

CONTINUED PAYMENT TO EMPLOYEES

SEC. 18006. A local educational agency, State, institution of higher education, or other entity that receives funds under ''Education Stabilization Fund'', shall to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus.

DEFINITIONS

SEC. 18007. Except as otherwise provided in sections 18001– 18006 of this title, as used in such sections—

(1) the terms ''elementary education'' and ''secondary education'' have the meaning given such terms under State law;

(2) the term ''institution of higher education'' has the meaning given such term in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.);

(3) the term ''Secretary'' means the Secretary of Education;

(4) the term ''State'' means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico;

(5) the term ''cost of attendance'' has the meaning given such term in section 472 of the Higher Education Act of 1965.

(6) the term ''Non-public school'' means a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and

(B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section;

(7) the term ''public school'' means a public elementary or secondary school; and

(8) any other term used that is defined in section 8101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801) shall have the meaning given the term in such section.

MAINTENANCE OF EFFORT

SEC. 18008. (a) A State's application for funds to carry out sections 18002 or 18003 of this title shall include assurances that the State will maintain support for elementary and secondary education, and State support for higher education (which shall include State funding to institutions of higher education and state need based financial aid, and shall not include support for capital projects or for research and development or tuition and fees paid by students) in fiscal years 2020 and 2021 at least at the levels of such support that is the average of such State's support for elementary and secondary education and for higher education provided in the 3 fiscal years preceding the date of enactment of this Act.

(b) The secretary may waive the requirement in subsection (a) for the purpose of relieving fiscal burdens on States that have experienced a precipitous decline in financial resources.

REPORTING ON USE OF FUNDS SEC. 15011.

(a) In this section—

(1) the terms ''agency'', ''appropriate congressional committees'', ''Committee'', ''covered funds'', and ''Coronavirus response'' have the meanings given those terms in section 15010;

(2) the term ''covered recipient'' (A) means any entity that receives large covered funds; and (B) includes any State, the District of Columbia, and any territory or possession of the United States; and

(3) the term ''large covered funds'' means covered funds that amount to more than $150,000.

…

(b)(2) Not later than 10 days after the end of each calendar quarter, each covered recipient shall submit to the agency and the Committee a report that contains—

(A) the total amount of large covered funds received from the agency;

(B) the amount of large covered funds received that were expended or obligated for each project or activity;

(C) a detailed list of all projects or activities for which large covered funds were expended or obligated, including—

(i) the name of the project or activity;

(ii) a description of the project or activity; and

(iii) the estimated number of jobs created or retained by the project or activity, where applicable; and

(D) detailed information on any level of subcontracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 (31 U.S.C. 6101 note) allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

(3) Not later than 30 days after the end of each calendar quarter, the Committee, in consultation with the agency that made large covered funds available to any covered recipient shall make the information in reports submitted under paragraph (2) publicly available by posting the information on the website established under section 15010(g).

(4)(A) Each agency, in coordination with the Committee and the Director of the Office of Management and Budget shall provide user-friendly means for covered recipients to meet requirements of this subsection.

(B) Federal agencies may use existing mechanisms to ensure that information under this subsection is reported accurately.

(c)(1) The Director of the Office of Management and Budget, in consultation with the Secretary of the Treasury, the Administrator of the Small Business Administration, and the Chairperson of the Council of Economic Advisors, shall submit to the appropriate congressional committees and publicly release on the website established under section 15010(g) quarterly reports that detail the impact of programs funded through large covered funds on employment, estimated economic growth, and other key economic indicators, including information about impacted industries.

(2)(A) The first report submitted under paragraph (1) shall be submitted not later than 45 days after the end of the first full quarter following the date of enactment of this Act.

(B) The last report required to be submitted under paragraph (1) shall apply to the quarter in which the Committee terminates.

## APPENDIX B:  STATE ALLOCATION TABLE
## Elementary and Secondary School Emergency Relief Fund

| STATE | STATE TOTAL | Minimum LEA Distribution[1] | Maximum SEA Reservation | Maximum for SEA Administration[2] |
|---|---|---|---|---|
| TOTAL | 13,229,265,000 | 11,906,338,500 | 1,322,926,500 | 66,146,325 |
| | | | | |
| ALABAMA | 216,947,540 | 195,252,786 | 21,694,754 | 1,084,738 |
| ALASKA | 38,407,914 | 34,567,123 | 3,840,791 | 192,040 |
| ARIZONA | 277,422,944 | 249,680,650 | 27,742,294 | 1,387,115 |
| ARKANSAS | 128,758,638 | 115,882,774 | 12,875,864 | 643,793 |
| CALIFORNIA | 1,647,306,127 | 1,482,575,514 | 164,730,613 | 8,236,531 |
| COLORADO | 120,993,782 | 108,894,404 | 12,099,378 | 604,969 |
| CONNECTICUT | 111,068,059 | 99,961,253 | 11,106,806 | 555,340 |
| DELAWARE | 43,492,753 | 39,143,478 | 4,349,275 | 217,464 |
| DISTRICT OF COLUMBIA | 42,006,354 | 37,805,719 | 4,200,635 | 210,032 |
| FLORIDA | 770,247,851 | 693,223,066 | 77,024,785 | 3,851,239 |
| GEORGIA | 457,169,852 | 411,452,867 | 45,716,985 | 2,285,849 |
| HAWAII | 43,385,229 | 39,046,706 | 4,338,523 | 216,926 |
| IDAHO | 47,854,695 | 43,069,226 | 4,785,470 | 239,273 |
| ILLINOIS | 569,467,218 | 512,520,496 | 56,946,722 | 2,847,336 |
| INDIANA | 214,472,770 | 193,025,493 | 21,447,277 | 1,072,364 |
| IOWA | 71,625,561 | 64,463,005 | 7,162,556 | 358,128 |
| KANSAS | 84,529,061 | 76,076,155 | 8,452,906 | 422,645 |
| KENTUCKY | 193,186,874 | 173,868,187 | 19,318,687 | 965,934 |
| LOUISIANA | 286,980,175 | 258,282,158 | 28,698,018 | 1,434,901 |
| MAINE | 43,793,319 | 39,413,987 | 4,379,332 | 218,967 |
| MARYLAND | 207,834,058 | 187,050,652 | 20,783,406 | 1,039,170 |
| MASSACHUSETTS | 214,894,317 | 193,404,885 | 21,489,432 | 1,074,472 |
| MICHIGAN | 389,796,984 | 350,817,286 | 38,979,698 | 1,948,985 |
| MINNESOTA | 140,137,253 | 126,123,528 | 14,013,725 | 700,686 |
| MISSISSIPPI | 169,883,002 | 152,894,702 | 16,988,300 | 849,415 |
| MISSOURI | 208,443,300 | 187,598,970 | 20,844,330 | 1,042,217 |
| MONTANA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| NEBRASKA | 65,085,085 | 58,576,577 | 6,508,509 | 325,425 |
| NEVADA | 117,185,045 | 105,466,541 | 11,718,505 | 585,925 |
| NEW HAMPSHIRE | 37,641,372 | 33,877,235 | 3,764,137 | 188,207 |
| NEW JERSEY | 310,371,213 | 279,334,092 | 31,037,121 | 1,551,856 |
| NEW MEXICO | 108,574,786 | 97,717,307 | 10,857,479 | 542,874 |
| NEW YORK | 1,037,045,603 | 933,341,043 | 103,704,560 | 5,185,228 |
| NORTH CAROLINA | 396,311,607 | 356,680,446 | 39,631,161 | 1,981,558 |
| NORTH DAKOTA | 33,297,699 | 29,967,929 | 3,329,770 | 166,489 |
| OHIO | 489,205,200 | 440,284,680 | 48,920,520 | 2,446,026 |
| OKLAHOMA | 160,950,476 | 144,855,428 | 16,095,048 | 804,752 |

[1] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[2] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.

| STATE | STATE TOTAL | Minimum LEA Distribution[3] | Maximum SEA Reservation | Maximum for SEA Administration[4] |
|---|---|---|---|---|
| OREGON | 121,099,019 | 108,989,117 | 12,109,902 | 605,495 |
| PENNSYLVANIA | 523,807,198 | 471,426,478 | 52,380,720 | 2,619,036 |
| RHODE ISLAND | 46,350,444 | 41,715,400 | 4,635,044 | 231,752 |
| SOUTH CAROLINA | 216,311,158 | 194,680,042 | 21,631,116 | 1,081,556 |
| SOUTH DAKOTA | 41,295,230 | 37,165,707 | 4,129,523 | 206,476 |
| TENNESSEE | 259,891,154 | 233,902,039 | 25,989,115 | 1,299,456 |
| TEXAS | 1,285,886,064 | 1,157,297,458 | 128,588,606 | 6,429,430 |
| UTAH | 67,821,787 | 61,039,608 | 6,782,179 | 339,109 |
| VERMONT | 31,148,360 | 28,033,524 | 3,114,836 | 155,742 |
| VIRGINIA | 238,599,192 | 214,739,273 | 23,859,919 | 1,192,996 |
| WASHINGTON | 216,892,447 | 195,203,202 | 21,689,245 | 1,084,462 |
| WEST VIRGINIA | 86,640,471 | 77,976,424 | 8,664,047 | 433,202 |
| WISCONSIN | 174,777,774 | 157,299,997 | 17,477,777 | 873,889 |
| WYOMING | 32,562,651 | 29,306,386 | 3,256,265 | 162,813 |
| PUERTO RICO | 349,113,105 | 314,201,795 | 34,911,311 | 1,745,566 |

[3] The totals in the Minimum LEA Distribution, Maximum SEA Reservation, and Maximum for SEA Administration columns have been rounded to the nearest whole dollar.

[4] With the funds not subgranted to LEAs, the SEA may reserve up to an amount equal to ½ of 1 percent of the total allocation for administrative costs.