**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>　vs.<br><br>ELISABETH "BETSY" D. DEVOS, in her official capacity as the United States Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>　　　　*Defendants*. | **Case No. 1:20-cv-01996 (DLF)** |

**DECLARATION OF DR. TAMU LUCERO IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTIVE RELIEF OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

1.　　My name is Dr. Tamu Lucero. I am the Superintendent of Stamford Public Schools ("SPS"), the public school district in Stamford, Connecticut. This is my eighth year at SPS. I served for six years as Assistant Superintendent, eight months as Deputy Superintendent and one year as Superintendent. I have worked in public education for 26 years. I have a bachelor's degree in Elementary Education, and a master's degree and doctorate in Educational Administration. SPS is the local education agency ("LEA") for Stamford, Connecticut and is a plaintiff in this lawsuit against Secretary of Education Elisabeth "Betsy" DeVos (the "Secretary") and the United States Department of Education (the "Department") challenging the rule issued July 1, 2020 entitled *CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools*, 85 Fed. Reg. 39,479 (the "Rule"), and corresponding federal regulations, *see generally* 34 C.F.R. § 76.665.

1

2. SPS's principal address is 888 Washington Boulevard, Stamford, Connecticut 06901. SPS's telephone number is (203) 977-4105.

3. I have compiled the information in the statements set forth below through personal knowledge, consultation with SPS personnel, and review of relevant documents and databases. I have also familiarized myself with the Rule and its impact on SPS's schools and students.

4. SPS has twenty-one public schools and a total enrollment of 16,600 students. The district expects enrollment to increase in the 2020–21 school year as a result of the closure of two local high schools, a charter school and a private school, in the city this year. The SPS student population is 44.5% Latinx, 30% White, 14.5% African-American, 7% Asian and 3% multi-racial. Among SPS students, 59% qualify for free or reduced-price lunch, 14% are English Language learners, and 14% are students with disabilities.

5. SPS has 11 Title I schools. The total enrollment in the district's Title I schools is 6,576 students.

6. There are 2,035 private-school students who reside in Stamford. Only 17 private-school students are low-income for the purposes of calculating the set-aside for equitable services pursuant to Title I. There are 11 private schools in Stamford.

7. SPS relies on local funds to support over 96% of its operating budget. The State provides less than $500 per pupil annually to SPS through its school funding formula. This year, Stamford's Board of Finance held the mill rate flat in order to alleviate the financial burden facing the City's taxpayers caused by the pandemic. As a result, SPS's budget was reduced and funds to cover the additional costs associated with the pandemic were drastically curtailed. Because of the budget limitations, SPS was forced to cut over $12.5 million in staff, services,

and programming, including school counselors, deans of students, all middle and high school media specialists, and kindergarten paraprofessionals.

8. SPS needs increased funding of $15 million to respond to COVID-19.

9. SPS anticipates receiving $2.7 million from the Coronavirus Aid, Relief, and Economic Security Act's ("CARES Act") Elementary and Secondary Schools Emergency Relief ("ESSER") Fund. Connecticut Governor Ned Lamont has not advised us how much, if any, Governor's Emergency Eduation Relief ("GEER") Fund monies SPS will receive.

10. The ESSER allocation is an entitlement determined by the federal and state governments. The State notified SPS of the CARES Act ESSER funding on May 13, 2020. On June 8, 2020, SPS was notified that the amount to be spent on equitable services would be determined using the Title I formula. The district is now in the second iteration of the grant application because we began the process on June 8, 2020 only to be told on July 8, 2020 that the calculations would be different. SPS is now in the process of completing its application to receive the funds, which is due August 20, 2020. SPS is coordinating with the nonpublic schools in the district to complete the application on their behalf as well as completing the district's public-school portion of CARES Act funds.

11. SPS intended to use CARES Act funds on the following resources, programs, and staff: cleaning supplies and personal protective equipment; hotspots, software for online learning, and a texting application that translates into 100 languages; targeted support programs for disengaged students; support programs for students needing social emotional support; after school intervention and reading supports; bus aides; Technical Support Specialists for each school building to assist teachers, staff, and students with learning technology; and restoration of school counselor and dean of students positions that have been lost due to budget cuts.

3

12. Under the Rule, SPS must choose one of two options for calculation of equitable services funding. Under Option 1, the district must set aside a share of its CARES Act funding for equitable services proportionate to the total number of private-school students residing in the district rather the proportion of low income school students. Under Option 2, the district can calculate its equitable services funding based on the proportion of low-income private-school students but then faces onerous restrictions on the use of the rest of its CARES Act funding. Specifically the district may not use that funding in any non-Title I schools and must follow the "supplement, not supplant" rule.

13. If SPS set aside funding for equitable services under the calculation in Section 1117 of the Elementary and Secondary Education Act of 1965—*i.e.*, based on the number of low-income students residing in the district who attend private schools, it would be required to set aside $20,000 for equitable services.

14. Under Option 1 in the Rule, calculating equitable services funding based on the proportion of total private-school students, rather than low-income private-school students, SPS would be forced to set aside $272,945 for equitable services.

15. If SPS chose Option 1, it would be unable to afford Technical Support Specialists, who would fill a critical need for remote learning and to ensure all students are able to use essential technology.

16. If the district chose Option 2 under the Rule, because of the "supplement, not supplant" requirement, it would be forbidden from using CARES Act funds to pay for and thus unable to afford the following in its schools: school counselors, deans of students, all middle and high school media specialists, and kindergarten paraprofessionals, and other resources lost in this year's budget cuts.  In choosing Option 2, the district would be unable to afford the following in its non-Title I schools because of the Title I-only restriction: cleaning supplies and personal

4

protective equipment ("PPE"); mobile hot-spots, software for online learning, and a texting application that translates into 100 languages; targeted support programs for disengaged students; support programs for students needing social emotional support; after school intervention and reading supports; bus aides; Technical Support Specialists for each school building to assist teachers, staff, and students with learning technology; and restoration of school counselor and dean of students positions that have been lost due to budget cuts.  SPS would not benefit by choosing Option 2 because there are only 11 schools considered Title I schools in the district.  SPS needs services for *all* low-income students across the district.  All schools meet the requirements of Title I, but because the Title I funding is not enough to be spread across the district, we have designated the funds to be spent at the elementary schools.  Therefore, using Option 2 would not benefit all of the neediest students.

17.   Loss of the above programs, services, and staff will have a significant negative effect on the district and its students while a decision on the merits in this litigation is pending. Students have been out of the traditional classroom for months.  So much learning has been lost. Even though teachers and administrators worked hard to make distance learning successful, it is impossible to replace face to face learning, especially for the primary grades.  In addition, we just were not prepared for distance learning in March. It would be detrimental to students and learning to put a hold on the above programs while waiting for a decision.  The district has been planning in an effort to provide quality teaching and learning since March.  It is essential that we have the technology software in Fall so that we can "hit the road running" once we are back in session. We were planning on purchasing the below software with the ESSER funds.  Because our district experienced budget cuts of $12.5 million due to COVID-19, we are unable to fund these programs.

| Program | Description |
|---|---|
| Lexia Core Reading | Licenses for Lexia, a program for the development of oral language, reading, spelling, and writing skills for students who are learning English at the elementary level |
| Google Suite | Classroom management and remote learning tool for all certified staff K-12 for a three-year license |
| Screencastify | A program allowing staff to make asynchronous recordings of lessons |
| Destiny Texbook Manager | A management tool for 1:1 initiative and technology hardware |
| Talking Points | A texting App that translates into 100 languages |
| Hotspots | Mobile hotspots for families without internet access |

In addition, the district planned to hire five Technology Support Specialists funded from ESSER grant to provide professional development to teachers on using the above technology as well as how to enable teachers to live stream to homes from the classroom.  Without the Technology Support Specialists, this will not be possible.

      18.  If  the use of the ESSER funds is delayed, it is unlikely we would be able to find qualified and available Technology Support Specialists midyear.  Therefore, under Option 1, if the funds were to be released later, we would likely not be able to hire those critical staff members at that point. In addition, the Technology Support Specialists are needed as soon as possible to begin to prepare teachers through professional development prior to the  start of the school year.  They are an integral part of the distance learning plan. Under Option 2, should the funds be released later, we would not have the software programs in place for our non-Title I schools.  Thus, our teachers would be unprepared for their use and our students will have be denied essential tools for distance learning.  As a result, they will  have lost valuable learning time that cannot be recaptured.  Delaying support services for high-need disengaged students in our non-Title I schools would also mean that for months, we would be unable to ensure that our students most at-risk of learning loss are accessing education.  In addition, it is unlikely we

6

would be able to hire staff for such support programs midyear. A delay in being able to use the funds will also severely impact our ability to pay for resources, such as PPE, that are essential to reopening in the fall. Moreover, if the "supplement, not supplant" restriction were lifted after a delay, it would also likely leave us unable to hire the staff cut and whom we planned to replace, such as guidance counselors, because candidates would not be available midyear. It does not make any sense to delay the funds when the projects and programs for the coming school year are beginning now. We need the full measure of CARES Act funds as soon as possible so that we can put our back-to-school plans in place.

19. Choosing between the options in the Rule imposes an administrative burden on SPS at a time when the district is also trying to figure out how to open up safely. SPS staff had to determine the impact each option would have on the district, review existing resources and needs in light of these impacts, then present the information to the school board. This burden is estimated at 100 hours of staff time. The district is already at capacity with many staff members working overtime to create and implement a plan for students to attend school safely.

20. There is also an administrative burden on SPS associated with using a new calculation method for equitable services and then trying to figure out how to provide services to all private-school students. Much time was already spent on following the strict federal guidelines the first time. The district has had to recreate the entire process when we were notified of the change in proportional share for the private schools, taking an estimated 40 hours. Staff members are needed to assist in meeting with private schools, explaining and determining how to spend the ESSER funds to the private schools. It has been difficult to contact the schools during summer months when schools are not in session. Option 1 requires the district to work with many more private schools than before—including numerous schools with whom the district did not have a previous relationship. SPS estimates that approximately 200 additional

hours of staff time will be involved in meeting and preparing applications, and working through the year to obtain services and on monitoring.

21. Using CARES Act funds only for Title I schools would also impose an administrative burden on SPS. SPS would have the burden of overseeing the 11 Title I schools to ensure that the funding was supplementing rather than supplanting. This is a timely process, from requests to purchase orders, with many staff members involved. In addition, oversight at the schools would be necessary to monitor staff funded from these funds. All of this imposes extra work at the administrative end, estimated at the cost of one full-time employee.

22. For SPS, there is a difference of over $250,000 between Option 1 and Option 2 for SPS. Were it not for the Rule, the district would be able to provide more needed services to low-income students, English Learner students, students with disabilities, and homeless students. With students at home since March, so many are having mental health problems and need our support. In addition, with the $12.5 million budget cut, there were many positions that were cut. The district would also be able to use the $250,000 to reinstate one or two positions to maintain the level of education prior to the pandemic. In addition, if the district had been able to submit the application in July, as was the original plan, the district would be receiving funding in a timely manner and would be able to implement the activities immediately. Having to go through the process twice with a deadline of late August or later, the district will need to begin school without the necessary resources to provide support to all students.

I declare under penalty of perjury under that the foregoing is true and correct.  Executed on August 10, 2020.

.

_____
DR. TAMU LUCERO