**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE (NAACP), *et al.*,

              Plaintiffs,

     v.

ELISABETH DEVOS, *et al.*,

             Defendants.

No. 1:20-cv-1996 (DLF)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR PARTIAL
SUMMARY JUDGMENT**

## INTRODUCTION

In a time of global pandemic and economic turmoil, Congress saw fit to provide emergency funding for services to support schools throughout the nation.  In doing so, Congress mandated that these services be provided *equitably*—for the benefit of both public and non-public school students.  The Department of Education's interpretation of the Coronavirus Aid, Relief, and Economic Security Act, which ensures an equitable distribution between public and private schools, is a reasonable one entitled to deference.  Because Plaintiffs fail to demonstrate that the agency acted contrary to Congress's mandate in issuing its Interim Final Rule, their motion[1] should be denied.

## BACKGROUND

### I.   STATUTORY BACKGROUND

This case arises from an interim final rule issued by the Department of Education to implement the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020).  The CARES Act—which Congress enacted to help many sectors of society respond to the coronavirus pandemic—appropriates more than $16 billion into two relief funds, and charges the Department of Education with allocating those funds to the Nation's public schools.  CARES Act §§ 18002–03.  Public school districts that receive CARES Act funds must then "provide equitable services" to private-school students "in the same manner as provided under" a different statute: Section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA), Pub. L. No. 89-10 (1965) (codified at 20 U.S.C. § 6320).   CARES Act § 18005.  Plaintiffs argue that, because the rule allegedly apportions CARES Act funds for equitable services to private school students in a manner inconsistent with section 1117 of the ESEA, the rule is unlawful on a variety of theories.

---

[1] This Court converted Plaintiffs' Motion for Preliminary Injunction, ECF No. 36, into a motion for partial summary judgment. *See* ECF No. 41 (setting briefing schedule after telephonic hearing regarding scheduling). Defendants therefore address only the pure questions of law that are properly presented at this early stage of litigation, before the agency has had an opportunity to produce the administrative record.

**A.  The Elementary and Secondary Education Act of 1965**

The ESEA is a comprehensive statutory scheme that supports students in the Nation's elementary and secondary schools.  Title I-A of the ESEA is designed to "improv[e] the academic achievement of" students who are failing (or are at risk of failing) to meet academic standards.  20 U.S.C. §§ 6314(a), 6315(c).  Title I-A accomplishes this by providing federal funding through States to local school districts (referred to as local educational agencies, or LEAs) based primarily on the number of economically disadvantaged children who reside in each district.  *Id.* §§ 6332–37; *see id.* § 6333(c) (establishing the parameters for allocating Title I-A funds among States and their constituent public school districts).

The goal of Title I is to provide "all children significant opportunity to receive a fair, equitable, and high-quality education," regardless of whether those children attend a public or private school.  *See* 20 U.S.C. §§ 6301–02.  To that end, section 1117 of the ESEA (codified at 20 U.S.C. § 6320) requires local school districts to supply academic services—such as special-education services, counseling, mentoring, and tutoring—to certain children enrolled in private schools.  *Id.* § 6320(a)(1)(A).  Such services must "be equitable in comparison to services and other benefits for public school children" who benefit from Title I-A funds.  *Id.* § 6320(a)(3)(A).  Accordingly, section 1117 instructs local school districts to set aside funds for private school students "equal to the proportion of funds allocated to participating [Title I-A] school attendance areas based on the number of children from low-income families who attend private schools" and reside in those attendance areas.  *Id.* § 6320(a)(4)(A)(i).  These funds are then used to provide services to private-school students who are eligible to receive them.  A private-school student's eligibility for these services does not turn on his or her socioeconomic standing, despite the fact that the amount of money a school district must reserve to pay for such services is calculated by reference to the number of low-income private-school students who live in participating Title I-A attendance areas within the district's borders.  Instead, a student's eligibility depends on the extent to which he or she is "failing, or . . . at risk of failing, to meet" applicable academic standards along with residence in a participating Title I-A attendance area.  *Id.* § 6315(c)(1)(B).

Section 1117 separately requires local school districts to "timely and meaningful[ly]

consult[] with appropriate private school officials." 20 U.S.C. § 6320(a)(1)(A). The statute sets forth a detailed consultation procedure that specifies the issues that must be discussed, *id.* § 6320(b)(1)(A)-(L), (4); the way disagreements must be raised, *id.* § 6320(b)(2), (6); and the timeframe in which consultation must occur, *id.* § 6320(b)(3). The statute also requires that "[t]he control of funds provided under" Title I-A of the ESEA "shall be in a public agency." *Id.* § 6320(d)(1).

## B. The CARES Act

The CARES Act appropriated over $16 billion in financial assistance that can be used to support elementary and secondary schools, and instructed the Secretary of Education to administer and allocate that money through two separate funds.

The Governor's Emergency Education Relief (GEER) Fund provides emergency grants to state governors. CARES Act § 18002. Governors may use GEER funds to "support . . . any . . . education related entity within the State that the Governor deems essential for carrying out emergency educational services to students." *Id.* § 18002(c). Governors may also use GEER funds to give "emergency support . . . grants to local education agencies that the State educational agency deems have been most significantly impacted by coronavirus." *Id.* The Department of Education must allocate GEER funds among States using a specified statutory formula. *Id.* § 18002(b) (directing the Secretary to allocate funds based 60 percent on a State's "relative population of individuals aged 5 through 24," and 40 percent on the amount of Title I-A funds that State would receive under the ESEA, 20 U.S.C. § 6333(c)).

The Elementary and Secondary School Emergency Relief (ESSER) Fund provides emergency grants for elementary and secondary schools. CARES Act § 18003. The Department of Education must allocate ESSER funds among States "in the same proportion as each State received under [Title I-A] of the ESEA . . . in the most recent fiscal year." *Id.* § 18003(b). Similarly, States must allocate at least 90 percent of their ESSER funds to their school districts "in proportion to the amount of funds such local educational agencies and charter schools that are local educational agencies received under [Title I-A] of the ESEA . . . in the most recent fiscal year."

*Id.* § 18003(c).  A school district may use ESSER funds to pay for services that fall within twelve broad categories of expenditures, including emergency preparedness; cleaning supplies; distance-learning technology; meal services; mental health; "[a]ny activity authorized by the ESEA" or several other education-related statutes; and any "[o]ther activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff."  *Id.* § 18003(d).

The CARES Act directs GEER and ESSER funds to public school districts, but because the coronavirus pandemic has affected both public and private institutions, section 18005 of the CARES Act instructs school districts that receive GEER or ESSER funds to "assist[] . . . non-public schools" using the CARES Act funds they have been allocated.  CARES Act § 18005 (casing fixed).  Specifically, local districts "shall provide equitable services in the same manner as provided under section 1117 [20 U.S.C. § 6320] of the ESEA of 1965 to students and teachers in non-public schools."  *Id.* § 18005(a) (referencing 20 U.S.C. § 6320).  Section 18005 further requires that these equitable services must be "determined in consultation with representatives of non-public schools."  *Id.*  Finally, section 18005 requires that "[t]he control of funds for" equitable services provided to private school students "shall be in a public agency."  *Id.* § 18005(b).

## II.    REGULATORY BACKGROUND

In April 2020, the Department issued guidance to help public school districts implement their section 18005 obligation to provide equitable services to students and teachers at private schools.  U.S. Dep't of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs* (Apr. 30, 2020) (hereinafter "Guidance Document"), https://oese.ed.gov/files/2020/06/Providing-Equitable-Services-under-the-CARES-Act-Programs-Update-6-25-2020.pdf.   The Department's guidance noted that the CARES Act—unlike Title I-A of the ESEA—places no restrictions on the eligibility of private-school students and teachers to receive "equitable services" under section 18005.  The guidance thus advised that GEER and ESSER funds may be used to "serve all non-public school students and teachers without regard to family income, residency, or eligibility based on low achievement."  *Id.* at 3.  The

guidance also noted that the CARES Act permits public school districts that receive GEER or ESSER funds to spend that money to help *all* public schools within the district, and not merely schools with a sufficient number of low-income students to qualify for funding under Title I-A of the ESEA.  The guidance thus advised that, when calculating the share of "equitable services" that public school districts must give private school students under section 18005, public school districts must account for the private schools' total enrollment—not merely for the number of low-income students who reside in a Title I-A school attendance area.  *Id.* at 6–7.

In July 2020, the Department formalized its guidance in an interim final rule.  CARES Act Programs; Equitable Services to Students and Teachers in Non-public Schools, 85 Fed. Reg. 39,479.  The Department issued the rule without prior notice and comment because of the significant educational disruptions caused by the coronavirus pandemic and the need for certainty among recipients of CARES Act funding.  Specifically, section 18005 of the CARES Act forbids public school districts that receive GEER or ESSER funds from using those funds without consulting with the private schools within their boundaries, which in turn requires districts to "determin[e] the amount of funds available for [equitable] services."  *Id.* at 39,483.  The Department provided a 30-day comment period, however, and committed to considering the views of interested parties in determining whether to undertake additional rulemaking.  *Id.* at 39,484.

The Department explained that the rule was necessary to "resolve[] a critical ambiguity . . . with respect to the equitable services obligation owed by LEAs that receive CARES Act funds to students and teachers in non-public schools."  85 Fed. Reg. at 39,479.  The Department noted that, apart from requiring equitable services to be provided "in the same manner as provided under section 1117" of the ESEA, section 18005 did not specify how to ensure that the services provided are in fact "equitable."  *Id.* at 39,479–81.  The Department further noted that section 1117 of the ESEA is inconsistent with the CARES Act in several crucial respects.  For example, section 1117 forbids private-school students from benefiting from equitable services provided under the ESEA unless they are failing (or in danger of failing) to satisfy certain curricular standards.  20 U.S.C. § 6320.  Section 1117 also requires private school students to reside in a Title I-A school attendance area to receive services.  *Id.* § 6320(a)(4)(A).  But both

GEER and ESSER funds may plainly be used for the benefit of all students, not merely those students in academic jeopardy or who reside in a particular part of a district.  The Department therefore concluded that rulemaking was necessary to resolve these ambiguities.  *See* 85 Fed. Reg. at 39,479 (recognizing that the Department was obliged to "construe the CARES Act based on plain meaning, context, and coherence within the overall statutory structure . . . and fit, if possible, all its parts into a harmonious whole").

The Department then explained that a "mechanistic application" of section 1117 to section 18005's equitable-services requirement would "disadvantage" private-school students and contravene congressional intent.  85 Fed. Reg. at 39,479.  The Department noted that, if section 1117's proportional-allocation provisions were applied to CARES Act funds, public school districts would only be required to reserve funds for private schools commensurate to the number of low-income students at each private school who reside in a Title I-A school area—while remaining free to spend their portion of the funds on projects benefiting all public-school students. *Id.* at 39,482.  As the Department explained, "the CARES Act does not limit services based on residence and poverty," so "it stands to reason that an LEA should not use residence and poverty to determine the proportional share of available funds for equitable services to non-public school students."  *Id.* at 39,482–83.

The rule's interpretation of section 18005 differs from the Department's prior guidance in that it accords public school districts more choice about how to satisfy the equitable-services requirement.  The Department sought to broaden the number of options available to such districts in response to criticism from certain States that its guidance was too inflexible.  85 Fed. Reg. at 39,480.  Under the rule, school districts have two pathways to compliance.  First, a school district can commit to using its CARES Act funds exclusively on schools participating in Title I-A of the ESEA—that is, on schools with high instances of poverty.  *Id.* at 39,482.  If so, that district need only reserve funds for equitable services as specified by section 1117's proportional-allocation provisions—that is, based on the number of low-income students enrolled at private schools who reside in a Title I-A area.  34 C.F.R. § 76.665(c)(1)(i).  Second, a school district may instead commit to using CARES Act funds to benefit all schools, not merely schools with high instances

6

of poverty.  *Id.* at 39,482.  To maintain equity, that district must then reserve funds for equitable services using the same measure—that is, the number of all students enrolled at participating private schools.  34 C.F.R. § 76.665(c)(1)(ii).

The Department determined that its interpretation was the appropriate way to ensure that "[e]ducational services and other benefits for students and teachers in non-public elementary and secondary schools [] be equitable in comparison to services and other benefits for public school students and teachers participating in CARES Act programs." 34 C.F.R. § 76.665(d).[2]

## ARGUMENT

Under Rule 56, a party is entitled to summary judgment if "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Where, as here, "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal[.]" *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  In such cases, the court must limit its review to the administrative record" and the facts and reasons contained therein to determine whether the agency's action was "consistent with the relevant APA standard of review." *Policy & Research, LLC v. United States Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (quoting *Ho–Chunk, Inc. v. Sessions*, 253 F. Supp. 3d 303, 307 (D.D.C. 2017)); *see also Caiola v. Carroll*, 851 F.2d 395, 398 (D.C. Cir. 1988).

Under the APA, courts must uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2)(A), or is "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).  The court's function is simply "to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (citation omitted).  Here, because the administrative record has not yet been

---

[2] On May 15, 2020, the House of Representatives passed legislation, referred to as the "HEROES Act," that would amend the CARES Act to require that "equitable services shall be provided by the local educational agency in which the students reside, and the amount of funds available for such equitable services shall be based on the number of nonpublic school students who were identified in the calculation under section 1117(c)(1) of the ESEA for purposes of Title I-A during the 2019–2020 school year relative to the sum of such students in public schools" that same year. *See* HEROES Act, H.R. 6800, 116th Cong. § 10604 (2020).

produced by the agency, only the threshold legal question of the agency's authority to issue the rule is properly before the Court.

### PLAINTIFFS HAVE NOT SHOWN THAT THE AGENCY ACTED WITHOUT LEGAL AUTHORITY

**A.**  Plaintiffs' principal arguments resolve to the same contention: That the Department's rule should be set aside because it cannot be reconciled with section 18005 of the CARES Act, and because the CARES Act did not give the Department authority to interpret section 18005. *See* ECF No. 36-1, Mot. for Prelim. Inj. or Summ. J., "Mot.," at 14–21 (arguing rule is *ultra vires*); *id.* at 22–23 (contending rule is inconsistent with the Spending Clause); *id.* at 23–25 (challenging rule under APA as exceeding statutory authority).  No matter how framed, these arguments lack merit.

Section 18005 of the CARES Act requires public school districts to provide equitable services to private school students "in the same manner" as that specified in section 1117 of the ESEA.  CARES Act, § 18005.  Section 1117 applies to certain equitable services provided within the ambit of Title I-A of the ESEA, and includes a proportional-apportionment formula based on the number of low-income students who reside in a Title I-A public school attendance area and are enrolled in a private school.  20 U.S.C. § 6320(a)(4)(A).  But as the Department explained, section 1117—and the ESEA more broadly—cannot be imported into the CARES Act scheme in "mechanistic" fashion.  85 Fed. Reg. 39,479.

Two examples illustrate the point.  First, section 1117 prohibits private-school students from receiving "equitable services" using Title I-A funds unless they are at risk of failing out of school.  20 U.S.C. § 6320(a)(1)(A) (restricting eligibility for services to "eligible children"); *id.* § 6315(c)(1)(B) (defining "eligible children" as "children identified by the school as failing, or most at risk of failing, to meet . . . State academic standards").  But the plain text of the CARES Act makes clear that GEER and ESSER funds may be used to pay for a broad range of services that benefit *all* students—such as disaster-preparedness planning, sanitation supplies, distance-learning technology, and pandemic-response plans developed in coordination with authorities at every level of government.  CARES Act §§ 18002(c), 18003(d); *see* 85 Fed. Reg. at 39,480. Incorporating section 1117's "eligible children" restriction into the CARES Act would contravene

those other CARES Act provisions by forcing private schools to restrict these services to the academically challenged—for instance, by implementing a pandemic-response plan that applies only to that subset of students, or by purchasing sanitation supplies that can be used only to clean certain desks.

Second, two of section 18005's provisions are substantively identical to two provisions in section 1117. *See* 85 Fed. Reg. at 39,481. Section 18005(a) requires public school districts to consult with private schools in deciding how equitable services should be provided, just like section 1117(b). *Compare* CARES Act § 18005(a) *with* 20 U.S.C. § 6320(b). And section 18005(b) requires public schools to maintain control over all CARES Act funds, using language nearly identical to that in section 1117(d). *Compare* CARES Act § 18005(b) *with* 20 U.S.C. § 6320(d). If the CARES Act's use of the phrase "in the same manner" incorporated every jot and tittle of section 1117, both the consultation and the public-control provisions of section 18005 would be superfluous.

For these reasons, the Department concluded, the phrase "in the same manner" must mean that section 18005 incorporates something less than every provision of section 1117.

**B.**     In light of the disparate purposes of the CARES Act (to provide emergency relief to all students and schools) and Title I-A (to provide services for low-achieving students), and the text of the statute, the Department reasonably concluded that "in the same manner" does not incorporate section 1117's proportional-apportionment provisions. Those provisions—developed in the wholly separate context of equitable services provided under Title I-A—require public school districts to reserve funds in proportion to the number of low-income students enrolled in private schools who reside in Title I attendance areas. 20 U.S.C. § 6320(a)(4)(A). As noted, however, Congress designed both the GEER and the ESSER programs to permit expenditures across a wide swath of areas that clearly benefit all students. *See* CARES Act §§ 18002(c), 18003(d). Given this tension, the Department properly declined to interpret the phrase "in the same manner" to import section 1117's proportional-apportionment provisions into the CARES Act. *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.")

(citation and internal quotation marks omitted)); *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (holding that courts "construe statutes, not isolated provisions").  Indeed, the word "manner" suggests that section 18005 refers to the way in which services are provided under section 1117, and not how the money to pay for those services is apportioned.  *See American Heritage Dict.* 763 (2d College ed. 1985) (defining "manner" as "[a] way of doing something or the way in which a thing is done or happens").[3]

In any event, "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, *implicitly or explicitly*, by Congress."  *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) (emphasis added).  The phrase "in the same manner" is at a minimum ambiguous with regard to the question of whether Congress intended section 1117's proportional-apportionment provisions to apply to "equitable services" provided with CARES Act funds.  To the extent the text of section 18005 does not supply a clear answer to that question, the Department may use rulemaking to "develop a harmonious construction faithful" to Congress's directive that billions of dollars in emergency appropriations be used *equitably*.  85 Fed. Reg. at 39,479.  Indeed, the Secretary of Education has broad authority to "make, promulgate, [and] issue . . . rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."  20 U.S.C. § 1221e-3; *accord id.* § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department.").[4]  And it is well settled that, "whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the

---

[3] Furthermore, where Congress intended to prescribe the apportionment of funds in the CARES Act, it did so expressly.  *See, e.g.*, CARES Act § 18002(b) ("The amount of each grant under subsection (a) shall be allocated by the Secretary to each State as follows . . . .").

[4] In *Washington v. DeVos*, No. 2:20-cv-01119 (W.D. Wash Aug. 21, 2020) (order granting preliminary injunction), the court found that there is no delegation of rulemaking authority to the Department with regard to section 18005 of the CARES Act.  However, 20 U.S.C. §§ 1221e–3 and 3474 can abrogate the need for Congress to speak to the Department's rulemaking authority each time it legislates.  Congress routinely passes laws that the Department implements through rulemaking without each law explicitly referencing its authority.

given situation has depended upon more than ordinary knowledge respecting the matter subjected to agency regulations," an agency's resolution of a statutory ambiguity warrants deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (citation omitted).

Deference is appropriate where, as here, the agency's interpretation of an ambiguous statute is reasonable.  *See, e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 394 (D.C. Cir. 2011) ("we must uphold the NIH's interpretation of Dickey-Wicker if it is but 'reasonable'" (citing *Chevron*, 467 U.S. at 844)); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (deference owed to agency interpretation of the 2000 Appropriations Act).  The Department of Education resolved the tension between the CARES Act and the provisions of section 1117 by reference to Congress's command that the services provided to private schools be "equitable."  CARES Act § 18005(a).  The Department determined that it is inequitable to apportion expenditures for private schools on the basis of low-income students residing in Title I-A school attendance areas when public school districts may use their share of CARES Act funds to benefit all schools and students.  85 Fed. Reg. at 39,483.  In the Department's expert judgment, equity in this context instead demands either that: (1) public school districts that spend CARES Act funds to benefit all schools and students apportion private-school funds based on total enrollment; or (2) public school districts that choose to apportion private-school funds based on low-income enrollment then limit their own spending to low-income schools.  *Id.* at 39,482.  Those, of course, are the same two pathways to section 18005 compliance that the challenged rule sets forth.  *Id.*[5]

Plaintiffs dispute (Mot. 18, 20) that section 18005 is ambiguous.  In their view, if Congress had intended that CARES Act funds be apportioned to private schools based on total enrollment, Congress would have written section 18005 to cross-reference section 8501 of the ESEA, which

---

[5] Plaintiffs additionally contend that the rule imposes a "supplement, not supplant" restriction that "prohibits the LEA from using CARES Act funds to cover expenditures that would normally be covered by state and local funds."  Mot. 11 (citing 20 U.S.C. § 6321(b)(1)).  To the extent this Court believes that the language in the rule must be read as imposing an improper restriction on CARES Act funds, the proper course would be to sever the "supplement not supplant" provision rather than to vacate the rule in its entirety.  *See MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).

is codified at 20 U.S.C. § 7881.  That statute governs equitable services rendered under different ESEA programs, and it is functionally identical to section 1117 in all but one respect:  Unlike section 1117, section 8501 requires public school districts to reserve funds for private schools in proportion to their total enrollment in the relevant program.  *Id.* § 7881(a)(4)(A).  But even if Congress had enacted this hypothetical version of section 18005, ambiguity would remain.  Like section 1117, section 8501 also includes consultation and public-control provisions indistinguishable from those present in section 18005.  *Id.* § 7881(c) (consultation); *id.* § 7881(d) (public control).  Thus, had Congress required CARES Act funds to be apportioned "in the same manner as that specified in § 8501," questions would remain about *which* provisions of section 8501 Congress meant to incorporate—since incorporating *all* of section 8501's provisions would create the very same superfluity whose existence illustrates the ambiguity that the Department intended the rule to resolve.

Indeed, if the statute were clear, one would expect that states and localities distributing CARES Act funds would be in agreement on the proper interpretation of section 18005.  Yet plaintiffs in separate actions challenging the rule have advanced diverging interpretations of the statute.  For example, in an action pending in the Northern District of California, Michigan and other states argue that section 18005 incorporates section 1117 *in its entirety*—including "Section 1117's eligibility requirements providing that only at-risk private-school students are entitled to services."  Plts. Mot. for Prelim. Inj., *Mich. v. DeVos*, No. 3:20-cv-04478-JD, ECF 34 at 7 (N.D. Cal.) (citing 20 U.S.C. § 6320(a)).  By contrast, in the Western District of Washington, Washington State argues that "[b]ecause the CARES Act refers to the methodology and procedures of Section 1117, the non-methodological and non-procedural aspects of Section 1117 are not necessarily important here.  The formula is what matters."  Reply in Support of Mot. for Prelim. Inj., *Wash. v. DeVos*, No. 2:20-cv-01119-BJR, ECF 51 at 3 (W.D. Wash.).  That plaintiffs cannot agree on how to read section 18005 further confirms the provision's ambiguity.

Plaintiffs next assert (Mot. 20–21) that the agency's decision must be set aside because it "conflicts with the Department's *own* prior guidance concerning section 1117 of the ESEA" and thus reverses prior guidance without adequate explanation.  But the agency has not reversed

course or rescinded prior policy. The Department's general interpretation of section 1117's equitable-services mandate, issued in October 2019, remains unaltered—as does its interpretation of the provision of equitable services *using Title I funds*. In contrast, the challenged rule relates to equitable services provided using CARES Act funds—a question the Department could not possibly have had any position or policy on previously. As the rule explains, the Department's interpretation rests on the fact that CARES Act funds can be used more broadly than Title I-A funds, and that the national emergency prompting its passage "has harmed *all* our Nation's students by disrupting their education." 85 Fed. Reg. at 39,479. To the extent Plaintiffs assert that Congress intended CARES Act funds to benefit a district's most vulnerable students, the district has the ability under the rule to focus its funds on its high-poverty Title I-A schools.

Plaintiffs also contend (Mot. 28–29) that the Department lacked good cause to issue the rule as an interim final rule. This argument is belied by Plaintiffs' request for the extraordinary remedy of an injunction (or insistence that this Court should expedite summary judgment briefing), which they claim is necessitated by the same exigent circumstances underlying the Department's decision. Plaintiffs cannot meaningfully dispute that the coronavirus pandemic constitutes an emergency of unprecedented scale; indeed, the harms to schools engendered by that emergency form the basis of their motion. And as the Department recognized, "in light of the current national emergency['s] . . . disruption on education in both public and non-public schools, and the immediate need for certainty," good cause existed to waive ordinary rulemaking procedures. 85 Fed. Reg. at 39,483. Plaintiffs' counter to the Department's rationale—that "Congress provided LEAs with clear instructions on how to allocate funding for equitable services," and thus no rulemaking was necessary (Mot. 30) simply begs the ultimate question in this case and thus provides no additional reason that notice-and-comment rulemaking should have been undertaken before issuance of the rule.

**C.**    Plaintiffs' constitutional claims should fail for the same reasons that their APA claims should be rejected. Each such claim rests on the premise that the Department of Education lacked statutory authority to issue the challenged rule. But as the Supreme Court has held, "in cases in which the [government] concedes, either implicitly or explicitly, that the only source of

13

[its] authority is statutory, no constitutional question whatever is raised," "only issues of statutory interpretation." *Dalton v. Specter*, 511 U.S. 462, 474 n.6 (1994).  Plaintiffs' contrary view would have the sweeping implication that every challenge to an agency regulation could be re-characterized as a "constitutional" claim, given the general absence of any background constitutional authority for agencies to take action in the absence of congressional authorization. Because the challenged rule is a permissible construction of section 18005, there is no freestanding constitutional impediment to the Department's actions.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment should be denied.

Dated: August 24, 2020                                      Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director


*/s/  William K. Lane III*
WILLIAM K. LANE III
(D.C Bar No. 1034955)
Counsel, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 305-7920
william.lane2@usdoj.gov

*Attorneys for Defendants*