# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE (NAACP), *et al*.,

     *Plaintiffs*,

   vs.                        Civil Case No. 1:20-cv-01996 (DLF)

ELISABETH "BETSY" D. DEVOS,
in her official capacity as the United
States Secretary of Education, and the
UNITED STATES DEPARTMENT OF
EDUCATION,

     *Defendants*.

**Brief of National Education Association, AASA, The School
Superintendents Association, American Federation of Teachers, Americans
United for Separation of Church and State, In the Public Interest,
National School Boards Association, Network for Public Education,
and Professors of Education, as *Amici Curiae* In Support of
Plaintiffs' Motion for Partial Summary Judgment**

Jeffrey W. Burritt (Bar No. 493812)
National Education Association
1201 16th Street, N.W.
Washington, D.C. 20036
202-822-7231
jburritt@nea.org

*Counsel for Amici Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Local Rules 7(o)(5) and Federal Rules of Appellate Procedure 29(a)(4)(A) and 26.1, organizational *Amici* certify that they are all non-profit associations or advocacy groups that represent or advocate on behalf of public school educators, school boards, administrators, parents, students, or taxpayers, or work to expand and strengthen the quality of public education available to all children. A detailed description of each group member is set forth in *Amici's* Statement of Interest below.

*Amici* certify that none of them issue stock or have a parent corporation, nor does any public company have a 10% or greater ownership interest in any of the *Amici*.

 /s Jeffrey W. Burritt
Jeffrey W. Burritt
*Counsel for Amici Curiae*

i

# **TABLE OF CONTENTS**

Corporate Disclosure Statement ............................................................. i

Table of Authorities .................................................................... iii

*Amici's* Statement of Interest ..............................................................1

Argument....................................................................................5

    I.    The Secretary's Diversion of Critical Funding from
        Public Schools Is Based on a Misreading of the CARES Act
        that Ignores Key Historical and Statutory Context .........................6

    II.   The Secretary's Unlawful Diversion of CARES Funds
        Will Harm Our Most Vulnerable Students.................................... 15

Conclusion ...................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Barrera v. Wheeler*,
   475 F.2d 1338 (8th Cir. 1973) ................................................................. 11-13, 17

*Eagle Pharm., Inc. v. Azar*,
   952 F.3d 323 (D.C. Cir. 2020)...........................................................................7

*Jam v. Int'l Fin. Corp.*,
   139 S. Ct. 759 (2019)........................................................................................10

*Michigan v. DeVos*,
   _F. Supp. 3d _, No. 20-cv-04478-JD, 2020 WL 5074397
   (N.D. Cal. Aug. 27, 2020) (order granting preliminary injunction)............*passim*

*Miles v. Apex Marine Corp.*,
   498 U.S. 19 (1990)............................................................................................10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)............................................................................................7

*Orton Motor, Inc. v. U.S. Dep't of Health & Human Servs.*,
   884 F.3d 1205 (D.C. Cir. 2018)........................................................................10

*Qi-Zhuo v. Meissner*,
   70 F.3d 136 (D.C. Cir. 1995)............................................................................15

*Washington v. DeVos*,
   _ F. Supp. 3d _, No. 20-cv-1119, 2020 WL5079038 (W.D. Wash.
   Aug. 21, 2020) (order granting preliminary injunction)........................5, 7, 8, 16

## Statutes and Regulations

20 U.S.C. § 28 *et seq*.................................................................................................9

20 U.S.C. § 241e(a)(2) (1972) ..................................................................................12

20 U.S.C. § 6320.............................................................................................7, 10, 13

20 U.S.C. § 7881 ............................................................................................11

34 C.F.R. § 200.62 ..........................................................................................13

34 C.F.R. § 200.64 ..........................................................................................13

45 C.F.R. § 116.19 (1972) ..............................................................................12

Pub. L. No 89-10, 79 Stat. 27-58 § 201 (1965) ....................................9, 12

Pub. L. No. 114-95; 114 Stat. 1177 (2015), The Every Student Succeeds Act.........9

Pub. Law No. 116-127, 134 Stat 178 (Mar. 18, 2020), Families First
      Coronavirus Response Act................................................................26

Pub. L. No. 116-136, 134 Stat. 281 (Mar. 7, 2020) ("CARES Act"),
      Coronavirus Aid, Relief, and Economic Security Act................................*passim*

## Other Authorities

Brooke Auxier & Monica Anderson, *As Schools Close Due to the Coronavirus,
      Some U.S. Students Face a Digital "Homework Gap,"* Pew Research Ctr.
      (Mar. 16, 2020), https://pewrsr.ch/2EkfrS1 ........................................19

Matt Barnum, *School Budgets Are In Big Trouble, Especially In High-Poverty
      Areas. Here's Why—And What Could Help*, CHALKBEAT (Apr. 7, 2020),
      https://bit.ly/2QrABzX ....................................................................21

Bruce D. Baker, et al., *Closing America's Education Funding Gaps*, Century
      Found., (July 20, 2020), https://bit.ly/32zVZJ2 .................................20

Bruce D. Baker, *Evaluating the Recession's Impact on State School Finance
      Systems*, Educ. Pol'y Analysis Archives 22(91) (Sept. 15, 2014),
      https://bit.ly/34BMUSs....................................................................20

Bruce D. Baker, et al., *Is School Funding Fair? A National Report Card*,
      Educ. L. Ctr., (7th Ed. 2018), https://bit.ly/34CWsN7.......................17

Mellissa Chang, *Private and Charter Schools Receive Approximately $5.7 Billion in PPP Loans, Raising Questions About Equity in Education*, COVID Stimulus Watch (Aug. 27, 2020), https://bit.ly/3hDGeXQ .................25

Matthew Chingos & Kristin Blagg, *School Funding: Do Poor Kids Get Their Fair Share?*, Urban Inst. (May 2017), https://urbn.is/2Esnc80 ..........19, 20

Michelle Conlin & M.B. Pell, *Dozens of Expensive Private Schools Received Millions in U.S. Pandemic Loans*, REUTERS (July 6, 2020), https://reut.rs/2Ecp0Cw ....................................................................25

The COVID Tracking Project, *The COVID Racial Data Tracker*, https://covidtracking.com/race (last visited Aug. 24, 2020)..............................22

Emma Dorn, et al., *COVID-19 and Student Learning in the United States: The Hurt Could Last a Lifetime*, McKinsey & Co. (June 1, 2020), https://mck.co/31o2oaM ............................................................19, 25

*Equal*, Dictionary.com, https://www.dictionary.com/browse/equal?s=t (last visited Aug. 24, 2020) ..............................................................16

*Equitable*, Dictionary.com, https://www.dictionary.com/browse/equitable?s=t (last visited Aug. 24, 2020).............................................................16

Julia Isaacs, *Spending on public schools has declined in the wake of the Great Recession*, Urban Inst. (Sept. 28. 2016), https://urbn.is/32qcXJP ..........20

David S. Knight, *Are High-Poverty School Districts Disproportionately Impacted by State Funding Cuts?: School Finance Equity Following the Great Recession,* 43 J. Educ. Finance 169 (Fall 2017), https://muse.jhu.edu/article/688011 ........21

Letter from Betsy DeVos, Sec'y, U.S. Dep't. of Educ., to Carissa Moffat Miller, Exec. Cir. CCSSO (May 22, 2020), https://bit.ly/3gwK83r .............................16

Letter from Council of the Great City Schools to Nancy Pelosi, Speaker, House of Representatives (Apr. 28, 2020), https://bit.ly/3lbFJ9u..........19, 21, 25

Michael Leachman & Eric Figueroa, *K-12 School Funding Up in Most 2018 Teacher-Protest States, But Still Well Below Decades Ago,* Ctr. on Budget & Pol'y Priorities (March 6, 2019), https://bit.ly/3aRnfpV ................................20

Michael Leachman, et al., *A Punishing Decade for School Funding*, Ctr. on Budget & Pol'y Priorities (Nov. 29, 2017) https://bit.ly/3ldB9Yw ..................20

Nat'l Advisory Council on the Educ. of Disadvantaged Children, *Annual Report to the President and the Congress* (1969) .......................................12, 17

Richard A. Oppel, Jr., et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. TIMES (July 5, 2020) https://nyti.ms/3aYsDrC...................22

Yin Paradies, *A Systematic Review of Empirical Research on Self-Reported Racism and Health*. 35 Int J Epidemiol. 888 (Aug. 2006) .................................22

Yarna Serkez, *Who Is Most Likely To Die From Coronavirus?* N.Y. TIMES (June 4, 2020), https://nyti.ms/3aSnJwa......................................................21, 22

U.S. Bureau of Labor Statistics, Report 1082, *Labor Force Characteristics by Race and Ethnicity, 2018* (Oct. 2019), https://bit.ly/3aSsdD1 ..........................22

U.S. Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019: Health Equity Considerations & Racial & Ethnic Minority Groups* (July 24. 2020), https://bit.ly/2CRPmZC .......................................................21, 22

U.S. Dep't. of Educ., *Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A): Purpose*, https://bit.ly/2EwulUI (last visited July 7, 2020)......................................................................................6

U.S. Dep't. of Educ., *CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools*, 85 Fed. Reg. 39,479 (Jul. 1, 2020) (to be codified at 34 C.F.R. pt. 76) ........................................................................6

U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, NCES 2020-009, *Digest of Education Statistics* (2018), https://bit.ly/3guCTsM ..........................18

U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, *Fast Facts: Back to School Statistics* (2020), https://bit.ly/3b032OR .................................................18

U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, NCES 2019-106 30, *School Choice in the United States* (2019), https://bit.ly/3ja4wJk ...................17

U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, Table 235.10, *Revenues For Public Elementary and Secondary Schools, By Source of Funds: Selected Years, 1919-20 Through 2016-17* (2019), https://bit.ly/2QxqLwF .....19

U.S. Dep't. of Educ., *Proposed Rule: Title I—Helping Disadvantaged Children Meet High Standards*, 60 Fed. Reg. 21400 (May 1, 1995) ...............13

U.S. Dep't. of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the Cares Act Programs* (Apr. 30, 2020) .......6, 14

## *AMICI'S* STATEMENT OF INTEREST[1]

The over three million members of the National Education Association ("NEA") serve as educators in our nation's public school districts, colleges, and universities. Since its founding over a century and a half ago, NEA and its affiliates have worked to create, expand and strengthen the quality of public education available to all children. In the current crisis, NEA believes that restoring public education services and funding, and doing so equitably, is central to our nation's recovery.

The American Federation of Teachers, AFL-CIO ("AFT") is a national labor union that represents 1.7 million members nationwide. The largest segment of AFT's members are public school educators and educational support personnel, many of whom work in school districts where a significant portion of the student population receive Title I and now CARES Act resources.

Americans United for Separation of Church and State is a national, nonsectarian public interest organization that is committed to preserving the constitutional principles of religious freedom and the separation of religion and government. Americans United has long fought to ensure that public tax dollars are

---

[1] Pursuant to Local Rule 7(o)(5) and Fed. R. App. P. 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in party, no party or party's counsel contributed money to fund the preparation or submission of this brief, and no person other than *amici* and their counsel contributed money to fund the preparation or submission of this brief.

used only for educational services that are appropriate for all students, regardless of what their religious beliefs may be.

In the Public Interest ("ITPI") is a national nonprofit research and policy organization that studies how the privatization of public goods impacts service quality, democracy, equity, and government budgets. ITPI advocates for strong public institutions that work for everyone, and has done extensive research and policy work to minimize the impacts of privatization on public school funding and to ensure transparency and accountability in the use of public funds.

The National School Boards Association ("NSBA") is a federation of associations in U.S. states and the territory of the Virgin Islands representing over 90,000 school board members governing nearly 13,600 school districts serving approximately 50 million public school students. NSBA's mission is to work with and through its member state associations to advocate for equity and excellence in public education through school board leadership.

The Network for Public Education, founded in 2013, is a national advocacy group whose mission is to preserve, promote, improve, and strengthen public schools for current and future generations of students. It has nearly 350,000 member supporters.

The Professors of Education are Bruce D. Baker, Ed.D; Preston Green, Ed.D, J.D.; and Kevin Welner, Ph.D, J.D. Dr. Baker is a Professor in the Graduate

2

School of Education at Rutgers, The State University of New Jersey, and is one of the nation's leading experts in the field of education finance, and his research frequently addresses equity issues in school funding. Dr. Green is the John and Carla Klein Professor of Urban Education at the University of Connecticut's Neag School of Education. He has written five books and numerous articles on education law, with a particular focus on the legal and policy issues pertaining to educational access and school choice. Dr. Welner is a professor at the University of Colorado Boulder, School of Education, and director of the National Education Policy Center. He is co-author of the casebook *Education and the Law* (West Academic, 2019), as well as other books and scholarly articles concerning education equity issues and the opportunity gap.

AASA, The School Superintendent's Association ("AASA"), founded in 1865, is the professional organization for over 13,000 educational leaders in the United States and throughout the world. AASA members range from chief executive officers, superintendents and senior level school administrators to cabinet members, professors and aspiring school system leaders. Throughout its more than 150 years, AASA has advocated for the highest quality public education for all students and provided programing to develop and support school system leaders. AASA members advance the goals of public education and champion children's causes in their districts and nationwide.

*Amici* believe that public education is the cornerstone of our nation's social, economic, and political structure; that education is a civil right necessary to the dignity and freedom of the American people; and that every child deserves equitable access to a free public education that maximizes their individual potential. *Amici* also respect the decision of individuals to educate their children at their own expense in privately supported, non-segregated, private schools. But they oppose using limited public funds to subsidize private schools—which are, by their nature, exclusive. Public schools serve all students, including a disproportionate number of our neediest students, and *amici* oppose redirecting CARES Act funds from the schools and communities that need them most in order to benefit private schools.

# **ARGUMENT**

In the worst public health and economic crisis in most of our lifetimes, one

that has hit Black, Latinx and Native communities the hardest in terms of illness,

death and economic deprivation, the U.S. Department of Education under the

direction of Secretary Betsy DeVos has undertaken to divert to private schools

over $1 billion in critical funds that Congress appropriated under the CARES Act

for our neediest students.

The provision of the CARES Act at issue in this case is "plain as day."

*Michigan v. DeVos*, _ F. Supp. 3d _, No. 20-cv-04478-JD, 2020 WL 5074397,

at \*5 (N.D. Cal. Aug. 26, 2020) (order granting preliminary injunction), and

"unequivocally and plainly instruct[s]" the Secretary to allocate the CARES Act

funding in the same manner as Title I of the Elementary and Secondary Education

Act ("ESEA"), which has been for the last half century our nation's flagship

education program for funding our neediest students. *Washington v. DeVos*,

_ F. Supp. 3d _, No. 20-cv-1119-BJR, 2020 WL 5079038, at \*7 (W.D. Wash. Aug.

21, 2020) (order granting preliminary injunction). As two other district courts have

now held, the Secretary has no statutory authority to divert those critical funds. *Id*.;

*Michigan*, 2020 WL 5074397. *Amici* submit this brief in support of Plaintiffs'

request that this court reach the same result.

## I.      The Secretary's Diversion of Critical Funding from Public Schools is Based on a Misreading of the CARES Act that Ignores Key Historical and Statutory Context

The Department's guidance and interim final rule interpret "equitable services" in CARES Act § 18005 to mean equal funding for private schools.[2] But that is not how "equitable services" has ever been understood, or how Congress used it in the CARES Act. From its original enactment in 1965 to the present day, the overriding purpose of Title I of ESEA has been to distribute additional funds to our nation's neediest students.[3] The Department's interpretation is at odds with the history and purpose of Title I and the clear intent of Congress in invoking Title I to distribute CARES funds, and the Department's actions represent an about-face from its own understanding of how Title I-funded equitable services operate.

In determining whether a statute is ambiguous, courts first look to the "traditional tools" of statutory construction, including the law's text, context, structure and history. *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 338 (D.C. Cir. 2020). *Amici* agree with Plaintiffs—and with the two other district courts that have

---

[2] *See, e.g.,* U.S. Dep't. of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the Cares Act Programs* 3 (Apr. 30, 2020) (claiming that "[n]othing in the CARES Act suggests Congress intended to differentiate between students based upon the public or non-public nature of their school with respect to eligibility for relief"); U.S. Dep't. of Educ., *CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools,* 85 Fed. Reg. 39,479, 39,480 (Jul. 1, 2020) (to be codified at 34 C.F.R. pt. 76) (asserting that "[t]he CARES Act programs do not favor students based on public or non-public school attendance").

[3] U.S. Dep't. of Educ., *Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A): Purpose,* https://bit.ly/2EwulUI (last visited Aug. 27, 2020).

now ruled on the issue—that this Court need not look beyond the plain text of the CARES Act to decide in their favor, because Section 18005's directive that equitable services must be provided "in the same manner" as provided under Section 1117 of Title I of the Elementary and Secondary Education Act ("ESEA"), 20 U.S.C. § 6320, is unambiguous. As two district courts have already held, this directive can only be reasonably understood to mean that the CARES Act funding is to be distributed using the same method or procedures used under Section 1117. *Michigan v. DeVos*, 2020 WL 5074397; *Washington v. DeVos*, 2020 WL 5079038. Indeed, the Supreme Court already has construed exactly the same statutory phrase, albeit it in a different statute, and reached the same conclusion. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 545 (2012) (finding that "in the same manner" was best understood to mean "to use the same methodology and procedures").

While nothing more is needed to rule in plaintiffs' favor, *Amici* add that the structure and context of the CARES Act, as well as the history of the Title I provisions it cites, also weigh solidly in favor of Plaintiffs' arguments.

The CARES Act provides funds for public education primarily through a $31 billion dollar "Education Stabilization Fund" established in Sections 18001-18005 of the Act. The Fund has three components. The key component fund for present purposes is the $13 billion Elementary and Secondary School Emergency Relief

7

("ESSER") Fund established by Section 18003, which is dedicated exclusively to elementary and secondary schools. Local education agencies ("LEAs") may also receive funds from the smaller $3 billion Governor's Emergency Education Relief ("GEER") Fund established by Section 18002(c) if their state directs some portion of the GEER fund to LEA needs, and if they are one of the districts in their state "most significantly impacted by coronavirus," or if they are "essential for carrying out emergency educational services" specified in Section 18003.

In creating the Education Stabilization Fund and its component programs, Congress did not direct the Department to distribute CARES funds equally to private school students or schools. Instead, Section 18005 of the CARES Act "unequivocally and plainly" instructs that an LEA receiving ESSER or GEER funds must provide equitable services "in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools . . . ." *Washington*, 2020 WL 5079038, at *7 (citing CARES Act § 18005).

Congress's directive to allocate funding to serve students with the highest needs is consistent with the overall structure of the CARES Act and ESEA. ESSER provisions in the CARES Act reference the Title I funding formula from ESEA. CARES Act § 18003(b) orders the Secretary to distribute ESSER funds to states "in the same proportion as each state received under part A of Title I of the ESEA of 1965 in the most recent fiscal year." Each state must, in turn, allocate the funds

8

to LEAs and charter schools in proportion to the amount of funds they received under part A of Title I. CARES Act § 18003(c). Only after the funds are so distributed are LEAs instructed to provide services to private school students "in the same manner as provided under section 1117." CARES Act § 18005(a).

When Congress distributed ESSER funds using the Title I formula, it understood and intended that those resources would flow primarily to LEAs and schools with high concentrations of disadvantaged children—because that is what Title I does. Title I was the centerpiece of the Elementary and Secondary Education Act of 1965, and it remains the centerpiece of the ESEA under its most recent re-authorization, the Every Student Succeeds Act of 2015, Pub. L. No. 114-95; 114 Stat. 1177 (2015) (codified at 20 U.S.C. § 28 *et seq*.). In the law's original policy statement, Congress said it was intended "to provide financial assistance… to local educational agencies serving areas with concentrations of children from low-income families." Pub. L. No. 89-10, 79 Stat. 27-58 § 201 (1965). While ESEA saw numerous revisions in the ensuing decades, the purpose of Title I has not changed. According to the Department's own website, Title I's purpose remains to "provide[] financial assistance to local educational agencies (LEAs) and schools with high numbers or high percentages of children from low-income families." *Id*.

9

The CARES Act direction in Section 18005 that funding be provided "in the same manner" as under Section 1117 makes Congress's intent "plain as day." *Michigan*, 2020 WL 5074397, at *5. Congress meant for CARES Act funding to flow according to student needs, not overall student enrollment. It is an elementary principle of statutory construction that courts will "assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp*., 498 U.S. 19, 32 (1990), and "legislates against the backdrop" of that statutory framework, *Orton Motor, Inc. v. U.S. Dep't of Health & Human Servs.*, 884 F.3d 1205, 1214 (D.C. Cir. 2018). This is particularly the case where Congress references a specific statutory provision. *Jam v. Int'l Fin. Corp*., 139 S. Ct. 759, 769 (2019) ("a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted"). It is safe to say that when Congress referred directly, clearly, and unambiguously to Title I's equitable services provisions it understood that they require expenditures to be "based on the number of children from low-income families who attend private schools," 20 U.S.C. § 6320(a)(4)(A)(i), not based on total private school enrollment.

The statutory context makes that presumption even stronger in this instance because Congress had a clear alternative. Section 1117 is not the only portion of ESEA to address equitable services. Section 8501 also requires LEAs that receive

federal funds in connection with certain specified programs to provide equitable services to private school students. *Id*. § 7881. But unlike Section 1117, which allocates expenditures based on the number of low-income private-school students, Section 8501 requires LEAs to provide equitable services based on whether students are eligible for those services. *Id*. § 7881(b)(2). Given that the CARES Act does not restrict eligibility for ESSER or GEER funded services to disadvantaged students, if Congress had intended CARES funds to flow to private schools based on total private school enrollment rather than the concentration of disadvantaged students, it could have simply referenced Section 8501. But instead it chose to reference Section 1117 of Title I.

The history of ESEA's equitable services provisions further confirms that the Secretary's interpretation is inconsistent not just with the text of Section 1117 and the intent of Title I, but with how equitable services under Title I have always been understood. The concept of equitable services has been present in ESEA in some form since its original enactment—though in the beginning it was referred to as "comparable services." *Barrera v. Wheeler*, 475 F.2d 1338, 1348 (8th Cir. 1973), *aff'd*, 417 U.S. 402 (1974). The core principle of "comparable services" was the same as "equitable services" today: to require local educational agencies (LEAs) "to plan and administer programs that would meet the particularized needs of all educationally disadvantaged children," including disadvantaged children attending

11

private schools. *Id*. at 1342, 1355 (citing 20 U.S.C. § 241e(a)(2) (1972), 45 C.F.R.

§ 116.19 (1972)).

But as the Eighth Circuit explained in the most prominent early dispute over

LEAs' obligation to provide services to private school students under Title I of the

original ESEA, interpreting Title I's "comparable services" provisions  to mean

*equal sharing of funds* with private schools "fails to properly interpret Title I in

conformity with the Act's intended purpose." *Id*. at 1344. In so holding, the Eighth

Circuit relied on both the language of the statute itself and a report from the

National Advisory Council on the Education of Disadvantaged Children, which

ESEA had charged with reporting annually to Congress and the President on the

progress of Title I. *See* Pub. L. No. 89-10, 79 Stat. 27-58 § 212 (1965). In the

report, the Council noted that some private schools had complained about "not

receiving their 'fair share'" of Title I funds, with the groups' definition of "fair

share" referring to a "percentage coinciding with the percentage of nonpublic

school children in the city." *Barrera,* 475 F.2d at 1347 n.11 (quoting Nat'l

Advisory Council on the Educ. of Disadvantaged Children, *Annual Report to the*

*President and the Congress* 38 (1969)). The Council dismissed private schools'

concerns, noting that not only did Title I "intend[] no such 'sharing' or division of

funds," but that such a claim was "inconsistent with the intent" of Title I given that

"the number of disadvantaged nonpublic school children was not proportionate to

the number of disadvantaged public school children in any city in the present study." *Id*.

Congress has since added more specifics to Title I concerning how LEAs are to provide "equitable services" to private school students, but the program still rests on the basic principle that *disadvantaged children* should be the primary beneficiaries of Title I-funded services. The current text of Section 1117 itself reflects this. Not only are LEAs directed to base expenditures for equitable services on the number of children from low-income families in the district, 20 U.S.C. § 6320(a)(4)(A)(i), but Section 1117 clearly expresses that services are meant to be provided "consistent with the number of *eligible children* identified under Section 6315(c)." *Id*. § 6320(a)(1) (emphasis added). "Eligible children" includes private school students who are economically disadvantaged, English language learners, disabled, neglected, eligible for Head Start, or homeless. *Id*. § 6315(c). The Department's most recent regulations echo these two requirements, 34 C.F.R. §§ 200.62, 200.64, just as they have for decades.[4]

Instead of accounting for this statutory framework, context and history in interpreting Section 18005 of the CARES Act, the Department's guidance and

---

[4] *See, e.g.*, U.S. Dep't. of Educ., *Proposed Rule: Title I—Helping Disadvantaged Children Meet High Standards*, 60 Fed. Reg. 21400 (May 1, 1995) ("Although funds are allocated on the basis of poor children . . . private school children eligible to be served are children who reside in a participating public school attendance area and who have educational needs under section 1115(b) of Title I.").

interim final rule reach the untenable conclusion that the phrase "in the same manner as under section 1117" means that every provision in Section 1117 was incorporated into the CARES Act by reference *except* for those targeting aid to students most in need. This is "interpretive jiggery-pokery in the extreme." *Michigan*, 2020 WL 5074397, at *5 (cleaned up). In its guidance, in particular, the Department painstakingly directs CARES funding recipients to observe the other Section 1117 requirements: they must ensure funds remain under public control and that services be secular, neutral and nonideological; designate an equitable services ombudsman; and follow the procedural requirements of notice and consultation with private schools about allocation of funds.[5]

The proffered rationale for this odd parsing is that the CARES Act uses specific call-outs to point to the provisions of Section 1117 that it truly means to incorporate: Section 18005(a) of the CARES Act echoes requirements contained in Section 1117 when it states that services are to be provided "in consultation with representatives of non-public schools," and Section 18005(b) specifies that CARES funds must remain under public control. But if these requirements suggest anything, it is that the reference to Section 1117 was needed to import requirements for equitable services administration other than those specifically mentioned in Section 18005—most significantly, the poverty-based formula for

[5] U.S. Dep't. of Educ., *Providing Equitable Services*, *supra* note 2 at 3-5.

14

determining expenditures. The Department's actions, which interpret all sections related to the poverty-based formula out of existence, violate the "endlessly reiterated principle of statutory construction . . . that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995).

The text and structure of the CARES Act, including its use of Title I, show that Congress clearly intended to prioritize assisting disadvantaged students. Section 18005's reference to Title I is fully consistent with this structure. The Department's interpretation would defeat Congressional intent and the plain meaning of the law, is inconsistent with the nature of federal education funding and equitable services as they have always been understood, and ought to be rejected by this Court.

## II.    The Secretary's Unlawful Diversion of CARES Funds Will Harm Our Most Vulnerable Students

The Department has defended its interpretation of Section 18005 by claiming that it ensures equal treatment of public and private school students, and that allocating CARES resources according to Section 1117's poverty-based formula would "improperly discriminate" against private school students.[6] But as Judge Rothstein recognized in *Washington v. DeVos*, "'[e]quitable' does not mean the

---

[6] Letter from Betsy DeVos, Sec'y, U.S. Dep't. of Educ., to Carissa Moffat Miller, Exec. Cir. CCSSO (May 22, 2020), https://bit.ly/3gwK83r.

same thing as 'equal.'" 2020 WL 5079038, at *9 (*comparing Equitable*,

Dictionary.com ("characterized by equity or fairness; just and right; fair;

reasonable"),[7] *with Equal*, Dictionary.com ("as great as; the same as")).[8] The

groups of students targeted by Title I and the equitable services requirement—

including those who are economically disadvantaged, English language learners,

disabled, neglected, eligible for Head Start, or homeless—are suffering

disproportionately from the pandemic. Far from being just, fair or reasonable, the

Department's interpretation would inflict yet another layer of harm on these

vulnerable communities.

   As discussed *supra* in Section I at pages 9-14, increasing *equity* has always

been Congress's central concern in allocating federal education funds under Title I;

the concept of "equitable services" under Title I has never been intended to direct

equal funds to private school students. That is so, as the National Advisory Council

on the Education of Disadvantaged Children alluded to early on in Title I's history,

because there are important differences between the overall populations of public

and private school students and families even in the best of times. *Barrera*,

475 F.2d at 1347 n.11 (quoting Nat'l Advisory Council on the Educ. of

---

[7] Available at https://www.dictionary.com/browse/equitable?s=t  (last visited Aug. 24, 2020).

[8] Available at https://www.dictionary.com/browse/equal?s=t  (last visited Aug. 24, 2020).

Disadvantaged Children, *Annual Report to the President and the Congress* 38 (1969)).

Public and private schools are not similarly situated in terms of the communities and students they serve. According to the Department's own National Center for Education Statistics ("NCES"), in 2016 (the most recent year of available data) just eight percent of private school students in the United States were below the U.S. Census Bureau's poverty threshold, compared with more than 18 percent of public school students.[9] The disparity between public and private schools in the proportion of "near-poor" students is also significant, with just 21 percent of private school students coming from such households compared with between 39 and 45 percent of public school students.[10] In all but three states— Alaska, South Dakota and Wyoming—private school families have higher incomes, on average, than public school families.[11] In over half of states and the District of Columbia, private school families make at least 140 percent of what public school families make, and the disparity ranges as high as 292 percent.[12]

---

[9] U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, NCES 2019-106, *School Choice in the United States* 30 (2019), https://bit.ly/3ja4wJk.

[10] *Id*.

[11] Bruce D. Baker, et al., *Is School Funding Fair? A National Report Card*, Educ. L. Ctr. 19 (7th Ed. 2018), https://bit.ly/34CWsN7.

[12] *Id*.

Communities of color are also disproportionately represented in public schools. This fall, NCES estimates that 23.4 million of the nation's 50.7 million public school students will be white—about 46 percent.[13] By contrast, 69 percent of private school students are white, nine percent Black, and 10 percent Hispanic or Latinx.[14] Put another way, public schools today serve an estimated 94 percent of our nation's students of color and 96 percent of its low-income students.[15]

Finally, public schools also serve higher concentrations of children who face unique challenges in remote learning environments. According to NCES, public schools serve 95 percent of students with special needs.[16] Many of these students require services that are difficult or impossible to provide remotely. Public schools are also more likely to serve students—especially very low-income and homeless students—who do not have access to the technology necessary for remote instruction such as a computer and internet connection.[17] Approximately 17 percent

---

[13] U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, *Fast Facts: Back to School Statistics* (2020), https://bit.ly/3b032OR.

[14] Nat'l Ctr. for Educ. Statistics, *School Choice in the United States*, *supra* note 9 at 22.

[15] *Compare id.* (discussing racial and ethnic makeup of private schools), *with* Nat'l Ctr. for Educ. Statistics, *Fast Facts*, *supra* note 13 (reflecting that as of fall 2020 there are 50.7 million students in public schools and 5.7 million in private schools).

[16] U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, NCES 2020-009, *Digest of Education Statistics* Ch. 2 (2018), https://bit.ly/3guCTsM.

[17] Brooke Auxier & Monica Anderson, *As Schools Close Due to the Coronavirus, Some U.S. Students Face a Digital 'Homework Gap,'* Pew Research Ctr. (Mar. 16,

of U.S. teens are unable to do homework online because they lack access to a reliable computer and internet connection.[18] Among Black students and very low-income students, who disproportionately attend public schools, these numbers are substantially higher at around one quarter for each group.[19]

Public and private schools are also not similarly situated in terms of their general funding conditions or the challenges they face during recessions. Even during the best of times, schools in lower-income communities are less able to raise revenue than their higher-income counterparts,[20] in large part because of our education funding system's reliance on local property taxes.[21] Most states attempt to address this shortfall by providing additional state revenues to schools that serve needier student populations or have less property wealth.[22] But even in states that

---

2020), https://pewrsr.ch/2EkfrS1; Emma Dorn, et al., *COVID-19 and Student Learning in the United States: The Hurt Could Last a Lifetime*, McKinsey & Co. (June 1, 2020), https://mck.co/31o2oaM; Letter from Council of the Great City Schools to Nancy Pelosi, Speaker, House of Representatives (Apr. 28, 2020), https://bit.ly/3lbFJ9u.

[18] Brooke Auxier & Monica Anderson, *supra* note 17.

[19] *Id.*

[20] Matthew Chingos & Kristin Blagg, *School Funding: Do Poor Kids Get Their Fair Share?*, Urban Institute, (May 2017), https://urbn.is/2Esnc80.

[21] U.S. Dep't. of Educ., Nat'l Ctr. for Educ. Statistics, Table 235.10, *Revenues For Public Elementary and Secondary Schools, By Source of Funds: Selected Years, 1919-20 Through 2016-17* (Aug. 2019), https://bit.ly/2QxqLwF (showing historical allocation of public school funds between federal, state and local sources).

[22] Chingos & Blagg, *supra* note 20 at 2.

close the gap in terms of dollars spent,[23] poorer districts' increased reliance on state funds means they tend to experience deeper revenue shortfalls in a recession.

During the Great Recession of 2008, for example, federal stimulus programs played a critical role in stabilizing state and local education budgets.[24] But as stimulus funds ran out, state and local funding remained at recession levels, which led to significant budget cuts.[25] In fact, at the time the COVID crisis hit, many state education budgets—and the funds they provide to lower-wealth school districts— either had not yet fully recovered from the Great Recession, or had recovered only very recently.[26] Both the initial cuts and delayed recoveries tended to be worse in

---

[23] Bruce D. Baker, et al., *Closing America's Education Funding Gaps*, Century Found. (July 20, 2020), https://bit.ly/32zVZJ2 (taking into account the fact that students who are falling behind need additional services, and illustrating funding gaps based on student need rather than dollars spent).

[24] Julia Isaacs, Urban Inst., *Spending on public schools has declined in the wake of the Great Recession* (Sept. 28. 2016), https://urbn.is/32qcXJP.

[25] *Id*.; Bruce D. Baker, *Evaluating the Recession's Impact on State School Finance Systems*, Educ. Pol'y Analysis Archives 22(91) at 2 (Sept. 2014), https://bit.ly/34BMUSs.

[26] Michael Leachman, et al., *A Punishing Decade for School Funding*, Ctr. on Budget & Pol'y Priorities (Nov. 29, 2017), https://bit.ly/3ldB9Yw (reviewing U.S. Census Bureau data and concluding that "[i]n 2015, the latest year for which comprehensive spending data are available . . . 29 states were still providing less total school funding per student than they were in 2008"); Michael Leachman & Eric Figueroa, *K-12 School Funding Up in Most 2018 Teacher-Protest States, But Still Well Below Decades Ago*, Ctr. on Budget & Pol'y Priorities (March 6, 2019), https://bit.ly/3aRnfpV.

high-poverty school districts.[27] And all indicators suggest that the current recession will be more severe than the Great Recession in terms of its impact on state education budgets.[28]

The families and communities served by public and private schools are not similarly situated in terms of their exposure to coronavirus and the resources needed to mount a response. Due to "[l]ong-standing systemic health and social inequities," the same families most likely to rely on public schools have also been those most heavily-impacted by the pandemic.[29] Members of low-income communities and communities of color are more likely to live in multi-generational households,[30] and more likely to work in occupations in which telecommuting and

---

[27] Baker, *supra* note 25 at 24; Matt Barnum, *School Budgets Are in Big Trouble, Especially in High-Poverty Areas. Here's Why—And What Could Help*, CHALKBEAT (Apr. 7, 2020), https://bit.ly/2QrABzX (citing David S. Knight, *Are High-Poverty School Districts Disproportionately Impacted by State Funding Cuts?: School Finance Equity Following the Great Recession,* 43 J. Educ. Finance 169 (Fall 2017), https://muse.jhu.edu/article/688011.

[28] Barnum, *supra* note 27; Letter from Council of the Great City Schools, *supra* note 17 (warning that "[s]everal big city school districts are now projecting 15 to 25 percent cuts in overall revenues going into next school year").

[29] U.S. Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019: Health Equity Considerations & Racial & Ethnic Minority Groups* (July 24. 2020), https://bit.ly/2CRPmZC (hereafter "CDC Equity Report"); Yarna Serkez, *Who Is Most Likely To Die From Coronavirus?* N.Y. TIMES (June 4, 2020), https://nyti.ms/3aSnJwa.

[30] *Id.*

social distancing are difficult or impossible.[31] They are more likely to suffer from health conditions that put them at higher risk for the most serious cases of COVID-19,[32] and less likely to have adequate access to health care.[33] When people of color seek care, they are more likely to encounter discrimination.[34]

All of these factors add up to higher infection and death rates in low-income communities and communities of color. According to data recently obtained by the *New York Times* from the Centers for Disease Control, coronavirus infection rates for Black Americans are well over double the rates for whites.[35] Infection rates for Latinx Americans were more than triple that of whites.[36] According to the COVID Tracking Project, which assembles data reporting by every state, Black Americans

---

[31] U.S. Bureau of Labor Statistics, Report 1082, *Labor Force Characteristics by Race and Ethnicity, 2018* (Oct. 2019), https://bit.ly/3aSsdD1.

[32] Serkez, *supra* note 29.

[33] CDC Equity Report, *supra* note 29; Serkez, *supra* note 29.

[34] CDC Equity Report, *supra* note 29 (citing Yin Paradies, *A Systematic Review of Empirical Research on Self-Reported Racism and Health*, 35 Int. J. Epidemiol. 888 (Aug. 2006), https://bit.ly/3aPmYDW).

[35] Richard A. Oppel, Jr., *et al.*, *The Fullest Look Yet at the Racial Inequity of Coronavirus*, N.Y. TIMES (July 5, 2020), https://nyti.ms/3aYsDrC (showing an infection rate of 62 per 10,000 residents for Black Americans and 23 per 10,000 residents for white Americans).

[36] *Id.* (showing an infection rate of 73 per 10,000 residents for Latinx Americans).

are dying at 2.4 times the rate of white Americans, and death rates among Latinx

Americans and American Indians are nearly 1.5 times that of whites.[37]

Because public schools reflect the communities they serve, the same schools

most in need of additional assistance before the coronavirus pandemic now face

disproportionate challenges in responding to the crisis. Higher community

infection rates mean that the stakes will be higher for public schools if they are

unable to obtain necessary cleaning supplies and protective equipment, or hire and

train additional staff. Public schools serving large numbers of at-risk students may

be forced to switch to fully remote instruction to keep families, students, staff and

community members safe. When this occurs, existing disparities between public

and private school students will be further amplified because as discussed above,

public school students are less likely to have the technological infrastructure they

need to make the transition as smooth as possible for students.

Given the far greater impact of the pandemic on public school students and

their families and communities, public schools that serve disadvantaged students

have an extraordinary need for additional support. Congress recognized this fact

both in its use of the Title I formula to distribute the lion's share of support to

---

[37] The COVID Tracking Project, *The COVID Racial Data Tracker*, https://covidtracking.com/race (last visited Aug. 24, 2020).

public primary and secondary schools in the CARES Act, and in mapping out

allowable uses of funds to focus on schools and students with the greatest need.[38]

Requiring public schools to redirect that support to provide additional services

to private school students will damage their response efforts in ways that cannot be

undone. They may be unable to maintain current staffing levels, let alone hire

additional staff to carry out physical distancing and other safety recommendations.

*Cf. Michigan*, 2020 WL 5074397, at *8 (noting that the Department's actions could

deprive Michigan public schools of over $16 million in funding, "the equivalent of

laying off 466 teachers from public schools in Flint, Michigan.") They will buy

fewer cleaning supplies, and take fewer steps to retrofit classrooms. *Id.*

("Wisconsin schools had to choose between diverting over $4 million of CARES

Act funding to private schools or abandoning district-wide coronavirus preparation

such as sanitizing school buses."). And they may be unable to assist families in

purchasing computers and other supplies necessary for remote learning. The public

---

[38] Cares Act § 18002(c)(1) permits GEER funds to be used to "provide emergency support through grants" to LEAs "most significantly impacted by coronavirus"; Cares Act § Section 18003(d) permits a broader range of uses for ESSER funds, but continuously references services for low-income students, students with disabilities, English language learners, homeless students, and or federal programs targeted towards specific groups of high-need students.

health consequences of the Department's actions are real, and the learning losses that result from funding shortfalls would be significant and long-lasting.[39]

Finally, contrary to what the Department's rhetoric suggests, private schools are not the victims of "discrimination" in federal funding; in fact they have *more* options for obtaining stimulus funds than public schools, and have fully availed themselves of those avenues. Most significantly, the CARES Act created the $349 billion Paycheck Protection Program ("PPP"), which provides forgivable loans to businesses and non-profit organizations, including private schools. CARES Act § 1102, 1106, 1107(a)(1). Private schools, including elite institutions with large endowments,[40] have to date received an estimated $4.5 billion dollars in forgivable loans under the PPP—approximately six times more per facility than public schools.[41] Private schools are also eligible for the Employee Retention Credit under CARES Act § 2301, and payroll tax credits under the Families First Coronavirus

---

[39] Letter from Council of the Great City Schools, *supra* note 17; Dorn, *supra* note 17 (discussing the impact of learning losses on future earnings, racial and socioeconomic inequality, and the broader economy).

[40] Michelle Conlin & M.B. Pell, *Dozens of Expensive Private Schools Received Millions in U.S. Pandemic Loans*, REUTERS (July 6, 2020), https://reut.rs/2Ecp0Cw.

[41] Mellissa Chang, *Private and Charter Schools Receive Approximately $5.7 Billion in PPP Loans, Raising Questions About Equity in Education*, COVID Stimulus Watch (Aug. 27, 2020), https://bit.ly/3hDGeXQ (analyzing PPP loan disclosures from the Small Business Administration).

Response Act. Pub. Law No. 116-127, 134 Stat 178 §§ 7001–7005 (Mar. 18, 2020). Public schools are not eligible for assistance from any of these programs.

The Department's reading of Section 18005 to require equal funding for private school students—regardless of whether their household income is $20,000 or $2 million—cannot be squared with the equitable purposes underlying the CARES Act and the Title I provisions upon which it relies, or with the Act's plain text. If this flawed interpretation is allowed to stand, the very students Congress sought to help through the CARES Act will be deprived of over a billion dollars of dollars in critical aid at a time when they are facing unprecedented challenges.

## <u>CONCLUSION</u>

For the foregoing reasons, we urge this Court to grant the Plaintiffs' Motion for Partial Summary Judgment.

*Respectfully Submitted,*

Dated: August 28, 2020

/s Jeffrey W. Burritt
Jeffrey W. Burritt (Bar No. 493812)
National Education Association
1201 16th Street, N.W.
Washington, D.C. 20036
202-822-7231
jburritt@nea.org

*Counsel for Amici Curiae* National Education Association; American Federation of Teachers; Americans United for Separation of Church and State; In the Public Interest; National School Boards Association; Network for Public Education; Professors of Education; and AASA, The School Superintendents Association