**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), *et al.*, | Case No. **1:20-cv-01996 (DLF)** |
| *Plaintiffs*, | |
| vs. | |
| ELISABETH "BETSY" D. DEVOS, in her official capacity as the United States Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants*. | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................2

I.      SUMMARY JUDGMENT STANDARD ..........................................................2

II.     THE RULE IS FACIALLY UNLAWFUL UNDER THE APA .........................3

        A.    The Secretary Lacked Any Delegated Authority to Promulgate the Rule
              and Therefore It Must Be Vacated ..........................................................3

        B.    Section 18005 of the CARES Act Is Not Ambiguous as to the Allocation
              Formula for Equitable-Services Funding ................................................5

              1.    *"Provide equitable services in the same manner as" clearly and
                    unambiguously includes the manner of calculating the proportion
                    of funds for equitable services under section 1117*...................6

              2.    *None of the irrelevant statutory provisions Defendants cite render
                    Section 18005's allocation formula ambiguous.* .......................8

              3.    *There is no inconsistency in the characterization of section 18005
                    by plaintiffs in the various lawsuits challenging the Rule.* .......10

        C.    The Rule Is Not Entitled To Deference, Because It Is An Unreasonable
              Interpretation Of The Statute .................................................................11

III.    DEFENDANTS DO NOT MEANINGFULLY CONTEST PLAINTIFFS'
        CONSTITUTIONAL CLAIMS......................................................................13

IV.     DEFENDANTS DO NOT DISPUTE THAT NATIONWIDE VACATUR IS THE
        APPROPRIATE REMEDY IF THE RULE IS FACIALLY UNLAWFUL ...................15

CONCLUSION....................................................................................................16

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**FEDERAL CASES**

*Adamski v. McHugh*,
    304 F. Supp. 3d 227 (D.D.C. 2015) ..............................................................................14, 15

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ...........................................................................................2

*Am. Petroleum Inst. v. EPA*,
    52 F.3d 1113 (D.C. Cir. 1995) ............................................................................................4

*Ass'n of Private Sector Colls. and Univs. v. Duncan*,
    870 F. Supp. 2d 133 (D.D.C. 2012) ....................................................................................4

*Chamber of Commerce of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ..........................................................................................14

*City of Los Angeles v. Barr*,
    941 F.3d 931 (9th Cir. 2019) ..............................................................................................4

*City of Philadelphia v. Att'y Gen. of U.S.*,
    916 F.3d 276 (3d Cir. 2019) ................................................................................................4

*Dalton v. Specter*,
    511 U.S. 462 (1994) ....................................................................................................13, 14

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ..........................................................................................15

*District of Columbia v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) ......................................................................................13

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ..........................................................................................15

*Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
    469 U.S. 256 (1985) ............................................................................................................7

*Michigan v. DeVos*,
    No. 3:20-cv-04478, ECF No. 82 (N.D. Cal. Aug. 26, 2020) ..............................................5

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ............................................................................................................6

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998) ........................................................................ 15

*Nat'l Mining Ass'n v. U.S. Dep't of the Interior,*
105 F.3d 691 (D.C. Cir. 1997) .......................................................................... 4

*Oakley v. Devos,*
No.20-cv-03215-YGR, 2020 WL 3268661 (N.D. Cal. June 17, 2020) .................... 5

*Partlo v. Johanns,*
No. CIV.A.04-1462 CKK, 2006 WL 1663380, at *13 (D.D.C. June 11, 2006),
*aff'd,* 224 F. App'x 7 (D.C. Cir. 2007) ............................................................... 7

*Sierra Club v. Mainella,*
459 F. Supp. 2d 76 (D.D.C. 2006) ..................................................................... 2

*Sierra Club v. Trump,*
963 F.3d 874 (9th Cir. 2020) ........................................................................... 14

*South Dakota v. Dole,*
483 U.S. 203 (1987) ........................................................................................ 14

*Tex. Alliance for Home Care Servs. v. Sebelius,*
681 F.3d 402 (D.C. Cir. 2012) ......................................................................... 14

*Util. Air Regulatory Grp. v. EPA,*
573 U.S. 302 (2014) ................................................................................. 4, 13

*Washington v. DeVos,*
No. 2:20-cv-1119-BJR, 2020 WL 4922256 (W.D. Wash. Aug. 21, 2020) ........ 3, passim

*Yates v. United States,*
574 U.S. 528 (2015) ......................................................................................... 9

**FEDERAL STATUTES**

5 U.S.C. ch. 5, subch. I § 500 *et seq.*
Administrative Procedure Act ........................................................................... 2

20 U.S.C. § 1221e-3 ............................................................................................ 3

20 U.S.C. § 3474 ................................................................................................ 3

Pub. L. No. 116-136, 134 Stat. 281 (2020)
("CARES Act"), Coronavirus Aid, Relief, and Economic Security Act ............ 1, passim

## TABLE OF AUTHORITIES
### (Continued)

**Page**

FEDERAL RULES

Fed. R. Civ. P. 56(a) ............................................................................................................2

FEDERAL REGULATIONS

85 Fed. Reg. 39,479 (July 1, 2020)...........................................................................1, 8

OTHER AUTHORITIES

*Michigan v. DeVos*,
    No. 3:20-cv-04478-JD, ECF No. 35 (N.D. Cal. July 20, 2020) ............................................10

*Washington v. DeVos*,
    No. 2:20-cv-01119-BJR, ECF No. 51 (W.D. Wash. Aug. 9, 2020) .......................................10

Webster's Third New International Dictionary (Unabridged) 1827................................6

## INTRODUCTION

Defendants' Opposition concedes that the CARES Act does not expressly give the Department rulemaking authority.  Instead, Defendants claim that the ambiguity of the statute provides the basis for promulgating the Rule governing allocation of funds for equitable services under the Department's general rulemaking powers.  There are two fatal problems with Defendants' position.  First, the Department's general rulemaking authority is not a sufficient basis, under well-established law, to promulgate rules governing "formula grants" in the CARES Act that must be distributed according to specific statutory guidelines.  Second, the CARES Act is not at all ambiguous as to the allocation of the funds for equitable services.  The statute's direction that local education agencies "shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools" means what it says: funds shall be allocated for the benefit of private-school students based upon the number of low-income students in private schools—just as public schools have done for decades under section 1117 of the ESEA.  Without rulemaking authority or statutory ambiguity, the Rule must be vacated.

Defendants claim that "a 'mechanistic application' of § 1117 to § 18005's equitable-services requirement would 'disadvantage' private-school students," ECF No. 46 ("Opp.") at 6 (quoting 85 Fed. Reg. at 39,479).  Defendants, however, do not have discretion to make such a policy judgment that requires rewriting the statute.  When faced with the unambiguous text of a statute, a "mechanistic application" is all that an agency is permitted to do.  Likewise, Defendants' assertion that they "reasonably concluded that 'in the same manner' does not incorporate section 1117's proportional-apportionment provisions," Opp. at 9, is wrong— Defendants cannot rewrite the parts of the incorporated statute with which they do not agree.  In short, Defendants cannot substitute their policy preference for a clear statutory mandate by

1

Congress.  The Rule is *ultra vires* and as such violates the APA as well as the Spending Clause and the constitutional separation of powers.  The proper remedy is vacatur, which has nationwide effect.  Prompt and permanent vacatur is particularly important here because school districts need immediate clarity as they start this challenging year and two other courts have issued preliminary injunctions enjoining the Rule for only some districts and states, resulting in a patchwork of mandates.

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

This Court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  Thus "the entire case . . . is a question of law," and the district court "sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks and footnote omitted).

Under the APA, the Court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  The Court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority."  5 U.S.C. § 706(2).

Because the Department has not yet produced the administrative record, only Plaintiffs' constitutional and APA claims concerning the Department's constitutional and statutory authority to issue the Rule—Counts One through Four of the First Amended Complaint, *see* ECF No. 35 at 49–54—are before the Court on this motion for partial summary judgment.

II.     **THE RULE IS FACIALLY UNLAWFUL UNDER THE APA**

   A.     **The Secretary Lacked Any Delegated Authority to Promulgate the Rule and Therefore It Must Be Vacated**

It is undisputed that the CARES Act does not expressly delegate specific rulemaking authority to the Secretary to promulgate the Rule. *See* Opp. at 10 & n.4 (acknowledging that the Department engaged in rulemaking without Congress "explicitly referencing its authority"); *see also Washington v. DeVos*, No. 2:20-cv-1119-BJR, 2020 WL 4922256, at \*6 (W.D. Wash. Aug. 21, 2020) ("The Department does not, and indeed cannot, argue that Congress explicitly delegated it rulemaking authority over the CARES Act, because such authority is simply absent from its text.").

The general rulemaking statutes upon which Defendants rely, 20 U.S.C. § 1221e-3 and § 3474, are of no help to Defendants. Section 3474 authorizes the Secretary to prescribe rules and regulations only to the extent "necessary or appropriate to administer and manage the functions of the Secretary or the Department." 20 U.S.C. § 3474. And section 1221e-3 confers general rulemaking authority on the Secretary only to the extent necessary "to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law." 20 U.S.C. § 1221e-3.

Here, the Secretary has no authority under the CARES Act to "administer" any "function" with respect to the GEER and ESSER funds. *See* 20 U.S.C. § 1221e-3. As Plaintiffs set out in their Motion, ECF No. 36-1 ("Mot.") at 16–17, sections 18002 and 18003 of the CARES Act, which govern the GEER and ESSER Funds, direct the Secretary to do nothing more than distribute the majority of the GEER and ESSER funds to either the Governor of each state, or to each State Educational Agency, in accordance with prescribed formulas. CARES Act, Pub. L. No. 116-136, §§ 18002(b) & 18003(b), 134 Stat. 281, 565 (2020) (to be codified as 20 U.S.C. § 3401). Once GEER and ESSER funds are distributed, they are not part of a program

3

"administered" by the Department.  Defendants do nothing to refute these arguments; they simply cite the Secretary's general rulemaking authority without further explanation.  *See* Opp. at 10.

Defendants' invocation of the Secretary's general rulemaking authority is particularly inapposite where, as here, the Rule imposes conditions on the use of mandatory federal grants to be distributed according to specific statutory guidelines, often referred to as "formula grants." Courts have expressed serious skepticism when an agency attempts to impose special conditions on mandatory federal grants absent express authority to do so—and one Circuit has held such rulemaking is barred—because allowing an agency to impose additional conditions "would be antithetical to the concept of a formula grant."  *City of Los Angeles v. Barr*, 941 F.3d 931, 942 (9th Cir. 2019) (holding that agencies have no rulemaking authority over formula grants); *see also City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 288 (3d Cir. 2019) (concluding that Congress would not hide "such a broad power" to impact mandatory federal grants "in a statute outlining ministerial duties").  Courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks and citation omitted).

Further, an agency's "general rulemaking provisions" do not permit it "to trump Congress's specific statutory directive."  *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 105 F.3d 691, 694 (D.C. Cir. 1997); *see also Ass'n of Private Sector Colls. and Univs. v. Duncan*, 870 F. Supp. 2d 133, 155 (D.D.C. 2012) (vacating portion of Department of Education rule, despite general rulemaking authority, where rule was "not in accordance with" substantive statute).  An agency "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of [that agency] in a particular area."  *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995).

In accordance with these principles, two courts have already preliminarily found that the Rule is unlawful because the Secretary lacked rulemaking authority to issue the Rule. *Washington*, 2020 WL 4922256, at *6 ("[N]othing in either the text or construction of Section 18005 of the CARES Act evidences an intent to import general rulemaking authority."); *Michigan v. DeVos*, No. 3:20-cv-04478, ECF No. 82 at 12 (N.D. Cal. Aug. 26, 2020) ("The Department went well beyond its statutory authority by trying to replace the share formula mandated by Congress in Section 18005(a) with one of its own choosing."); *see also Oakley v. Devos*, No.20-cv-03215-YGR, 2020 WL 3268661, at *9 (N.D. Cal. June 17, 2020) (noting that "Congress has been explicit when it intended to provide the Secretary with authority to establish eligibility criteria or impose conditions" on the CARES Act funds).

For these reasons, the Department's general rulemaking authority does not allow it to go beyond the limited functions it is authorized to perform under the CARES Act.  Because the Secretary lacked any authority to promulgate the Rule, the Rule is void.

### B.    Section 18005 of the CARES Act Is Not Ambiguous as to the Allocation Formula for Equitable-Services Funding

Defendants' sole argument in defense of the Rule is that section 18005 is ambiguous, requiring clarification in the form of a regulation.  Defendants contend that the statute is ambiguous for two reasons:  First, they claim there is tension between section 1117's focus on low-income students and the CARES Act's goal of helping all students in all schools.  *See* Opp. at 8–9.  Second, they claim that because section 18005 includes other provisions similar to the provisions of section 1117, "[i]f the CARES Act's use of the phrase 'in the same manner' incorporated every jot and tittle of section 1117, both the consultation and the public-control provisions of section 18005 would be superfluous."  Opp. at 9.  These invented "ambiguities" do not give Defendants a basis for issuing a Rule at all, and certainly not a Rule that fails to address the claimed ambiguities but contradicts the plain dictates of the statute.

5

      ***1.***     ***"Provide equitable services in the same manner as" clearly and unambiguously includes the manner of calculating the proportion of funds for equitable services under section 1117.***

Defendants admit—as they must—that the plain language of the statute requires LEAs "to provide equitable services to private school students 'in the same manner' as specified in section 1117 of the ESEA." Opp. at 8. Defendants then inexplicably contend that the "Department reasonably concluded that 'in the same manner' does not incorporate section 1117's proportional-apportionment provisions." Opp. at 9. To fill this self-created "ambiguous" hole in the statute, Defendants promulgated a Rule that either requires a different apportionment formula altogether, or imposes spending restrictions on LEAs that choose to follow section 1117's apportionment formula. But the Department cannot create an ambiguity by reading out portions of the incorporated statute it does not like and filling the resulting void with its own policy preferences.

There is simply no ambiguity here permitting any type of rulemaking by the Department. First, section 18005 instructs that LEAs "shall *provide* equitable services in the same manner as *provided* under section 1117." "Provide" means "to supply what is needed for sustenance or support," "to fit out or fit up," or "to supply for use." Webster's Third New International Dictionary (Unabridged) 1827. In other words, "provide" means to supply funds in the same manner. *Accord Michigan*, No. 3:20-cv-4478-JD, ECF No. 82 at 7 ("The words Congress used in Section 18005(a) of the CARES Act are familiar and uncomplicated, to say the least.").

Second, section 18005 instructs that LEAs "shall provide equitable services *in the same manner as* provided under section 1117." As Plaintiffs explained in their Motion, *see* Mot. at 19, "in the same manner as" means "to use the same methodology and procedures," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 545–46 (2012) ("[The Affordable Care Act's] command that the penalty be 'assessed and collected in the same manner' as taxes is best read as referring to those chapters [of the Internal Revenue Code] and giving the [Treasury] Secretary the same

6

authority and guidance with respect to the penalty.”); *see also Lawrence Cty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 271 (1985) (reading a state statute requiring that federal funds be distributed “in the same manner as taxes are distributed” to mean that localities allocated tax revenues and federal aid in proportionally identical ways); *Partlo v. Johanns*, No. CIV.A.04-1462 CKK, 2006 WL 1663380, at *13 (D.D.C. June 11, 2006) (holding that statute requiring Secretary to “‘make assistance available under this section in the same manner as provided under’ the 2000 [version of the statute]” “directed conformity” with the prior statute), *aff’d*, 224 F. App’x 7 (D.C. Cir. 2007).

Defendants do not distinguish this precedent in any way. *See generally* Opp. at 8–11. To use the same “methodology and procedures” to calculate equitable-services funding as under section 1117 requires allocation of funds based upon the number of low-income private-school students, and not the total number of private-school students.

Third, section 18005 instructs that LEAs “shall provide equitable services in the same manner as provided *under section 1117*.”   “[H]istorically speaking, Congress’s reference to Section 1117 of the ESEA cannot be construed as casual or incidental; it is an explicit citation to a formula with which LEAs are well acquainted.” *Washington*, 2020 WL 4922256, at *8.  Thus, there is no ambiguity in the cross-reference to the provision of equitable services under section 1117, which refers “to a simple, familiar, and time-tested formula” well-known to LEAs and to the Department. *Id.*; *see* Mot. at 8 (detailing the Department’s decades-old guidance interpreting section 1117 to require the calculation of equitable-services funding based on the number of low-income students in private schools).

For these reasons, the direction for allocation of funds for equitable services under the CARES Act is clear and unambiguous.

> **2.     None of the irrelevant statutory provisions Defendants cite render Section 18005's allocation formula ambiguous.**

Defendants have no answers to the above arguments.  Instead, they offer two theories outside the plain text of the provision at issue for why that provision is ambiguous, neither of which creates a basis for promulgating the Rule.

First, Defendants argue that Section 18005 is ambiguous because of the "disparate purposes of the CARES Act (to provide emergency relief to all students and schools) and Title I-A (to provide services for low-achieving students)."  Opp. at 9; *see also id.* at 13 ("The Department's interpretation rests on the fact that CARES Act funds can be used more broadly than Title I-A funds, and that the national emergency prompting passage of the CARES Act 'has harmed *all* our Nation's students by disrupting their education.'" (citing 85 Fed. Reg. at 39,479)).

Even if the "purpose" of the CARES Act could supersede the plain text, Defendants are wrong in their characterization of that purpose.  The Act expressly provides that one of the purposes of the ESSER Fund is to address "the unique needs of *low-income* children or students."  CARES Act, Pub. L. No. 116-136, § 18003(d)(4), 134 Stat. 281, 566 (to be codified as 20 U.S.C. § 3401) (emphasis added).  As one court has already held, "[d]istribution of funds under the poverty-based formula will not result in private schools receiving no [Education Stabilization Fund] funding; only in receiving funding in a smaller proportion than they would under the Department-created formula.  This reflects Congress's stated intent in the CARES Act to distribute education funding to all, but to concentrate on those in direst need."  *Washington*, 2020 WL 4922256, at *7.  The Act's purpose thus supports Plaintiffs' reading of section 18005.

Second, Defendants argue that section 18005 is ambiguous because it contains two provisions—one that requires LEAs to consult with private schools and one that requires public schools to maintain control over all CARES Act funds—that are substantively similar to

8

provisions of section 1117.  *See* Opp. at 9, 12.  Accordingly, Defendants' argument goes, if

section 18005(a)'s reference to section 1117 "incorporated every jot and tittle" of section 1117,

section 18005's consultation and control provisions would be rendered superfluous.  *See id.* at 9.

In fact, the presence of separate consultation and control requirements proves that the

allocation mechanism under section 1117 *must* be incorporated in section 18005(a).  Because, as

Defendants recognize, section 18005 elsewhere includes consultation and control requirements,

section 18005(a) must incorporate section 1117's allocation formula, or else its reference to

"section 1117" would be meaningless.  Courts use canons of construction "to resolve ambiguity,

not create it."  *Yates v. United States*, 574 U.S. 528, 564 (2015).  Far from being ambiguous, the

CARES Act's allocation, consultation, control, and use provisions make sense:   Section

18005(a) directs how the funds are to be allocated ("in the same manner as Section 1117," in

consultation with private schools), section 18005(b) directs how the funds are to be controlled,

and sections 18002 and 18003 direct how the funds are to be used.[1]

In any event, even if one concludes that the CARES Act's reference to section 1117 also

incorporates the *consultation* and *control* provisions and thus makes them duplicative of portions

of section 18005, this does not provide a basis for the Department to rewrite the *allocation*

provision of section 1117.  That section remains, because there is no ambiguity as to how that

---

[1] The same conclusion flows from the CARES Act's allocation of GEER and ESSER funds to
States and State Educational Agencies ("SEAs").  In prescribing how the GEER and ESSER
Funds were to be allocated to Governors and SEAs, respectively, Congress specified that those
funds should be awarded—either using a specific formula of 60% based on total population and
40% based on the relative number of children as counted under Title I, in the case of GEER, or
"in proportion to" the amount of funds the SEA received pursuant to Title I-A in the most recent
fiscal year, in the case of ESSER.  Congress had to prescribe formulas for allocation of funds to
Governors and SEAs because there is no allocation provision concerning those entities in section
1117.  By contrast, section 1117 already includes an allocation provision for LEAs, and
Congress expressly incorporated that provision into section 18005(a).

provision of section 1117—and therefore section 18005—is to be implemented.[2]  Yet the Rule

effectively excises that provision by forcing LEAs either to use a different formula, or to use the

section 1117 formula but with extra-statutory conditions attached.

> **3.**       ***There is no inconsistency in the characterization of section 18005 by plaintiffs in the various lawsuits challenging the Rule.***

In a further effort to manufacture ambiguity in the CARES Act, Defendants argue that

"plaintiffs in separate actions challenging the [R]ule have advanced diverging interpretations of

the statute."  Opp. at 12.  Defendants contend that "in an action pending in the Northern District

of California, Michigan and other states argue that section 18005 incorporates section 1117 in its

entirety—including 'Section 1117's eligibility requirements providing that only at-risk private-

school students are entitled to services.'"  Opp. at 12 (quoting Plts. Mot. for Prelim. Inj.,

*Michigan v. DeVos*, No. 3:20-cv-04478-JD, ECF No. 35 at 7 (N.D. Cal. July 20, 2020)).[3]  They

claim that the Washington plaintiffs disagree.  *Id.*  This point is wrong and also irrelevant.

Defendants' citation to the Michigan plaintiffs' brief (Opp. at 12) is to the background

section describing Defendants' April 2020 guidance document.  *See id.* (quoting *Michigan v.

DeVos*, No. 3:20-cv-04478-JD, ECF No. 35 at 7).  It is not a statement of the plaintiffs' position

in that case.  Nor do the Michigan plaintiffs and the Washington plaintiffs disagree.  *See

Washington v. DeVos*, No. 2:20-cv-01119-BJR, ECF No. 51 at 3 (W.D. Wash. Aug. 9, 2020)

("Because the CARES Act refers to the methodology and procedures of Section 1117, the non-

methodological and non-procedural aspects of Section 1117 are not necessarily important here.

The formula is what matters."); *Michigan v. DeVos*, No. 3:20-cv-04478-JD, ECF No. 35 at 12

---

[3] Defendants cite this portion of the Michigan plaintiffs' memorandum in support of their motion for preliminary injunctive relief as ECF 34.  The correct ECF number is 35.

("Congress chose to adopt proportional allocation under Title I-A of the ESEA, and the method and procedure of Section 1117 of the ESEA for equitable services. . . .").

Moreover, the issue here is whether there was ambiguity regarding the *allocation* of funds that would necessitate the Rule on allocation.  Plaintiffs in all actions challenging the Rule agree that there is absolutely no ambiguity in the CARES Act about the proper allocation of funds for equitable services, which every school district immediately understood when they read the CARES Act based upon decades of implementing section 1117.  There is nothing ambiguous about the allocation formula under the statute that necessitated promulgation of the Rule.

### C.    The Rule Is Not Entitled To Deference, Because It Is An Unreasonable Interpretation Of The Statute

Even if the CARES Act was ambiguous (and it is not), the Rule is an unreasonable interpretation of the statute.  Defendants contend that the "Department of Education resolved the tension between the CARES Act and the provisions of section 1117 by reference to Congress's command that the services provided to private schools be 'equitable.'"  Opp. at 11 (quoting CARES Act, Pub. L. No. 116-136, § 18005(a), 134 Stat. 281, 568 (to be codified as 20 U.S.C. 2401).  That is, they decided that the use of the term "equitable" meant the funds should be divided up equally between public- and private-school students.  This is simply wrong.

The Department's reading of the word "equitable" in section 18005 to mean "equal funding" simply deletes the term of art "equitable services" from the statute.  This is a decades-old term well-understood by LEAs and the Department.  *See* Mot. at 8.  Defendants ignore the well-understood meaning of the phrase.  There is also no basis for concluding that Congress intended the allocation of funds to be "equal" between public- and private-school students by referring to "equitable services."  As the court in the Washington case reasoned, "the term 'equitable' in Section 18005 modifies 'services,' and does not refer, as the Department would have it, to how funds should be apportioned.  Thus, the context and plain meaning of this term

show that Congress meant" the funds should be apportioned exactly as "equitable services" funds have been apportioned for decades.  *Washington*, 2020 WL 4922256, at *17.

Nor is there any inequity here that needs to be remedied by the Department.  Private schools were able to obtain funding under the Payroll Protection Program ("PPP")—funds unavailable to the overwhelming majority of public schools.  *See generally* CARES Act, Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286–94.  Allowing private schools to double-dip at the expense of public-school students would create an inequity, not eliminate one.  Regardless, Defendants are not permitted to impose their policy judgment about equity over the unambiguous dictates of the statute.

The Rule is also unreasonable because Option Two imposes additional, entirely extra-statutory restrictions—a prohibition on the use of funds for *any* non-Title I schools, and a "supplement, not supplant" requirement on schools' use of funds—which are nowhere to be found in the provisions of the CARES Act governing elementary and secondary education.  *See* Mot. at 21–22.  Tellingly, Congress *did* impose supplement-not-supplant requirements on the use of other types of CARES Act funds.  *See, e.g.*, CARES Act, Pub. L. No. 116-136, § 3404(a)(3), 134 Stat. 281, 392 (to be codified as 42 U.S.C. § 296b) (Nursing Workforce Development Program) ("Such Federal funds are intended to supplement, not supplant, existing non-Federal expenditures for such activities.").  But Congress did not impose such requirements on elementary- and secondary-education funds.  Defendants offer *no* argument that the "supplement, not supplant" restriction is lawful.  To the contrary, they relegate mention of this prominent provision of the Rule to a footnote that comes close to conceding it is unlawful, arguing only that if the Court finds that condition is unauthorized under the statute, it should sever it, rather than vacating the whole Rule.  *See* Opp. at 11 n.5.

Likewise, the choice itself has no basis in the statute.  Defendants concede that the Department introduced the "choice" "in response to criticism from certain States that its guidance was too inflexible."  Opp. at 6.  But the Department cannot use a problem it created to justify its extra-statutory Rule.  A regulation that does not address the ambiguity it purports to interpret and is contrary to the plain language of the statute would not be reasonable, even if the Department had grounds for promulgating the rule.  *See Util. Air Regulatory Grp.*, 573 U.S. at 328 ("[T]he need to rewrite clear provisions of the statute should have alerted EPA that it had taken a wrong interpretive turn.  Agencies are not free to adopt . . . unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." (internal quotation marks and citation omitted)); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 24–25 (D.D.C. 2020) (holding plaintiffs were likely to succeed on merits of claim that rule was an unreasonable construction of ambiguous statute where "neither of the Final Rule's two core standards answers the question that Congress asked" (internal quotation marks omitted)).

Because the Rule is in excess of the Secretary's statutory authority and not in accordance with law, the Court can and should vacate the Rule on these grounds.

## III.   DEFENDANTS DO NOT MEANINGFULLY CONTEST PLAINTIFFS' CONSTITUTIONAL CLAIMS

In response to Plaintiffs' arguments that the Rule is *ultra vires* in violation of the constitutional separation of powers and violates the Spending Clause, Defendants argue only that "there is no freestanding constitutional impediment to the Department's actions," because the only source of Defendants' authority is statutory.  Opp. at 14.  Citing *Dalton v. Specter*, 511 U.S. 462, 474 n.6 (1994), Defendants suggest that a plaintiff can never bring both an APA challenge and a constitutional challenge to an agency regulation.  *See* Opp. at 14.

One court of appeals has already rejected the precise argument Defendants make here.  In *Sierra Club v. Trump*, 963 F.3d 874, 889–90 (9th Cir. 2020), the court rejected the government's argument that *Dalton* "means that when there is a claim that an Executive Branch official acted in excess of his statutory authority, there is no constitutional violation."  As the court explained, "*Dalton* does not hold that every action in excess of statutory authority is not a constitutional violation.  Rather, *Dalton* suggests that some actions in excess of statutory authority may be constitutional violations, while others may not.  Specifically, *Dalton* suggests that a constitutional violation may occur when an officer violates an express prohibition of the Constitution."  *Id.*  The court went on to hold that the Appropriations Clause is just such an express prohibition.

The same reasoning applies to the Spending Clause.  Like the Appropriations Clause, the Spending Clause "contains such a constitutional prohibition," *id.*—namely, prohibiting conditions on federal funds unless those conditions are "unambiguous[]" and related "to the federal interest in particular . . . programs," *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citations omitted).  As with violations of the Appropriations Clause, then, violations of the Spending Clause can give rise to an independent cause of action.  *See Sierra Club*, 963 F.3d at 890.

Likewise, courts in this Circuit recognize two types of *ultra vires* claims—one that the agency action is "in excess of statutory authority" or "not in accordance with law" under the APA, and one that is a "non-statutory, non-APA ultra vires claim."  *See Adamski v. McHugh*, 304 F. Supp. 3d 227, 236–37 (D.D.C. 2015) (citing *Tex. Alliance for Home Care Servs. v. Sebelius*, 681 F.3d 402, 408 (D.C. Cir. 2012)); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996)).  The latter "derives from the contention that the agency has acted without the authority to do so, and it is based on the inherent power of the federal courts 'to

14

reestablish the limits on [executive] authority' through judicial review." *Id.* at 237 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

Accordingly, Defendants' argument, *see* Opp. at 13–14, that these claims are not freestanding lacks merit.  Although the Court need not reach these claims if it concludes that the Rule violates the APA, they provide an alternative, independent ground for vacating the Rule—and one that goes uncontested on the merits by Defendants.

## IV.   DEFENDANTS DO NOT DISPUTE THAT NATIONWIDE VACATUR IS THE APPROPRIATE REMEDY IF THE RULE IS FACIALLY UNLAWFUL

Defendants do not dispute that vacatur, which has nationwide effect, is the appropriate remedy should the Court conclude that the Rule is facially unlawful.[4]  In this Circuit, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  Nationwide vacatur is particularly important here because school districts all over the country are looking for clear direction on the allocation of these funds at a critically stressful time.  Further, two courts' issuance of preliminary injunctions enjoining the Rule has resulted in various rules for various districts.  *Washington*, 2020 WL 4922256, at *11; *Michigan*, No. 3:20-cv-04478, ECF No. 82 at 15.  Prompt resolution of this issue permanently and on a nationwide basis is essential.

---

[4] Indeed, by arguing in a footnote that the Court should sever the Rule's "supplement, not supplant" requirement, instead of vacate the Rule, if the Court concludes that portion of it is unlawful, Opp. at 11 n.5, Defendants implicitly concede that if the Rule is unlawful, vacatur is the remedy.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that this Court hold that the Rule is unlawful on its face, vacate the Rule in its entirety, and remand to the Department.

Dated:  August 28, 2020           Respectfully submitted,

MUNGER, TOLLES & OLSON LLP
    TAMERLIN J. GODLEY
    (Admitted *Pro Hac Vice*)
    JONATHAN KRAVIS
    (D.C. Bar No. 973780)
    ADELE M. EL-KHOURI
    (D.C. Bar No. 1025090)
    JESSICA REICH BARIL
    (Admitted *Pro Hac Vice*)
    DAVID P. THORESON
    (Admitted *Pro Hac Vice*)

By:        /s/ *Adele M. El-Khouri*
      ADELE M. EL-KHOURI

TAMERLIN J. GODLEY
Tamerlin.Godley@mto.com
JESSICA REICH BARIL
Jessica.Baril@mto.com
DAVID P. THORESON
David.Thoreson@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California, 90017
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

JONATHAN KRAVIS
Jonathan.Kravis@mto.com
ADELE M. EL-KHOURI
Adele.El-Khouri@mto.com
MUNGER, TOLLES & OLSON LLP
1117 F. Street, N.W., Seventh Floor
Washington, D.C. 20004
Telephone:   (202) 220-1100
Facsimile:    (202) 220-2300

*Counsel for All Plaintiffs*
*Additional Co-Counsel for All Plaintiffs Listed on*
*Next Page*

**Additional Co-Counsel for All Plaintiffs**

BACARDI JACKSON
bacardi.jackson@splcenter.org
(Admitted *Pro Hac Vice*)
CHRISTINE BISCHOFF
christine.bischoff@splcenter.org
(Admitted *Pro Hac Vice*)
KATHERINE DUNN
katherine.dunn@splcenter.org
(Admitted *Pro Hac Vice*)
LINDSEY RUBINSTEIN
lindsey.rubinstein@splcenter.org
(Admitted *Pro Hac Vice*)
SAM BOYD
sam.boyd@splcenter.org
(Admitted *Pro Hac Vice*)
MICHAEL TAFELSKI
michael.tafelski@splcenter.org
(Admitted *Pro Hac Vice*)

SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
Telephone:      (334) 315-0179
Facsimile:      (334) 956-8481

WENDY LECKER
WLecker@edlawcenter.org
(Admitted *Pro Hac Vice*)
JESSICA LEVIN
JLevin@edlawcenter.org
(Admitted *Pro Hac Vice*)

EDUCATION LAW CENTER
60 Park Place, Suite 300
Newark, New Jersey 07102
Telephone:      (973) 624-1815
Facsimile:      (973) 624-7339