**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), *et al.*, <br><br>        *Plaintiffs*, <br><br>    vs. <br><br> ELISABETH "BETSY" D. DEVOS, in her official capacity as the United States Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION, <br><br>        *Defendants*. | **Case No. 1:20-cv-01996 (DLF)** |

**AMICUS CURAIE BRIEF OF THE CENTER FOR LAW AND EDUCATION
IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**CORPORATE DISCLOSURE**

The Center for Law and Education states that it is a non-profit corporation exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code and is not a publicly held corporation that issues stock. It has no parent corporation.

## TABLE OF CONTENTS

I.   STATEMENT OF INTEREST ......................................................................1

II.  INTRODUCTION ...................................................................................2

III. ARGUMENT ..........................................................................................4

A.   THE DEPARTMENT'S RATIONALE FOR DEPARTING FROM THE ALLOCATION
     METHOD IN ESEA SECTION 1117..............................................................4

B.   FUNDAMENTAL FLAWS WITH THE DEPARTMENT'S RATIONALE............................5

1.   The fundamental premise of the IFR – that the formula for allocating funds
     must match the requirements for use of the funds, including which students
     are eligible to be served – is completely inconsistent with the way in which
     Title I *and* the CARES Act actually function, including a variety of funding
     allocations (including but not limited to equitable services) that *all* are based
     on poverty and in which student eligibility is *never* based on poverty ..................5

a.   The vast majority of students receiving Title I services are in schools
     where *all* students are eligible to receive services, just as is true of the
     uses of funds in the CARES Act ................................................................6

b.   Some pots of funds in the two laws are used to serve all students,
     others only are low-achieving students but in all cases the allocation
     formula for determining pots is based solely on a different factor –
     the relative proportion of low-income students .......................................6

c.   The Department's Title I regulations provide an explicit rationale for
     LEAs' allocating funds for equitable services based on relative
     shares of low-income students that is equally applicable and important
     for allocating the CARES funds...............................................................7

d.   Rather than the structure of the CARES Act being different Title I,
     they are parallel. Both reflect long-standing federal policy of driving
     dollars to groups of students based on the numbers of low-income
     families while not limiting services based on individual family
     income. The IFR introduces what purports to be a critical distinction
     between the two that does not exist ..........................................................6

2.   The Department incorrectly cites the CARES Act requirement that funds be
     distributed to LEAs based on their relative shares of low-income students as
     part of the rationale for why it need not and should also be the basis for
     determining equitable services allocations, despite the requirement in Section
     1117....................................................................................................9

3.   The Department's claim that only by allocating funds on the basis of total
     enrollment will the fund be sufficient to provide services that are equitable
     is incorrect and would make ESEA section 1117 absurd, even as applied to
     Title I itself ........................................................................................10

**TABLE OF CONTENTS**

**(Continued)**

4.  Basing the allocation of equitable service funds on proportions of all enrolled students rather than all low-income students will actually prevent services from being equitable ........................................................................................11

5.  Basing the allocation formula on private schools' share of all students will actually mean that the funds set aside to serve students in private schools means that, unlike all other pots of money, the amount allocated to serve students being educated in private schools will actually be based on low-income students who are *not* being educated in those schools ......................14

6.  Any differences between the Title I and the CARES Act concerning student residence provide no basis for the interim final rule's abandonment of the allocation formula in Section 1117 ....................................................................15

C.  OTHER MAJOR PROBLEMS WITH IFR AND THE FLAWED REASONING BEHIND IT ..................15

1.  The published material accompanying the IFR inadvertently but clearly demonstrates that the Department goes beyond claiming ambiguity in the CARES Act to an unfounded claim that Congress actually made a serious drafting error that the Department is choosing to correct....................................15

2.  The IFR's wholly inappropriate alternative option to limit CARES Act services only to Title I schools reflects the same flawed assumptions about the purported relationship between the formula for allocating and the uses of those funds......................................................................................................16

D.  MAJOR PORTIONS OF THE ANALYSIS IN THIS BRIEF WERE PROVIDED TO THE DEPARTMENT PRIOR TO ITS ISSUANCE OF THE INTERIM FINAL RULE BUT WERE SIMPLY NOT TAKEN INTO ACCOUNT OR ADDRESSED BY THE DEPARTMENT....................17

IV.  CONCLUSION ..............................................................................................................18

APPENDIX "A": Letter from Assistant Secretary of Education Frank T. Brogan to Paul Weckstein (June 23, 2020) ................................................................................20

# TABLE OF AUTHORITIES

## FEDERAL STATUTES

20 U.S.C. Sec. 1228a(b) ...........................................................................................13

20 U.S.C. Sec. 6317 ........................................................................................ 2, passim

20 U.S.C. Sec. 6318 ........................................................................................ 2, passim

Elementary and Secondary Education Act, 20 U.S.C. Sec.6301 *et seq.* ........................... 1, passim

Pub. L. No. 116-136, 134 Stat. 281 (2020)
("CARES Act"). Coronavirus Aid, Relief, and Economic Security Act............................ 2, passim

## FEDERAL REGULATIONS

85 Fed. Reg. 39,479 (July 1, 2020)................................................................................ 4. passim

20 C.F.R. Section 200.64(a)(1)............................................................................................7. 10

## OTHER AUTHORITIES

Center for Law and Education, *Flawed Guidance on Equitable Services for Private
School Students in the CARES Act* .......................................................................17-18

Education Week, *Devastated Budgets and Widening Inequities: How the Coronavirus Collapse
Will Impact Schools* (May 8, 2020).......................................................................... 18

Frank Grogan, Assistant Secretary of Education, Letter to Paul Weckstein (in response to
Center for Law and Education comments on non-regulatory guidance) (June 23, 2020)............ 18

National Center for Education Statistics, *Study of the Title I, Part A Grant Program
Mathematical Formulas* (2019) .................................................................................6

U.S. Department of Education, Updated Non-Regulatory Guidance under Title I, Part A
(October 27, 2019) .................................................................................................5-6

## I.      STATEMENT OF INTEREST

Amicus curiae Center for Law and Education is a national non-profit resource, advocacy and support center dedicated to advancing the right of all students to high-quality education, particularly for low-income students. The Center has an extensive fifty-year history of collaborating with educators, families, their advocates, and community organizations to implement Title I of the Elementary and Secondary Education and other key federal education programs (e.g., career and technical education, special education, and bilingual education), the civil rights statutes, and state education reform initiatives through internal school capacity-building and outside advocacy. It has also worked to improve federal policies under those laws.

With respect to the issue before this Court, the Center has submitted detailed comments and analysis on the non-regulatory guidance issued by the United States Department of Education concerning the provision of equitable services under the CARES Act, as well as on the interim final rule at issue in this case.

The Center has solely authored this proposed brief amicus curiae, and no party or party's counsel nor any other individual or entity other than the Center for Law and Education contributed money to fund preparation or submission of this brief.

## II.    INTRODUCTION

In this case, plaintiffs are challenging an interim final rule issued by the United States Department of Education ("the Department") concerning the provision of equitable services to students and teachers in non-public schools under section 18005 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act," P.L. No. 116-136, 134 Stat. 281 (March 27, 2020). Section 18005(a) of the CARES Act states that a local educational agency (LEA) receiving funds under either the Elementary and Secondary School Emergency Relief (ESSER) Fund or the Governor's Emergency Education Relief (GEER) Fund "shall provide equitable services in the same manner as provided under section 1117 of [Title I of] the Elementary and Secondary Act of 1965 (ESEA, 20 U.S.C. Sec. 6317) to students and teachers in non-public schools." Section 1117(a)(4)(A) and (c) explicitly provide that the proportion of the federal funds to be allocated to serving private school children shall be equal to the proportion of low-income children who attend private schools. Despite this clear language, the interim final rule says the LEA should instead allocate funds based on the proportion of all students in the LEA who attend private schools.

This *amicus* brief does not repeat the arguments made in the plaintiffs' memorandum of points and authorities in support of their motion for preliminary injunctive relief or, in the alternative, summary judgment. (Document 36-1). Instead, this brief focuses in detail on the reasoning supplied in the interim final rule (IFR, as well as in the non-regulatory guidance that preceded it) supporting the Department's conclusions that applying the allocation formula found in section 1117 of Title I would make no sense and that basing allocations on all students is necessary in order to properly implement the CARES Act. Those substantive conclusions, and the reasoning behind them, are central to the Department's claims both that the CARES Act

2

provision is ambiguous (because reading CARES Act section 18005 to literally incorporate the allocation method found in ESEA section 1117 would make no sense) and that, in resolving this ambiguity, the Department is properly exercising its authority by substituting an allocation formula based on proportions of all students. This brief demonstrates numerous flaws in the Department's logic and fundamental misinterpretation of both ESEA Title I and the CARES Act, central among them an effort to claim a necessary correspondence between which students are counted for purposes of determining funding allocations and how the funds, once allocated, are to be used, including which students are to be served – a correspondence that exists nowhere in either Title I or the CARES Act, neither in the equitable services provision nor in other parts of the programs – and how this not only undermines the claim that the formula substituted by the IFR is the only way to ensure equitable services but actually results in inequitable services. The brief further demonstrates that the IFR's substitute allocation formula is not simply apportioning funds based on the numbers of students enrolled in the private schools; the amount set aside to serve private schools is actually based, in significant part, on numbers of low-income students who in fact are *not* being educated in those private schools but rather in the public schools. In addition, as will be seen from the materials accompanying the IFR – which explicitly direct LEAs to a different, unrelated provision of the Elementary and Secondary Education Act in order to implement the IFR's allocation formula – the Department's position is not simply that Congress left some ambiguity (for which the Department's approach is the right answer), but instead amounts to a claim that Congress actually made a serious drafting error, a drastic conclusion totally lacking in any support.

### III.     ARGUMENT

**A.     THE DEPARTMENT'S RATIONALE FOR DEPARTING FROM THE ALLOCATION METHOD IN ESEA SECTION 1117**

The heart of the interim final rule's rationale for departing from the allocation method

clearly set out in Section 1117 is stated as follows:

> "Congress has already taken poverty into consideration in allocating CARES Act funds to LEAs. An LEA receives ESSER funds based on its proportionate share of Title I funds (section 18003(c) of the CARES Act). The Department allocates Title I funds to LEAs through four statutory formulas, all of which are based on poverty counts that include both public and non-public school children........ Similarly, 40 percent of the GEER funds a Governor receives is based on the State's share of Title I formula children (section 18002(b)(2) of the CARES Act). Thus, Congress targeted both ESSER and GEER funds to high-poverty areas to reflect their need.

> "However, once this allocation is made, the CARES Act authorizes an LEA to serve all students—public and non-public—who have been affected by COVID–19. *If the CARES Act does not limit services based on residence and poverty, then it stands to reason that an LEA should not use residence and poverty to determine the proportional share of available funds for equitable services to non-public school students.* In this context, only the use of enrollment data ensures that sufficient CARES Act funds are reserved to provide services to non-public school students and teachers that are equitable in comparison to their public school counterparts. In fact, this is the only way to give meaning to the phrase 'in the same manner' consistent with section 1117(a)(3) of the ESEA, which requires that benefits for 'private school children shall be equitable in comparison to services and other benefits for public school children.' In other words, if an LEA elects to use CARES Act funds to serve all its students, then only a calculation of proportional share based on all students—i.e., enrollment—satisfies the requirements of section 1117(a)(3)."[1]

---

[1] 34 Fed. Reg. 39482-83 (emphasis added). [Footnotes, on the specific low-income formulas used for Title I distribution to LEAs, and on the proportion of all elementary and secondary school students (approximately 9.1%) enrolled in private schools omitted. It is worth noting, however, that the proportion of the nation's low-income students that private schools serve is much, much smaller -- which is of course why the rule's departure from Sec. 1117 matters so much.]

B.     **FUNDAMENTAL FLAWS WITH THE DEPARTMENT'S RATIONALE**

1.     **The fundamental premise of the IFR – that the formula for allocating funds must match the requirements for use of the funds, including which students are eligible to be served – is completely inconsistent with the way in which Title I *and* the CARES Act actually function, including a variety of funding allocations (including but not limited to equitable services) that *all* are based on poverty and in which student eligibility is *never* based on poverty.**

The core error in the interim final rule, reflected in the italicized quote above, comes from confusing and conflating the formula for *allocating funds* with the requirements for *the use of funds* (including who is to be served) and assuming that there must be a particular relationship between the two. But that in fact is not the case, and indeed no such relationship is found in Title I itself. Under Section 1117 of Title I, the *allocation* of funds to serve students in private schools is based on the numbers of low-income students in those private schools (just as allocations to LEAs and public schools are). But there is simply *no* requirement that the Title I funds then be used to serve only low-income students in those private schools. Instead, the funds are to be used to serve those students who are failing, or are at most risk of failing, to meet the State's challenging academic standards,[2] in order to help them meet those standards. This is the exact same requirement that applies to use of Title I funds in public targeted assistance schools, which receive their allocations based on the number of low-income students, but then serve struggling and vulnerable students defined in exactly those same terms, regardless of family income.[3]

_____

[2] Along with homeless children; children in local institutions or programs for neglected and delinquent children and youth; and children who participated in the previous two years in a Head Start, Title I preschool, Title I migrant, or Title II, Part B, Subpart 2 literacy program.

[3] The Department's Title I guidance on providing equitable services to eligible private school children, teachers, and families recognizes this clear distinction between students counted for purposes of determining the allocation for private school students, devoting Part B of the guidance to the task of determining the number of students in poverty, and students eligible for services, addressed in Part C., "Delivery of Equitable Services." Under C-1 (page 30)., "What private school students are eligible for Title I services?", it flatly states: "Poverty is not a criterion for eligibility for services." U.S. Department of Education, Title I, Part A of the

Indeed, the Section 1117 provision on the private school students to be served directly incorporates the provision from the section on targeted assistance schools.

> **a.      The vast majority of students receiving Title I services are in schools where *all* students are eligible to receive services, just as is true of the uses of funds in the CARES Act.**

Equally telling, and completely contradicting the picture of Title I painted in the interim final rule: *95 percent* of students receiving Title I services are in schoolwide Title I programs that serve ***all*** students in the school.[4] In those schools, the Title I funds are available to improve the entire academic program for all students. Yet those schools too get their allocations solely on the basis of the numbers of low-income students enrolled. Those facts by themselves are enough to entirely melt away the purported distinction the interim final rule makes between Title I and the CARES Act, let alone any notion of a distinction so compelling that it requires LEAs to ignore the clear language of the CARES Act.

> **b.      Some pots of funds in the two laws are used to serve all students, others only are low-achieving students but in all cases the allocation formula for determining pots is based solely on a different factor – the relative proportion of low-income students.**

The fact that the pots of funds can be used (a) for low-achieving students as in the case of

---

Elementary Education Act of 1965, as Amended by the Every Student Succeeds Act: Providing Equitable Services to Eligible Private School Children, Teachers and Families – Updated Non-Regulatory Guidance (October 7, 2019).

[4] As the Department of Education's National Center for Education Statistics explains: "*It is important to note that there is no direct link between the formula-eligible children upon whom the distribution of funds is based and the children who receive services from Title I. Today, 95 percent of children served by Title I receive services in schoolwide programs that serve all children in the school, regardless of whether they meet one of the specific criteria for eligibility determination.* (table I.A)." National Center for Education Statistics, *Study of the Title I, Part A Grant Program Mathematical Formulas* (2019), Executive Summary (emphases added). https://nces.ed.gov/pubs2019/titlei/summary.asp. ["Formula-eligible" and "eligibility determination" here refer to eligibility to be counted in the formulas for allocating Title I funds, not to the students eligible for Title I services, which, as indicated above, are *never* limited to low-income students (even in targeted assistance schools or in serving students in private schools).]

(i) Title I targeted schools and (ii) for Title I services to private school students, or (b) for all the public school students as in the case of (i) Title I schoolwide programs and (ii) the LEAs' funds under the CARES Act, does not change the fact that in each of these four different cases, the amount of funds available to serve all the students eligible for services is limited based on the numbers of low-income students, even though *none* of these programs limits services to low-income students. And yet, despite the explicit directive from Congress to use *the same* approach for private school students under CARES, the interim final rule abandons it altogether.

      c.    **The Department's Title I regulations provide an explicit rationale for LEAs' allocating funds for equitable services based on relative shares of low-income students that is equally applicable and important for allocating the CARES funds.**

The rationale for allocating funds for public school students and private school students on the basis of the relative shares of low-income students (regardless of the fact that use of the funds will not be restricted to them) is further clarified in the Department of Education's Title I regulations on equitable participation: "Funds expended by an LEA . . . for services for eligible private school children in the aggregate must be equal to the amount of funds *generated by* private school children from low-income families."[5] In other words, the Title I allocation to the LEA was based on, and generated by, the total number of low-income children residing within the area served by the LEA, including those attending private schools as well as public schools, so the allocation of those funds to serve private school students versus public school students is tied to where the students who generated those funds are. The same rationale, of course, is applicable to the CARES Act, where ESSER funds are similarly driven to LEAs based on that same Title I formula. And this further highlights the irrationality, as well as illegality, of

---

[5] 20 C.F.R. Section 200.64(a)(1) (emphasis added).

ignoring the requirements of section 1117 that the CARES Act says are applicable, and counting *all* private school students in the allocation formula instead of tying the allocation of funds for private school students to the number of low-income students in private schools that generated the LEA's allocation.

> **d.      Rather than the structure of the CARES Act being different Title I, they are parallel. Both reflect long-standing federal policy of driving dollars to groups of students based on the numbers of low-income families while not limiting services based on individual family income. The IFR introduces what purports to be a critical distinction between the two that does not exist.**

Thus, rather than the structure of the CARES Act being different from Title I, they are directly parallel: Both require that the determination of the amount of funds allocated be based on the number of low-income students, and each then has its own definition of how those allocated funds are to be used, appropriate to the specific nature of the program, and in neither case limited to low-income students. The interim final rule, as written, unfortunately and incorrectly introduces what purports to be a critical distinction between the two where in fact none exists.

This proper understanding of the CARES Act provision incorporating Title I Section 1117 is also entirely consistent with the rest of the CARES Act. The Elementary and Secondary School Emergency Relief (ESSER) Fund dollars go to each State based on its share of Title I Part A funds (i.e. based on children from low-income families), as does each LEA's share of its State's ESSER funds – despite the fact that the funds (in the case of both Title I and ESSER) are not ultimately limited to serving low-income students.  And in the case of Title I funds, the LEA's allocations to schools are also based on numbers of low-income students.  There is nothing paradoxical, problematic, or novel about a structure that consistently channels federal funds based on low-income populations while not limiting services based on individual family

income – indeed, that is the core structure of both Title I and ESSER, as well as other federal

programs in various fields. It reflects an overall policy of driving federal resources to areas of

economic need. There is absolutely no basis for the interim final rule to state that a provision in

the CARES Act that also explicitly relies on an allocation provision based on low-income student

counts should depart from that structure.  If, instead, the reasoning in the interim final rule were

to hold sway, it would similarly argue that States should also not have been compelled to use the

poverty-based Title I formula in allocating ESSER funds to LEAs, since the ESSER funds will

be used by LEAs to benefit all students.

> **2.      The Department incorrectly cites the CARES Act requirement that funds
> be distributed to LEAs based on their relative shares of low-income students
> as part of the rationale for why it need not and should not also be the basis
> for determining equitable services allocations, despite the requirement in
> Section 1117.**

The fact that "Congress has already taken poverty into account in allocating CARES Act

funds to LEAs" (as well as in allocation ESSER funds to States) is not a sensible argument for

why it need not be taken into account in dividing funds between the pot available for public

schools in the LEA and the pot available for serving private school students. Rather it is, if

anything, further evidence that Congress meant what ESEA section 1117 says. That the CARES

Act follows Title I in driving funds from the federal government to the States and from States to

LEAs based on poverty counts, even though in no case are the students to be served defined by

poverty (and even though the vast majority of Title funds are used to benefit all students in Title

I schools), provides all the more reason to presume that providing equitable services in the same

manner as Section 1117 means applying that same allocation principle explicitly found there.

The fact that poverty is "already taken into account" at a higher level makes no more sense than

arguing that, since Congress had allocated Title I and ESSER funds to States based on poverty,

there was no need to allocate the funds to districts based on poverty, or that having already done

so at the LEA level, Congress had no need to require LEAs to distribute Title I funds to Title I

schools based on poverty, rather than on total enrollment (especially since the vast majority of

Title funds were to going to benefit entire school) *or* to require, as it clearly did, the allocations

for Title I equitable based on poverty. In fact, as noted earlier, the Department's own Title I

regulations spell out why the policy of allocating funds for equitable services based on poverty

counts actually flows out of the fact that the funds provided to the LEA are based on poverty

counts: "Funds expended by an LEA . . . for services for eligible private school children in the

aggregate must be equal to the amount of funds *generated by* private school children from low-

income families."[6]

> **3.     The Department's claim that only by allocating funds on the basis of total
> enrollment will the fund be sufficient to provide services that are equitable is
> incorrect and would make ESEA section 1117 absurd, even as applied to
> Title I itself.**

The quoted passage, *supra*, from the Department's analysis accompanying the Interim

Rule argues that "only the use of enrollment data ensures that sufficient CARES Act funds are

reserved to provide services to non-public school students and teachers that are equitable in

comparison to their public school counterparts. In fact, this is the only way to give meaning to

the phrase 'in the same manner' consistent with section 1117(a)(3) of the ESEA, which requires

that benefits for 'private school children shall be equitable in comparison to services and other

benefits for public school children.'' In other words, if, as the rule presumes, both all public

school students and all non-public school students are eligible to be served, the services for

private school students will not be equitable in comparison to those for public school children

---

[6] 20 C.F.R. Section 200.64(a)(1) (emphasis added).

unless the average amount of funds available per eligible student are the same. But that claim reflects another, related failure to look at how Title I itself actually works. Under Sec. 1117 as applied to Title I, the allocation for equitable services is based on the relative private school vs. public school share of low-income students, but the equitable services are provided to low-achieving students, regardless of income. The average amount of dollars to serve each eligible, low-achieving private school student will not be the same as the amount to serve each low-achieving public student – unless by coincidence the relative proportions of low-achieving students happen to be the same as the relative proportions of low-income students.  And no matter how many private school children are eligible for Title I services because they are low-achieving, if fewer of the private school children are low-income, fewer dollars are made available to serve those eligible children. [7] Thus if, as the explanation of the rule argues, services are not equitable under the terms of section 1117 unless the amount of funds to serve each eligible student in the private schools are the same as those in the public schools, then application of the formula in Sec. 1117 in Title I itself results in a violation of the equitable services requirements of Sec. 1117. That is, of course, an absurd result and clearly is not the meaning of equitable services in Title I any more than it is in the CARES Act.

   4.   **Basing the allocation of equitable service funds on proportions of all enrolled students rather than all low-income students will actually prevent services from being equitable.**

---

[7] This is no different in principle from the fact that, for schools or LEAs with higher proportions of low-income students get more federal assistance to meet the needs of their students than schools or LEAs with lower proportions, regardless of the extent, if any, to which the educational needs are greater. Similarly, it is no different in principle from the fact that, for two schoolwide program schools, which is where the vast majority of Title I-participating students are served and in which all students benefit, the one with the higher proportion of low-income students will receive more federal resources per eligible student than the other school.

It is not simply that the rule is wrong in presuming that the equitable services requirement cannot be met unless the allocations are based on enrollment (and specifically cannot be met if the Section 1117 poverty-based allocation formula is used). In addition, *basing the allocations on enrollment*, even if all students are eligible for CARES Act services, *will actually produce inequitable results*. All students being eligible for services does not create an individual entitlement, in public or private schools, to an equal amount of services and individual expenditures for each student. The CARES Act provisions on allowable uses of ESSER funds recognize a wide variety of student needs experienced by different students, for example in "Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population"[8] -- needs that, along with achievement gaps and barriers to their learning, have preceded but been exacerbated by the pandemic. Lack of consistent, adequate access to the internet, hardware, and software needed to make effective use of online learning is another need recognized among allowable of ESSER funds[9] and that is highly correlated with poverty, as well as homelessness. Language barriers for English learners, already correlated with lower

---

[8] CARES Act Sec. 18003(d)(4). See also Sec. 18003(d)(11), referencing that range of students in relation to summer classroom and online learning and supplemental afterschool program; (d)(1), on activities authorized by other federal programs (ESEA, IDEA, Perkins, Adult Education Literacy Act, and McKinney-Vento) that in turn have some substantial focus on meeting the educational needs of those populations; and (d)(3), on providing principals and school leaders with the resources necessary to address the needs of their individual schools, which of course are affected by their proportions of low-income students or of students who experience other challenges to learning requiring more resources to meet their needs.

[9] "Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the local educational agency that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment." Sec. 18003(d)(9).

achievement, have grown in the face of distance learning and greater isolation from English speakers.  In addition, the families of these various groups have been disproportionately impacted in other ways by the pandemic that in turn impact their children's conditions for learning (from loss of basic income in families that were already struggling economically up to and including a higher incidence of COVID-related deaths of parents and other family members). And not only are these various needs recognized in ESSER, but under the General Education Provisions Act (GEPA), LEAs have an affirmative legal obligation to describe in their CARES Act applications the steps they will take " *to ensure equitable access to, and equitable participation* in, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age."[10]

Thus, rather than there being a uniform level of need for every student, there are important needs that that are recognized by the CARES Act, that the LEAs may address and in some cases are required to address under GEPA, the Civil Rights Acts, and other federal laws, that are not uniform, and that are either directly related to poverty or tend to be heavily correlated with it. So if CARES Act funds within in a school district are allocated in equal amounts per student to serve public school and private school students but as is typically the case, the private schools have a much smaller portion of low-income students, English learners, homeless children, etc., the CARES Act resources available to provide services to meet actual needs will be much lower in the public schools. We are long past the point where allocating equal dollars

---

[10] GEPA Section 427(b)) [20 U.S.C. Sec. 1228a(b); emphasis added].

per child to two groups of children, one of which has much greater needs than the other, can be considered equitable.

5. **Basing the allocation formula on private schools' share of all students will actually mean that the funds set aside to serve students in private schools means that, unlike all other pots of money, the amount allocated to serve students being educated in private schools will actually be based on low-income students wo are *not* being educated in those schools.**

This last point further demonstrates the folly of the failure to allocate the funds for equitable services in the same manner as Sec. 1117, and the wisdom of following Sec. 1117 and its rationale, recognized in the Department's Title I regulations, of basing the relative shares of funds on the students who generated those funds, namely low-income students. Under the IFR, since the money reaches the district based on the low-income students residing within it, the pot of money available to serve students in private schools would be based on the total number of low-income students in the district, even when the private schools are *not* actually educating a proportionate share of those students. The dollars to serve students in every other pot is based on the number of low-income students being educated, but not this one under the IFR. *Funds set aside for serving this group of students become uniquely privileged because they are actually based on low-income students being educated elsewhere (namely in the public schools).* That is the result of basing the money that comes into the district on the number of low-income students residing in it but then not following through with determining the amount to be set aside for private school students on the same basis -- and for the same rationale recognized in the Department's Title I regulations. Thus, rather than the IFR being consistent with the CARES Act, it is actually entirely and fundamentally inconsistent, not just with Section 1117 of ESEA, but with the CARES Act itself. And the heavy price[11] for this inconsistency in providing these

---

[11] For example, in a district which roughly mirrors the national averages, private school students

funds that are actually based on the number of low-income that are *not* among the students

served is paid by the public school students of the district.

      **6.**      **Any differences between the Title I and the CARES Act concerning student residence provide no basis for the interim final rule's abandonment of the allocation formula in Section 1117**

The interim final rule also relies on the fact that Title I fund formula allocations carry

down to the school level, with not all schools in an LEA receiving Title I funds, and thus private

school students receive services only if they reside in an attendance area served by a Title I

school, while CARES fund allocations are specified only down to the LEA level and can thus

serve schools in all areas. But this difference requires simply applying the formula (along with

the residence provision) set forth in Section 1117 at the district level, rather than at the school

level. Moreover, there are LEAs in which *all* school attendance areas in the district are eligible

for Title I funds – for example, when at least 35% of children are from low-income families in

all attendance areas or schools. See ESEA Title I Section 1113(b)(1)(A). So even this is not

something novel in the CARES Act. Contrary to the interim final rule, it provides no basis for

abandoning that core formula altogether.

     **C.**    O**THER** M**AJOR** P**ROBLEMS WITH** IFR **AND THE FLAWED REASONING BEHIND IT**

      **1.**      **The published material accompanying the IFR inadvertently but clearly demonstrates that the Department goes beyond claiming ambiguity in the CARES Act to an unfounded claim that Congress actually made a serious drafting error that the Department is choosing to correct.**

Plaintiffs' memorandum in support of their motion for preliminary injunctive relief or, in

the alternative, summary judgment correctly points out that if Congress had wanted the

---

that constitute 9% of the students but less than 1% of the low-income students would get roughly
ten times as much money as they should because of the low-income students being educated not
in those private schools but in public schools from which those additional would be diverted.

determination of CARES Act funds to be based on the proportion of all students in private

schools, rather than the proportion of low-income students, it would have tied the equitable

services provision not to Section 1117 of ESEA but to Section 8501, under which LEAs allocate

funds for equitable services under other, non-Title I, Part A programs based on the relative

numbers of students. Indeed, that is the primary distinction between the two sections.

What we add here as *amicus* is that the Department, in discussing how LEAs can

determine the amount of funds to be allocated for equitable services, states,

> "For the majority of these LEAs, enrollment data should already be available for non-
> public schools that participate in equitable services under ESEA programs other than
> Title I. Equitable services under those programs are governed by section 8501 of the
> ESEA, which requires in determining expenditures for equitable services that an LEA
> take into account the number of non-public school students to be served."[12]

In other words, the Department, in order to carry out its version of equitable services, is

explicitly directing LEAs to look to Section 8501 of ESEA rather than Section 1117, precisely

the opposite of the choice that Congress made. So the IFR is, in essence, declaring that

Congress clearly made a very big drafting error in the CARES Act which the Department is

taking upon itself to correct. All of the analysis that precedes this rebuts that assumption, for

which there is no foundation.

**2.      The IFR's wholly inappropriate alternative option to limit CARES Act
         services only to Title I schools reflects the same flawed assumptions about the
         purported relationship between the formula for allocating and the uses of
         those funds.**

Plaintiffs' memorandum in support of their motion for preliminary injunctive relief or, in

the alternative, summary judgment demonstrates that the interim final rule's option of allowing

an LEA to follow section 1117 in using the proportion of low-income students as the basis for

---

[12] 34 Fed. Reg. 39485 (as part of the Department's analysis of the costs of implementing the
IFR).

allocating funds to serve students private schools only if it limits the use of the CARES Act

funds to Title I schools has no place in the CARES Act and provides no real option. Thus, the

interim final rule first *rejects* the clear requirement in section 1117 to base the allocations on the

relative proportions of low-income students because it erroneously concludes that such a formula

is inconsistent with the CARES Act and its purposes, when, as demonstrated above, it is not at all

inconsistent. It then *injects* a Title I requirement that actually *is* inconsistent with the CARES

Act and its purposes, to the detriment of the public school students and staff it is designed to

serve.   That core problem is then compounded by also incorporating a Title I requirement,

supplement not supplant, not from section 1117 of ESEA but instead from section 1118 of

ESEA. We also note that, in offering this "option," the interim final rule seems driven by the

same fallacy that has created the larger problem – namely, erroneous assumptions about the

relationship between the uses of funds and the formula for determining the amount of funds, so

that the use of the low-income formula for allocating equitable services funds is only permissible

if other portions of Title I, related to the use of funds, are also followed.

D.    **MAJOR PORTIONS OF THE ANALYSIS IN THIS BRIEF WERE PROVIDED TO THE DEPARTMENT PRIOR TO ITS ISSUANCE OF THE INTERIM FINAL RULE BUT WERE SIMPLY NOT TAKEN INTO ACCOUNT OR ADDRESSED BY THE DEPARTMENT.**

Significant portions of the analysis presented in this *amicus* brief were included in

extensive comments that *amicus* Center for Law and Education submitted to the Department of

Education in response to the Department's non-regulatory guidance on CARES Act equitable

services, which preceded its issuance of the interim final rule [in particular, the ways in which

the guidance conflated the basis for allocating funds and the uses of funds (including students to

be served), presuming a relationship between the two that exists neither in Title I nor in the

CARES Act, while creating a fatal conflict between the two Acts that also does not exist, as well

as the flaws in the conclusions drawn from the residence provisions of Title I].[13] Yet, in issuing

the interim final rule, the Department did not respond in any way to the analysis in those

comments (either by critiquing it or by acknowledging and adopting portions of it) -- neither in

its explanatory material accompanying the publication of the interim final rule or in its letter of

reply to the Center for Law and Education.[14] (As discussed above, the inappropriate new option

it created in the interim final rule does not do so; it suffers from the same faulty assumptions

analyzed in those comments.)

## III.   CONCLUSION

In conclusion, the interim final rule is thoroughly inconsistent with the plain language of

the Act and its interpretation commands LEAs to violate the law. Its conclusions are erroneously

arrived at by (a) conflating the *allocation* of funds with the *uses* of funds, when they are

intentionally distinct, while at the same time (b) creating a distinction between Title I and

CARES that, for purposes of the Act, does not exist. The result is not only contrary to the law. It

runs contrary to the intentions and goals of the law in seeking to help address losses incurred by

the pandemic. It has severe consequences for the funds that were expressly intended to be

available to serve public school students, particularly those in districts that have high

concentrations of low-income students in their public schools. And these districts are the ones

that are most typically in jeopardy of severe loss of revenues, since they typically depend more

on state tax revenues that the pandemic most threatens (e.g., income and sales taxes), unlike

wealthier districts that are typically more reliant on local property taxes.[15]

---

[13] http://www.cleweb.org/news-article/analysis-serious-flaws-federal-instructions-school-districts-serving-private-school

[14] *Attached* as Appendix "A".

[15] See, for example, "Devastated Budgets and Widening Inequities: How the Coronavirus Collapse Will Impact Schools," *Education Week* (May 8, 2020), including the link to charts

For all these reasons, we respectfully ask that the Court grant plaintiffs' motion for partial summary judgment.

Dated: August 29, 2020                    Respectfully submitted,

                                          By  s/ Paul Weckstein
                                          Paul Weckstein, *pro hac vice*
                                          (Massachusetts Bar No. 519000)
                                          Center for Law and Education
                                          7011 8th Street NW Washington,
                                          Telephone: 202-986-3000
                                          Facsimile:  202-986-6648
                                          Email:  pweckstein@cleweb.org

                                          Sponsoring attorney: Matthew B. Bogin

---

showing district-by-district risks. https://www.edweek.org/ew/articles/2020/05/09/devastated-budgets-and-widening-inequities-how-the.html.

[APPENDIX "A"]



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF ELEMENTARY AND SECONDARY EDUCATION

June 23, 2020

Paul Weckstein
Co-Director
Center for Law and Education
105 Chauncy Street, 6th Floor, Suite 3
Boston, MA 02111

Dear Mr. Weckstein:

Thank you for your letter to Secretary Betsy DeVos regarding the Coronavirus Aid, Relief, and Economic Security (CARES) Act. Your letter has been referred to the Office of Elementary and Secondary Education (OESE), and I am pleased to respond.

Secretary DeVos and the Department of Education (Department) appreciate your difference of opinion in interpreting how equitable services are to be provided under the Governor's Emergency Education Relief Fund (GEER Fund) and the Elementary and Secondary School Emergency Relief Fund (ESSER Fund) as established under the CARES Act. However, the Department disagrees with your interpretation. As a result, the Department will issue a rule on the topic in the next few weeks and will invite public comments. We trust that the process will resolve any issues in plenty of time for the next school year.

The CARES Act is a special, pandemic-related appropriation to benefit all American students, teachers, and families. The Department does not read in the CARES Act an intention to discriminate between children based on public or non-public school attendance. Because the virus affects everyone, the Department is resolved to make sure all children and schools may receive relief.

The CARES Act is not a Title I program. The CARES Act's student eligibility and use of funds provisions are significantly broader than those under Title I, Part A. As you know, section 1117(a)(3) requires that educational services and other benefits for students in non-public schools must be equitable in comparison to those for public school students. The services that an LEA may provide under the CARES Act programs are available to all public school students and teachers, not only low-income students and their teachers. Similarly, there is no limitation on attending a Title I school to receive services under CARES Act programs. Therefore, to make services equitable in comparison to public school students, it follows that the same principles must apply in providing equitable services to all non-public school students and teachers.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access*

[APPENDIX "A"]

The Department notes the requirement to provide equitable services is "in the same manner as provided under section 1117." By using the phrase "in the same manner," Congress appears to acknowledge that equitable services under the CARES Act cannot be provided *exactly* like Title I, Part A services. Given the CARES Act's particular funding structure and separate consultation and public control of funds provisions, this distinction makes sense. Had the intent been otherwise, Congress could have simply and explicitly directed LEAs to provide equitable services exactly as is written under section 1117.

Given the practical interplay between the CARES Act and section 1117, it is reasonable to determine that the proportional share of CARES Act funds should be budgeted for equitable services based on enrollment. It is worth noting that poverty is already accounted for in the LEA allocations under the ESSER Fund through the Title I, Part A formula. Similarly, the GEER Fund state allocation is based significantly on each State's share of Title I formula children but is explicitly authorized and designed to serve all students and teachers. In determining the share of CARES Act funds for equitable services based on enrollment, less than 10 percent of the funding nationwide will be provided for equitable services for non-public school students and teachers, with more than 90 percent of the funding directed to public school students and teachers.

The Department and I continue to work tirelessly for the students of our nation, especially in this time of uncertainty. Thank you for your attention to these matters and for your service.

Sincerely,

Frank T. Brogan
Assistant Secretary
for Elementary and Secondary Education