**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **Civil Case No. 1:20-cv-01996 (DLF)** |
| ELISABETH "BETSY" D. DEVOS, in her official capacity as the United States Secretary of Education and the UNITED STATES DEPARTMENT OF EDUCATION | ) ) ) ) ) | |
| Defendants. | ) ) | |

**TEXAS-FOCUSED EDUCATIONAL EQUITY ORGANIZATIONS'
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... 3

STATEMENT OF INTEREST .................................................................................................. 7

SUMMARY OF ARGUMENT .................................................................................................. 8

ARGUMENT ............................................................................................................................. 9

I.   The Department unlawfully replaced the equitable services allocation method that Congress expressly and unambiguously adopted with its own policy preferences. ........... 9

    A.   The Department's funding formula erroneously considers all private school students rather than only low-income private school students residing in the district................................................................................................. 10

    B.   Congress's method of equitable services funding was reasonable and responsive to the needs of public schools, which are not eligible for other CARES Act funds. .............................................................................................. 13

II.  The Rule will have devastating and irreparable impacts on Texas public school students and further entrench inequities already exacerbated by the COVID-19 crisis. ....................................................................................................................... 15

    A.   The Department's Rule will cost Texas school districts more than $38 million. ...................................................................................................... 15

    B.   The Department's Rule is particularly harmful for students of color, students from families with limited incomes, and other traditionally-marginalized communities. ................................................................................ 16

    C.   The Department's Rule will further exacerbate existing educational inequities by depriving Texas public school districts of funds desperately needed to keep school communities safe and provide critical education services............................................................................................................. 17

III. The Department's arbitrary actions have delayed distribution of critical resources. ....... 20

CONCLUSION......................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Edgewood v. Kirby*,
    777 S.W.2d 391 (Tex. 1989) ................................................................................ 18

*Edgewood v. Kirby*,
    804 S.W.2d 491 (Tex. 1991) ................................................................................ 18

*Edgewood v. Meno*,
    917 S.W.2d (Tex. 1995) ....................................................................................... 18

*Morath v. Tex. Taxpayer & Student Fairness Coalition*,
    490 S.W.3d 826 (Tex. 2016) ................................................................................ 18

*Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*,
    176 S.W.3d 746 (Tex. 2005) ................................................................................ 18

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ................................................................................................. 18

## Statutes

20 U.S.C. § 3401 ........................................................................................................... 7

20 U.S.C. § 6320(a)(1) ............................................................................................ 10, 11

20 U.S.C. § 70 ............................................................................................ 8, 10, 12, 13

26 U.S.C. § 501 ...................................................................................................... 13, 14

CARES Act, PL 116-136, 134 Stat. 281 (codified in scattered titles and sections of
    U.S.C.) ............................................................................................................ *passim*

H.R. 748 116th Cong. .................................................................................................... 7

PL 116-127, March 18, 2020, 134 Stat 178 ............................................................... 14

## Additional Authorities

Albert Cortez, *Report of the Intercultural Development Research Association Related to
the Extent of Equity in the Texas School Finance System and Its Impact on Selected
Student Related Issues Prepared for the Mexican American Legal Defense and
Educational Fund* at 11 (Aug. 2012),
    https://www.idra.org/images/stories/ACortez_Powerpoint_120312.pdf ................. 18

American School Counselor Association, *Student-to-School Counselor Ratio 2016-17*, https://www.schoolcounselor.org/asca/media/asca/home/Ratios16-17.pdf ............................ 19

Andrew Ujifusa, *DeVos to Release Rule Cementing COVID Aid Push for Private School Students*, EDUCATION WEEK  (May 26, 2020), https://blogs.edweek.org/edweek/campaign-k-12/2020/05/devos-covid-aid-private-school-students-rule.html.................................................................................................... 22

Bianca Quilantan, *Weekly Education: States Push Back Against Steering Coronavirus Funds to Private Schools*, POLITICO (June 1, 2020), https://www.politico.com/newsletters/morning-education/2020/06/01/meet-acts-new-topexecutive-788066........................................................................................................... 21

CARES Act Program; Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg., 39,479 (July 1, 2020) .............................................................. 7

Centers for Disease Control and Prevention, *Health Equity Considerations and Racial and Ethnic Minority Groups (*July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.................................................................. 20

Centers for Disease Control and Prevention, *Hospitalization Rates and Characteristics of Children Aged <18 Years Hospitalized with Laboratory-Confirmed COVID-19 —* COVID-NET, 14 States, March 1–July 25, 2020 (August 14, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6932e3.htm#:~:text=The%20cumulative%20COVID%2D19%E2%80%93associated,6.4)%20(Figure%201). (last accessed Aug. 27, 2020) .................................................................................................................... 20

Dr. José A. Cárdenas, Texas School Finance Reform: An IDRA Perspective (1997), https://www.idra.org/publications/texas-school-finance-reform-idra-perspective/.................. 18

Elizabeth McNichol and Michael Leachman, Center for Budget Policy Priorities, *States Continue to Face Large Shortfalls Due to COVID-19 Effects*, Center for Budget Policy Priorities (July 7, 2020), https://www.cbpp.org/research/state-budget-and-tax/states-continue-to-face-large-shortfalls-due-to-covid-19-effects ...................................... 17

Jeremy Blackman and Cayla Harris, *Legislature sidelined as three Texas GOP leaders steer $1B in budget cuts*, SAN ANTONIO EXPRESS-NEWS  (Aug. 27, 2020), https://www.expressnews.com/news/politics/texas_legislature/article/Legislature-sidelined-as-three-Texas-GOP-leaders-15517513.php ............................................................. 9

Letter from Betsy DeVos, Sec'y, U.S. Dep't of Educ., to Carissa Moffat Miller, Exec. Dir., CCSSO  (May 22, 2020), https://ccsso.org/sites/default/files/2020-06/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%2020.pdf ................................................................................................................ 22

Letter from Carissa Miller, Exec. Dir., CCSSO, to Lamar Alexander, U.S. Congress (June 24, 2020), https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf .............. 23

Morgan Craven and Roy L. Johnson, *An Analysis of How the Department of Education's Equitable Services Rule Will Harm Texas Students and School Districts*, IDRA ISSUE BRIEF (July 16, 2020), https://www.idra.org/wp-content/uploads/2020/07/Cutting-Public-School-Relief-Funds-to-Subsidize-Private-Schools-IDRA-Issue-Brief-July-16-2020.pdf........................................................ 11

Nat'l Center for Educ. Statistics at the Institute of Educ. Servs., *School Nurses in U.S. Public Schools* (April 30, 2020), https://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2020086.................................................. 19

Nat'l Center for Educ. Statistics, 2019 Digest of Education Statistics, Table 203.70 (Percentage distribution of enrollment in public elementary and secondary schools, by race/ethnicity and state or jurisdiction: Fall 2000 and fall 2017), https://nces.ed.gov/programs/digest/d19/tables/dt19_203.70.asp (last accessed Aug. 27, 2020) .......................................................................................................... 20

Stephen Rich et al., *Explore the SBA Data on Businesses that Received PPP Loans, The Washington Post*   , https://www.washingtonpost.com/graphics/2020/business/sba-ppp-data/?utm_campaign=wp_main&utm_medium=social&utm_source=twitter&itid=lk_inline_manual_5........................................................................................................ 14

Terrence Wilson, Intercultural Development Research Association, *Without Intervention, COVID-19-Induced Budgetary Shortfalls Will Fall Hardest on Marginalized Students in the South* (Mar. 22, 2020), https://www.idra.org/resource-center/without-intervention-covid-19-induced-budgetary-shortfalls-will-fall-hardest-on-marginalized-students-in-the-south/ ........................................................................ 17

Tex. Comptroller of Pub. Accounts, *Texas Comptroller Glenn Hegar Projects a Fiscal 2021 Ending Shortfall of $4.6 Billion in Revised Revenue Estimate* (July 20, 2020), https://comptroller.texas.gov/about/media-center/news/2020/200720-cre.php#:~:text=July%2020%2C%202020-,Texas%20Comptroller%20Glenn%20Hegar%20Projects%20a%20Fiscal%202021%20Ending%20Shortfall,Billion%20in%20Revised%20Revenue%20Estimate&text=(AUSTIN)%20%E2%80%94%20Texas%20Comptroller%20Glenn,ending%20shortfall%20of%20%244.58%20billion ............................................................... 17

Tex. Educ. Agency, *2019-2020 Student Enrollment: Statewide Totals*, https://rptsvr1.tea.texas.gov/adhocrpt/adste.html (last accessed Aug. 27, 2020) ................... 20

Tex. Educ. Agency, Office of Governance and Accountability, *Enrollment in Texas Public Schools, 2019-2020* (August 2020), https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf.............................................. 15, 17

U.S. Dep't of Educ., *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* at 2 (April 23, 2020), *https://oese.ed.gov/files/2020/04/ESSER-Fund-Notice-Final.pdf* ........................................... 21

U.S. Dep't of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs*, (April 30, 2020) ........................................ 8

U.S. Dep't of Educ., *Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (Oct. 7, 2019), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf ............................................................................................................ 11

U.S. Dep't. of Educ., *ESSER Fund State Allocation Table*  (2020), https://oese.ed.gov/files/2020/04/ESSER-Fund-State-Allocations-Table.pdf ......................... 15

## **STATEMENT OF INTEREST**

*Amici* are Texas-focused educational equity organizations that work to improve the quality of public education for all children, particularly historically-marginalized youth, including students of color and those from families with limited incomes. These organizations advocate for excellent educational opportunities for students, with a focus on fair school funding, expanded college access, opportunities for English learners, and high-quality neighborhood public schools. Some *amici* work directly with students and parents to advance educational equity. Protecting funds—including emergency relief funds—for students attending public schools is key to ensuring educational equity.

*Amici* organizations, their members, and the students and public school districts they serve will be harmed by the implementation of the interim final rule adopted by the U.S. Department of Education (the "Department") on July 1, 2020. *See* CARES Act Program; Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg., 39,479 (July 1, 2020) (the "Rule"). If this Rule stands, the Department will illegally divert millions of dollars allocated under the CARES Act, H.R. 748 116th Cong. 20 U.S.C. § 3401 note (2020) (the "Act"),[1] from public school children in families with limited means to private school students, regardless of their financial need. This unlawful diversion will have devastating consequences for Texas school districts that are struggling to re-open safely and for the students they serve. Drawing from their knowledge of and experience in Texas and national legislative processes, educational systems, and school communities, *amici* organizations detail the nature and scope of the harm to public school districts and students as a result of the Department's arbitrary and

---

[1] CARES Act, PL 116-136, 134 Stat 281. Because the CARES Act was codified in scattered titles of the United States Code, including as statutory notes, and for ease of reference, all CARES Act provisions enacted in Public Law 116-136, 134 Stat. 281, are cited herein simply as CARES Act § ____. CARES Act sections 18003 and 18005 are codified at 20 U.S.C. § 3401 note.

capricious actions. *Amici* have an interest in these proceedings and urge the Court to grant Plaintiffs' motion for partial summary judgment. Exhibit A includes a list and description of *amici*.

## SUMMARY OF ARGUMENT

The Department has tried to unlawfully rewrite important emergency legislation to support its own spending priorities rather than those of Congress. In particular, the Department seeks to divert hundreds of millions of dollars that Congress, in the midst of a pandemic, intended to support the emergency needs and high-quality remote educational programming of public schools, including hundreds in Texas, to private schools—regardless of the financial need of private school students. In contrast, Congress, in the CARES Act, appropriated approximately $13 billion directly for use by Local Education Agencies ("LEAs") and directed school districts to allocate a portion of that money to provide equitable services to private schools based on the number of *economically disadvantaged* students residing within the district but attending private schools.[2]

Congress's express reference to section 1117 of the Elementary and Secondary Education Act ("ESEA") is clear and unambiguous, and the Department's confusing and arbitrary roll-out was itself damaging to State Education Agencies ("SEAs") and public school districts. More than one month after Congress passed the Act, the Department issued non-binding regulatory guidance directing that equitable services should be provided to private schools based on their total student enrollment. *See* U.S. Dep't of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs,* (April 30, 2020) ("Guidance"). Because this "interpretation" directly contradicts the language of the Act, many

---

[2] Congress had already allocated significant resources to private schools, but not to most public schools, in the form of forgivable loans under the Paycheck Protection Program ("PPP"), CARES Act § 1102, and also made a variety of tax credits available to private schools but not public school districts.

states and school districts indicated that they would not follow the guidance in making their allocations under the CARES Act. In response, two months later, and more than three months after the enactment of the Act, the Department, without providing an opportunity for public notice and comment, adopted the Rule that effectively required the immediate adoption and implementation of its "interpretation" of the CARES Act's equitable services requirement as first set forth in the Guidance. As a result, more than three months after the enactment of the Act, most states and school districts have not yet been able to allocate the desperately-needed resources appropriated by Congress for schools.

The effect on Texas public school educators and students represented by *amici* will be devastating, especially in the context of a pandemic, economic crisis, and imminent state budget cuts.[3] The diverted money is needed to fund public school counselors, social workers and nurses and to purchase equipment like computers, faces masks, thermometers, hand sanitizer and COVID-19 tests. *Amici* serve disadvantaged communities where schools must address the digital divide to equitably provide online educational opportunities. The Department's unlawful rewrite of the CARES Act severely undermines this critical work.

## **ARGUMENT**

**I.  The Department unlawfully replaced the equitable services allocation method that Congress expressly and unambiguously adopted with its own policy preferences.**

The purpose of section 18003 of the CARES Act was to provide financial support to schools, students, and teachers in light of the COVID-19 pandemic. Most of this money is directed to states and public school districts, but—as with other federal grants—a certain portion of the funding must be used to provide equitable services to non-public school students and

---

[3] *See, e.g.*, Jeremy Blackman and Cayla Harris, *Legislature sidelined as three Texas GOP leaders steer $1B in budget cuts*, SAN ANTONIO EXPRESS-NEWS (Aug. 27, 2020), https://www.expressnews.com/news/politics/texas_legislature/article/Legislature-sidelined-as-three-Texas-GOP-leaders-15517513.php.

teachers. The CARES Act, in section 18005, expressly states that the funding must be allocated "in the same manner" as it is allocated in section 1117 of the ESEA, which has long been commonly known as the Title I funding formula.

The CARES Act is clear that the equitable services allocation for private schools must be based on the private school's low-income population residing in the relevant school district—just like Title I equitable service calculations. By expressly adopting section 1117's equitable services method and not other ESEA equitable services provisions, Congress rejected the Department's preferred approach of providing equitable services for private school students and teachers based on total private school enrollment, as the Rule attempts to do. Further, Congress's express adoption of section 1117's equitable services allocation method was reasonable and justifiable considering that the pandemic disproportionately impacts low-income communities and communities of color—like those served by Title I and *Amici*—and because the CARES Act and other emergency legislation also provide additional resources to private schools that are not available to public school districts.

A.     **The Department's funding formula erroneously considers all private school students rather than only low-income private school students residing in the district.**

Allocation of CARES Act funds with respect to private schools is statutorily and expressly tied to the well-established formula set forth in Title I. Under the CARES Act, school districts receiving funding under the Act "shall provide equitable services **in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools.**" CARES Act § 18005 (emphasis added). Section 1117 of the ESEA, or Title I, requires schools to provide equitable services "[t]o the extent consistent with **the number of *eligible children . . . in the school district*** . . . who are enrolled in private" school. 20 U.S.C. § 6320(a)(1) (emphasis added). Title I requires that "[e]xpenditures for educational services and

other benefits to eligible private school children shall be equal to the proportion of funds allocated to participating school attendance areas **based on the number of children from low-income families who attend private schools**." *Id.* § 6320(4)(A)(i) (emphasis added). Congress and the Department have long been aware of this methodology and, as recently as October 2019, the Department reaffirmed its long-standing guidance for school districts to "[e]nsure that its expenditures for equitable services [under Section 1117 of Title I] are equal to the proportion of funds generated by children from low-income families who reside in participating Title I public school attendance areas and attend private schools."[4]

However, the Department's Rule purports to interpret this provision of the CARES Act differently. The Rule, which carries the force of law, increases the funding that some LEAs will have to give to private schools, basing the calculation on the proportion of *all* students in the district who attend private schools, regardless of their families' incomes. The Department's directive that CARES Act funds should be provided to private schools on the basis of the *number of students attending private school within the school district's boundaries*, regardless of where those students live, rather than on the basis of the *number of low-income students residing in the school district's jurisdiction*—is illustrated[5] as follows:

---

[4] U.S. Dep't of Educ., *Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (Oct. 7, 2019), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf (emphasis added) ("October 2019 Guidance").
[5] *See* Morgan Craven and Roy L. Johnson, *An Analysis of How the Department of Education's Equitable Services Rule Will Harm Texas Students and School Districts*, IDRA ISSUE BRIEF (July 16, 2020), https://www.idra.org/wp-content/uploads/2020/07/Cutting-Public-School-Relief-Funds-to-Subsidize-Private-Schools-IDRA-Issue-Brief-July-16-2020.pdf ("IDRA Issue Brief"), attached as Exhibit B.

**Scenario 1: Calculating Spending by Private School Income**

If an LEA spends all of its CARES Act funds on its Title I schools, then it may either (a) use the ESSA Title I formula it used to calculate equitable services for the 2019-20 school year OR (b) base its calculation on the number of low-income students from participating private schools in its district as a proportion of all low-income students in the district who attend Title I and private schools:

Equitable services 1(a)

$$\frac{\text{ESSA Title I calculation from the 2019-20 school year}}{\text{\# of low-income Title I public school students +}}$$
\# of low-income private school students

OR
Equitable Services 1(b)

$$\frac{\text{\# of low-income students in participating private schools}}{\text{\# of low-income Title I public school students}}$$
$$\mathbf{+}$$
\# of low-income private school students

**Scenario 2: Calculating Spending by Total Private School Population**

If an LEA spends any CARES Act funds on non-Title I public schools in its district, then it must allocate equitable services funds based on the proportion of <u>all</u> students enrolled in any private school in the LEA that participates in a CARES Act program, regardless of income and even if the private school is not located within a Title I campus attendance area.

Equitable Services 2

$$\frac{\text{\# of students in participating private schools in the LEA}}{\text{\# of all students (public + participating private) in the LEA}}$$

Thus, the Department's position that the proportionate share is based on *the number of students who attend a private school that is located in the district*—rather than the *number of low-income students residing in the district who attend a private school*—impermissibly requires that the proportionate share be based not on which students *live* in the district, but which students *attend* private schools in the district. As with the use of "all" private school students in the formula rather than only "low-income" students, the use of "students who attend private school in the district, regardless of where the students reside" leads to more money diverted to private schools. It is also plainly inconsistent with the text of the CARES Act and the ESEA.

This distinction matters: LEAs across the nation and in Texas receive local tax revenue from persons living in their district, but not from those living outside it. Under the Department's interpretation, public schools are required to take money dedicated to the students who both reside in *and* attend school in their district and allocate it instead to students who may reside

elsewhere—and pay taxes elsewhere—but attend *private schools* in the district. Ignoring the residency requirement of Section 1117 of the ESEA, as expressly required by the CARES Act, conflicts with Texas's complex school finance regime and reflects the Department's arbitrary and unlawful interpretation.

### B. Congress's method of equitable services funding was reasonable and responsive to the needs of public schools, which are not eligible for other CARES Act funds.

It is well-documented that the COVID-19 pandemic has disproportionately impacted low-income communities and communities of color. Congress recognized this disparity in crafting the CARES Act with an explicit and specific reference to the Title I formula. As the primary source of federal support for elementary and secondary education, Title I targets precisely these communities and allocates resources based on low-income status and to focus on the students in private schools *residing* in these urban areas rather than those that may be commuting to those private schools from affluent suburbs.

In addition, allocating these CARES Act funds to private schools based on their total enrollment and thereby dramatically increasing their proportionate allocation would have been unreasonable and unfair for Congress to do, because private schools are eligible for other federal resources that public school districts are not. For example, the CARES Act also created the Paycheck Protection Program ("PPP"), through which the Small Business Administration ("SBA") provided loans to certain small businesses, including private schools. CARES Act § 1102. These loans will be fully forgiven by the SBA. CARES Act § 1106. Under PPP, all small businesses, as well as all tax-exempt non-profit organizations described in section 501(c)(3) of the Internal Revenue Code, are eligible to receive loans. CARES Act § 1102(a)(2)(D).[6] The 500-

---

[6] *See also* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (April 15, 2020) (the SBA interim final rule regarding implementation of CARES Act §§ 1102, 1106).

employee cap as well as the inclusion of  Section 501(c)(3) nonprofits opened the door for private schools to secure PPP loans to the tune of millions of dollars. In Texas school districts alone, a number of private schools each received over $1 million from PPP.[7] Below are a few examples:

| School Name | City, State | PPP Loan Range |
| --- | --- | --- |
| Newman International Academy | Arlington, TX | $2-$5 million |
| Hyde Park Baptist School | Austin, TX | $1-$2 million |
| Geneva School of Boerne | Boerne, TX | $1-$2 million |
| Prestonwood Christian Academy | Dallas, TX | $2–5 million |
| Bishop Lynch High School | Dallas, TX | $2–$5 million |
| St. Francis Episcopal School of Houston | Houston, TX | $2–5 million |
| Trinity School of Midland | Midland, TX | $1-$2 million |
| Antonian College Preparatory High School | San Antonio, TX | $1–$2 million |
| All Saints Episcopal School | Tyler, TX | $1-$2 million |

In addition to the benefit of these substantial sums in forgivable loans, private schools are also eligible for tax credits that are not available to public school districts. For example, private schools benefit from payroll tax credits under the Families First Coronavirus Response Act (the "FFCRA"), signed on March 18, 2020. PL 116-127, March 18, 2020, 134 Stat 178, Division G, §§ 7001–7005. The FFCRA provides small and mid-size employers refundable tax credits that reimburse them, dollar-for-dollar, for the cost of providing paid sick and family leave wages to their employees for leave related to COVID-19. *Id*. §§ 7001 ("Payroll Credit for Required Paid Sick Leave"), 7003 ("Payroll Credit for Required Paid Family Leave"). Similarly, private schools, but not public school districts, also benefit from the Employee Retention Credit, which is a refundable tax credit against certain employment taxes equal to 50 percent of the qualified wages an eligible employer pays to employees after March 12, 2020, and before January 1, 2021. CARES Act, § 2301. Eligible employers can get immediate access to the credit by reducing

---

[7] Stephen Rich et al., *Explore the SBA Data on Businesses that Received PPP Loans*, THE WASHINGTON POST (July 6, 2020), https://www.washingtonpost.com/graphics/2020/business/sba-ppp-data/?utm_campaign=wp_main&utm_medium=social&utm_source=twitter&itid=lk_inline_manual_5; *see also* Exhibit C.

employment tax deposits they are otherwise required to make. *Id*. For each employee, wages (including certain health plan costs) up to $10,000 can be counted to determine the amount of the 50% credit. *Id*. § 2301(a)(b)(1). Congress clearly has provided many significant COVID-19-related financial benefits to private schools that it has not provided to public school districts.

## II. The Rule will have devastating and irreparable impacts on Texas public school students and further entrench inequities already exacerbated by the COVID-19 crisis.

### A. The Department's Rule will cost Texas school districts more than $38 million.

The Department's Rule, which increases the funding that Texas LEAs must reserve for private schools to provide equitable services, will worsen existing inequities in schools. Texas is set to receive $307,026,008 from the GEER Fund and $1,285,886,064 from the ESSER Fund.[8] Under the Department's Rule, if Texas LEAs attempt to spend any amount of CARES Act money in non-Title I schools, including on cleaning and sanitization services or personal protective equipment, they will be required to calculate the proportional share for private schools based on total student enrollment. This would result in an equitable services reserve of more than 5% ($44,241,009) for the participating private schools and nonprofit homeschools within their district boundaries.[9] However, if those districts only spend funds on Title I schools, they would calculate equitable services spending by using the proportion of private school students from families with limited incomes or by using their 2019 Title I formula. This would result in LEAs setting aside approximately $5.4 million, not $44.2 million, for private and non-profit

---

[8] U.S. Dep't. of Educ., *ESSER Fund State Allocation Table* (2020), https://oese.ed.gov/files/2020/04/ESSER-Fund-State-Allocations-Table.pdf. *See also* Tex. Educ. Agency, Office of Governance and Accountability, *Enrollment in Texas Public Schools, 2019-2020* (August 2020), https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf.

[9] IDRA Issue Brief at 6. Note: The LEAs in this analysis set aside approximately 0.68% of their Title I, Part A funds for equitable services, based on the number of students from families with limited incomes enrolled in private schools. The new Department of Education rule basing equitable services funds on total private school enrollment would result in an equitable services reserve of approximately 5.49% if those private schools participate in a CARES Act program.

homeschools. Thus, the cost of the Rule's operation in Texas will be at least $38 million for the school districts sampled.[10]

**B.     The Department's Rule is particularly harmful for students of color, students from families with limited incomes, and other traditionally-marginalized communities.**

The future socioeconomic well-being of Texas will depend largely on how the state will educate its students of color, students from families with limited economic means, and English learner students. The Department's Rule will have a significant impact on many Texas school districts that serve high populations of students of color, students with limited economic resources and other traditionally-marginalized students. Several of the school districts that stand to lose the largest amount of funds under the Department's Rule are also those with the highest percentages of students of color and students from families with limited incomes. For example, Houston ISD, which will lose the largest amount of ESSER funds to private schools (over $8.6 million), has a population that is 91.2% students of color with 75% of students from families with limited incomes.[11] Similarly-situated are the following districts: Dallas ISD, which will lose over $6.8 million, has a population of 94.6% students of color and 86.7% of students from families with limited incomes;[12] Fort Worth ISD, which will lose over $2.3 million, has a population of 88.7% students of color and 77.7% of students from families with limited incomes;[13] and San Antonio ISD, which will lose over $1.9 million, has a population that is 97.8% students of color and 90.7% students from families with limited incomes.[14] The percentages in those districts of students of color and students from families with limited

---

[10] *Id.*
[11] *Id.* at 16.
[12] *Id.* at 14.
[13] *Id.* at 15.
[14] *Id.* at 18.

incomes far exceed the state average of those student populations when compared to all Texas school districts.[15]

C.   **The Department's Rule will further exacerbate existing educational inequities by depriving Texas public school districts of funds desperately needed to keep school communities safe and provide critical education services.**

Some analysts are anticipating state budget shortfalls of more than $550 billion between FY 2020 and FY 2022 due to the pandemic-related recession.[16] The Texas Comptroller estimated a $4.6 billion state budgetary shortfall by the end of FY 2021, which may increase as infection rates change.[17] State revenue shortfalls across the country will impact school district budgets, especially those in low-income communities that rely heavily on state funding for public schools.[18]

The costs of the Rule will be devastating and likely irreparable. Texas LEAs will lose vital funding that could be used to educate and keep students and staff safe during the pandemic. The Department's Rule means LEAs will have fewer funds to purchase resources needed for schools to respond to COVID-19, including devices to address the digital divide, instructional materials to address learning loss, and sanitization and health equipment. This Rule also reduces

---

[15] *See generally id.* at Appendix B; s*ee also* Tex. Educ. Agency, Office of Governance and Accountability, *Enrollment in Texas Public Schools, 2019-2020* (August 2020), https://tea.texas.gov/sites/default/files/enroll_2019-20.pdf.

[16] Elizabeth McNichol and Michael Leachman, Center for Budget Policy Priorities, *States Continue to Face Large Shortfalls Due to COVID-19 Effects*, Center for Budget Policy Priorities (July 7, 2020), https://www.cbpp.org/research/state-budget-and-tax/states-continue-to-face-large-shortfalls-due-to-covid-19-effects.

[17] Tex. Comptroller of Pub. Accounts, *Texas Comptroller Glenn Hegar Projects a Fiscal 2021 Ending Shortfall of $4.6 Billion in Revised Revenue Estimate* (July 20, 2020), https://comptroller.texas.gov/about/media-center/news/2020/200720-cre.php#:~:text=July%2020%2C%202020-,Texas%20Comptroller%20Glenn%20Hegar%20Projects%20a%20Fiscal%202021%20Ending%20Shortfall,Billion%20in%20Revised%20Revenue%20Estimate&text=(AUSTIN)%20%E2%80%94%20Texas%20Comptroller%20Glenn,ending%20shortfall%20of%20%244.58%20billion.

[18] Terrence Wilson, Intercultural Development Research Association, *Without Intervention, COVID-19-Induced Budgetary Shortfalls Will Fall Hardest on Marginalized Students in the South* (Mar. 22, 2020), https://www.idra.org/resource-center/without-intervention-covid-19-induced-budgetary-shortfalls-will-fall-hardest-on-marginalized-students-in-the-south.

the amount that LEAs can spend to support remote learning needs and other critical services for students and teachers.

These reductions will inevitably further exacerbate longstanding inequities illuminated by the COVID-19 crisis. For the last five decades, Texas-focused educational equity organizations have led campaigns in the Texas Legislature and in the courts to seek more equitable and adequate K-12 opportunities for those students and the districts that serve them.[19] Since the 1980s, families and LEAs in Texas have sued the state repeatedly to improve equity in funding across school districts. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973); *Edgewood v. Kirby*, 777 S.W.2d 391 (Tex. 1989); *Edgewood v. Kirby*, 804 S.W.2d 491 (Tex. 1991); *Edgewood v. Meno*, 917 S.W.2d (Tex. 1995); *Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746 (Tex. 2005); and *Morath v. Tex. Taxpayer & Student Fairness Coalition*, 490 S.W.3d 826 (Tex. 2016).

While some of those court cases have led to improved equity, Texas continues to have a system of school finance that relies heavily on property taxes and property wealth. Consequently, the quality of education still largely depends on the zip code in which a student lives. In the last Texas school finance case to reach the Texas Supreme Court, *Morath v. Texas Taxpayer & Student Fairness Coalition*, analysis by the Intercultural Development Research Association ("IDRA") found that Texas' 100 wealthiest and 100 poorest school districts have vastly different racial and ethnic concentrations with the wealthiest districts enrolling about 54% white students and 32% Latino students compared to the poorest districts that enrolled only 7% white students and 91% Latino students.[20] In 2012, the 100 wealthiest school districts had access to an

---

[19] See, *e.g.*, Dr. José A. Cárdenas, *Texas School Finance Reform: An IDRA Perspective* (1997), https://www.idra.org/publications/texas-school-finance-reform-idra-perspective/                      .

[20] Albert Cortez, *Report of the Intercultural Development Research Association Related to the Extent of Equity in the Texas School Finance System and Its Impact on Selected Student Related Issues Prepared for the Mexican*

additional $1,000 to spend per child than the 100 poorest districts, while taxing at significantly lower tax rates.[21] IDRA also found that students of color and students from families with limited economic means in Texas are more likely to attend under-resourced schools with more limited access to high-quality teaching and curriculum.[22]

Without the Department's Rule, school districts could purchase an additional 51 million protective masks, 160,000 Chromebooks, or hire at least 500 additional counselors, psychologists, school nurses or social workers to address educational and safety needs during the pandemic.[23] Protective equipment and technology are critical as some students return to their classrooms and some continue to engage in remote learning. Counselors, social workers, school nurses and others who are trained to address the social, mental health, and other physical health needs of students and families can help to mitigate the traumatic impacts of the pandemic and recession and that ensure students are prepared to learn. Many students in this country do not have access to mental or behavioral health supports in schools or even full-time nurses. The national student-to-counselor ratio is 455:1, well above the recommended ratio of 250:1.[24] Despite clear guidance from the American Academy of Pediatrics that all schools have at least one full-time nurse, only 52% of schools met that recommendation in 2015-16.[25] Without these needed supports and resources, students' physical, mental, emotional, and educational outlook may be severely diminished due to the pandemic.

---

*American Legal Defense and Educational Fund* at 11 (Aug. 2012), https://www.idra.org/images/stories/ACortez_Powerpoint_120312.pdf.
[21] *Id.* at 15.
[22] *Id.* at 2.
[23] IDRA Issue Brief at 6.
[24] *See* American School Counselor Association, *Student-to-School Counselor Ratio 2016-17*, https://www.schoolcounselor.org/asca/media/asca/home/Ratios16-17.pdf.
[25] Nat'l Center for Educ. Statistics at the Institute of Educ. Servs., *School Nurses in U.S. Public Schools* (April 30, 2020), https://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2020086.

The potential impact is greater for students from marginalized groups, particularly students of color. Research by the Center for Disease Control ("CDC") shows that people of color are disproportionately impacted by the COVID-19 virus.[26] Additionally, the CDC reports that the rate of hospitalization for children under 18 years old has increased steadily from March to July 2020, that Latino and Black children have significantly higher rates of cumulative COVID-19 hospitalizations than White children, and that Latino children had the highest hospitalization rate of any racial/ethnic group.[27] Also, over half of the K-12 students in Texas are Latino, the third highest percentage in the country, and over 12% of students in Texas are Black.[28] These facts taken together indicate that students of color are particularly vulnerable to the impacts of COVID-19 and the Department's Rule will operate to exacerbate these pre-existing health and education inequities.

### III.   The Department's arbitrary actions have delayed distribution of critical resources.

The Department's Rule—an unlawful abuse of agency authority diverting hundreds of millions of dollars of much-needed funds away from the nation's most vulnerable students—has also led to considerable confusion that has delayed the distribution of critical resources. Congress passed the CARES Act on March 27, 2020. Section 18002(a) of the Act mandated: "[T]he Secretary *shall* make Emergency Education Relief grants to the Governor of each State with an approved application"; "*shall* issue a notice inviting applications not later than 30 days of

---

[26] Centers for Disease Control and Prevention, *Health Equity Considerations and Racial and Ethnic Minority Groups* (July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html.

[27] Centers for Disease Control and Prevention, *Hospitalization Rates and Characteristics of Children Aged <18 Years Hospitalized with Laboratory-Confirmed COVID-19* — COVID-NET, 14 States, March 1–July 25, 2020 (August 14, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6932e3.htm#:~:text=The%20cumulative%20COVID%2D19%E2%80%93associated,6.4)%20(Figure%201). (last accessed Aug. 27, 2020.

[28] Tex. Educ. Agency, *2019-2020 Student Enrollment: Statewide Totals*, https://rptsvr1.tea.texas.gov/adhocrpt/adste.html (last accessed Aug. 27, 2020; *See also* Nat'l Center for Educ. Statistics, 2019 Digest of Education Statistics, Table 203.70 (Percentage distribution of enrollment in public elementary and secondary schools, by race/ethnicity and state or jurisdiction: Fall 2000 and fall 2017), https://nces.ed.gov/programs/digest/d19/tables/dt19_203.70.asp (last accessed Aug. 27, 2020.

enactment of this Act"; and "*shall* approve or deny applications not later than 30 days after receipt." CARES Act § 18002(a) (emphasis added). However, the Department's interpretation of the Act has constantly shifted since its enactment and thus delayed delivery on this mandate. For example, the Rule issued on July 1, 2020 contains *new* substantive requirements that differ both from those in the Act (enacted in March), the Department's initial notice, and the Department's April 30, 2020 Guidance.[29] Moreover, by virtue of its interim nature, the Rule also creates the possibility for yet additional changes in the Department's policy after the 30-day comment period. Throughout this period of uncertainty, however, the Department has consistently done one thing: presented school districts with an impossible choice between compliance with its current "interpretation" or with the actual terms of the Act. If school districts do the former, they forfeit hundreds of millions of dollars to private schools and also run the risk of violating certifications that they will follow the allocation requirements of the Act. If they do the latter, they risk penalties from the Department. The Department's actions over the last four months thus have created an untenable situation.

These shifting formulations have caused unnecessary confusion and uncertainty in an already-uncertain time for schools. According to one report,[30] after publication of the April 30 Guidance, a number of states led by both Republican and Democratic governors rejected the Department's interpretation. For example, Oklahoma, Mississippi, Indiana, Maine, Washington, Pennsylvania, New Mexico and Wisconsin, all began calculating allocations according to the plain text of the statute. On the other hand, 10 states—including Texas—indicated they would or

---

[29] *See* U.S. Dep't of Educ., *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* at 2 (April 23, 2020) (the "Notice"), *https://oese.ed.gov/files/2020/04/ESSER-Fund-Notice-Final.pdf.*
[30] *See* Bianca Quilantan, *Weekly Education: States Push Back Against Steering Coronavirus Funds to Private Schools*, POLITICO (June 1, 2020), https://www.politico.com/newsletters/morning-education/2020/06/01/meet-acts-new-topexecutive-788066.

were likely to follow the Department's guidance.[31] Still other states such as Colorado, Illinois and Ohio followed the Department's cautionary directive in a letter response to the Council of Chief State School Officers [32] and advised school districts to calculate the equitable share based on students in poverty, but to set aside the difference in funding in an escrow account.[33]

Then, by adopting the Rule more than three months after the CARES Act was enacted, the Department added yet another layer of confusion and complexity to Congress's simple mandate to "make Emergency Education Relief grants to the Governor of each State with an approved application." *See* CARES Act § 18002(a). Indeed, instead of merely codifying the already-flawed and inequitable approach suggested by the Guidance, the Rule effectively created two ostensible choices for school districts on how to calculate the proportional share of CARES Act funds for equitable services. However, neither of these "choices" is viable. Under the Rule, school districts can either (1) follow the Department's preferred approach, in violation of the Act, and forfeit a substantial share of their funds for the benefit of private schools, but maintain their congressionally-granted discretion with respect to how to spend the remaining funds; or (2) maintain the full funding intended for public schools under the CARES Act, but give up the ability to serve all of their students and adhere to severe restrictions on how the money can be spent.

Neither option is allowed by the Act, as discussed above, and neither one is workable for Texas schools and students. First, the funds allocated are desperately needed by school districts trying to reopen during the pandemic. COVID-19 has drastically affected public education in the

---

[31] *Id.*

[32] *See* Letter from Betsy DeVos, Sec'y, U.S. Dep't of Educ., to Carissa Moffat Miller, Exec. Dir., CCSSO  (May 22, 2020)        (hereinafter    "DeVos    Letter"),        https://ccsso.org/sites/default/files/2020-06/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%2020.pdf.

[33] Andrew Ujifusa, *DeVos to Release Rule Cementing COVID Aid Push for Private School Students*, EDUCATION WEEK  (May 26, 2020), https://blogs.edweek.org/edweek/campaign-k-12/2020/05/devos-covid-aid-private-school-students-rule.html.

United States. School districts across the nation were ordered to close and transition to online learning in the spring, incurring significant additional expenses to ensure all students (particularly low-income students like many of those served by *Amici*'s members) had adequate access to necessary technology. Since then, as noted above, states throughout the country have faced declining revenue and corresponding budget cuts, including billions of dollars in reduction to funding for public education. These cuts come at the same time when the additional costs of re-opening schools safely, according to protocols recommended by the CDC, are estimated by the CCSSO to be between $158 and $245 billion.[34] Schools and students cannot afford to lose more resources at this time.

Similarly, it is impractical for school districts to give up their ability under the CARES Act to use these funds with flexibility in any school in which they are needed. Some of the emergency funds authorized by Congress are desperately needed precisely to make up for lost state and local revenue, an approach complicated if not made unworkable by the Rule. Likewise, as discussed in Section II above, resources to open schools safely like personal protective equipment for schools opening for in-person instruction or technology to support online instruction are needed at all public schools—not just Title I schools—but the Rule will restrict districts from using the funds in this manner, unless they adopt the Department's allocation method. As a result, the Rule does not give school districts any actual choice.

Thus, the Department's arbitrary deployment of its preferred policy position through the Guidance and then the Rule is unlawful, inequitable, and has unnecessarily delayed provision of critical resources to Texas school districts and students.

---

[34] Letter from Carissa Miller, Exec. Dir., CCSSO, to Lamar Alexander, U.S. Congress   (June 24, 2020), https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf.

## **CONCLUSION**

The Plaintiffs' motion for partial summary judgment should be granted.

Dated: August 28, 2020                                  Respectfully submitted,

HUSCH BLACKWELL LLP

*/s/ Steven A. Neeley*
Steven A. Neeley (D.C. Bar No. 998792)
750 17th Street, NW, Suite 900
Washington, D.C. 20006
Phone: (202) 378-2300
Fax: (202) 378-2319
steve.neeley@huschblackwell.com

Paige Duggins-Clay (TX Bar No. 24105825)
*Pro hac vice motion pending*
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Phone: (512) 472-1156
Fax: (512) 479-1101
paige.duggins-clay@huschblackwell.com

Shmuel B. Shulman (MO Bar No. 71175)
*Pro hac vice motion pending*
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63141
Phone: 314-345-6275
Fax: 314-480-1505
shmuli.shulman@huschblackwell.com