Kelly M. Dermody*
Eric B. Fastiff (D.D.C. Bar No. 453854)
Michael Levin-Gesundheit*
Christopher Jordan*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008
kdermody@lchb.com
efastiff@lchb.com
mlevin@lchb.com
cjordan@lchb.com

Kartik Sameer Madiraju*
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone:  212.355.9500
Facsimile:  212.355.9592
kmadiraju@lchb.com

*Counsel for Proposed Amici Curiae Eureka City Unified School District, Fairfax County Public Schools, and San Antonio Independent School District*

[Additional Counsel listed on signature page]
*Pro hac vice* pending

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> ELISABETH "BETSY" D. DEVOS, in her official capacity as the United States Secretary of Education; UNITED STATES DEPARTMENT OF EDUCATION, <br><br> *Defendants*. | Civil Case No. **1:20-cv-01996 (DLF)** <br><br> **BRIEF OF AMICI CURIAE, ATLANTA PUBLIC SCHOOLS, EUREKA CITY UNIFIED SCHOOL DISTRICT, FAIRFAX COUNTY PUBLIC SCHOOLS, and SAN ANTONIO INDEPENDENT SCHOOL DISTRICT IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

INTEREST OF AMICI CURIAE ...............................................................................1

I.      INTRODUCTION ......................................................................................10

II.     ARGUMENT.............................................................................................13

        A.      The DOE Rule Will Harm Low-Income Students and Public
                Schools No Matter Which Allocation Option *Amici* Choose ............15

                1.      The DOE Rule's first allocation option forces *Amici* to
                        divert funds away from low-income and vulnerable
                        students to private schools regardless of need. ........................16

                2.      The DOE Rule's second allocation option would likewise
                        force *Amici* to divert CARES Act funds from low-income
                        students and additionally require them to abandon or
                        underfund essential programs. .................................................19

        B.      The Department of Education Rule Burdens and Restricts the
                Autonomy of *Amici*, Whom Congress Trusted to Make Funding
                Allocations..................................................................................21

III.    CONCLUSION...........................................................................................24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Policy and Research, LLC v. United States Dep't of Health and Human Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) .......................................................................14

**Statutes**

20 U.S.C. § 6301, *et seq* ......................................................................................13
34 C.F.R. § 76.665(c)(1)(i)(A) ...................................................................... 12, 19
34 C.F.R. § 76.665(c)(1)(ii) .......................................................................... 12, 16
85 Fed. Reg. 39,479 (July 1, 2020) ................................................................. 1, 15
85 Fed. Reg. 39,482 (July 1, 2020) ............................................................... 16, 19
CARES Act § 18001, 134 Stat. 564 ......................................................................11
Pub. L. No. 116-136, 134 Stat. 281 (2020) ............................................................1
Title I, Part A, Department of Education,
    https://www2.ed.gov/programs/titleiparta/index.html ........................................12

**Other Authorities**

Fed. R. Civ. P. 7.1 ...................................................................................................2
Local Civil Rule 26.1 ..............................................................................................2

**Treatises**

Strategic Plan, Fairfax County Public Schools, https://www.fcps.edu/about-
    fcps/strategic-plan .............................................................................................22

## INTEREST OF AMICI CURIAE

Proposed *Amici curiae* are four school districts that oversee more than 400 schools, with nearly 350,000 students in their care.  Each district provides elementary and secondary education to a diverse group of children, and administers programs that address the needs of their students regardless of income level, primary language, disability, or specialized learning requirements.  Each district allocates federal funding based on the needs of each public and non-public school, needs that each district is uniquely positioned to assess and understand. Proposed *Amici* all depend on funding provided for in the Coronavirus Aid, Relief, and Economic Security Act ("CARES") Act to continue providing quality education and support services to their students, and to ensure that they can reopen schools safely.  *See* Pub. L. No. 116-136, 134 Stat. 281 (2020).  Proposed *Amici* write to share a unique perspective on the uniformly negative impacts that the U.S. Department of Education's ("DOE") Interim Final Rule will have on school districts and students across the country, regardless of district location, size, or composition.  *See* CARES Act Programs: Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg. 39,479 (July 1, 2020) ("the DOE

Rule").  Below are individual interest statements from each Proposed *Amicus*
school district.[1]

## Atlanta Public Schools – Atlanta, Georgia

Atlanta Public Schools ("APS") is a school district serving the Atlanta
region with 91 learning sites, including 58 neighborhood schools and 3 alternative
programs, and over 52,000 students enrolled.  The district has over 5,000 teachers.
APS' mission is to ensure a caring culture of trust and collaboration, with the aim
that every one of its students will graduate ready for college and a career.  APS'
goals are to create a school district where students love learning, educators inspire,
families engage, and the community trusts the system.  APS has a very diverse
student population in its care.  Of its more than 52,000 students, 73% are Black or
African-American, and 7.6% are Hispanic or Latinx.  Nearly three-quarters of APS
students qualify for free or reduced-price meals.  Over 4,000 APS students report a
disability.  APS offers a wide-range of educational and support programs to its
students, such as Atlanta Virtual Academy, an online learning resource that assists
students in remedial learning and recovery of school credits.  The district also has a
transition program for students enrolling in its schools after having been
homeschooled.  APS provides a Social Emotional Learning program that aims to

---

[1] As government entities, *Amici* need not file disclosure statements under Federal
Rule of Civil Procedure 7.1 or Local Civil Rule 26.1.  This brief was authored by
*pro bono* counsel from the law firm Lieff Cabraser Heimann & Bernstein, LLP.
No party contributed to the drafting or funding of this brief.

teach students the knowledge, attitudes, and skills necessary to understand and manage emotions, set and achieve positive goals, feel and show empathy for others, and establish and maintain positive relationships.  APS also offers a comprehensive summer learning curriculum at several of its schools, called "Power Up."  During the COVID-19 pandemic, APS created and continues to operate a program called "Summer ReCharge," which offers summer reading, technological activities, and food distribution services to students as they learn remotely.

As part of its plan to reopen schools safely, APS instituted the "APS Return + Learn" protocol that will reopen schools in phases, using a distance and online learning model and virtual interaction with educators.  APS' broad range of resources and programs to facilitate virtual and distance learning for its students, as well as its reopening efforts, are in danger of being underfunded because of the DOE Rule.  APS' students, a majority of whom is low income and in need of extra assistance from the District, will be negatively impacted by the DOE Rule.

**Eureka City Unified School District – Humboldt County, California**

Eureka City Unified School District ("Eureka City Schools") is a district overseeing 12 schools in the Humboldt County region of California.  Eureka City Schools have nearly 4,000 students in their care, from kindergarten to the 12th grade ("K-12").  The district has a diverse student population: 23.5% are Hispanic or Latinx; 5.6% are Native American; 11% are Asian-American; and 10.5%

-3-

identify as multi-racial.  Seventy percent of students in the district qualify for free

or reduced-price meals.  Sixteen percent of students have a disability.  Eureka City

Schools offer a wide range of educational and support programs for their students,

including an after school program that is free and open to students in kindergarten

through the eighth grade.  The program involves students in academic and sports

activities from the end of the school day through 6:00PM, and provides a nutritious

meal to all participating students.  Eureka City Schools created the program to care

for its most vulnerable students, and priority for enrollment is given to foster and

homeless youth, students with special academic or financial needs, and to

accommodate families with two working parents or parents who work extended

hours.  The district also created an Indian Education Program whose goal is to

address the concerns and amplify the voices of the Native American community in

the district, in partnership with a Parent Advisory Committee led by parents of

Native American students.

Eureka City Schools offers a free breakfast and lunch meal program to its

students enrolled in its after school program, which in addition to the program's

evening meal, ensures that the district's most vulnerable students are provided

three meals every school day.

During the COVID-19 pandemic, the district undertook significant efforts to

create a virtual and distance learning program, so that the education of its students

would not be interrupted.  The district offers radio broadcast story-telling sessions for elementary school students, conducted by Eureka City Schools teachers and staff, as well as digital learning resources in academic subjects and physical education for all students.  Eureka City Schools implemented both synchronous and asynchronous online learning, with virtual office hours so that students could call teachers and receive assistance with schoolwork.  To ensure accessibility to online learning tools for all families, the district distributed more than 2500 laptops to households within the district, along with more than 225 hotspots for internet access.  Eureka City Schools also changed its grading policy to reflect the impact of the pandemic on learning and student attention capacity.

The district began offering mental health and counseling support to students and families of students, including a phone line operated by professional staff, and a resource center with a food pantry, hygiene supplies, laundry vouchers, and childcare supplies.  The district provides supplies directly to students who are unable to access the center.  Eureka City Schools has also provided over 200,000 free meals to children during the pandemic, and continues to do so.

The DOE Rule will force Eureka City Schools to divert funds away from schools in need, and will prevent the district from reopening schools safely.

**Fairfax County Public Schools – Fairfax County, Virginia**

Fairfax County Public Schools ("FCPS") is the largest school district in the state of Virginia, and the tenth largest school district in the United States.  It serves Fairfax County, Virginia, with 198 schools and centers.  FCPS is also Virginia's third largest employer, employing more than 24,000 teachers, staff, and administrators.  FCPS has over 188,000 students in its care from pre-kindergarten through 12th grade.  The district is very diverse: the student population is 27% Hispanic or Latinx; 20% Asian; and 10% Black or African-American.  FCPS students speak over 200 languages.  Nearly 30% of FCPS students are economically disadvantaged, while 15% are reported as students with disabilities.  Twenty-seven percent of FCPS students are English Learners.

FCPS believes that school districts can be a catalyst that transform a community's most valuable potential—children—and help shape a thriving future for them.  FCPS aims to foster creative thinking, a culture of caring, and lifelong connections.  The district's mission is to inspire and empower students to meet high academic standards, lead healthy, ethical lives, and be responsible and innovative global citizens.

FCPS has a variety of academic and support programs for all of its students, and for its most vulnerable students.  FCPS operates a summer program called Summer Learning 2020, which includes a fine arts curriculum, a "Tech Adventure

-6-

Camp," an extended school year program that focuses on vulnerable students, credit recovery programs, and preschool autism classrooms.  FCPS also has a comprehensive set of resources for students with disabilities, including adapted physical education, assistive technology services, behavior intervention services, and assessment options for students with disabilities.  FCPS provides an afterschool program for middle school students that focuses on academic support, social skills development, community involvement, and programs to prepare students for the world after high school such as a driver education curriculum.

During the COVID-19 pandemic, FCPS undertook significant efforts to ensure that several of these resources were available virtually and online.  FCPS instituted distance-learning programs to ensure no interruption in the education of their students—these resources took into account the needs of students with disabilities and English learners, as well as students without reliable access to technology.  The District is also offering free breakfast and lunch meals to its students who are studying remotely, via 'pop-up' distribution and pick-up centers, drop-offs on bus routes, and meal pick-up services at schools.

The DOE Rule will significantly hamper FCPS' ability to provide educational and other supporting resources to its students, and will render FCPS unable to reopen its schools safely.

## San Antonio Independent School District - San Antonio, Bexar County, Texas

San Antonio Independent School District ("SAISD") is a district overseeing 106 schools in San Antonio, Texas.  SAISD has nearly 50,000 students in its care, from kindergarten through the 12th grade.  SAISD's primary mission is to improve the lives of children through quality education and preparation for success in higher education.  SAISD believes that every student can learn and achieve at high levels, that the district is responsible for the education and safety of every student, and that everyone should be treated with respect.  SAISD is one of the largest school districts in Texas, and has a very diverse student body.  Ninety percent of SAISD students are Hispanic or Latinx, and 6.3% are Black or African-American.  Ninety percent of SAISD students are economically disadvantaged.  Twenty percent of SAISD students are English Learners.  More than 10% of the student population has a disability.

The district operates a Community Eligibility Program that provides free and reduced-price breakfast and lunch meals to all students during the school year.  To assist families and students with additional support needs, SAISD offers social and emotional learning programs for students, and employs district social workers that are trained to work with children and youth.  The district offers an extended day program that provides classes and workshops to students.

SAISD has implemented a robust protocol to reopen its schools safely, called Safe School Start.  Under the program, SAISD implemented fully remote and virtual learning, and provided laptop and accessibility devices to students in need.  The district is providing personal protective equipment and masks to students free of charge, and has started a curbside a bus-stop meal drop off for all students in remote learning programs.  SAISD will be conducting daily health checks, and implementing comprehensive cleaning and disinfecting procedures.

SAISD will not be able to reopen safely without ensuring that it can allocate CARES Act relief funds to the schools and students that need it the most.  The DOE Rule will impede SAISD from providing the protection, resources, and support to its students, and will endanger the safety of its students, educators, and staff.

## I.   __INTRODUCTION__

Proposed *Amici curiae* Atlanta Public Schools, Eureka City Unified School District, Fairfax County Public Schools, and San Antonio Independent School District are four public school districts from across the nation.  They oversee more than 400 schools and serve nearly 350,000 students.  *Amici* write to underscore the urgency of Plaintiffs' request for summary judgment and to highlight the devastating impacts on America's most vulnerable children should the U.S. Department of Education be permitted to execute its unlawful rule on the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.

Nearly eight months into the COVID-19 pandemic, every aspect of American life has been disturbed or uprooted.  More than 5.8 million people in the United States have contracted COVID-19, including over 180,000 people who have died as a result.  Over 124,000 public schools serving grades K-12, like those in *Amici* districts here, have physically closed temporarily.  More than 55 million children, most too young to comprehend this tragedy, have been impacted. Classrooms that have historically invited kids to dream and question and strive have been forced to pioneer new methods of socially distant or even online learning, re-packaging an educational experience never before implemented on the scale or with the socioeconomic diversity of students in American public schools.

*Amici* are gravely concerned about what will happen to the students, teachers, and staff across their districts and the country without increased funding and support.

Fortunately, Congress began responding to this crisis with the CARES Act, creating the Education Stabilization Fund and appropriating $16.1 billion for kindergarten through 12th grade educational institutions, like *Amici* here. Under the CARES Act, school districts may apply for financial support under three funds: (1) the Governor's Emergency Education Relief Fund ("GEER"); (2) the Elementary and Secondary School Emergency Relief Fund ("ESSER"); and (3) the Higher Education Emergency Relief Fund ("HEER"). *Amici* are school districts who qualify for GEER and ESSER funding. *See* CARES Act § 18001, 134 Stat. 564.

Despite the clear directive of Congress, however, Defendants improperly issued an Interim Final Rule ("DOE Rule"), which impermissibly restricted funding allocated by Congress to K-12 public schools and diverts it to private schools instead. The DOE Rule forces school districts such as *Amici* to choose one of two methods to allocate the amount of CARES Act funds diverted to private schools in their districts: (1) allocate based on *total* private school enrollment, instead of low-income private school enrollment, which drives funding away from the most economically disadvantaged in the area to those with the greatest economic advantages; or (2) allocate based only on low-income private school

enrollment, but face restrictions not found in the CARES Act, including that it may not fund any non-Title I school in the district[2] nor any program previously funded by state and local dollars.  *See* 34 C.F.R. § 76.665(c)(1)(ii); (c)(1)(i)(A).  The DOE Interim Final Rule is illegal.

Plaintiffs filed suit challenging the administrative and constitutional validity of the DOE Rule, and filed for a preliminary injunction in light of the imminent and irreparable harm it would cause to school districts across the country.  *See* Dkt. No. 35.  Recognizing the urgent need to resolve the litigation and adjudicate Plaintiffs' claims, this Court entered an expedited briefing schedule on the merits. *See* Dkt. No. 41 (and accompanying Order of August 17, 2020, by Freidrich, J.).

Because the Rule will cause grievous harm to young people in the form of support and staffing shortages at their schools that cannot be undone, and because it divests authority from the districts to make spending choices focused purely on what they deem to be in the best interests of their students, *Amici* urge the Court to grant Plaintiffs' Motion for Partial Summary Judgment.

---

[2] A Title I school is any school with at least 40% of the student population qualifying as low-income, based on census poverty line data or measure such as eligibility for free and reduced price meals.  A non-Title I school is one whose student population does not meet these low-income proportion thresholds.  *See* Title I, Part A, Department of Education, https://www2.ed.gov/programs/titleiparta/index.html (last accessed August 28, 2020).

II.   **ARGUMENT**

Since approximately March 2020 and continuing into the 2020-2021 school year, school districts across the country have required unprecedented expenditures, including for teacher, student, and staff personal protective equipment ("PPE"); cleaning and disinfecting supplies; testing stations and kits; the hiring of additional personnel to maintain social distancing principles; and all variety of technical support for teachers and students thrust into online communication platforms. School districts are faced with enormous unbudgeted costs, expected to top the hundreds of billions across the country.

In providing economic relief to school districts, Congress specified that CARES Act funds used for equitable services[3] should be allocated in accordance with the requirements of the Elementary and Secondary Education Act ("ESEA") Section 1117.  20 U.S.C. § 6301, *et seq.*  ESEA Section 1117 directs districts to allocate equitable services funding based on the number of low-income students in their district—this method is the traditional calculation that *Amici* districts employ each year.

---

[3] Equitable services include: books, materials, and equipment necessary to implement the Title I program; extended-day services; summer programs; Saturday programs; counseling programs; computer-assisted instruction (CAI) with non-instructional computer technicians who supervise computer labs, maintain discipline, and escort students to and from class; home tutoring; computers and software products; and take-home computers.

The DOE Rule places additional and novel restrictions on the allocation of CARES Act funds that make it practically impossible for public schools and low-income students to get the resources they urgently need.  Without sufficient funding, public schools will face dire financial challenges in the coming months.

*Amici* write separately to underscore the urgency of the issues presented by this case and provide a detailed factual account of the negative impacts the CARES Act allocation restrictions imposed by Defendants will have on *Amici*'s low-income and vulnerable students.

The Court's prompt consideration of this matter is critical.  Expedited resolution here is well supported given the grave consequences of delayed action. *See Policy and Research, LLC v. United States Dep't of Health and Human Servs.*, 313 F. Supp. 3d 62, 67-70 (D.D.C. 2018) (allowing expedited briefing on the merits of challenge to agency action suddenly shortening funding period for adolescent health programs previously approved for five-year grants).

*First*, the Department of Education Rule will force *Amici* to divert millions of dollars away from public schools and low-income students regardless of the allocation option they select.  As a direct consequence of the Rule and its allocation options, *Amici* face the prospect of underfunding or altogether eliminating several programs needed to support students and safely reopen schools.

-14-

The DOE Rule will severely impact *Amici*'s ability to safely reopen and provide educational, social, and health services to the students who need it the most.

*Second*, the DOE Rule impermissibly narrows the autonomy and discretion afforded to *Amici* by Congress.  By not prescribing a specific allocation method, Congress acknowledged that school districts are best equipped to address the needs and funding requirements of their own students.  But the DOE Rule does not give effect to Congress' words, and instead places limits on *Amici*'s discretion, and forces them, in the throes of a pandemic, to implement a novel allocation method and train administrators in allocation compliance, while simultaneously attempting to ensure the safety of students and educators.  *See* 85 Fed. Reg. 39,479 (July 1, 2020) (CARES Act).  The Rule must be enjoined.

### A.   The DOE Rule Will Harm Low-Income Students and Public Schools No Matter Which Allocation Option *Amici* Choose

*Amici* and school districts across the country have undertaken significant efforts and expenditures to ensure students in their care continue their education during the pandemic, and are now endeavoring to reopen schools safely.  Successfully reopening will require significant economic resources, especially for public schools that are solely dependent on federal and state funds to operate.

The statutory directive of the CARES Act was a signal from Congress to school districts that these economic resources were forthcoming.  The DOE Rule instead takes from public schools and hundreds of thousands of vulnerable students

the essential funding and resources that they desperately need.  Choosing either of the two allocation methods dictated by the DOE Rule would serve only to deprive *Amici*'s public schools and their students of educational resources, meal programs, and protective equipment, thereby endangering their health and education.

If *Amici* select the first option and allocate funds based on total private school enrollment, they will be forced to divert funds away from public schools towards private schools, even if private schools have substantially fewer students in need.  Conversely, should *Amici* select the second option and allocate based on low-income enrollment alone, the DOE Rule forces *Amici* to not fund non-Title I schools and underfund programs previously receiving state or local funding.

1. **The DOE Rule's first allocation option forces *Amici* to divert funds away from low-income and vulnerable students to private schools regardless of need.**

Under the first option, school districts are required to allocate funding to private schools proportionally based on *total* private school enrollment.  *See* 85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R.§ 76.665(c)(1)(ii).  This option does not account for the number of low-income students in private schools, and will negatively impact thousands of students in *Amici*'s public schools.  Nearly half of the students in *Amici*'s care are low-income and/or qualify for free or reduced-price meals, but very few of these students attend private school.

For example, Fairfax County Public Schools applied for and expects to receive $2,037,089 from the GEER Fund, and has received $21,691,840 from the ESSER Fund. *See* Declaration of Dr. Scott Brabrand, Superintendent of Fairfax County Public Schools ("Brabrand Decl.") at ¶¶ 10, 11. The district plans to use these funds for essential resources and support for their students, including personal protective equipment, curriculum resources, special education remediation and recovery, and student registration and scheduling. *Id.* at ¶ 12. The district also plans to use funds to support students with disabilities who have an Individualized Education Program, including virtual psychological evaluation, math and literacy software, and speech and early childhood special education software. *Id*. at ¶ 13. Because so many students lack access to the Wi-Fi needed for remote learning, the district will also be purchasing and providing 1,000 mobile Wi-Fi units and an unlimited data plan for 5,500 Wi-Fi units for the school year, as well as laptops and sleeves for virtual learning. *Id*. at ¶¶ 15, 18. Fairfax County Public Schools will also use funds to acquire cleaning and sanitizing materials, disinfection chemicals, and glass protective barriers. *Id*. at ¶¶ 16, 17.

If they select the DOE Rule's first option, Fairfax County Public Schools would be forced to divert $1 million, or 5%, of ESSER funds from public schools to private schools, even though total low-income private school enrollment is 847 students, which is only 1% of all low-income students in the district. *Id.* at ¶ 21.

-17-

Eureka City Unified School District would be forced to divert 10% of CARES Act funds to private schools if it selects the first allocation option, even though only 300 students in its district are enrolled in private school, and far fewer qualify as low-income.  *See* Declaration of Dr. Fred Van Vleck, Superintendent of Eureka City Unified School District ("Van Vleck Decl.") at ¶¶ 11-13.  This diversion will render the district unable to provide laptops and wireless connection devices for remote learning to students that need it most.  *Id.* at ¶¶ 10, 13-14. Because the district is operating on a remote-learning only basis, this technology and wireless connectivity is an absolute necessity to its most vulnerable students. *Id.*

Atlanta Public Schools received $22,948,079 from the CARES Act ESSER Fund, which it needs to provide remote learning resources for its students and to implement social distancing and safety protocols in preparation for reopening its schools.  *See* Declaration of Dr. Lisa Herring, Superintendent of Atlanta Public Schools ("Herring Decl.") at ¶¶ 8, 10, 11.  APS intends to use its funds to provide compensatory special education services and to provide personal protective equipment across the district.  *Id.* at ¶¶ 11, 16.  Because APS needed to use these funds across all of its schools, it reluctantly decided to allocate its funds according to the first option under the DOE Rule, and as a result was forced to divert $1.1 million to private school students—more than 5% of its total grant.  *Id.* at ¶ 9.  Less

-18-

than 0.5% of private school students within APS qualify as low-income.  *Id.*

Because of the DOE Rule, APS allocated to private schools an amount ten times

greater than what ESEA Section 1117 and the CARES Act require.  *Id.* at ¶ 9.

APS has determined that compliance with the DOE Rule will hamper, rather than

facilitate, district efforts to provide personal protective equipment for public

schools and low-income students.  *Id.* at ¶ 11-13, 16.  The Rule will make it

difficult for APS to provide special education for students with disabilities, and to

provide a device and wireless connectivity to every child in need.  Nevertheless,

despite the restrictive options under the Rule, APS is committed to ensuring that all

of its students receive the resources and support they need.  *Id.* at ¶¶ 11-13, 16.

> **2.**   **The DOE Rule's second allocation option would likewise force *Amici* to divert CARES Act funds from low-income students and additionally require them to abandon or underfund essential programs.**

Under the second option provided for in the DOE Rule, school districts are

permitted to allocate funding based on the number of low-income students in

private schools, as required by the CARES Act and by Section 1117 of the ESEA.

*See* 85 Fed. Reg. 39,482 (July 1, 2020); 34 C.F.R § 76.665(c)(1)(i)(A).  However,

should *Amici* select this option, wishing to restrict private school funds to students

who need it the most, the DOE Rule punishes the districts with two prohibitive

conditions: (1) districts selecting the second option may only allocate to Title I

schools, leaving non-Title I schools with nothing; and (2) districts selecting the

second option cannot supplant state and local dollars with CARES Act funds, it may only supplement those funds, at a time when state and local budgets are severely impacted by the pandemic.

The DOE Rule's second option would force *Amici* to underfund programs or effectively eliminate services that they provided to public schools.  Any non-Title I schools in *Amici*'s districts would receive nothing.

San Antonio Independent School District has applied for and expects to receive $21,164,881 from the ESSER Fund, which it plans to use for instructional continuity, and training to facilitate transition to remote and virtual teaching.  *See* Declaration of Pedro Martinez, Superintendent of SAISD ("Martinez Decl.") at ¶ 7.  SAISD chose to allocate according to the second option, leaving several of its schools without CARES Act funds.  Martinez Decl. at ¶ 10-11.  With restrictions to its funding, SAISD will need to prioritize the provision of certain programs and resources over others, instead of being able to support all of its students and schools.  *Id.* at ¶ 12.  To achieve this, the district will need to seek other funding sources to ensure their COVID-19 response is aligned to meet the needs of their students.  *Id.* at ¶ 12.  Even as the school year begins, SAISD is uncertain whether other funding sources will be available.  *Id.* at ¶ 13.

Atlanta Public Schools chose the first option under the DOE Rule because the second option would have left several of its non-Title I schools without funds,

where large numbers of low-income and vulnerable students are in attendance.  *See* Herring Decl. at ¶ 14.  Eureka City Schools determined that complying with either of the two options under the DOE Rule would widen the achievement gap between low-income and other students.  *See* Van Vleck Decl. at ¶ 13.  Eureka City Schools decided not to select the second option, because the severe restrictions imposed by the second option would make it impossible to purchase the necessary technology students in its non-Title I schools require to continue learning.  *Id.* at ¶ 14.

Because state and local funds were impacted by the pandemic, Atlanta Public Schools faced reductions in school budgets, new textbook adoption was postponed, central office expenses were significantly reduced, and various educational initiatives planned for the 2020-2021 fiscal year were delayed indefinitely.  *See* Herring Decl. at ¶ 7.  The DOE Rule's second option would have prevented APS from addressing these funding gaps; left with no alternative, APS selected the first option and diverted money to private schools.  *Id.* at ¶ 14.

  **B.**  <u>**The Department of Education Rule Burdens and Restricts the Autonomy of *Amici*, Whom Congress Trusted to Make Funding Allocations**</u>

School district staff, administrators, and educators work tirelessly throughout the year to ensure a safe and quality educational environment for students.  Their work is multifaceted and complex, and often underappreciated.  The COVID-19 pandemic has only increased their burden.  While Congress acted

to provide some relief by passing the CARES Act, the DOE Rule does the opposite.  The DOE's allocation scheme will create an unprecedented administrative burden that undermines *Amici*'s local autonomy and expertise.

*First,* the DOE Rule denies the autonomy and disregards the local expertise of school districts who understand the needs of the schools they administer.  *Amici* determine allocations months in advance, using detailed strategic plans, and in consultation with various stakeholders.  For example, Fairfax County Public Schools determines allocations based on its annual Strategic Plan.  The 2019-2020 FCPS Strategic Plan aims to achieve four goals using its budget: student success, caring culture, premier workforce, and resource stewardship.[4]  To achieve these goals, the district engaged in lengthy review and consideration, and analyzed data such as socioeconomic achievement gaps, employee retention, workplace safety, and new programs to address student and employee needs.[5]

During the COVID-19 pandemic, *Amici* have also developed resources strategically, ensuring that remote learning and meal distribution is equitable and accessible to the most vulnerable students.  The DOE Rule imposes an allocation approach that fails to account for the diversity of students and school needs in each

---

[4] *See* Strategic Plan, Fairfax County Public Schools, https://www.fcps.edu/about-fcps/strategic-plan (last accessed August 27, 2020).
[5] *Id.*

*Amicus* district.  The Rule forces *Amici* to make allocations that do not align with data on the ground or the consensus they reach with community stakeholders.

*Second,* the DOE Rule imposes a novel administrative burden on *Amici* that is not required by the CARES Act or the ESEA.  For example, SAISD diverted staff resources and administrator time to address the new calculation and allocation methods, which has consequently decreased the time available to address student health and instructional needs ahead of reopening.  *See* Martinez Decl. at ¶ 14. SAISD staff will now have additional duties of administering the increased ESSER fund allocation to private schools, while focusing on their existing role in ensuring regulatory compliance.  *Id.* at ¶ 15.  Absent the DOE Rule, SAISD would have made its allocations pursuant to existing ESEA and CARES Act statutory requirements, which its staff are already trained to do.  *Id.* at ¶ 16.

Eureka City Schools will face the additional compliance obligation of having to determine the demographics and poverty levels of all students enrolled in private schools within the district.  This will divert scarce resources needed at a time Eureka City Schools is trying to ensure it can provide remote learning technology to its students, as well as support resources such as mental health counseling and family engagement services.  *See* Van Vleck Decl. at ¶ 8.

The traditional allocation methods as prescribed in the ESEA, and required by the CARES Act, would allow *Amici* to address funding gaps and provide the

resources their students need.  For example, if Atlanta Public Schools were able to allocate its ESSER funding using traditional calculation methods, the district would be able to close several budgetary gaps created by the loss of state and local funding.  The DOE Rule upends the allocation method prescribed by statute, and forces *Amici*'s administrators to train staff on the new allocation methods, expend time and resources to ensure compliance with the new method, and revisit funding amounts with their schools.  This administrative burden ultimately translates into further uncertainty and frustration for parents, teachers, and students.

But for the DOE Rule, *Amici* would have distributed CARES Act funds efficiently and equitably to the schools and students that need it the most, and would be free to prioritize the services that permit them to reopen safely.  The Department of Education Rule stymies this effort.

## III.   **CONCLUSION**

Congress acknowledged that *Amici* are best positioned to make funding allocation decisions among their schools and students.  Under the DOE Rule, *Amici* and school districts nationwide will be forced to deny aid to public schools and economically vulnerable students at a time when they are in greatest need. The ultimate consequence will be to exacerbate the COVID-19 pandemic, and jeopardize the health and education of countless children.  It is critical the Court act quickly to prevent this unnecessary tragedy from happening.

For the reasons stated above, *Amici* respectfully request that the Court grant

Plaintiffs' Motion for Partial Summary Judgment.  The health and educational

future of millions of children depend on it.

Dated:  August 28, 2020                    Respectfully submitted,


                                           */s/ Eric B. Fastiff*

                                           Kelly M. Dermody*
                                           Eric B. Fastiff (D.C. Bar No. 453854)
                                           Michael Levin-Gesundheit*
                                           Christopher Jordan*

                                           LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP
                                           275 Battery Street, 29th Floor
                                           San Francisco, CA  94111-3339
                                           Telephone:  415.956.1000
                                           Facsimile:  415.956.1008

                                           Kartik Sameer Madiraju*

                                           LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP
                                           250 Hudson Street, 8th Floor
                                           New York, NY 10013
                                           Telephone:  212.355.9500
                                           Facsimile:  212.355.9592

                                           *Counsel for Proposed Amici Curiae
                                           Eureka City Unified School District,
                                           Fairfax County Public Schools, and San
                                           Antonio Independent School District*


                                           */s/ Neeru Gupta*
                                           Neeru Gupta*

                                           NELSON MULLINS RILEY &
                                           SCARBOROUGH LLP
                                           201 17th Street NW, Suite 1700
                                           Atlanta, GA 30363
                                           Telephone:  404.322.6109
                                           Facsimile:  404.322.6050

*Counsel for Proposed Amicus Curiae
Atlanta Public Schools*

\**Pro hac vice* pending