UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), *et al.*,

      *Plaintiffs*,

                                    Case No. 1:20-cv-1996-DLF

v.

ELISABETH "BETSY" D. DEVOS, in her
official capacity as the United States Secretary
of Education, and the UNITED STATES
DEPARTMENT OF EDUCATION,

      *Defendants*.

**BRIEF OF AMICUS CURIAE SOUTHERN EDUCATION FOUNDATION IN SUPPORT
OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Benjamin L. Snowden (D.C. Bar #997863, DDC #D00298)
KILPATRICK TOWNSEND & STOCKTON LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
919-420-1700 Telephone
919-420-1800 Facsimile
bsnowden@kilpatricktownsend.com

*Attorneys for Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

STATEMENT OF INTEREST OF THE AMICUS CURIAE ......................................................1

ARGUMENTS AND AUTHORITIES...........................................................................................2

     I.      Plaintiffs Correctly Argue That The Department's Rule And
Guidance Are Inconsistent With The CARES Act, *Ultra Vires*,
And Otherwise Unlawful. .........................................................................................2

     II.     The Department's *Ultra Vires* Rule And Guidance, Which Deny
Or Impair Resources Allocated To Public Schools, Are
Inconsistent With The Equity In Education That SEF And Persons
Of Color Have Been Pursuing For More Than 150 Years.....................................6

     III.    The Secretary's Rule, By Advantaging Private Schools,
Disproportionately Disadvantages Students Of Color and Low-
Income Students..................................................................................................13

CONCLUSION..............................................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Aaron v. McKinley*,
173 F. Supp. 944 (E.D. Ark.),
*aff'd. sub nom. Faubus v. Aaron*, 361 US. 197 (1959) ............................................................. 11

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ..................................................................................................................... 14

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ....................................................................................................................... 3

*Brown v. Board of Education*,
347 U.S. 483 (1954) ............................................................................................... 7, 10, 15, 16

*Brown v. South Carolina State Bd. of Educ.*,
296 F. Supp. 199 (D.S.C.),
*aff'd. per curiam*, 393 U.S. 222 (1968) ....................................................................................... 11

*Clinton v. City of New York*,
524 U.S. 417 (1998) ....................................................................................................................... 3

*Coffey v. State Educ. Fin. Com.*,
296 F. Supp. 1389 (S.D. Miss. 1969) ............................................................................................ 11

*Cumming v. Richmond County Board of Education*,
175 U.S. 528 (1899) ..................................................................................................................... 10

*Griffin v. State Bd. of Educ.*,
239 F. Supp. 560 (E.D. Va. 1965) ................................................................................................ 11

*Griffin v. State Bd. of Educ.*,
296 F. Supp. 1178 (E.D. Va. 1969) .............................................................................................. 11

*Hall v. St. Helena Parish School Ed.*,
197 F. Supp. 649 (E.D. La. 1961),
*aff'd*, 368 U.S. 515 (1962) ........................................................................................................... 11

*Hawkins v. North Carolina State Bd. of Educ.*,
11 Race Rel. L. Rep. 745 (W.D.N.C. 1966) ............................................................................... 11

*In re Aiken Cty.*,
725 F.3d 255 (D.C. Cir. 2013) ....................................................................................................... 3

*Lee v. Macon County Bd. of Educ.*,
231 F. Supp. 743 (E.D. Ala. 1964) .............................................................................................. 11

*Lee v. Macon County Bd. of Educ.*,
  267 F. Supp. 458 (M.D. Ala. 1967) ...................................................................... 11

*McLaurin v. Oklahoma State Regents*,
  339 U.S. 637 (1950) ........................................................................................... 10

*Pettaway v. County School Bd.*,
  230 F. Supp. 480 (E.D. Va.),
  *aff'd,* 339 F.2d 486 (4th Cir. 1964) ................................................................... 11

*Plessy v. Ferguson*,
  163 U.S. 537 (1896) ............................................................................................. 9

*Poindexter v. Louisiana Fin. Assistance Com.*,
  275 F. Supp. 833 (E.D. La. 1967),
  *affd. per curiam*, 389 US. 571 (1968) .............................................................. 11

*Poindexter v. Louisiana Fin. Assistance Com.*,
  296 F. Supp. 686 (E.D. La. 1968) ....................................................................... 11

*State of Washington v. DeVos*,
  Case No. 2:20-cv-01119-BJR (W.D. Wash.) ....................................................... 16

*Sweatt v. Painter*,
  339 U.S. 629 (1950) ........................................................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................................. 3

## STATUTES

20 U.S.C. § 6313(a)(2) ................................................................................................ 5

20 U.S.C. § 6320(a)(4)(A) .......................................................................................... 5

## RULES & REGULATIONS

Ala. Const. art. XIV, § 256 .......................................................................................... 8

Ark. Const. art. XIV, § 1 .............................................................................................. 8

Fla. Const. art. IX, § 1 ................................................................................................. 8

Ga. Const. art. VIII, § 1 ............................................................................................... 8

Ky. Const. § 183 ........................................................................................................... 8

La. Const. art. VIII, § 1 ................................................................................................ 8

La. Const. art. VIII, § 11 .............................................................................................. 8

La. Const. art. VIII, § 13 ...................................................................................................... 8

Md. Const. art. VIII, § 1 ....................................................................................................... 8

Md. Const. art. VIII, § 3 ....................................................................................................... 8

Miss. Const. art. 8, § 201 ..................................................................................................... 8

Miss. Const. art. 8, § 206 ..................................................................................................... 8

Miss. Const. art. 8, § 206A ................................................................................................... 8

N.C. Const. art. IX, § 1 ......................................................................................................... 8

N.C. Const. art. IX, § 2 ......................................................................................................... 8

Okla. Const. art. XIII, § 1 ..................................................................................................... 8

Okla. Const. art. XIII, § 1a ................................................................................................... 8

S.C. Const. art. XI, § 3 .......................................................................................................... 8

Tenn. Const. art. XI, § 12 ..................................................................................................... 8

Texas Const. Art. XII, § 1 ..................................................................................................... 8

Texas Const. Art. XII, § 3 ..................................................................................................... 8

Texas Const. Art. XII, § 5 ..................................................................................................... 8

U.S. Const. Art. 1, § 1 .......................................................................................................... 3

Va. Const. art. VIII, § 1 ........................................................................................................ 8

Va. Const. art. VIII, § 2 ........................................................................................................ 8

W.Va. Const. art. 12, § 1 ...................................................................................................... 8

W.Va. Const. art. 12, § 12 .................................................................................................... 8

W.Va. Const. art. 12, § 5 ...................................................................................................... 8

## **OTHER AUTHORITIES**

A. Boyle and K. Lee,
  *Title I at 50 – A Retrospective*, American Institutes for Research (2015)
  (available at https://www.air.org/sites/default/files/downloads/report/Title-I-at-
  50-rev.pdf) .................................................................................................................... 12

*CARES Act Programs;*
*Equitable Services to Students and Teachers in Non-Public Schools,* 85 Fed.
Reg. 39,479 (July 1, 2020)............................................................................*passim*

Charlotte Mostertz,
*Teach Your Children Well: Historical Memory of the Civil War and*
*Reconstruction, Public Education, and Equal Protection*, 22 U. Pa. J. Const. L.
589 (2020)................................................................................................................... 8

Claudia Goldin & Lawrence F. Katz,
THE RACE BETWEEN EDUCATION AND TECHNOLOGY (Harv. Univ. 2008) ................................. 9

D. Tyack and R. Lowe,
*The Constitutional Moment: Reconstruction and Black Education in the South*,
Am. J. Educ. Vol. 94 No. 4 (Feb. 1986) .............................................................. 7, 9

Derek W. Black,
*Educational Gerrymandering: Money, Motives, and Constitutional Rights*, 94
N.Y.U. L. Rev. 1385 (2019) ....................................................................................... 7

E. Cascio, E. Lewis, N. Gordon, and S. Reber,
*Financial Incentives and the Desegregation of Southern Public Schools* (May
2005) (available at
https://www.economics.uci.edu/files/docs/colloqpapers/s06/Gordon.pdf) ............................ 12

James D. Anderson,
THE EDUCATION OF BLACKS IN THE SOUTH, 1860 -1935 (Univ. N.C. Press 1988)............ *passim*

Jongyeon Ee et al.,
*Private Schools in American Education: A Small Sector Still Lagging in*
*Diversity* (UCLA Civ. Rights Project Working Paper Mar. 5, 2018)...................................... 15

Judith A. Winston,
*Achieving Excellence and Equal Opportunity in Education: No Conflict of*
*Laws*, 53 Admin. L. Rev. 997, 1004 (2001) ............................................................ 12

K. Robson, J. Schiess, and J. Trinidad,
*Education in the American South: Historical Context, Current State, and*
*Future Possibilities*, Bellwether Education Partners (May 2019) (available at
https://files.eric.ed.gov/fulltext/ED596492.pdf) .................................................. 9, 13

Ltr. from Thomas Jefferson to George Wythe,
13 August 1786, *Founders Online,* National Archives, available at
https://founders.archives.gov/documents/Jefferson/01-10-02-0162........................................... 6

Richard Kruger,
SIMPLE JUSTICE (1975)........................................................................................... 10

Sam P. Wiggins,
HIGHER EDUCATION IN THE SOUTH (1966).............................................................. 10

Southern Education Foundation,
  *A History of Private Schools & Race in the American South*, available at
  https://www.southerneducation.org/publications/historyofprivateschools .............................. 14

Thomas V. O'Brien,
  THE POLITICS OF RACE AND SCHOOLING: PUBLIC EDUCATION IN GEORGIA,
  1900-1961 (1999) ................................................................................................................ 11

The Southern Education Foundation, through the undersigned counsel,[1] hereby respectfully submits this amicus curiae brief in support of Plaintiffs' motion for a preliminary injunction and for partial summary judgment.

## STATEMENT OF INTEREST OF THE AMICUS CURIAE

Originally founded in 1867 as the Peabody Fund, the Southern Education Foundation ("SEF" or the "Foundation") is a 501(c)(3) nonprofit organization supported by partners and donors committed to advancing equitable education policies and practices that elevate learning for low-income students and students of color in the southern states of Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia. As a leader in education for over 150 years, SEF develops, disseminates, and amplifies research-based solutions and promising ideas for policymakers and grows the capacity of education leaders and influencers to create systemic, positive change in early childhood, K-12 and post-secondary education. Through its work in research, advocacy and government affairs, and leadership development, the Foundation has long worked to improve educational opportunities for students most in need.

SEF believes education equity is essential to achieve quality and fairness in public education. Equity only exists when race and income are no longer the most reliable predictors of student success, and educational systems work to ensure that each child receives what they need when they need it, to develop children to their full academic and social potential, both for the child's benefit and the benefit of our local and national communities. SEF's mission is to see that every student, regardless of background, has access to an education that propels them toward an opportunity-rich life and thereby advances our nation's potential and ideals.

---

[1] Counsel acknowledge the able assistance of Emmy Wydman, Duke University School of Law, J.D. 2022 in preparing this brief.

Public education in the South came about following the Civil War.  Private philanthropic funds drafted the implementing legislation and recruited Black elected officials during the Reconstruction Period to present legislation by which the citizens, through their taxes, would fund public education.  This was done to sustain the work private philanthropy was doing (training teachers, building schools, buying books, etc.) and create in the South what had already been established in the North, specifically, publicly funded education.  The philanthropic funds responsible for these efforts ultimately consolidated into one fund—the SEF.

Given SEF's legacy in the creation of Southern public education, it seeks to submit its position, as a friend-of-the-court, that funding for public education should not be withheld or disproportionately diverted to fund private schooling, and that such a diversion would be inequitable in that its benefits would inure primarily to white and higher-income children, and not to Black and low-income students.  SEF endeavors, in submitting this brief, to avoid an Interim Rule and Guidance from the Department of Education that do violence to the plain meaning of the CARES Act, violate constitutionally-enshrined separation of powers limitations, and run afoul of a century and a half of progress in equitable public education.

## ARGUMENTS AND AUTHORITIES

I.    **Plaintiffs Correctly Argue That The Department's Rule And Guidance Are Inconsistent With The CARES Act, *Ultra Vires*, And Otherwise Unlawful.**

The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) (referred to herein as the "CARES Act" or the "Act") arises in unprecedented and difficult times for modern public education.  Throughout SEF's territory, and throughout the country, students who attend public schools are hard hit by the distance learning requirements and deprivation of school services necessitated by the COVID-19 pandemic.  These students are disproportionately African-American or low-income students.

The Act recognizes the greater needs faced by public school students.  Public schools within public school districts ("LEAs") are the primary beneficiaries of the Act and are directed to set aside amounts for the benefit of private school students "in the same manner" as Title I funds are calculated for the benefit of disadvantaged private school students (i.e., based on the number of local students from low-income families who attend private schools from the district).  The Secretary has no authority to deviate from the Act's plain and unambiguous directive.  U.S. Const. Art. 1, § 1; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (stating executive action "must stem either from an act of Congress or from the Constitution itself"); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution . . . authorizes the President to enact, to amend, or to repeal statutes.").  Yet, by issuing the April 30, 2020, guidance (the "Guidance Document") and publishing the Interim Final Rule, *CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools,* 85 Fed. Reg. 39,479 (July 1, 2020) (the "Rule"), the Department has departed from the mandate of the Act, contrary to the instructions of Congress, in a manner that disadvantages public schools and deepens a divide in resources with historical implications.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (noting that agencies cannot contradict congressional allocations of funds); *In re Aiken Cty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[W]here previously appropriated money is available for an agency to perform a statutorily mandated activity," separation-of-powers principles dictate that "federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress.").

The Rule's "supplant not supplement" requirement under Option 2 is contradictory to the plain language of Section 18003(d) of the CARES Act with regard to paying employees and contractors and maintaining programs. The CARES Act urges school districts receiving funds to

continue to pay their employees and contractors, and to maintain existing educational services to the best of their ability. CARES Act § 18003(d)(12), 134 Stat. 566-567 (authorizing use of ESSER Fund grants for any "activities that are necessary to maintain the operation of and continuity of services in [LEAs] and continuing to employ existing staff of the [LEA]"); *see also id.* § 18002(c)(1), 134 Stat. 565 (authorizing use of GEER Fund grants "to support the ability of . . . [LEAs] to continue to provide educational services to their students and to support the on-going functionality of [LEA]").  In contrast, the Guidance Document restricts these same school districts from spending CARES Act funds on expenses previously covered by traditional funding (i.e. state and local funds), which includes paying their employees and contractors and maintaining materials and programming. The Department's Rule and Guidance Document thus unfairly and unlawfully preclude school districts from using the emergency allocation to prevent damage resulting from cuts in traditional funding sources that are attributable to the pandemic.  During these unprecedented times, Southern public schools, and the students of color and low-income students who depend on those public schools for their constitutional right to a free education and other necessary services, need the funding promised by the CARES Act without interference from the Department.

The Department's limitations on school districts' discretion is in conflict with the CARES Act's textual grant of flexibility in the districts' use of funding and the intent of the CARES Act Education Stabilization Fund—to enable educational institutions to "prevent, prepare for, and respond to coronavirus" amid budgetary shortfalls due to the COVID-19 pandemic. CARES Act § 18001, 134 Stat. 565-566.  Section 18003(d)(3) of the CARES Act encourages school districts to use specifically earmarked CARES Act funding to provide "resources necessary to address the needs of their individual schools."  In direct tension with this language, Option 2 coercively

restricts how funds can be used.  By limiting CARES Act funding to only Title I schools and only expenses not covered by traditional funding sources (the "supplant not supplement" requirement), the Rule removes the district administrators' discretion against Congress' desire for districts' flexibility in the funding.  Amid a global pandemic, even the Department itself acknowledged that "Congress . . . intended that grantees have substantial flexibility in the use of these [CARES Act] dollars."   CARES Act § 18003(d)(3), 134 Stat. 566.   The Department's curtailment of congressionally-conferred discretion to school districts would undermine the public education system in the South and the students of color and low-income students who need it.

The calculation for "equitable services" under the CARES Act provided by Congress is not ambiguous and is directly contradicted by the Department in the Guidance Document. The CARES Act allocates a majority of their funding to three separate sub-funds. When using funds from two of the three sources, school districts must set aside some funds to provide "equitable services," which include books and materials, computers and class equipment, and summer, extended-day, and Saturday programs, among others, to private school students within their districts.  134 Stat. 568.  The funds are to be "provided *in the same manner* as provided under Section 1117 of the [Elementary and Secondary Education Act of 1965 ("ESEA")]." 134 Stat. 568 (emphasis added). The referenced section outlines the proportion of Title 1-A funds for public versus private schools in a given district.  20 U.S.C. § 6320(a)(4)(A).  Section 1117 of the ESEA expressly calculates the proportion of Title I-A funds based on the number of *low-income* private school children in the district. 20 U.S.C. § 6320(a)(4)(A); *see also* 20 U.S.C. § 6313(a)(2) (defining "school attendance area").   Conversely, the Guidance Document directs funds to be allocated based on *total* enrollment of private school children in the district.  Guidance Document at 4-6. Considering that the CARES Act could have either left the calculation up for interpretation or provided a different

calculation but specifically chose Section 1117 of the ESEA, there is no ambiguity in the intended calculation for the allocation of funds between public and private school children. The Guidance Document is again clearly contradictory to the plain language of the CARES Act.  The Department's Rule and Guidance Document would divert much needed funds away from students of color and low-income students in Southern public schools when those funds are most needed.

Further, SEF adopts and incorporates by reference the positions on the Department's Rule and Guidance Document set out in Plaintiff's Amended Complaint, with which SEF agrees.  SEF respectfully submits that the Court should grant a preliminary injunction and partial summary judgment to the Plaintiffs.

## II.   The Department's *Ultra Vires* Rule And Guidance, Which Deny Or Impair Resources Allocated To Public Schools, Is Inconsistent With The Equity In Education That SEF And Persons Of Color Have Been Pursuing For More Than 150 Years.

Universal, quality education is a pillar of a free society, as Thomas Jefferson recognized in proposing government-sponsored education in 1787 Virginia legislation.  JAMES D. ANDERSON, THE EDUCATION OF BLACKS IN THE SOUTH, 1860 -1935, 18 (Univ. N.C. Press 1988); *see also* Ltr. from Thomas Jefferson to George Wythe, 13 August 1786, *Founders Online,* National Archives, available at https://founders.archives.gov/documents/Jefferson/01-10-02-0162 (encouraging a correspondent to "[p]reach . . . a crusade against ignorance; establish and improve the law for educating the common people. Let our countrymen know that the people alone can protect us against these evils [of monarchial government].")  The legislation he drafted, however, opened schools only to Virginia's white children.  ANDERSON, *supra* at 18-19.  Further, as a general rule, there was opposition to state-mandated public education by the South's governing planter class. *Id.* at 20-22.

The end of the Civil War provided the impetus to establish a system of public education in the South.  At the time the Fourteenth Amendment was passed, education of white children in the South was largely privatized, and education of Black children was virtually nonexistent.  *Brown v. Board of Education*, 347 U.S. 483, 489-90 (1954).  After the Civil War, "Congress saw the provision of public education as a central pillar of state citizenship and a necessity of rebuilding democracy."  Derek W. Black, *Educational Gerrymandering: Money, Motives, and Constitutional Rights*, 94 N.Y.U. L. Rev. 1385, 1428 (2019).  As Charles Sumner told his fellow Senators, education was essential in order to bring the Southern states back into a genuine union:

> In a republic education is indispensable.  A republic without education is like the creature of imagination, a human being without a soul, living and moving blindly, with no sense of the present or the future.  It is a monster.  Such have been the rebel States.  They have been for years nothing more than political monsters.  But such they must be no longer.

Quoted in D. Tyack and R. Lowe, *The Constitutional Moment: Reconstruction and Black Education in the South,* Am. J. Educ. Vol. 94 No. 4 at 237 (Feb. 1986).

The movement towards public education in the South drew particular strength from the formerly enslaved, who saw education as essential to true emancipation.  The formerly enslaved population possessed a strong communal value for education and a strong desire to see their children educated.  ANDERSON, *supra,* at 22-36.  In the aftermath of the Civil War, formerly enslaved people enlisted assistance from Republican politicians, the Freedmen's Bureau, Northern missionary societies, and the Union Army to establish universal, state-supported public education.  *Id.* at 21.  As W.E.B. DuBois said, "the first great mass movement for public education at the expense of the state, in the South, came from Negroes."  Tyack & Lowe, *supra* at 238.  "Overall, . . . the Reconstruction conventions and legislatures were responsible for founding universal public schooling in the South."  *Id*. at 249.  Indeed, "one of Reconstruction's greatest triumphs . . . [was]

the widespread establishment of public, state-run schools and great advances in literacy for Black students and white students alike."  Charlotte Mostertz, *Teach Your Children Well: Historical Memory of the Civil War and Reconstruction, Public Education, and Equal Protection*, 22 U. Pa. J. Const. L. 589, 594 (2020).

After the end of the Civil War, formerly enslaved people and Republican politicians gained influence in Southern state legislatures and established the foundation for universal public education in the South.  ANDERSON, *supra,* at 21.  During Reconstruction, these states adopted, through integrated legislatures, new state constitutions that enshrined the right to free public education.  *Id.* at 36; *see also* Ala. Const. art. XIV, § 256; Ark. Const. art. XIV, § 1; Fla. Const. art. IX, § 1; Ga. Const. art. VIII, § 1, ¶ I; Ky. Const. § 183; La. Const. art. VIII, §§ 1, 11 & 13; Md. Const. art. VIII, §§ 1, 3; Miss. Const. art. 8, §§ 201, 206 & 206A; N.C. Const. art. IX, §§ 1, 2; Okla. Const. art. XIII, §§ 1, 1a; S.C. Const. art. XI, § 3; Tenn. Const. art. XI, § 12; Texas Const. Art. XII, §§ 1, 3 & 5; Va. Const. art. VIII, § 1, 2; & W.Va. Const. art. 12, §§ 1, 5 & 12.

However, the triumph of public education in the South was undermined by the regime of post-Reconstruction racial segregation.  A conflict arose between the planters' desire for Black labor, including child labor, and the competing demands of education.  ANDERSON, *supra* at 39-40.  With the end of Reconstruction, Southern legislatures were again dominated by the planter class, who left the public school systems underdeveloped.  *Id.* at 40.  Strict labor laws directed at Black Southerners and extra-legal activities further weakened universal public education available to all.  *Id.* at 41-42.  During this time, the disparities in funding and quality between white public schools and Black public schools increased sharply.  Nevertheless, Black children continued to make gains in part because of public education.  By 1930, 60% of Black children ages 5-20 were in school (as compared with 71% of white children) – and much higher percentages in cities with

large Black populations.  K. Robson, J. Schiess, and J. Trinidad, *Education in the American South: Historical Context, Current State, and Future Possibilities* at 73, Bellwether Education Partners (May 2019) (available at https://files.eric.ed.gov/fulltext/ED596492.pdf).   Black illiteracy had dropped from 79.9% in 1870 to 44.5% in 1900; by 1930, illiteracy among Black Southerners was down to 16%.  Tyack & Lowe, *supra* at 249; Robson, Schiess & Trinidad, *supra* at 73.

By the late 1870's and 1880's, white attitudes shifted slightly in favor of universal public education, particularly for whites.  The shift was primarily influenced by the Populist movement, recognition of the need to industrialize the South and the resulting need for education, and concerns by some that white Southerners might otherwise be disadvantaged by the African-American community's emphasis on education.  ANDERSON, *supra* at 44-45.  As support for universal public education expanded, disagreements arose about what the content and quality of that education should be, and the problems of institutional societal discrimination manifested themselves in those disagreements.  Some favored industrial-only education for African-Americans in a way that would reinforce the post-Reconstruction social and political order, while African-American citizens generally favored a more traditional, liberal arts education.  *Id*. at 50-126 & 215-17.

Between 1910 and 1940, the United States experienced the "high school movement" in which overall high school attendance rose from approximately 15% to 73% enrollment.  CLAUDIA GOLDIN & LAWRENCE F. KATZ, THE RACE BETWEEN EDUCATION AND TECHNOLOGY 195 (Harv. Univ. 2008).  This movement generally extended only to white Southerners, and its boom was far less evident among the South's Black population.  ANDERSON, *supra* at 204-06.  In large measure, this disparity arose from the "equal, but separate" holding in *Plessy v. Ferguson*, 163 U.S. 537 (1896), and a lack of faithfulness to the equality aspect of this since-overruled standard.  ANDERSON, *supra* at 205-10.  In many instances, white-dominated legislatures would simply close

or decline to fund Black high schools, sometime in favor of funding Black elementary schools. *Id*.; *Cumming v. Richmond County Board of Education*, 175 U.S. 528 (1899) (rejecting, on economic grounds, a challenge to a local school board's decision to fund only schools for white citizens), *overruled by Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954).

When a significant number of African-American Southerners began migrating from rural life to urban centers during the Great Migration after World War I, white Southern politicians began to favor the existence and funding of a significant number of Black secondary schools. ANDERSON, *supra* at 218-21.  African-American leaders worked to obtain philanthropic donations to assist in the construction and staffing of those schools without restrictions that the schools be limited to industrial education.  Although philanthropic societies initially resisted such restrictions, they ultimately came to accept them, as African-Americans were forced out of the labor market in significant numbers during the Depression.  *Id.* at 82-84, 221-28 & 245-54.

A significant push for integration began in the 1940's, and flowing from those efforts, the Supreme Court showed an increasing willingness to strike down segregation in Southern graduate and professional schools.  *Sweatt v. Painter*, 339 U.S. 629 (1950); *McLaurin v. Oklahoma State Regents*, 339 U.S. 637 (1950).  In its landmark decision in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), the Supreme Court finally enforced the constitutional prohibition against segregation in public schools.  These decisions did not, unfortunately, bring full equity in Southern education in part because of the rise of white private school enrollment in the South beginning in the 1940's.

As a result of integration decisions, even more Southern white students left public schools and transferred to private schools.  RICHARD KRUGER, SIMPLE JUSTICE 256-84 (1975); SAM P. WIGGINS, HIGHER EDUCATION IN THE SOUTH 169 (1966).  Southern state legislatures enacted as

many as 450 laws and resolutions between 1954 and 1964 attempting to block, postpone, limit, or evade the desegregation of public schools, many of which expressly authorized the systematic transfer of public assets and monies to private schools. THOMAS V. O'BRIEN, THE POLITICS OF RACE AND SCHOOLING: PUBLIC EDUCATION IN GEORGIA, 1900-1961, 99-198 (1999).   The intervention of the federal judiciary was required to stop the diversion of funds and assets from private schools. *See, e.g., Coffey v. State Educ. Fin. Com*., 296 F. Supp. 1389 (S.D. Miss. 1969); *Griffin v. State Bd. of Educ.*, 296 F. Supp. 1178 (E.D. Va. 1969); *Poindexter v. Louisiana Fin. Assistance Com.*, 296 F. Supp. 686 (E.D. La. 1968); *Brown v. South Carolina State Bd. of Educ.*, 296 F. Supp. 199 (D.S.C.), *aff'd. per curiam*, 393 U.S. 222 (1968); *Poindexter v. Louisiana Fin. Assistance Com.*, 275 F. Supp. 833 (E.D. La. 1967), *aff'd per curiam*, 389 US. 571 (1968); *Lee v. Macon County Bd. of Educ.*, 267 F. Supp. 458 (M.D. Ala. 1967); *Hawkins v. North Carolina State Bd. of Educ.*, 11 Race Rel. L. Rep. 745 (W.D.N.C. 1966); *Griffin v. State Bd. of Educ.*, 239 F. Supp. 560 (E.D. Va. 1965); *Lee v. Macon County Bd. of Educ.*, 231 F. Supp. 743 (E.D. Ala. 1964); *Pettaway v. County School Bd.*, 230 F. Supp. 480 (E.D. Va.), *aff'd,* 339 F.2d 486 (4th Cir. 1964); *Hall v. St. Helena Parish School Ed.*, 197 F. Supp. 649 (E.D. La. 1961), *aff'd*, 368 U.S. 515 (1962); *Aaron v. McKinley*, 173 F. Supp. 944 (E.D. Ark.), *aff'd. sub nom. Faubus v. Aaron*, 361 US. 197 (1959).

Federal funding for education assumed new importance in the 1960's with the enactment of the Elementary and Secondary Education Act of 1965 (ESEA).  A principal goal of the statute was to improve educational equity for children from low-income families and children of color through a series of federal grants to school districts serving low-income populations.  In particular, ESEA was designed to promote desegregation of schools in the South:   "In the former Confederacy, the average district . . . stood to raise per pupil expenditures by 20 percent if it made

11

a 'good faith effort' to desegregate its schools for the first time."  E. Cascio, E. Lewis, N. Gordon, and S. Reber, *Financial Incentives and the Desegregation of Southern Public Schools* (May 2005), at 1 (available at https://www.economics.uci.edu/files/docs/colloqpapers/s06/Gordon.pdf).  In its first year, almost half of all revenues under Title I of the ESEA went to Southern states.  *Id.*  By 2015, Title I provided funds to more than 56,000 public schools with disadvantaged students, and served more than 21 million children.  A. Boyle and K. Lee, *Title I at 50 – A Retrospective*, American       Institutes       for       Research       (2015)       at       1       (available       at https://www.air.org/sites/default/files/downloads/report/Title-I-at-50-rev.pdf).  Children of color in particular have benefited from the federal funding provided by ESEA:

> Children of color have been the principal beneficiaries of this program because African-American and Hispanic children represent a disproportionate number of poor students, and often enter school educationally disadvantaged as compared to their white and more affluent counterparts. This disadvantage in education is a manifestation of the legacy of discrimination, racism, and racial isolation that has forged an almost inextricable bond between race and poverty status, which act as indicators of low academic achievement and unequal access to education, housing, and job opportunities.

Judith A. Winston, *Achieving Excellence and Equal Opportunity in Education: No Conflict of Laws,* 53 Admin. L. Rev. 997, 1004 (2001).

Public education remains a significant force for progress in the South today, promoting the twin goals of racial justice and economic equality.  "The South is home to more than one-third of all public K-12 students, more than half of whom are minorities"; as of 2019, of the more than 7.7 million Black students enrolled in public K-12 schools nationwide, 4.3 million (56%) live in the South.  Robson, Schiess & Trinidad, *supra* at 38.  Although private school education plays a role in the South, it is relatively small; in 2015-2016, private school enrollment in Southern states ranged from 4% to 17% of students, with most states enrolling under 10% of students in private

schools.  Moreover, white students are overrepresented in the private school population: more than two-thirds of private school students in the South are white, compared to half of public school students.  *Id*. at 47.  Children from low-income families are overrepresented in the public school population in the South: in all Southern states except Virginia and West Virginia, more students qualify for free or reduced-price lunches than the national average.  *Id*. at 42.  And of course, funding remains a critical component of the public education system.  Per-pupil spending in the South is below the national average in all Southern states except for West Virginia.  *Id*. at 48. Critical to the issues raised by this lawsuit, most Southern states continue to rely relatively heavily on federal funding, as fourteen Southern states receive more federal funding than the national average.  *Id*. at 49.

### III.    The Secretary's Rule, By Advantaging Private Schools, Disproportionately Disadvantages Students Of Color And Low-Income Students.

Beginning in the 1940's, private schools in the South were established, expanded, and supported to preserve the Southern tradition of racial segregation in the face of federal courts' dismantling of "separate but equal."  White students then left public schools for both traditional and newly formed private schools. Private school enrollment in the fifteen states of the South rose by more than 125,000 students—roughly 43%—in response to U.S. Supreme Court decisions outlawing segregation in graduate and professional schools in the South.  Southern Education Foundation, *A History of Private Schools & Race in the American South*, available at: *https://www.southerneducation.org/publications/historyofprivateschools* (citations omitted).

The South's private school enrollment increased by more than 250,000 students, to almost one million students, from 1958 to 1965. From the mid-1960's to 1980, as public schools in the South began to desegregate slowly through federal court orders, private school enrollment increased by more than 200,000 students across the region – with about two-thirds of that growth

occurring in six states: Alabama, Georgia, Louisiana, Mississippi, North Carolina, and South Carolina. *Id.* By 1980, private school enrollment in the South grew from an 11% share of the nation's private school enrollment to 24%. *Id.* The eleven Southern states of the old Confederacy enrolled between 675,000 and 750,000 white students in the early 1980's, and it is estimated that 65 to 75% of these students attended schools in which 90% or more of the student body was white. *Id.* (citations omitted).

Litigation between the IRS and private schools in the South culminated in *Bob Jones Univ. v. United States*, 461 U.S. 574 (1983), in which the Supreme Court upheld the application of the IRS' non-discrimination policies to religious schools. As a result of the new IRS non-discrimination rules and the *Bob Jones University* case, all private schools in the South began publishing regular statements of non-discrimination in admission, and most began admitting at least a small number of African-American students and other students of color.

Much of the legislation adopted and considered to fund private schools in the Southern states in recent years has been introduced and supported with the stated purpose of improving educational opportunities for low-income students, many of whom are students of color, especially Black and Hispanic students. An analysis of demographic and enrollment patterns, in addition to the historical uses of such policies, paints a very different picture. While public schools in the United States served a student body that was approximately 51% white and 48.3% children of color – primarily Hispanic and Black children – nearly three out of every four private school students were white. Comprised of both a wide range of religious schools and a smaller set of independent, nonsectarian schools, the nation's private schools enrolled over twenty percentage points more white students than public schools.

Most states that have enacted vouchers and tax credit scholarship programs (i.e. public funding for private schooling) in recent years do not collect or publicly provide reliable data on the race and ethnicity of students who attend private schools with public funding.  Yet, enrollment patterns in private schools show that they are still overwhelmingly white, even in states where education tax credits and/or vouchers have been implemented. As a result, economically vulnerable students and students of color are disproportionately represented in public schools and underrepresented in private schools, with a recent analysis concluding that private school enrollment in the United States was 68.6% white and students from low-income families make up only 9% of private school enrollment but over 50% of public-school enrollment.  *See* First Amended Compl. (Dkt. #35) at 8 n.4 (citing Jongyeon Ee et al., *Private Schools in American Education: A Small Sector Still Lagging in Diversity* (UCLA Civ. Rights Project Working Paper Mar. 5, 2018) (finding that private school enrollment in the United States was 68.6% white and students from low-income families make up only 9% of private school enrollment but over 50% of public-school enrollment)).

In light of these public/private school enrollment patterns, public funding of private schools undermines the Supreme Court's integration decisions, such as *Brown v Board of Education*. Currently, at least nineteen states have statewide programs that provide public funding to support children's attendance in private schools. These state programs are located in each region of the nation, but they are concentrated in the South. Twelve Southern states have enacted legislation that directly or indirectly funds private schools.  This phenomenon is occurring more than 60 years after *Brown v. Board of Education* declared racial segregation in the nation's public schools "inherently unequal" and a violation of the U.S. Constitution and, in tandem with the Civil Rights Act of 1964 and the Elementary and Secondary School Act of 1965, abolished the legalized

separation of white and Black students and prevented taxpayer dollars from going to *de jure* segregated public schools.

Diverting public funding toward private schools harms students of color and low-income students. Plaintiffs have correctly noted that the Secretary's Rule "will most negatively impact students in high-poverty districts; because of long-standing institutional racism, students of color are disproportionately represented in those schools and districts, whereas white students are disproportionately enrolled in the private schools to which the Rule attempts to funnel federal funds." First Amended Compl. (Dkt. #35) at 10. The district court in *State of Washington v. DeVos*, Case No. 2:20-cv-01119-BJR (W.D. Wash.), similarly noted in its August 21, 2020 Order Granting Motion for Preliminary Injunction:

> The nature of this pandemic is that its consequences have fallen most heavily on the nation's most vulnerable populations, including its neediest students. The funding provided throughout the CARES Act, and in particular to schools, is desperately and urgently needed to provide some measure of relief, many of which cannot be undone. Congress, in its wisdom and without equivocation, determined that funding to schools should be distributed according to the same formula found in Section 1117 of the ESEA; to allow otherwise under the guise of a manufactured ambiguity runs counter to the APA and to Congressional intent. . . . *[D]istribution of CARES Act funding according to an enrollment-based formula ineluctably advantages private schools at the expense of public schools. Forcing the State to divert funds from public schools ignores the extraordinary circumstances facing the State and its most disadvantaged students.*

Order Granting Motion for Preliminary Injunction (Dkt. #54) at 19-20 (emphasis added).

The question is not whether private schools receive any funding under the CARES Act. Under a proper interpretation of the Act, private schools will receive the allocation intended by Congress. The question is whether private schools will receive more than their share. This will be the result if the Department's *ultra vires* Rule are sustained. If sustained, the result is that funding will not benefit students who most need it and would most benefit from it, further

disadvantaging persons of color and low-income students and promoting inequity and inequality in education contrary to the will of Congress.

## CONCLUSION

SEF respectfully asks this Court to enforce the CARES Act as Congress wrote it and, in so doing, to protect our public schools, which are facing unprecedented hardships as they continue to educate the majority of our nation's schoolchildren and the majority of our country's students of color and low-income students.

Respectfully submitted,

/s/ Benjamin L. Snowden
Benjamin L. Snowden
D.C. Bar No. 997863
KILPATRICK TOWNSEND & STOCKTON LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Telephone: (919) 420-1700

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August, 2020, I electronically filed the forgoing AMICUS CURIAE SOUTHERN EDUCATION FOUNDATION'S UNOPPOSED MOTION FOR LEAVE TO FILE AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered CM/ECF users.

/s/ Benjamin L. Snowden
Benjamin L. Snowden