**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ELISABETH D. DEVOS, *et al.*,<br><br>*Defendants.* | No. 20-cv-1996 (DLF) |

**MEMORANDUM OPINION**

In March of 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). Pub. L. No. 116-136, 134 Stat. 281 (2020) (to be codified as 20 U.S.C. § 3401 note). As part of its comprehensive relief effort, the CARES Act appropriated billions of dollars in funding for elementary and secondary schools across the nation. *See* CARES Act § 18001. A few months later, the Department of Education interpreted those funding provisions in an Interim Final Rule. 85 Fed. Reg. 39,479 (July 1, 2020). This suit soon followed. Before the Court is the plaintiffs' motion for preliminary injunction or, in the alternative, summary judgment, Dkt. 36, which the Court considers as an expedited motion for summary judgment pursuant to Federal Rule of Civil Procedure 65(a)(2). For the reasons that follow, the Court will grant the motion.

## I. BACKGROUND

### A. Statutory Framework

In response to the ongoing global pandemic of 2020, Congress passed a comprehensive relief effort known as the CARES Act. Pub. L. No. 116-136, 134 Stat. 281 (2020). The CARES

Act appropriated billions of dollars to aid schools through the challenges of the pandemic. *See* CARES Act § 18001. The Act did so through three sub-funds, two of which are relevant here. The first, the Governors' Emergency Education Relief Fund (GEER), provides governors with discretion to distribute funding to the Local Education Agencies (LEAs) that need it most. *Id.* § 18002. The second, the Elementary and Secondary School Emergency Relief Fund (ESSER), directs the Department of Education to disburse funds to each state. Each state then disburses funds to its LEAs, which pass on funding to schools pursuant to a specific formula. *Id.* § 18003.

Unlike the GEER fund (and other CARES Act sub-funds), the ESSER fund leaves no room for discretion as to which LEAs or schools receive funding. Rather, it dictates that the funds "*shall* be allocated by the Secretary to each State in the same proportion as each State received under part A of title I of the [Elementary and Secondary Education Act (ESEA)] of 1965 in the most recent fiscal year." *Id.* (emphasis added).

The Act also dictates how certain private schools may receive GEER and ESSER funding. It states that any "local educational agency receiving funds . . . shall provide equitable services in the same manner as provided under § 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools." *Id.* § 18005. Thus, the Act incorporates by reference a *different* statute, which in turn describes, among other things, the formula for how funds should be divided between public and private schools. *See* 20 U.S.C. § 6320(a)(4)(A)(i) (§ 1117 of the ESEA). The referenced provision states: "Expenditures for educational services and other benefits to eligible private school children shall be equal to the proportion of funds allocated to participating school attendance areas based on the number of children from low-income families who attend private schools." *Id.* These provisions are the subject of this litigation.

**B. Regulatory Background**

In April 2020, the Department of Education issued guidance about CARES Act funding for private schools. *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs*, https://oese.ed.gov/files/2020/06/Providing-Equitable-Services-under-the-CARES-Act-Programs-Update-6-25-2020.pdf (Apr. 30, 2020). The Department advised that the GEER and ESSER funds should be used to "serve *all* non-public school students and teachers without regard to family income, residency, or eligibility based on low achievement." *Id.* at 3 (emphasis added).

The Department made this position binding in July 2020, when it issued an interim final rule to the same effect. *See* 85 Fed. Reg. 39,479. In its explanation, the Department reasoned that the relevant text of the CARES Act was ambiguous and that its interpretation was reasonable in light of the text, structure, and purpose of the CARES Act. It ultimately announced: "We have concluded the phrase 'in the same manner as provided under section 1117' does not simply mean 'as provided under section 1117.'" *Id.*

In other words, the Department does not read the CARES Act to require that funds be disbursed pursuant to the formula outlined in § 1117 of the ESEA. Rather, it contends that all private schools are entitled to equal relief funding as public schools, regardless of low-income student population. *Id.* The Department thus declared that LEAs have "two options" under the Act. *See* 85 Fed. Reg. 39,482. They can either disburse funds equally between all public schools and all private schools *or* disburse funds based on low-income student population for both public and private schools. *Id.* Either way, the Department interprets the CARES Act to forbid differentiation between public and private schools. *See id.*

Although the Department engaged in rulemaking to issue its interim final rule, the CARES Act does not vest the Department with rulemaking authority. *See generally* CARES Act §§ 18001–18005. The Department thus rested its authority to issue the interim final rule on its general rulemaking powers to administer programs under its purview. *See* 85 Fed. Reg. 39,481.

Further, the Department issued the interim final rule without engaging in notice and comment rulemaking. *See* 85 Fed. Reg. 39,484 ("Waiver of Proposed Rulemaking"). Instead, the Department opened a post-issuance comment period of thirty days. *Id.* To justify foregoing the usual rulemaking process, the Department cited the Administrative Procedure Act (APA) exception for good cause, finding that notice and comment was "impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), given the exigencies of the global pandemic. *Id.*

**C. Procedural History**

The plaintiffs—advocacy groups, public school districts, and parents of children who attend public schools—brought this suit on July 22, 2020.[1] Dkt. 1. On August 11, 2020, the plaintiffs moved for a preliminary injunction or, in the alternative, summary judgment. Dkt. 36. After providing notice and considering the parties' respective positions during a status hearing, the Court consolidated the preliminary injunction motion into an expedited motion for summary

[1] At the time of this writing, two other federal district courts have granted preliminary injunctions enjoining the Department's interim final rule. *See Michigan v. DeVos*, No. 3:20-cv-04478, ECF No. 82 at *7 (N.D. Cal. Aug. 26, 2020) ("The Department went well beyond its statutory authority by trying to replace the share formula mandated by Congress in Section 18005(a) with one of its own choosing."); *Washington v. DeVos*, No. 2:20-cv-1119, 2020 WL 4922256 (W.D. Wash. Aug. 21, 2020) (holding that "Congress neither explicitly, nor implicitly by ambiguity, granted the Department the authority to promulgate the Interim Final Rule").

judgment under Federal Rule of Civil Procedure 65(a)(2).[2] *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he parties should normally receive clear and unambiguous notice [of the court's intent to consolidate] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases.").

In this expedited motion, the plaintiffs assert four claims, each of which presents a pure question of law: first, whether the Department's actions are ultra vires, in violation of the separation of powers; second, whether the Department's interim final rule violates the Spending Clause, U.S. Const. art. I, § 8; and third and fourth, whether the Department's actions violate the APA as an agency action not in accordance with law or in excess of statutory authority, 5 U.S.C. § 706(2)(A), (C). In short, plaintiffs primarily contend that (1) the Department did not have authority to issue the interim final rule, and (2) the interim final rule the Department did issue was contrary to the CARES Act.

## II. LEGAL STANDARD

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it has the potential to change the substantive outcome of the litigation. *See id.* at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). And a dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

---

[2] Although the plaintiffs styled their reply brief as a motion for partial summary judgment, *see* Pl's Reply, Dkt. 64, the Court treats the motion as a motion for summary judgment because a ruling on the claims addressed in the motion resolves the case.

In a case reviewing agency action, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). "[T]he entire case . . . is a question of law" and the district court "sits as an appellate tribunal." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks and footnote omitted).

## III. ANALYSIS

The APA instructs courts to "hold unlawful and set aside agency action" that is in excess of statutory authority or "not in accordance with law." 5 U.S.C. § 706(2)(A), (C). Plaintiffs contend that the Department's interim final rule violates the APA on both grounds and should be "set aside" accordingly. *Id.*

The Court agrees. The interim final rule is contrary to the unambiguous mandate of the Act. And the Act provides neither express rulemaking authority nor any ambiguity for the agency to clarify. For these reasons, the rule must be "set aside." *Id.*

### A. The Department's Interim Final Rule

When an agency's interpretation of a statute is at issue, the two-step *Chevron* test applies. *See Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) (citing *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837 (1984)). First, the Court determines whether the statute is ambiguous. *See Chevron*, 467 U.S. at 843 n.9. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* That means that if the text of the statute is clear, the inquiry finds its end. If the statute is ambiguous, on the other hand, the question

becomes whether the agency's interpretation is a reasonable one. *Holland Mining*, 309 F.3d at 815. If the agency's interpretation is reasonable, it is entitled to deference. *Id.*

A court's "task is to construe what Congress has enacted. [A court] begin[s], as always, with the language of the statute." *Duncan v. Walker*, 533 U.S. 167, 172 (2001). The statute states: "A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services *in the same manner as provided under section 1117* of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools." CARES Act § 18005 (emphasis added).

In some statutory interpretation cases, courts must make sense of vague terms, contradictory provisions, or "inartful drafting." *King v. Burwell*, 576 U.S. 473, 491 (2015). This is not one of those cases. In describing the funding mechanism for the GEER and ESSER sub-funds, Congress spoke with clarity and precision. It used mandatory language, cross-referenced a statutory provision by section number, and left no term up to interpretation.

The statute commands that the LEAs *shall* distribute funds in the manner specified. CARES Act § 18005. And it specifies that manner by cross-referencing § 1117 of the ESEA by name. *Id.* "[A] statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019). Section 1117 of the ESEA likewise clearly describes a particular formula for providing equitable services to private schools—one based on the number of children from low-income families. *See* 20 U.S.C. § 6320(a)(4)(A)(i).

Throughout these provisions, Congress used ordinary language in its ordinary sense. "In the same manner" means "to use the same methodology and procedures." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 545–46 (2012) (internal quotation marks omitted). Thus,

providing equitable services "in the same manner" as § 1117 means to use the same methodology and procedures described in § 1117—the formula that accounts for the number of children from low-income families.

Section 8501, another provision of the ESEA, confirms as much. It provides equal funding to private and public schools without accounting for income. *See* 20 U.S.C. §§ 7881(a)–(b). Had Congress intended to permit the equal-funding formula the Department adopted in its interim final rule, it could have easily done so by referencing § 8501 in the CARES Act. Instead, however, Congress chose to reference § 1117. In doing so, Congress expressed a clear and unambiguous preference for apportioning funding to private schools based on the number of children from low-income families, even though the Department's chosen alternative of equal funding was readily available at the time of drafting. In the end, it is difficult to imagine how Congress could have been clearer.

The Department's arguments to the contrary do not change this straightforward conclusion. The Department first contends that the term "equitable services" is ambiguous and that its interpretation is reasonable. In isolation, it might be true that "equitable" is an ambiguous term. But the Act does not use the term in isolation. It does not say that funds should be disbursed in an equitable manner without further explanation. Quite the opposite, the Act directs a specific formula for providing "equitable services"—the one described in § 1117 of the ESEA.

Nonetheless, the Department found the provision ambiguous and substituted its own "expert judgment" for the kind of policy it deemed equitable. Defs.' Opp'n at 11, Dkt. 46; *see id.* ("The Department determined that it is inequitable to apportion expenditures for private schools on the basis of low-income students residing in Title I-A school attendance areas when public school districts may use their share of CARES Act funds to benefit all schools and

students.”). Although some might agree with the Department’s position as a matter of policy, “[a]n agency has no power to ‘tailor’ legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.” *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325 (2014).

In its interim final rule, the Department also argued that § 18005(a) as a whole is “facially ambiguous.” 85 Fed. Reg. 39,481. It noted that “Congress did not need to add the words ‘in the same manner’ if it simply intended to incorporate ‘section 1117 of the ESEA of 1965’ by reference in the CARES Act. The unqualified phrase ‘as provided in’ alone would have been sufficient.” *Id.* But simply because Congress could have been clearer, that alone does not render an unambiguous text ambiguous. In any case, it is not at all obvious how the Department’s proposed revision of “as provided in” is any clearer than Congress’s chosen words of “in the same manner as provided under.” *See Nat’l Fed’n of Indep. Bus.*, 567 U.S. at 545–46 (interpreting “in the same manner” to mean “the same methodology and procedures.”).

The Department also relies on purposive arguments. It posits that the purpose of the CARES Act is “to provide emergency relief to *all* students and schools,” Opp’n at 9 (emphasis added), while the purpose of Title I-A is “to provide services to low-achieving students.” *Id.* Because these purposes are “disparate,” the Department reasons, it cannot be the case that Congress intended to incorporate § 1117’s formula for providing equitable services. *Id.* But even if purposive arguments could overcome the plain text of the statute, which they cannot, the purpose of the CARES Act is not so clear-cut. Indeed, the text of the CARES Act itself calls for “[a]ctivities to address the unique needs of low-income children or students.” CARES Act § 18003(d)(4).

Finally, the Department makes an argument based on the statute’s structure. It argues that “section 1117—and the ESEA more broadly—cannot be imported into the CARES Act

scheme in 'mechanistic' fashion." Opp'n at 8. The Department's principal support for this point is that certain provisions in § 1117 of the ESEA (other than the formula for how to provide equitable services) are superfluous with other sections of the CARES Act. *See* Opp'n at 9 (noting that "two of § 18005's provisions are substantively identical to two provisions in § 1117"). For example, § 1117 of the ESEA includes a provision requiring public schools to consult with private schools about equitable services, much like the CARES Act. *Compare* CARES Act § 18005(a), *with* 20 U.S.C. § 6320(b). So too, both statutes contain language about public schools retaining control over funds. *Compare* CARES Act § 18005(b), *with* 20 U.S.C. § 6320(d). The Department reasons that "[i]f the CARES Act's use of the phrase 'in the same manner' incorporated every jot and tittle of section 1117, both the consultation and the public-control provisions of § 18005 would be superfluous." Opp'n at 9.

While it is true that courts generally avoid giving a statute a meaning that would render parts of the text superfluous, "the rule against giving a portion of text an interpretation which renders it superfluous does not prescribe that a passage which could have been more terse does not mean what it says." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011). "Redundancy is not a silver bullet. . . . Sometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019). And the plain reading of § 18005 is that it incorporates the formula described in § 1117 for distributing equitable services by the number of children from low-income families.

**B. Plaintiffs' Remaining Arguments**

Plaintiffs raise one additional statutory argument. They contend that the Department exceeded its delegated authority by promulgating the interim final rule.

Although Congress explicitly granted other agencies rulemaking authority in the text of the CARES Act, *see, e.g.*, CARES Act §§ 1114, 3513(f), 12003(c), there is no question that Congress did not vest the Department with express rulemaking authority, *see id.* §§ 18001–18005; Opp'n at 10 & n.4. Thus, the Department based its authority on its general rulemaking powers, *see* 85 Fed. Reg. 39,481: first, the power to make rules "governing the applicable programs administered by[] the department," 20 U.S.C. § 1221e-3; and second, the power to make rules "as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department." 20 U.S.C. § 3474.

Of course, "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). "Agencies are . . . bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Id.* And neither of the general rulemaking authority provisions provides support for the Department's actions here. As discussed above, § 1117 is not ambiguous. It left no gaps for the agency to fill and thus delegated no implicit authority to the Department.

After all, the GEER and ESSER sub-funds are not "programs" administered by the Department. *See* 20 U.S.C. § 1221e-3. The sub-funds, in contrast to other CARES Act provisions, provide the Secretary with no discretion as to disbursement or any other programmatic decisionmaking. Rather, they simply direct that the Secretary *shall* allocate funds in the same proportion and in the same manner as the cross-referenced ESEA statute. CARES Act §§ 18003, 18005. By contrast, other provisions of the CARES Act (which are not at issue in this case) do provide the Secretary with discretion. In the sub-fund for higher education

(HEER), for example, Congress appropriated 2.5% of the funds for the institutions that the Secretary determines have the greatest unmet needs. *See id.* § 18004(a)(3). Congress knew how to delegate programmatic authority to the Secretary when it wanted to and chose not to do so here.

Further, the rulemaking was neither "necessary" nor "appropriate" to "manage the functions of the Secretary or the Department," 20 U.S.C. § 3474. The interim final rule was not "necessary" to accomplish the statute's unambiguous directive—indeed, it went far beyond that directive by interpreting the statute to require a different formula. The Department "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions . . . in a particular area." *Am. Petrol. Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995). Because the Act is not ambiguous and did not otherwise delegate rulemaking authority, the Department acted beyond its authority in promulgating the interim final rule.

In addition to the statutory arguments discussed above, Plaintiffs raise two constitutional arguments. They contend that the interim final rule violates the Spending Clause and the separation of powers. *See* Pl.'s Mem. at 14, 22, Dkt. 36-1. Because plaintiffs' statutory claims fully resolve this motion, the Court need not reach these constitutional questions. The plaintiffs also bring two additional APA claims in their amended complaint: an arbitrary and capricious challenge and a challenge to the Department's invocation of the "good cause" exception to notice-and-comment rulemaking. *See* Am. Compl. ¶¶ 107–23, Dkt. 35. Because these claims do not present pure questions of law and the Department has not yet produced an administrative record, they were not consolidated into the expedited motion for summary judgment. *See* Pl's Reply at 2. The remaining APA claims will be moot following this grant of summary judgment.

*See* Unofficial Transcript at 4:3–7 (plaintiffs acknowledging that none of their remaining claims would survive if the rule were vacated).

***

In enacting the education funding provisions of the CARES Act, Congress spoke with a clear voice. It declared that relief funding shall be provided to private schools "in the same manner as provided under section 1117." CARES Act § 18005. Contrary to the Department's interim final rule, that cannot mean the opposite of what it says.

"The authority to issue regulations is not the power to make law, and a regulation contrary to a statute is void." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009). It is long-settled that "[a] regulation which . . . operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936). Thus, the Department's interim final rule, which conflicts with the unambiguous text of the statute, is void. *See* 5 U.S.C. § 706(2)(A), (C); *see Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

**CONCLUSION**

For the foregoing reasons, the plaintiffs' motion for summary judgment is granted. A separate order consistent with this decision accompanies the memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

September 4, 2020